**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **Case No. 21-32292** |
| | § | |
| **NB LOFT VUE DST,** *et al.* | § | **Chapter 11** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.** | § | |

## DECLARATION OF DAVID BROWN

Pursuant to 28 U.S.C. § 1746, I, David Brown, declare as follows under penalty of perjury:

1.      "My name is David Brown.  I am a Senior Asset Manager for Fannie Mae, creditor and party-in-interest in the above-referenced bankruptcy case.  I am of sound mind and competent to make this declaration.  I have personal knowledge of all the facts stated within this declaration based on my personal review of the books and records of Fannie Mae pertaining to the loan in the amount of $23,265,000.00 made by Berkeley Point Capital, LLC d/b/a Newmark Knight Frank ("Berkeley") to NB Vue Mac, DST, and subsequently assigned by Berkeley to Fannie Mae, including the records attached to this declaration, and all statements of fact contained herein are true and correct.  I am authorized to make this declaration.

2.      Attached hereto are business records of Fannie Mae.  The documents attached hereto as Exhibits A-1 through A-10 are true and correct copies of documents kept by Fannie Mae in the regular course of business, and it was the regular course of business of Fannie Mae for an employee or representative with knowledge of the act or event recorded to make or keep the record, and these records were made or kept at or near the time of the act or event, or reasonably soon thereafter:

- o  **Exhibit A-1:** Loan Agreement
- o  **Exhibit A-2:** Note
- o  **Exhibit A-3:** Security Instrument
- o  **Exhibit A-4:** Assignments
- o  **Exhibit A-5:** First Forbearance Agreement
- o  **Exhibit A-6:** Notice of Default
- o  **Exhibit A-7:** First Modification
- o  **Exhibit A-8:** Post-Modification Notice of Default
- o  **Exhibit A-9:** Second Modification
- o  **Exhibit A-10:** Second Post-Modification Notice of Default

3.      The records of Fannie Mae reflect the following facts:

a.      Berkeley made a loan to Vue Mac in the original principal amount of $23,265,000.00 ("Loan") pursuant to that certain Multifamily Loan and

EXIHBIT A

Security Agreement dated December 18, 2015 ("Loan Agreement") executed by and between Vue Mac and Berkeley. A true and correct copy of the Loan Agreement is attached as **Exhibit A-1** and incorporated herein by reference.

b.   The Loan is further evidenced by that certain Multifamily Note dated December 18, 2015 ("Note"), made by Vue Mac payable to Berkeley in the original principal amount of $23,265,000.00. Interest periodically accrued on the outstanding balance of the Loan in accordance with the terms of the Note.  A true and correct copy of the Note, duly indorsed to Fannie Mae, is attached as **Exhibit A-2** and incorporated herein by reference.

c.   To secure the obligations to Berkeley under the Note, Vue Mac granted to Rebecca S. Conrad ("Trustee"), as trustee for the benefit of Berkeley, all of its interests in real property located at  4460 S. MacGregor Way, Houston, Texas 77021 (the "Property") and other rights associated therewith (the "Real Property Collateral"), as described in that certain Multifamily Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated December 18, 2015 ("Security Instrument"), executed by Vue Mac in favor of Berkeley. The Security Instrument was recorded on December 18, 2015 in the official records of Harris County, Texas as Instrument Number: 20150570034. A true and correct copy of the Security Instrument is attached as **Exhibit A-3** and incorporated herein by reference.

d.   Pursuant to the Security Instrument, Vue Mac's obligations were further secured by certain personal property of Vue Mac, including without limitation, Vue Mac's fixtures, equipment, accounts, and other collateral related to the Property (collectively, the "Personal Property Collateral" and together with the Real Property Collateral, collectively, the "Collateral"). The Collateral encompasses all real and personal property related to the Property, including, without limitation, all accounts, contracts, leases, rents, revenues, and profits related to the Property (collectively, the "Rents"), as well as all property of Vue Mac defined as cash collateral in Bankruptcy Code Section 363(a) . Further, Vue Mac assigned its rights in and to the Leases, Rents, interests and privileges related to the Property to Berkeley.

e.   Immediately after the Loan's closing, pursuant to that certain Assignment of Collateral Agreements and Other Loan Documents dated December 18, 2015 ("Assignment of Collateral Agreements") and Assignment of Security Instrument dated December 18, 2015 ("Assignment of Security Instrument" and together with the Assignment of Collateral Agreements, collectively, the "Assignments"), Berkeley assigned all of its rights and interests in the Loan Agreement, Note, Security Instrument and other loan documents to Fannie Mae. The Assignment of Security Instrument was recorded on December 18, 2015 in the official records of Harris County, Texas as Instrument Number: 20150570035. A true and correct copy of the

2

Assignments are attached as **Exhibit A-4** and incorporated herein by reference.

f.   Beginning with the monthly payment due in April 2020, Vue Mac was unable to make payments due under the Loan Documents. As a result, Vue Mac and Fannie Mae entered into a Forbearance Agreement dated May 5, 2020 and executed May 8, 2020 ("First Forbearance Agreement") whereby Fannie Mae agreed to forbear from exercising its rights and remedies under the Loan Documents. A true and correct copy of the First Forbearance Agreement is attached as **Exhibit A-5** and incorporated herein by reference.

g.   However, after the expiration of the forbearance period under the First Forbearance Agreement, Vue Mac defaulted on the Loan by failing to pay amounts owed under the Loan Documents. By letter dated August 24, 2020 ("Notice of Default"), Fannie Mae , through counsel, notified Vue Mac of the defaults, that all outstanding Obligations were due and immediately payable, and that Fannie Mae may institute foreclosure proceedings on the Property. A true and correct copy of the Notice of Default is attached as **Exhibit A-6** and incorporated herein by reference.

h.   Fannie Mae, Vue Mac and the guarantors of the Loan subsequently executed that certain Loan Modification Agreement on November 1, 2020 ("First Modification") whereby Fannie Mae conditionally rescinded acceleration of the Loan and reinstated the original maturity date. A true and correct copy of the First Modification is attached as **Exhibit A-7** and incorporated herein by reference.

i.   However, Vue Mac defaulted on the terms of the First Modification, and by letter dated December 4, 2020 ("Post-Modification Notice of Default"), Fannie Mae, through counsel, notified Vue Mac that all outstanding Obligations were due and immediately payable and that Fannie Mae may institute foreclosure proceedings on the Property. A true and correct copy of the Post-Modification Notice of Default is attached as **Exhibit A-8** and incorporated herein by reference.

j.   Fannie Mae, Vue Mac and the guarantors of the Loan subsequently executed that certain Forbearance and Second Loan Modification Agreement on January 5, 2021 ("Second Modification") whereby Fannie Mae conditionally rescinded acceleration of the Loan, reinstated the original maturity date and agreed to forbear from exercising its rights and remedies under the Loan Documents. A true and correct copy of the Second Modification is attached as **Exhibit A-9** and incorporated herein by reference.

k.   However, Vue Mac defaulted on the terms of the Second Modification, and by letter dated May 3, 2021 ("Second Post-Modification Notice of Default"), Fannie Mae, through counsel, notified Vue Mac that all

3

outstanding Obligations were due and immediately payable and that Fannie Mae may institute foreclosure proceedings on the Property. A true and correct copy of the Second Post-Modification Notice of Default is attached as **Exhibit A-10** and incorporated herein by reference.

l.     Due to Vue Mac's failure to cure its defaults, Fannie Mae instituted foreclosure proceedings for the Property and the foreclosure sale was set to occur on July 6, 2021. However, on that same date, Vue Mac filed its bankruptcy petition to prevent Fannie Mae from foreclosing on the Property."

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 9th day of September, 2021.

_____
David Brown

# MULTIFAMILY LOAN AND SECURITY AGREEMENT

## (NON-RECOURSE)

## (MASTER LEASE)

### BY AND BETWEEN

### NB VUE MAC, DST, a Delaware statutory trust

### AND

### BERKELEY POINT CAPITAL LLC, a Delaware limited liability company

### DATED AS OF

### December 18, 2015



DMEAST #23702427 v9

EXHIBIT A-1

# TABLE OF CONTENTS

**ARTICLE 1 - DEFINITIONS; SUMMARY OF MORTGAGE LOAN TERMS** ................................... 1

SECTION 1.01   DEFINED TERMS. ........................................................................................ 1
SECTION 1.02   SCHEDULES, EXHIBITS, AND ATTACHMENTS INCORPORATED. ..................... 1

**ARTICLE 2 - GENERAL MORTGAGE LOAN TERMS** ................................................................ 2

SECTION 2.01   MORTGAGE LOAN ORIGINATION AND SECURITY. ......................................... 2
   (a)   Making of Mortgage Loan. ............................................................................... 2
   (b)   Security for Mortgage Loan. ............................................................................ 2
   (c)   Protective Advances. ....................................................................................... 2
SECTION 2.02   PAYMENTS ON MORTGAGE LOAN. .......................................................... 2
   (a)   Debt Service Payments. ................................................................................... 2
   (b)   Capitalization of Accrued But Unpaid Interest. ................................................ 3
   (c)   Late Charges. ................................................................................................... 3
   (d)   Default Rate. .................................................................................................... 4
   (e)   Address for Payments. ..................................................................................... 5
   (f)   Application of Payments. ................................................................................. 5
SECTION 2.03   LOCKOUT/PREPAYMENT. ......................................................................... 6
   (a)   Prepayment; Prepayment Lockout; Prepayment Premium. ............................... 6
   (b)   Voluntary Prepayment in Full. ........................................................................ 6
   (c)   Acceleration of Mortgage Loan. ...................................................................... 7
   (d)   Application of Collateral. ................................................................................. 7
   (e)   Casualty and Condemnation. ............................................................................ 7
   (f)   No Effect on Payment Obligations. .................................................................. 7
   (g)   Loss Resulting from Prepayment. ..................................................................... 8

**ARTICLE 3 - PERSONAL LIABILITY** ........................................................................................ 8

SECTION 3.01   NON-RECOURSE MORTGAGE LOAN; EXCEPTIONS. ..................................... 8
SECTION 3.02   PERSONAL LIABILITY OF BORROWER (EXCEPTIONS TO NON-RECOURSE PROVISION).9
   (a)   Personal Liability Based on Lender's Loss. ...................................................... 9
   (b)   Full Personal Liability for Mortgage Loan. .................................................... 10
SECTION 3.03   PERSONAL LIABILITY FOR INDEMNITY OBLIGATIONS. ................................ 11
SECTION 3.04   LENDER'S RIGHT TO FOREGO RIGHTS AGAINST MORTGAGED PROPERTY. ............... 11

**ARTICLE 4 - BORROWER AND MASTER LESSEE STATUS** ...................................................... 11

SECTION 4.01   REPRESENTATIONS AND WARRANTIES. .................................................... 11
   (a)   Due Organization and Qualification. .............................................................. 11
   (b)   Location. ......................................................................................................... 12
   (c)   Power and Authority. ..................................................................................... 12
   (d)   Due Authorization. ......................................................................................... 12
   (e)   Valid and Binding Obligations. ...................................................................... 13
   (f)   Effect of Mortgage Loan on Borrower's Financial Condition. .......................... 13
   (g)   Economic Sanctions, Anti-Money Laundering, and Anti-Corruption. ............... 14
   (h)   Single Asset Status of Borrower and Affiliated Master Lessee ........................ 15
   (i)   No Bankruptcies or Judgments. ...................................................................... 16
   (j)   No Actions or Litigation. ................................................................................ 17
   (k)   Payment of Taxes, Assessments, and Other Charges. ..................................... 17

| | | |
|---|---|---|
| (l) | Not a Foreign Person. | 17 |
| (m) | ERISA. | 18 |
| (n) | Default Under Other Obligations. | 18 |
| (o) | Prohibited Person. | 18 |
| (p) | No Contravention. | 19 |
| (q) | Lockbox Arrangement. | 19 |
| SECTION 4.02 | COVENANTS. | 19 |
| (a) | Maintenance of Existence; Organizational Documents. | 19 |
| (b) | Economic Sanctions, Anti-Money Laundering, and Anti-Corruption. | 20 |
| (c) | Payment of Taxes, Assessments, and Other Charges. | 21 |
| (d) | Borrower and Affiliated Master Lessee Single Asset Status. | 21 |
| (e) | ERISA. | 22 |
| (f) | Notice of Litigation or Insolvency. | 23 |
| (g) | Payment of Costs, Fees, and Expenses. | 23 |
| (h) | Restrictions on Distributions. | 24 |
| (i) | Lockbox Arrangement. | 24 |

**ARTICLE 5 - THE MORTGAGE LOAN** .......... **24**

| | | |
|---|---|---|
| SECTION 5.01 | REPRESENTATIONS AND WARRANTIES. | 24 |
| (a) | Receipt and Review of Loan Documents. | 24 |
| (b) | No Default. | 24 |
| (c) | No Defenses. | 24 |
| (d) | Loan Document Taxes. | 25 |
| SECTION 5.02 | COVENANTS. | 25 |
| (a) | Ratification of Covenants; Estoppels; Certifications. | 25 |
| (b) | Further Assurances. | 26 |
| (c) | Sale of Mortgage Loan. | 26 |
| (d) | Limitations on Further Acts of Borrower. | 27 |
| (e) | Financing Statements; Record Searches. | 27 |
| (f) | Loan Document Taxes. | 27 |

**ARTICLE 6 - PROPERTY USE, PRESERVATION, AND MAINTENANCE** .......... **28**

| | | |
|---|---|---|
| SECTION 6.01 | REPRESENTATIONS AND WARRANTIES. | 28 |
| (a) | Compliance with Law; Permits and Licenses. | 28 |
| (b) | Property Characteristics. | 28 |
| (c) | Property Ownership. | 29 |
| (d) | Condition of the Mortgaged Property. | 29 |
| (e) | Personal Property. | 29 |
| (f) | Master Lease Fees. | 29 |
| SECTION 6.02 | COVENANTS. | 29 |
| (a) | Use of Property. | 29 |
| (b) | Property Maintenance. | 30 |
| (c) | Property Preservation. | 32 |
| (d) | Property Inspections. | 32 |
| (e) | Compliance with Laws. | 33 |
| (f) | All Representations and Covenants Deemed Borrower Responsibility. | 33 |
| SECTION 6.03 | MORTGAGE LOAN ADMINISTRATION MATTERS REGARDING THE PROPERTY. | 34 |
| (a) | Property Management. | 34 |
| (b) | Subordination of Fees to Affiliated Property Managers; Affiliated Master Lessee. | 35 |

(c)     Property Condition Assessment. ........................................................................... 35

**ARTICLE 7 - LEASES AND RENTS** ................................................................................. 35

SECTION 7.01     REPRESENTATIONS AND WARRANTIES. ...................................................... 35
(a)     Prior Assignment of Rents. ............................................................................. 36
(b)     Prepaid Rents. ................................................................................................ 36
(c)     Master Lease. ................................................................................................. 36
SECTION 7.02     COVENANTS. ..................................................................................... 37
(a)     Leases. ........................................................................................................... 37
(b)     Commercial Leases. ....................................................................................... 38
(c)     Payment of Rents. .......................................................................................... 39
(d)     Assignment of Rents. ..................................................................................... 40
(e)     Further Assignments of Leases and Rents. ................................................... 40
(f)     Options to Purchase by Tenants. ................................................................... 40
(g)     Special Covenants Regarding Master Lease Documents. ............................. 40
SECTION 7.03     MORTGAGE LOAN ADMINISTRATION REGARDING LEASES AND RENTS. ................. 43
(a)     Material Commercial Lease Requirements. ................................................... 43
(b)     Residential Lease Form. ................................................................................ 44
(c)     Master Lease Structure Consideration. ......................................................... 44

**ARTICLE 8 - BOOKS AND RECORDS; FINANCIAL REPORTING** .............................. 44

SECTION 8.01     REPRESENTATIONS AND WARRANTIES. ...................................................... 44
(a)     Financial Information. .................................................................................... 44
(b)     No Change in Facts or Circumstances. ......................................................... 44
SECTION 8.02     COVENANTS. ..................................................................................... 45
(a)     Obligation to Maintain Accurate Books and Records. .................................. 45
(b)     Items to Furnish to Lender. ........................................................................... 45
(c)     Audited Financials. ........................................................................................ 48
(d)     Delivery of Books and Records. .................................................................... 48
SECTION 8.03     MORTGAGE LOAN ADMINISTRATION MATTERS REGARDING BOOKS AND RECORDS
                 AND FINANCIAL REPORTING. ................................................................ 49
(a)     Lender's Right to Obtain Audited Books and Records. ................................. 49
(b)     Credit Reports; Credit Score. ........................................................................ 49

**ARTICLE 9 - INSURANCE** ................................................................................................ 49

SECTION 9.01     REPRESENTATIONS AND WARRANTIES. ...................................................... 49
(a)     Compliance with Insurance Requirements. ................................................... 50
(b)     Property Condition. ........................................................................................ 50
SECTION 9.02     COVENANTS. ..................................................................................... 50
(a)     Insurance Requirements. ................................................................................ 50
(b)     Delivery of Policies, Renewals, Notices, and Proceeds. .............................. 50
SECTION 9.03     MORTGAGE LOAN ADMINISTRATION MATTERS REGARDING INSURANCE ................. 51
(a)     Lender's Ongoing Insurance Requirements. .................................................. 51
(b)     Application of Proceeds on Event of Loss. ................................................... 52
(c)     Payment Obligations Unaffected. .................................................................. 54
(d)     Foreclosure Sale. ........................................................................................... 54
(e)     Appointment of Lender as Attorney-In-Fact. ............................................... 55

**ARTICLE 10 - CONDEMNATION** ............................................................................................... 55

SECTION 10.01   REPRESENTATIONS AND WARRANTIES........................................................ 55
   (a)   Prior Condemnation Action. ...................................................................................... 55
   (b)   Pending Condemnation Actions. ................................................................................ 55
SECTION 10.02   COVENANTS............................................................................................ 55
   (a)   Notice of Condemnation............................................................................................ 55
   (b)   Condemnation Proceeds............................................................................................. 55
SECTION 10.03   MORTGAGE LOAN ADMINISTRATION MATTERS REGARDING CONDEMNATION. ....... 56
   (a)   Application of Condemnation Awards. ...................................................................... 56
   (b)   Payment Obligations Unaffected. .............................................................................. 56
   (c)   Appointment of Lender as Attorney-In-Fact. ............................................................ 56
   (d)   Preservation of Mortgaged Property........................................................................... 56

**ARTICLE 11 - LIENS, TRANSFERS, AND ASSUMPTIONS** ................................................. 57

SECTION 11.01   REPRESENTATIONS AND WARRANTIES........................................................ 57
   (a)   No Labor or Materialmen's Claims. ........................................................................... 57
   (b)   No Other Interests. ..................................................................................................... 57
SECTION 11.02   COVENANTS............................................................................................ 57
   (a)   Liens; Encumbrances................................................................................................. 57
   (b)   Transfers. ................................................................................................................... 58
   (c)   Master Lease. ............................................................................................................. 61
   (d)   No Other Indebtedness............................................................................................... 61
   (e)   No Mezzanine Financing or Preferred Equity. .......................................................... 61
SECTION 11.03   MORTGAGE LOAN ADMINISTRATION MATTERS REGARDING LIENS, TRANSFERS, AND
                ASSUMPTIONS. ......................................................................................................... 62
   (a)   Assumption of Mortgage Loan. ................................................................................. 62
   (b)   Transfers to Key Principal-Owned Affiliates or Guarantor-Owned Affiliates. ......... 63
   (c)   Estate Planning. ......................................................................................................... 64
   (d)   Termination or Revocation of Trust. .......................................................................... 65
   (e)   Death of Key Principal or Guarantor; Transfer Due to Death. ................................... 65
   (f)   Bankruptcy of Guarantor. .......................................................................................... 66
   (g)   Further Conditions to Transfers and Assumption....................................................... 68
   (h)   Additional Permitted Transfers.................................................................................. 68

**ARTICLE 12 - IMPOSITIONS** ...................................................................................................... 69

SECTION 12.01   REPRESENTATIONS AND WARRANTIES........................................................ 69
   (a)   Payment of Taxes, Assessments, and Other Charges. ............................................... 69
SECTION 12.02   COVENANTS............................................................................................ 70
   (a)   Imposition Deposits, Taxes, and Other Charges. ....................................................... 70
SECTION 12.03   MORTGAGE LOAN ADMINISTRATION MATTERS REGARDING IMPOSITIONS. .............. 72
   (a)   Maintenance of Records by Lender. ........................................................................... 72
   (b)   Imposition Accounts. ................................................................................................. 73
   (c)   Payment of Impositions; Sufficiency of Imposition Deposits. ................................... 73
   (d)   Imposition Deposits Upon Event of Default............................................................... 73
   (e)   Contesting Impositions. ............................................................................................. 73
   (f)   Release to Borrower................................................................................................... 74

**ARTICLE 13 - REPLACEMENT RESERVE AND REPAIRS**..................................................... 74

SECTION 13.01    COVENANTS................................................................................................ 74
   (a)    Initial Deposits to Replacement Reserve Account and Repairs Escrow Account. ........ 74
   (b)    Monthly Replacement Reserve Deposits......................................................................... 74
   (c)    Payment for Replacements and Repairs........................................................................... 74
   (d)    Assignment of Contracts for Replacements and Repairs. ................................................ 75
   (e)    Indemnification................................................................................................................ 75
   (f)    Amendments to Loan Documents..................................................................................... 75
   (g)    Administrative Fees and Expenses. ................................................................................. 75
SECTION 13.02    MORTGAGE LOAN ADMINISTRATION MATTERS REGARDING RESERVES. ................ 76
   (a)    Accounts, Deposits, and Disbursements.......................................................................... 76
   (b)    Approvals of Contracts; Assignment of Claims. ............................................................ 83
   (c)    Delays and Workmanship................................................................................................ 83
   (d)    Appointment of Lender as Attorney-In-Fact. ................................................................. 84
   (e)    No Lender Obligation. ..................................................................................................... 84
   (f)    No Lender Warranty. ....................................................................................................... 84

**ARTICLE 14 - DEFAULTS/REMEDIES** ..................................................................................... 84

SECTION 14.01    EVENTS OF DEFAULT. .............................................................................. 84
   (a)    Automatic Events of Default............................................................................................ 85
   (b)    Events of Default Subject to a Specified Cure Period. .................................................... 86
   (c)    Events of Default Subject to Extended Cure Period. ....................................................... 86
SECTION 14.02    REMEDIES................................................................................................. 87
   (a)    Acceleration; Foreclosure. .............................................................................................. 87
   (b)    Loss of Right to Disbursements from Collateral Accounts. ............................................ 87
   (c)    Remedies Cumulative. ..................................................................................................... 88
SECTION 14.03    ADDITIONAL LENDER RIGHTS; FORBEARANCE. ................................... 88
   (a)    No Effect Upon Obligations. ........................................................................................... 88
   (b)    No Waiver of Rights or Remedies.................................................................................... 89
   (c)    Appointment of Lender as Attorney-In-Fact. ................................................................. 89
   (d)    Borrower Waivers............................................................................................................ 90
SECTION 14.04    WAIVER OF MARSHALING. ...................................................................... 91

**ARTICLE 15 - MISCELLANEOUS**.............................................................................................. 91

SECTION 15.01    GOVERNING LAW; CONSENT TO JURISDICTION AND VENUE. ............... 91
   (a)    Governing Law. ............................................................................................................... 91
   (b)    Venue. .............................................................................................................................. 91
SECTION 15.02    NOTICE..................................................................................................... 92
   (a)    Process of Serving Notice................................................................................................ 92
   (b)    Change of Address............................................................................................................ 92
   (c)    Default Method of Notice. ............................................................................................... 92
   (d)    Receipt of Notices............................................................................................................ 93
   (e)    Master Lessee Notices. .................................................................................................... 93
SECTION 15.03    SUCCESSORS AND ASSIGNS BOUND; SALE OF MORTGAGE LOAN. ............... 93
   (a)    Binding Agreement........................................................................................................... 93
   (b)    Sale of Mortgage Loan; Change of Servicer.................................................................... 93

SECTION 15.04    COUNTERPARTS. ................................................................................................ 93
SECTION 15.05    JOINT AND SEVERAL (OR SOLIDARY) LIABILITY. ................................................ 93
SECTION 15.06    RELATIONSHIP OF PARTIES; NO THIRD PARTY BENEFICIARY. ............................ 94
   (a)      Solely Creditor and Debtor. ............................................................................... 94
   (b)      No Third Party Beneficiaries. ............................................................................ 94
SECTION 15.07    SEVERABILITY; ENTIRE AGREEMENT; AMENDMENTS. ....................................... 94
SECTION 15.08    CONSTRUCTION. ............................................................................................... 94
SECTION 15.09    MORTGAGE LOAN SERVICING. ......................................................................... 95
SECTION 15.10    DISCLOSURE OF INFORMATION.......................................................................... 96
SECTION 15.11    WAIVER; CONFLICT. ........................................................................................ 96
SECTION 15.12    NO RELIANCE. ................................................................................................. 96
SECTION 15.13    SUBROGATION. ................................................................................................ 96
SECTION 15.14    COUNTING OF DAYS. ....................................................................................... 97
SECTION 15.15    REVIVAL AND REINSTATEMENT OF INDEBTEDNESS.............................................. 97
SECTION 15.16    TIME IS OF THE ESSENCE. ................................................................................ 97
SECTION 15.17    FINAL AGREEMENT........................................................................................... 97
SECTION 15.18    WAIVER OF TRIAL BY JURY............................................................................... 98

DMEAST #23702427 v9
**Multifamily Loan and Security Agreement**
**(Non-Recourse) (Master Lease)**                **Form 6001.NR.ML**                **Page vi**
**Fannie Mae**                                                  **10-15**                © **2015 Fannie Mae**

### SCHEDULES & EXHIBITS

**Schedules**

| | | |
|---|---|---|
| Schedule 1 | Definitions Schedule (required) | **Form 6101.FR.ML** |
| Schedule 2 | **Summary of Loan Terms (required)** | Form 6102.FR.ML |
| Schedule 3 | **Interest Rate Type Provisions (required)** | **Form 6103.FR** |
| Schedule 4 | **Prepayment Premium Schedule (required)** | Form 6104.01 |
| Schedule 5 | **Required Replacement Schedule (required)** | |
| Schedule 6 | **Required Repair Schedule (required)** | |
| Schedule 7 | **Exceptions to Representations and Warranties Schedule (required)** | |
| Schedule 8 | **Master Lessee Estoppel Certificate** | **Form 6469.ML** |

# MULTIFAMILY LOAN AND SECURITY AGREEMENT
## (Non-Recourse)
## (Master Lease)

This MULTIFAMILY LOAN AND SECURITY AGREEMENT (as amended, restated, replaced, supplemented, or otherwise modified from time to time, the "**Loan Agreement**") is made as of the Effective Date (as hereinafter defined) by and between NB VUE MAC, DST, a Delaware statutory trust ("**Borrower**"), and BERKELEY POINT CAPITAL LLC, a Delaware limited liability company ("**Lender**").

## RECITALS:

WHEREAS, Borrower desires to obtain the Mortgage Loan (as hereinafter defined) from Lender to be secured by the Mortgaged Property (as hereinafter defined); and

WHEREAS, Lender is willing to make the Mortgage Loan on the terms and conditions contained in this Loan Agreement and in the other Loan Documents (as hereinafter defined);

NOW, THEREFORE, in consideration of the making of the Mortgage Loan by Lender and other good and valuable consideration, the receipt and adequacy of which are hereby conclusively acknowledged, the parties hereby covenant, agree, represent, and warrant as follows:

## AGREEMENTS:

## ARTICLE 1 - DEFINITIONS; SUMMARY OF MORTGAGE LOAN TERMS

**Section 1.01      Defined Terms.**

Capitalized terms not otherwise defined in the body of this Loan Agreement shall have the meanings set forth in the Definitions Schedule attached as Schedule 1 to this Loan Agreement.

**Section 1.02      Schedules, Exhibits, and Attachments Incorporated.**

The schedules, exhibits, and any other addenda or attachments are incorporated fully into this Loan Agreement by this reference and each constitutes a substantive part of this Loan Agreement.

# ARTICLE 2 - GENERAL MORTGAGE LOAN TERMS

**Section 2.01      Mortgage Loan Origination and Security.**

**(a)      Making of Mortgage Loan.**

Subject to the terms and conditions of this Loan Agreement and the other Loan Documents, Lender hereby makes the Mortgage Loan to Borrower, and Borrower hereby accepts the Mortgage Loan from Lender.  Borrower covenants and agrees that it shall:

(1)      pay the Indebtedness, including the Prepayment Premium, if any (whether in connection with any voluntary prepayment or in connection with an acceleration by Lender of the Indebtedness), in accordance with the terms of this Loan Agreement and the other Loan Documents; and

(2)      perform, observe, and comply with this Loan Agreement and all other provisions of the other Loan Documents.

**(b)      Security for Mortgage Loan.**

The Mortgage Loan is made pursuant to this Loan Agreement, is evidenced by the Note, and is secured by the Security Instrument, this Loan Agreement, and the other Loan Documents that are expressly stated to be security for the Mortgage Loan.

**(c)      Protective Advances.**

As provided in the Security Instrument, Lender may take such actions or disburse such funds as Lender reasonably deems necessary to perform the obligations of Borrower under this Loan Agreement and the other Loan Documents, and to protect Lender's interest in the Mortgaged Property.

**Section 2.02      Payments on Mortgage Loan.**

**(a)      Debt Service Payments.**

**(1)      Short Month Interest.**

If the date the Mortgage Loan proceeds are disbursed is any day other than the first day of the month, interest for the period beginning on the disbursement date and ending on and including the last day of the month in which the disbursement occurs shall be payable by Borrower on the date the Mortgage Loan proceeds are disbursed.  In the event that the disbursement date is not the same as the Effective Date, then:

(A)      the disbursement date and the Effective Date must be in the same month, and

(B)      the Effective Date shall not be the first day of the month.

(2)     **Interest Accrual and Computation.**

Except as provided in Section 2.02(a)(1), interest shall be paid in arrears.  Interest shall accrue as provided in the Schedule of Interest Rate Type Provisions and shall be computed in accordance with the Interest Accrual Method.  If the Interest Accrual Method is "Actual/360," Borrower acknowledges and agrees that the amount allocated to interest for each month will vary depending on the actual number of calendar days during such month.

(3)     **Monthly Debt Service Payments.**

Consecutive monthly debt service installments (comprised of either interest only or principal and interest, depending on the Amortization Type), each in the amount of the applicable Monthly Debt Service Payment, shall be due and payable on the First Payment Date, and on each Payment Date thereafter until the Maturity Date, at which time all Indebtedness shall be due.  Any regularly scheduled Monthly Debt Service Payment that is received by Lender before the applicable Payment Date shall be deemed to have been received on such Payment Date solely for the purpose of calculating interest due.  All payments made by Borrower under this Loan Agreement shall be made without set-off, counterclaim, or other defense.

(4)     **Payment at Maturity.**

The unpaid principal balance of the Mortgage Loan, any Accrued Interest thereon and all other Indebtedness shall be due and payable on the Maturity Date.

(5)     **Interest Rate Type.**

See the Schedule of Interest Rate Type Provisions for additional provisions, if any, specific to the Interest Rate Type.

(b)     **Capitalization of Accrued But Unpaid Interest.**

Any accrued and unpaid interest on the Mortgage Loan remaining past due for thirty (30) days or more may, at Lender's election, be added to and become part of the unpaid principal balance of the Mortgage Loan.

(c)     **Late Charges.**

(1)     If any Monthly Debt Service Payment due hereunder is not received by Lender within ten (10) days (or fifteen (15) days for any Mortgaged Property located in Mississippi or North Carolina to comply with applicable law) after the applicable Payment Date, or any amount payable under this Loan Agreement (other than the payment due on the Maturity Date for repayment of the Mortgage Loan in full) or any other Loan Document is not received by Lender within ten (10) days (or fifteen (15) days for any Mortgaged Property located in Mississippi or North Carolina to comply with

applicable law) after the date such amount is due, inclusive of the date on which such amount is due, Borrower shall pay to Lender, immediately without demand by Lender, the Late Charge.

The Late Charge is payable in addition to, and not in lieu of, any interest payable at the Default Rate pursuant to Section 2.02(d).

(2)     Borrower acknowledges and agrees that:

(A)     its failure to make timely payments will cause Lender to incur additional expenses in servicing and processing the Mortgage Loan;

(B)     it is extremely difficult and impractical to determine those additional expenses;

(C)     Lender is entitled to be compensated for such additional expenses; and

(D)     the Late Charge represents a fair and reasonable estimate, taking into account all circumstances existing on the date hereof, of the additional expenses Lender will incur by reason of any such late payment.

**(d)     Default Rate.**

(1)     Default interest shall be paid as follows:

(A)     If (i) any amount due in respect of the Mortgage Loan (other than amounts due on the Maturity Date) remains past due for thirty (30) days or more, or (ii) any other Event of Default has occurred and is continuing, interest on the unpaid amount(s) with respect to (i) above, and on the unpaid principal balance of the Mortgage Loan with respect to (ii) above, shall accrue from the date payment is due or the date of such Event of Default, as applicable, at the Default Rate and shall be payable upon demand by Lender.

(B)     If any Indebtedness due is not paid in full on the Maturity Date, then interest shall accrue at the Default Rate on all such unpaid amounts from the Maturity Date until fully paid and shall be payable upon demand by Lender.

Absent a demand by Lender, any such amounts shall be payable by Borrower in the same manner as provided for the payment of Monthly Debt Service Payments.  To the extent permitted by applicable law, interest shall also accrue at the Default Rate on any judgment obtained by Lender against Borrower in connection with the Mortgage Loan. To the extent Borrower or any other person is vested with a right of redemption, interest shall continue to accrue at the Default Rate during any redemption period until such time as the Mortgaged Property has been redeemed.

(2)     Borrower acknowledges and agrees that:

(A)      its failure to make timely payments will cause Lender to incur additional expenses in servicing and processing the Mortgage Loan; and

(B)      in connection with any failure to timely pay all amounts due in respect of the Mortgage Loan on the Maturity Date, or during the time that any amount due in respect of the Mortgage Loan is delinquent for more than thirty (30) days:

(i)      Lender's risk of nonpayment of the Mortgage Loan will be materially increased;

(ii)      Lender's ability to meet its other obligations and to take advantage of other investment opportunities will be adversely impacted;

(iii)      Lender will incur additional costs and expenses arising from its loss of the use of the amounts due;

(iv)      it is extremely difficult and impractical to determine such additional costs and expenses;

(v)      Lender is entitled to be compensated for such additional risks, costs, and expenses; and

(vi)      the increase from the Interest Rate to the Default Rate represents a fair and reasonable estimate of the additional risks, costs, and expenses Lender will incur by reason of Borrower's delinquent payment and the additional compensation Lender is entitled to receive for the increased risks of nonpayment associated with a delinquency on the Mortgage Loan (taking into account all circumstances existing on the Effective Date).

**(e)      Address for Payments.**

All payments due pursuant to the Loan Documents shall be payable at Lender's Payment Address, or such other place and in such manner as may be designated from time to time by written notice to Borrower by Lender.

**(f)      Application of Payments.**

If at any time Lender receives, from Borrower or otherwise, any payment in respect of the Indebtedness that is less than all amounts due and payable at such time, then Lender may apply such payment to amounts then due and payable in any manner and in any order determined by Lender or hold in suspense and not apply such payment at Lender's election. Neither Lender's acceptance of a payment that is less than all amounts then due and payable, nor Lender's application of, or suspension of the application of, such payment, shall constitute or be deemed to constitute either a waiver of the unpaid amounts or an accord and satisfaction.

Notwithstanding the application of any such payment to the Indebtedness, Borrower's obligations under this Loan Agreement and the other Loan Documents shall remain unchanged.

**Section 2.03      Lockout/Prepayment.**

> **(a)      Prepayment; Prepayment Lockout; Prepayment Premium.**

> > (1)      Borrower shall not make a voluntary full or partial prepayment on the Mortgage Loan during any Prepayment Lockout Period nor shall Borrower make a voluntary partial prepayment at any time. Except as expressly provided in this Loan Agreement (including as provided in the Prepayment Premium Schedule), a Prepayment Premium calculated in accordance with the Prepayment Premium Schedule shall be payable in connection with any prepayment of the Mortgage Loan.

> > (2)      If a Prepayment Lockout Period applies to the Mortgage Loan, and during such Prepayment Lockout Period Lender accelerates the unpaid principal balance of the Mortgage Loan or otherwise applies collateral held by Lender to the repayment of any portion of the unpaid principal balance of the Mortgage Loan, the Prepayment Premium shall be due and payable and equal to the amount obtained by multiplying the percentage indicated (if at all) in the Prepayment Premium Schedule by the amount of principal being prepaid at the time of such acceleration or application.

> **(b)      Voluntary Prepayment in Full.**

At any time after the expiration of any Prepayment Lockout Period, Borrower may voluntarily prepay the Mortgage Loan in full on a Permitted Prepayment Date so long as:

> > (1)      Borrower delivers to Lender a Prepayment Notice specifying the Intended Prepayment Date not more than sixty (60) days, but not less than thirty (30) days (if given via U.S. Postal Service) or twenty (20) days (if given via facsimile, e-mail, or overnight courier) prior to such Intended Prepayment Date; and

> > (2)      Borrower pays to Lender an amount equal to the sum of:

> > > (A)      the entire unpaid principal balance of the Mortgage Loan; plus

> > > (B)      all Accrued Interest (calculated through the last day of the month in which the prepayment occurs); plus

> > > (C)      the Prepayment Premium; plus

> > > (D)      all other Indebtedness.

In connection with any such voluntary prepayment, Borrower acknowledges and agrees that interest shall always be calculated and paid through the last day of the month in which the prepayment occurs (even if the Permitted Prepayment Date for such month is not the last day of such month, or if Lender approves prepayment on an Intended Prepayment Date that is not a

Permitted Prepayment Date). Borrower further acknowledges that Lender is not required to accept a voluntary prepayment of the Mortgage Loan on any day other than a Permitted Prepayment Date. However, if Lender does approve an Intended Prepayment Date that is not a Permitted Prepayment Date and accepts a prepayment on such Intended Prepayment Date, such prepayment shall be deemed to be received on the immediately following Permitted Prepayment Date. If Borrower fails to prepay the Mortgage Loan on the Intended Prepayment Date for any reason (including on any Intended Prepayment Date that is approved by Lender) and such failure either continues for five (5) Business Days, or into the following month, Lender shall have the right to recalculate the payoff amount. If Borrower prepays the Mortgage Loan either in the following month or more than five (5) Business Days after the Intended Prepayment Date that was approved by Lender, Lender shall also have the right to recalculate the payoff amount based upon the amount of such payment and the date such payment was received by Lender. Borrower shall immediately pay to Lender any additional amounts required by any such recalculation.

**(c)     Acceleration of Mortgage Loan.**

Upon acceleration of the Mortgage Loan, Borrower shall pay to Lender:

(1)     the entire unpaid principal balance of the Mortgage Loan;

(2)     all Accrued Interest (calculated through the last day of the month in which the acceleration occurs);

(3)     the Prepayment Premium; and

(4)     all other Indebtedness.

**(d)     Application of Collateral.**

Any application by Lender of any collateral or other security to the repayment of all or any portion of the unpaid principal balance of the Mortgage Loan prior to the Maturity Date in accordance with the Loan Documents shall be deemed to be a prepayment by Borrower. Any such prepayment shall require the payment to Lender by Borrower of the Prepayment Premium calculated on the amount being prepaid in accordance with this Loan Agreement.

**(e)     Casualty and Condemnation.**

Notwithstanding any provision of this Loan Agreement to the contrary, no Prepayment Premium shall be payable with respect to any prepayment occurring as a result of the application of any insurance proceeds or amounts received in connection with a Condemnation Action in accordance with this Loan Agreement.

**(f)     No Effect on Payment Obligations.**

Unless otherwise expressly provided in this Loan Agreement, any prepayment required by any Loan Document of less than the entire unpaid principal balance of the Mortgage Loan shall not extend or postpone the due date of any subsequent Monthly Debt Service Payments,

Monthly Replacement Reserve Deposit, or other payment, or change the amount of any such payments or deposits.

**(g)    Loss Resulting from Prepayment.**

In any circumstance in which a Prepayment Premium is due under this Loan Agreement, Borrower acknowledges that:

(1)    any prepayment of the unpaid principal balance of the Mortgage Loan, whether voluntary or involuntary, or following the occurrence of an Event of Default by Borrower, will result in Lender's incurring loss, including reinvestment loss, additional risk, expense, and frustration or impairment of Lender's ability to meet its commitments to third parties;

(2)    it is extremely difficult and impractical to ascertain the extent of such losses, risks, and damages;

(3)    the formula for calculating the Prepayment Premium represents a reasonable estimate of the losses, risks, and damages Lender will incur as a result of a prepayment; and

(4)    the provisions regarding the Prepayment Premium contained in this Loan Agreement are a material part of the consideration for the Mortgage Loan, and that the terms of the Mortgage Loan are in other respects more favorable to Borrower as a result of Borrower's voluntary agreement to such prepayment provisions.

# ARTICLE 3 - PERSONAL LIABILITY

**Section 3.01        Non-Recourse Mortgage Loan; Exceptions.**

Except as otherwise provided in this Article 3 or in any other Loan Document, none of Borrower, or any director, officer, manager, member, partner, shareholder, trustee, trust beneficiary, or employee of Borrower, shall have personal liability under this Loan Agreement or any other Loan Document for the repayment of the Indebtedness or for the performance of any other obligations of Borrower under the Loan Documents, and Lender's only recourse for the satisfaction of such Indebtedness and the performance of such obligations shall be Lender's exercise of its rights and remedies with respect to the Mortgaged Property and any other collateral held by Lender as security for the Indebtedness. This limitation on Borrower's liability shall not limit or impair Lender's enforcement of its rights against Guarantor under any Loan Document. Borrower acknowledges and agrees that Borrower's reliance upon incorrect or incomplete information received from Guarantor, Key Principal, or other Persons and the reporting of the same to Lender, whether or not Borrower had actual knowledge that such information was incorrect or incomplete and whether or not Borrower is otherwise in violation of the terms of this Loan Agreement, shall not be (and none of Borrower, Guarantor, nor Key Principal shall assert) a defense to Lender's determination that an Event of Default has occurred or that Borrower (or Guarantor) has incurred personal liability as set forth in this Article 3.

## Section 3.02    Personal Liability of Borrower (Exceptions to Non-Recourse Provision).

**(a)    Personal Liability Based on Lender's Loss.**

Borrower shall be personally liable to Lender for the repayment of the portion of the Indebtedness equal to any loss or damage suffered by Lender as a result of, subject to any notice and cure period, if any:

(1)    failure to pay as directed by Lender upon demand after an Event of Default (to the extent actually received by Borrower or Affiliated Master Lessee):

(A)    all Rents to which Lender is entitled under the Loan Documents; and

(B)    the amount of all security deposits then held or thereafter collected from tenants and not properly applied pursuant to the applicable Leases;

(2)    failure to maintain all insurance policies required by the Loan Documents, except to the extent Lender has the obligation to pay the premiums pursuant to Section 12.03(c);

(3)    failure to apply all insurance proceeds received by Borrower or Affiliated Master Lessee or any amounts received by Borrower or Affiliated Master Lessee in connection with a Condemnation Action, as required by the Loan Documents;

(4)    failure to comply with any provision of this Loan Agreement or any other Loan Document relating to the delivery of books and records, statements, schedules, and reports;

(5)    except to the extent directed otherwise by Lender pursuant to Section 3.02(a)(1), failure to apply Rents to the ordinary and necessary expenses of owning or operating, as applicable, the Mortgaged Property and Debt Service Amounts, as and when each is due and payable, except that Borrower will not be personally liable with respect to Rents that are distributed by Borrower in any calendar year if Borrower has paid all ordinary and necessary expenses of owning or operating, as applicable, the Mortgaged Property, and Debt Service Amounts for such calendar year;

(6)    waste or abandonment of the Mortgaged Property;

(7)    grossly negligent or reckless unintentional material misrepresentation or omission by Borrower, Affiliated Master Lessee, Guarantor, Key Principal, or any officer, director, partner, manager, member, shareholder, or trustee of Borrower, Affiliated Master Lessee, Guarantor, or Key Principal in connection with on-going financial or other reporting required by the Loan Documents, or any request for action or consent by Lender;

(8)     failure of the Master Lease to be subordinate to the lien of the Security Instrument or failure of the Master Lease to be terminated if so elected by Lender in accordance with the Loan Documents;

(9)     failure to effect a DST Conversion pursuant to a Springing Transfer.

Notwithstanding the foregoing, Borrower shall not have personal liability under clauses (1), (3), or (5) above to the extent that Borrower lacks the legal right to direct the disbursement of the applicable funds due to an involuntary Bankruptcy Event that occurs without the consent, encouragement, or active participation of (A) Borrower, Affiliated Master Lessee, Guarantor, or Key Principal, (B) any Person Controlling Borrower, Affiliated Master Lessee, Guarantor, or Key Principal or (C) any Person Controlled by or under common Control with Borrower, Affiliated Master Lessee, Guarantor, or Key Principal.

**(b)     Full Personal Liability for Mortgage Loan.**

Borrower shall be personally liable to Lender for the repayment of all of the Indebtedness, and the Mortgage Loan shall be fully recourse to Borrower, upon the occurrence of any of the following:

(1)     failure by Borrower to comply with the single-asset entity requirements of Section 4.02(d) of this Loan Agreement;

(2)     failure by Affiliated Master Lessee to comply with the single-asset entity requirements of Section 4.02(d) of this Loan Agreement or of the Master Lease;

(3)     a Transfer (other than a conveyance of the Mortgaged Property at a Foreclosure Event pursuant to the Security Instrument and this Loan Agreement) that is not permitted under this Loan Agreement or any other Loan Document;

(4)     the occurrence of any Bankruptcy Event (other than an acknowledgement in writing as described in clause (b) of the definition of "Bankruptcy Event"); provided, however, in the event of an involuntary Bankruptcy Event, Borrower shall only be personally liable if such involuntary Bankruptcy Event occurs with the consent, encouragement, or active participation of (A) Borrower, Affiliated Master Lessee, Guarantor, or Key Principal, (B) any Person Controlling Borrower, Affiliated Master Lessee, Guarantor, or Key Principal, or (C) any Person Controlled by or under common Control with Borrower, Affiliated Master Lessee, Guarantor, or Key Principal;

(5)     fraud, written material misrepresentation, or material omission by Borrower, Affiliated Master Lessee, Guarantor, Key Principal, or any officer, director, partner, manager, member, shareholder, or trustee of Borrower, Affiliated Master Lessee, Guarantor, or Key Principal in connection with any application for or creation of the Indebtedness; or

(6)      fraud, written intentional material misrepresentation, or intentional material omission by Borrower, Affiliated Master Lessee, Guarantor, Key Principal, or any officer, director, partner, manager, member, shareholder, or trustee of Borrower, Affiliated Master Lessee, Guarantor, or Key Principal in connection with on-going financial or other reporting required by the Loan Documents or any request for action or consent by Lender.

**Section 3.03      Personal Liability for Indemnity Obligations.**

Borrower shall be personally and fully liable to Lender for Borrower's indemnity obligations under Section 13.01(e) of this Loan Agreement, Section 7.02(g)(4) of this Loan Agreement, the Environmental Indemnity Agreement, and any other express indemnity obligations provided by Borrower under any Loan Document.  Borrower's liability for such indemnity obligations shall not be limited by the amount of the Indebtedness, the repayment of the Indebtedness, or otherwise, provided that Borrower's liability for such indemnities shall not include any loss caused by the gross negligence or willful misconduct of Lender as determined by a court of competent jurisdiction pursuant to a final non-appealable court order.

**Section 3.04      Lender's Right to Forego Rights Against Mortgaged Property.**

To the extent that Borrower has personal liability under this Loan Agreement or any other Loan Document, Lender may exercise its rights against Borrower personally to the fullest extent permitted by applicable law without regard to whether Lender has exercised any rights against the Mortgaged Property, the UCC Collateral, or any other security, or pursued any rights against Guarantor, or pursued any other rights available to Lender under this Loan Agreement, any other Loan Document, or applicable law.  For purposes of this Section 3.04 only, the term "Mortgaged Property" shall not include any funds that have been applied by Borrower or Master Lessee as required or permitted by this Loan Agreement prior to the occurrence of an Event of Default, or that Borrower was unable to apply as required or permitted by this Loan Agreement because of a Bankruptcy Event.  To the fullest extent permitted by applicable law, in any action to enforce Borrower's personal liability under this Article 3, Borrower waives any right to set off the value of the Mortgaged Property against such personal liability.

# ARTICLE 4 - BORROWER AND MASTER LESSEE STATUS

**Section 4.01      Representations and Warranties.**

The representations and warranties made by Borrower to Lender in this Section 4.01 are made as of the Effective Date and are true and correct except as disclosed on the Exceptions to Representations and Warranties Schedule.

**(a)      Due Organization and Qualification.**

Each of Borrower and Affiliated Master Lessee is validly existing and qualified to transact business and is in good standing in the state in which it is formed or organized, the Property Jurisdiction and in each other jurisdiction that qualification or good standing is required

according to applicable law to conduct its business with respect to the Mortgaged Property and where the failure to be so qualified or in good standing would adversely affect Borrower's ownership or operation of the Mortgaged Property or Affiliated Master Lessee's leasing or operation (as applicable) of the Mortgaged Property or the validity, enforceability, or the ability of Borrower to perform its obligations under this Loan Agreement or any other Loan Document, or Affiliated Master Lessee under the Master Lease Documents.

**(b)      Location.**

Borrower's General Business Address is Borrower's principal place of business and principal office.  Master Lessee's General Business Address is Master Lessee's principal place of business and principal office.

**(c)      Power and Authority.**

(1)      Borrower has the requisite power and authority:

(A)      to own the Mortgaged Property and to carry on its business as now conducted and as contemplated to be conducted in connection with the performance of its obligations under this Loan Agreement and under the other Loan Documents to which it is a party;

(B)      to execute and deliver this Loan Agreement and the other Loan Documents to which it is a party, and to carry out the transactions contemplated by this Loan Agreement and the other Loan Documents to which it is a party; and

(C)      to execute and deliver the Master Lease Documents to which it is a party, and to carry out the transactions contemplated by the Master Lease Documents.

(2)      Affiliated Master Lessee has the requisite power and authority:

(A)      to manage, lease, and operate (as applicable) the Mortgaged Property and to carry on its business as now conducted and as contemplated to be conducted in connection with the performance or its obligations under the Master Lease Documents; and

(B)      to execute and deliver the Master Lease Documents, to carry out the transactions contemplated by the Master Lease Documents, and to facilitate Borrower's compliance with the requirements of this Loan Agreement and the other Loan Documents.

**(d)      Due Authorization.**

(1)      The execution, delivery, and performance by Borrower of this Loan Agreement, the other Loan Documents to which Borrower is a party, and the Master Lease Documents to which Borrower is a party have been duly authorized by all

necessary action and proceedings by or on behalf of Borrower, and no further approvals or filings of any kind, including any approval of or filing with any Governmental Authority, are required by or on behalf of Borrower as a condition to the valid execution, delivery, and performance by Borrower of this Loan Agreement, any other Loan Documents to which Borrower is a party, or the Master Lease Documents, except filings required to perfect and maintain the liens to be granted under the Loan Documents and routine filings to maintain the good standing and existence of Borrower.

(2)     The execution, delivery, and performance by Affiliated Master Lessee of the Master Lease and other Master Lease Documents have been duly authorized by all necessary action and proceedings by or on behalf of Affiliated Master Lessee, and no further approvals or filings of any kind, including any approval of or filing with any Governmental Authority, are required by or on behalf of Affiliated Master Lessee as a condition to the valid execution, delivery, and performance by Affiliated Master Lessee of the Master Lease or the other Master Lease Documents, except filings required to perfect and maintain the liens to be granted under the  Master Lease Documents and routine filings to maintain the good standing and existence of Affiliated Master Lessee.

**(e)     Valid and Binding Obligations.**

(1)     This Loan Agreement, the other Loan Documents, and the Master Lease Documents to which Borrower is a party have been duly executed and delivered by Borrower and constitute the legal, valid, and binding obligations of Borrower, enforceable against Borrower in accordance with their respective terms, except as such enforceability may be limited by applicable Insolvency Laws or by the exercise of discretion by any court.

(2)     The Master Lease and other Master Lease Documents have been duly executed and delivered by Affiliated Master Lessee and constitute the legal, valid, and binding obligations of Affiliated Master Lessee, enforceable against Affiliated Master Lessee in accordance with their respective terms, except as such enforceability may be limited by applicable Insolvency Laws or by the exercise of discretion by any court.

**(f)     Effect of Mortgage Loan on Borrower's Financial Condition.**

The Mortgage Loan will not render Borrower Insolvent, and the Master Lease Document obligations will not render Affiliated Master Lessee Insolvent.  Borrower has sufficient working capital, including proceeds from the Mortgage Loan, cash flow from the Mortgaged Property including the Master Lease, or other sources, not only to adequately maintain the Mortgaged Property in accordance with the terms of the Loan Documents and the Master Lease, but also to pay all of Borrower's outstanding debts as they come due, including all Debt Service Amounts, exclusive of Borrower's ability to refinance or pay in full the Mortgage Loan on the Maturity Date.  In connection with the execution and delivery of this Loan Agreement and the other Loan Documents (and the delivery to, or for the benefit of, Lender of any collateral contemplated thereunder), and the incurrence by Borrower of the obligations under this Loan Agreement and the other Loan Documents, Borrower did not receive less than reasonably equivalent value in

exchange for the incurrence of the obligations of Borrower under this Loan Agreement and the other Loan Documents. Affiliated Master Lessee has sufficient working capital, cash flow from the Mortgaged Property, or other resources, not only to maintain the Mortgaged Property in accordance with the terms of the Master Lease, but also to pay the rents and other obligations under the Master Lease Documents, as well as other obligations under this Loan Agreement and the other Loan Documents that Borrower elects to pass through to Affiliated Master Lessee pursuant to the terms of the Master Lease.

**(g)    Economic Sanctions, Anti-Money Laundering, and Anti-Corruption.**

(1)    None of Borrower, Affiliated Master Lessee, Guarantor, or Key Principal, nor to Borrower's knowledge, any Person Controlling Borrower, Affiliated Master Lessee, Guarantor, or Key Principal, nor any Person Controlled by Borrower, Affiliated Master Lessee, Guarantor, or Key Principal that also has a direct or indirect ownership interest in Borrower, Affiliated Master Lessee, Guarantor, or Key Principal, is in violation of any applicable civil or criminal laws or regulations (including those requiring internal controls) intended to prohibit, prevent, or regulate money laundering, drug trafficking, terrorism, or corruption, of the United States and the jurisdiction where the Mortgaged Property is located or where the Person resides, is domiciled, or has its principal place of business.

(2)    None of Borrower, Affiliated Master Lessee, Guarantor, or Key Principal, nor to Borrower's knowledge, any Person Controlling Borrower, Affiliated Master Lessee, Guarantor, or Key Principal, nor any Person Controlled by Borrower, Affiliated Master Lessee, Guarantor, or Key Principal that also has a direct or indirect ownership interest in Borrower, Affiliated Master Lessee, Guarantor, or Key Principal, is a Person:

(A)    against whom proceedings are pending for any alleged violation of any laws described in Section 4.01(g)(1);

(B)    that has been convicted of any violation of, has been subject to civil penalties or economic sanctions pursuant to, or had any of its property seized or forfeited under any laws described in Section 4.01(g)(1); or

(C)    with whom any United States Person, any entity organized under the laws of the United States or its constituent states or territories, or any entity, regardless of where organized, having its principal place of business within the United States or any of its territories, is prohibited from transacting business of the type contemplated by this Loan Agreement and the other Loan Documents under any other applicable law.

(3)    Borrower, Affiliated Master Lessee, Guarantor, and Key Principal are in compliance with all applicable economic sanctions laws administered by OFAC, the United States Department of State, or the United States Department of Commerce.

**(h)      Single Asset Status of Borrower and Affiliated Master Lessee.**

Borrower represents that:

(1)      Borrower does not own or lease any real property, personal property, or assets other than the Mortgaged Property;

(2)      Affiliated Master Lessee does not own or operate any real or personal property other than the Mortgaged Property pursuant to the Master Lease and does not own any other real property, personal property, or other assets;

(3)      neither Borrower nor Affiliated Master Lessee owns, operates, or participates in any business other than the leasing, ownership, management, operation, and maintenance of the Mortgaged Property;

(4)      neither Borrower nor Affiliated Master Lessee has any material financial obligation under or secured by any indenture, mortgage, deed of trust, deed to secure debt, loan agreement, or other agreement or instrument to which Borrower or Affiliated Master Lessee, respectively, is a party, or by which Borrower or Affiliated Master Lessee is otherwise bound, or to which the Mortgaged Property is subject or by which it is otherwise encumbered, other than:

(A)      unsecured trade payables incurred in the ordinary course of the operation of the Mortgaged Property (exclusive of amounts for rehabilitation, restoration, repairs, or replacements of the Mortgaged Property) that (i) are not evidenced by a promissory note, (ii) are payable within sixty (60) days of the date incurred, and (iii) as of the Effective Date, do not exceed, in the aggregate, four percent (4%) of the original principal balance of the Mortgage Loan;

(B)      if the Security Instrument grants a lien on a leasehold estate, Borrower's obligations as lessee under the ground lease creating such leasehold estate;

(C)      with respect to Borrower only, obligations under the Loan Documents and obligations secured by the Mortgaged Property to the extent permitted by the Loan Documents; and

(D)      Borrower's and Master Lessee's respective obligations under the Master Lease Documents;

(5)      Borrower and Affiliated Master Lessee have maintained their respective financial statements, accounting records, and other partnership, real estate investment trust, limited liability company, or corporate documents, as the case may be, separate from those of any other Person (unless Borrower's or Affiliated Master Lessee's assets have been included in a consolidated financial statement prepared in accordance with generally accepted accounting principles);

(6)      neither Borrower nor Affiliated Master Lessee has commingled its assets or funds with those of any other Person, unless such assets or funds can easily be segregated and identified in the ordinary course of business from those of any other Person;

(7)      each of Borrower and Affiliated Master Lessee has been adequately capitalized in light of its contemplated business operations;

(8)      neither Borrower nor Affiliated Master Lessee has assumed, guaranteed, or pledged its assets to secure the liabilities or obligations of any other Person (except in connection with the Mortgage Loan or other mortgage loans that have been paid in full or collaterally assigned to Lender, including in connection with any Consolidation, Extension and Modification Agreement or similar instrument), or held out its credit as being available to satisfy the obligations of any other Person;

(9)      neither Borrower nor Affiliated Master Lessee has made loans or advances to any other Person; and

(10)     neither Borrower nor Affiliated Master Lessee has entered into, or is  a party to, any transaction with any Borrower Affiliate or Affiliate of Affiliated Master Lessee, respectively, except in the ordinary course of business and on terms which are no more favorable to any such Borrower Affiliate or Affiliate of Affiliated Master Lessee, respectively, than would be obtained in a comparable arm's length transaction with an unrelated third party, provided that neither Borrower's acquisition of the Mortgaged Property nor Borrower's entry into and performance of its obligations under the Master Lease Documents shall be deemed to breach this representation.

**(i)      No Bankruptcies or Judgments.**

None of Borrower, Master Lessee, Guarantor, or Key Principal, nor to Borrower's knowledge, any Person Controlling Borrower, Master Lessee, Guarantor, or Key Principal, nor any Person Controlled by Borrower, Master Lessee, Guarantor, or Key Principal that also has a direct or indirect ownership interest in Borrower, Master Lessee, Guarantor, or Key Principal, is currently:

(1)      the subject of or a party to any completed or pending bankruptcy, reorganization, including any receivership or other insolvency proceeding;

(2)      preparing or intending to be the subject of a Bankruptcy Event; or

(3)      the subject of any judgment unsatisfied of record or docketed in any court; or

(4)      Insolvent.

**(j)     No Actions or Litigation.**

(1)     There are no claims, actions, suits, or proceedings at law or in equity by or before any Governmental Authority now pending against or, to Borrower's knowledge, threatened against or affecting Borrower, Affiliated Master Lessee, the Master Lease, or the Mortgaged Property not otherwise covered by insurance (except claims, actions, suits, or proceedings regarding fair housing, anti-discrimination, or equal opportunity, which shall always be disclosed); and

(2)     there are no claims, actions, suits, or proceedings at law or in equity by or before any Governmental Authority now pending or, to Borrower's knowledge, threatened against or affecting Affiliated Master Lessee, Guarantor, or Key Principal, which claims, actions, suits, or proceedings, if adversely determined (individually or in the aggregate) reasonably would be expected to (A) materially adversely affect the financial condition or business of Borrower, Affiliated Master Lessee, Guarantor, or Key Principal or the condition, operation, or ownership of the Mortgaged Property (except claims, actions, suits, or proceedings regarding fair housing, anti-discrimination, or equal opportunity, which shall always be deemed material), or (B) result in the appointment of a receiver, trustee or other official that would exercise control over the Mortgaged Property and its management and operations.

**(k)     Payment of Taxes, Assessments, and Other Charges.**

Borrower confirms that:

(1)     each of Borrower and Affiliated Master Lessee has filed all federal, state, county, and municipal tax returns and reports required to have been filed by it;

(2)     each of Borrower and Affiliated Master Lessee has paid, before any fine, penalty, interest, lien, or costs may be added thereto, all taxes, governmental charges, and assessments due and payable with respect to such returns and reports;

(3)     there is no controversy or objection pending, or to the knowledge of Borrower, threatened in respect of any tax returns of Borrower or Affiliated Master Lessee; and

(4)     each of Borrower and Affiliated Master Lessee has made adequate reserves on its books and records for all taxes that have accrued but which are not yet due and payable.

**(l)     Not a Foreign Person.**

Borrower is not a "foreign person" within the meaning of Section 1445(f)(3) of the Internal Revenue Code.

**(m)   ERISA.**

Borrower represents and warrants that:

(1)   neither Borrower nor Affiliated Master Lessee is an Employee Benefit Plan;

(2)   no asset of Borrower or Affiliated Master Lessee constitutes "plan assets" (within the meaning of Section 3(42) of ERISA and Department of Labor Regulation Section 2510.3-101) of an Employee Benefit Plan;

(3)   no asset of Borrower or Affiliated Master Lessee is subject to any laws of any Governmental Authority governing the assets of an Employee Benefit Plan; and

(4)   none of Borrower, Affiliated Master Lessee, or any ERISA Affiliate is subject to any obligation or liability with respect to any ERISA Plan.

**(n)   Default Under Other Obligations.**

(1)   The execution, delivery, and performance of the obligations imposed on Borrower under this Loan Agreement and the Loan Documents to which it is a party will not cause Borrower to be in default under the provisions of any agreement, judgment or order to which Borrower is a party or by which Borrower is bound, and the execution, delivery and performance of the obligations imposed on Affiliated Master Lessee or Borrower under the Master Lease Documents will not cause Affiliated Master Lessee or Borrower to be in default under the provisions of any agreement, judgment, or order to which Affiliated Master Lessee or Borrower is a party or by which Affiliated Master Lessee or Borrower is bound.

(2)   None of Borrower, Affiliated Master Lessee, Guarantor, or Key Principal is in default under any obligation to Lender.  There is no condition under the Master Lease Documents that would cause Borrower, Affiliated Master Lessee, Guarantor, or Key Principal to be in default under any obligation to Lender.

**(o)   Prohibited Person.**

None of Borrower, Affiliated Master Lessee, Guarantor, or Key Principal is a Prohibited Person, nor to Borrower's knowledge, is any Person:

(1)   Controlling Borrower, Affiliated Master Lessee, Guarantor, or Key Principal a Prohibited Person; or

(2)   Controlled by and having a direct or indirect ownership interest in Borrower, Affiliated Master Lessee, Guarantor, or Key Principal a Prohibited Person.

### (p)     No Contravention.

Neither the execution and delivery of this Loan Agreement, the other Loan Documents to which Borrower or Affiliated Master Lessee is a party, or the Master Lease Documents to which Borrower or Affiliated Master Lessee is a party, nor the fulfillment of or compliance with the terms and conditions of this Loan Agreement, the other Loan Documents to which Borrower or Affiliated Master Lessee is a party, or the Master Lease Documents to which Borrower or Affiliated Master Lessee is a party, nor the performance of the obligations of Borrower or Affiliated Master Lessee under this Loan Agreement, the other Loan Documents, or the Master Lease Documents  does or will conflict with or result in any breach or violation of, or constitute a default under, any of the terms, conditions, or provisions of Borrower's or Affiliated Master Lessee's organizational documents, or any indenture, existing agreement, or other instrument to which Borrower or Affiliated Master Lessee is a party or to which Borrower, or Affiliated Master Lessee, the Mortgaged Property, or other assets of Borrower or Affiliated Master Lessee are subject.

### (q)     Lockbox Arrangement.

Borrower is not party to any type of lockbox agreement or similar cash management arrangement that has not been approved by Lender in writing, and no (1) direct or indirect owner of Borrower, (2) Affiliated Master Lessee, and (3) direct or indirect owner of Affiliated Master Lessee, is party to any type of lockbox agreement or similar cash management arrangement with respect to Rents or other income from the Mortgaged Property that has not been approved by Lender in writing.

### Section 4.02     Covenants.

### (a)     Maintenance of Existence; Organizational Documents.

Borrower and Affiliated Master Lessee shall each maintain its existence, its entity status, franchises, rights, and privileges under the laws of the state of its formation or organization (as applicable).  Borrower and Affiliated Master Lessee shall each continue to be duly qualified and in good standing to transact business in each jurisdiction in which qualification or standing is required according to applicable law to conduct its business with respect to the Mortgaged Property and where the failure to do so would adversely affect Borrower's or Affiliated Master Lessee's applicable ownership or operation of the Mortgaged Property or the validity, enforceability or the ability of Borrower to perform its obligations under this Loan Agreement or any other Loan Document, or Affiliated Master Lessee to perform its obligations under the Master Lease Documents.  Neither Borrower nor any partner, member, manager, officer, or director of Borrower, nor Affiliated Master Lessee nor any partner, member, manager, officer, or director of Affiliated Master Lessee, shall:

(1)     make or allow any material change to the organizational documents or organizational structure of Borrower or Affiliated Master Lessee, including changes relating to the Control of Borrower or Affiliated Master Lessee, unless such change or modification is made in connection with a Springing Transaction approved by Lender

pursuant to Section 11.03(h) or in connection with the sale of non-Controlling beneficial interests in Borrower, or

(2)     file any action, complaint, petition, or other claim to:

(A)     divide, partition, or otherwise compel the sale of the Mortgaged Property, or

(B)     otherwise change the Control of Borrower or Affiliated Master Lessee.

**(b)     Economic Sanctions, Anti-Money Laundering, and Anti-Corruption.**

(1)     Borrower, Affiliated Master Lessee, Guarantor, Key Principal, and any Person Controlling Borrower, Affiliated Master Lessee, Guarantor, or Key Principal, or any Person Controlled by Borrower, Affiliated Master Lessee, Guarantor, or Key Principal that also has a direct or indirect ownership interest in Borrower, Affiliated Master Lessee, Guarantor, or Key Principal shall remain in compliance with any applicable civil or criminal laws or regulations (including those requiring internal controls) intended to prohibit, prevent, or regulate money laundering, drug trafficking, terrorism, or corruption, of the United States and the jurisdiction where the Mortgaged Property is located or where the Person resides, is domiciled, or has its principal place of business.

(2)     At no time shall Borrower, Affiliated Master Lessee, Guarantor, or Key Principal, or any Person Controlling Borrower, Affiliated Master Lessee, Guarantor, or Key Principal, or any Person Controlled by Borrower, Affiliated Master Lessee, Guarantor, or Key Principal that also has a direct or indirect ownership interest in Borrower, Affiliated Master Lessee, Guarantor, or Key Principal, be a Person:

(A)     against whom proceedings are pending for any alleged violation of any laws described in Section 4.02(b)(1);

(B)     that has been convicted of any violation of, has been subject to civil penalties or economic sanctions pursuant to, or had any of its property seized or forfeited under, any laws described in Section 4.02(b)(1); or

(C)     with whom any United States Person, any entity organized under the laws of the United States or its constituent states or territories, or any entity, regardless of where organized, having its principal place of business within the United States or any of its territories, is prohibited from transacting business of the type contemplated by this Loan Agreement and the other Loan Documents under any other applicable law.

(3)     Borrower shall at all times:

(A)     remain, and shall cause Affiliated Master Lessee, Guarantor, and Key Principal to remain, in compliance with any applicable economic sanctions laws administered by OFAC, the United States Department of State, or the United States Department of Commerce;

**(c)     Payment of Taxes, Assessments, and Other Charges.**

Borrower and Affiliated Master Lessee shall each file all federal, state, county, and municipal tax returns and reports required to be filed by Borrower and Affiliated Master Lessee, respectively, and shall pay, or cause to be paid before any fine, penalty, interest, or cost may be added thereto, all taxes payable with respect to such returns and reports.

**(d)     Borrower and Affiliated Master Lessee Single Asset Status.**

Until the Indebtedness is fully paid, Borrower and Affiliated Master Lessee shall comply with the following:

(1)     neither such entity shall acquire, lease, or operate any real property, personal property, or assets other than, pursuant to the Master Lease, the fee or leasehold interest in the Mortgaged Property, as applicable;

(2)     neither such entity shall acquire, own, operate, or participate in any business other than, as lessor pursuant to the Master Lease, the leasing, ownership, management, operation, and maintenance of the Mortgaged Property;

(3)     neither such entity shall commingle its assets or funds with those of any other Person, unless such assets or funds can easily be segregated and identified in the ordinary course of business from those of any other Person;

(4)     each such entity shall  Borrower shall maintain its financial statements, accounting records, and other partnership, real estate investment trust, limited liability company, or corporate documents, as the case may be, separate from those of any other Person (unless such entity's assets are included in a consolidated financial statement prepared in accordance with generally accepted accounting principles);

(5)     each such entity shall have no material financial obligation under any indenture, mortgage, deed of trust, deed to secure debt, loan agreement, or other agreement or instrument to which it is a party or by which it is otherwise bound, or to which the Mortgaged Property is subject or by which it is otherwise encumbered, other than:

(A)     unsecured trade payables incurred in the ordinary course of the operation of the Mortgaged Property (exclusive of amounts (i) to be paid out of the Replacement Reserve Account or Repairs Escrow Account, or (ii) for

rehabilitation, restoration, repairs, or replacements of the Mortgaged Property or otherwise approved by Lender) so long as such trade payables (1) are not evidenced by a promissory note, (2) are payable within sixty (60) days of the date incurred, and (3) as of any date, do not exceed, in the aggregate, two percent (2%) of the original principal balance of the Mortgage Loan; provided, however, that otherwise compliant outstanding trade payables may exceed two percent (2%) up to an aggregate amount of four percent (4%) of the original principal balance of the Mortgage Loan for a period (beginning on or after the Effective Date) not to exceed ninety (90) consecutive days;

(B)   if the Security Instrument grants a lien on a leasehold estate, Borrower's obligations as lessee under the ground lease creating such leasehold estate; and

(C)   obligations under the Loan Documents and obligations secured by the Mortgaged Property to the extent permitted by the Loan Documents;

(6)   Neither Borrower nor Affiliated Master Lessee shall assume, guaranty, or pledge its assets to secure the liabilities or obligations of any other Person (except in connection with the Mortgage Loan or other mortgage loans that have been paid in full or collaterally assigned to Lender, including in connection with any Consolidation, Extension and Modification Agreement or similar instrument) or hold out its credit as being available to satisfy the obligations of any other Person;

(7)   Neither Borrower nor Affiliated Master Lessee shall make loans or advances to any other Person; or

(8)   Other than the Master Lease, neither Borrower nor Affiliated Master Lessee shall enter into, or become a party to, any transaction with any Borrower Affiliate (or Affiliate of an Affiliated Master Lessee), except in the ordinary course of business and on terms which are no more favorable to any such Borrower Affiliate (or Affiliate of an Affiliated Master Lessee) than would be obtained in a comparable arm's-length transaction with an unrelated third party, provided that neither Borrower's acquisition of the Mortgaged Property nor Borrower's entry into and performance of its obligations under the Master Lease Documents shall be deemed to breach this covenant.

**(e)   ERISA.**

Borrower covenants that:

(1)   no asset of Borrower or Affiliated Master Lessee shall constitute "plan assets" (within the meaning of Section 3(42) of ERISA and Department of Labor Regulation Section 2510.3-101) of an Employee Benefit Plan;

(2)     no asset of Borrower or Affiliated Master Lessee shall be subject to the laws of any Governmental Authority governing the assets of an Employee Benefit Plan; and

(3)     none of Borrower, Affiliated Master Lessee, nor any ERISA Affiliate shall incur any obligation or liability with respect to any ERISA Plan.

**(f)     Notice of Litigation or Insolvency.**

Borrower shall give immediate written notice to Lender of any claims, actions, suits, or proceedings at law or in equity (including any insolvency, bankruptcy, or receivership proceeding) by or before any Governmental Authority pending or, to Borrower's knowledge, threatened against or affecting Borrower, Master Lessee, the Master Lease, Guarantor, Key Principal, or the Mortgaged Property, which claims, actions, suits, or proceedings, if adversely determined reasonably would be expected to materially adversely affect the financial condition or business of Borrower, Master Lessee, the Master Lease, Guarantor, or Key Principal, or the condition, operation, or ownership of the Mortgaged Property (including any claims, actions, suits, or proceedings regarding fair housing, anti-discrimination, or equal opportunity, which shall always be deemed material).

**(g)     Payment of Costs, Fees, and Expenses.**

In addition to the payments specified in this Loan Agreement, Borrower shall pay, on demand, all of Lender's out-of-pocket fees, costs, charges, or expenses (including the reasonable fees and expenses of attorneys, accountants, and other experts) incurred by Lender in connection with:

(1)     any amendment to, or consent, or waiver required under, this Loan Agreement, any of the Loan Documents, or the Master Lease Documents (whether or not any such amendments, consents, or waivers are entered into);

(2)     defending or participating in any litigation arising from actions by third parties and brought against or involving Lender with respect to:

(A)     the Mortgaged Property, including the Master Lease;

(B)     any event, act, condition, or circumstance in connection with the Mortgaged Property; or

(C)     the relationship between or among Lender, Borrower, Master Lessee, Key Principal, and Guarantor in connection with this Loan Agreement or any of the transactions contemplated by this Loan Agreement or the Master Lease Documents;

(3)     the administration or enforcement of, or preservation of rights or remedies under, this Loan Agreement or any other Loan Documents including or in connection

with any litigation or appeals, any Foreclosure Event or other disposition of any collateral granted pursuant to the Loan Documents or collateral to which Lender acquires rights in virtue of the Master Lease; and

        (4)     any Bankruptcy Event or Guarantor Bankruptcy Event.

**(h)**    **Restrictions on Distributions.**

No distributions or dividends of any nature with respect to Rents or other income from the Mortgaged Property shall be made to any Person having a direct ownership interest in Borrower or Affiliated Master Lessee if an Event of Default has occurred and is continuing.

**(i)**    **Lockbox Arrangement.**

Borrower shall not enter into any type of lockbox agreement or similar cash management arrangement that has not been approved by Lender in writing, and no (1) direct or indirect owner of Borrower, (2) Affiliated Master Lessee, and (3) direct or indirect owner of Affiliated Master Lessee, shall enter into any type of lockbox agreement or similar cash management arrangement with respect to Rents or other income from the Mortgaged Property that has not been approved by Lender in writing.  Lender's approval of any such cash management arrangement may be conditioned upon requiring Borrower to enter into a lockbox agreement or similar cash management arrangement with Lender in form and substance acceptable to Lender with regard to Rents and other income from the Mortgaged Property.

# ARTICLE 5 - THE MORTGAGE LOAN

**Section 5.01**    **Representations and Warranties.**

The representations and warranties made by Borrower to Lender in this Section 5.01 are made as of the Effective Date and are true and correct except as disclosed on the Exceptions to Representations and Warranties Schedule.

**(a)**    **Receipt and Review of Loan Documents.**

Borrower has received and reviewed this Loan Agreement and all of the other Loan Documents.

**(b)**    **No Default.**

No default exists under any of the Loan Documents.

**(c)**    **No Defenses.**

The Loan Documents are not currently subject to any right of rescission, set-off, counterclaim, or defense by either Borrower or Guarantor, including the defense of usury, and neither Borrower nor Guarantor has asserted any right of rescission, set-off, counterclaim, or defense with respect thereto.

**(d)** **Loan Document Taxes.**

All mortgage, mortgage and lease recording, stamp, intangible, or any other similar taxes required to be paid by any Person under applicable law currently in effect in connection with the execution, delivery, recordation, filing, registration, perfection, or enforcement of any of the Loan Documents, including the Security Instrument, or the Master Lease Documents have been paid or will be paid in the ordinary course of the closing of the Mortgage Loan.

**Section 5.02** **Covenants.**

**(a)** **Ratification of Covenants; Estoppels; Certifications.**

Borrower shall:

(1)     promptly notify Lender in writing upon any violation of any covenant set forth in any Loan Document of which Borrower has notice or knowledge; provided, however, any such written notice by Borrower to Lender shall not relieve Borrower of, or result in a waiver of, any obligation under this Loan Agreement or any other Loan Document; and

(2)     within ten (10) days after a request from Lender, provide a written statement, signed and acknowledged by Borrower, together with such corresponding certifications from Master Lessee as Lender may request, certifying to Lender or any person designated by Lender, as of the date of such statement:

(A)     that the Loan Documents are unmodified and in full force and effect (or, if there have been modifications, that the Loan Documents are in full force and effect as modified and setting forth such modifications);

(B)     the unpaid principal balance of the Mortgage Loan;

(C)     the date to which interest on the Mortgage Loan has been paid;

(D)     that Borrower is not in default in paying the Indebtedness, or in performing or observing any of the covenants or agreements contained in this Loan Agreement or any of the other Loan Documents (or, if Borrower is in default, describing such default in reasonable detail);

(E)     whether or not there are then-existing any setoffs or defenses known to Borrower against the enforcement of any right or remedy of Lender under the Loan Documents; and

(F)     any additional facts reasonably requested in writing by Lender.

**(b)**     **Further Assurances.**

**(1)**     **Other Documents As Lender May Require.**

Within ten (10) days after request by Lender, Borrower shall, subject to Section 5.02(d) below, execute, acknowledge, and deliver, at its cost and expense, all further acts, deeds, conveyances, assignments, financing statements, transfers, documents, agreements, assurances, and such other instruments as Lender may reasonably require from time to time in order to better assure, grant, and convey to Lender the rights intended to be granted, now or in the future, to Lender under this Loan Agreement and the other Loan Documents.

**(2)**     **Corrective Actions.**

Within ten (10) days after request by Lender, Borrower shall provide, or cause to be provided, to Lender, at Borrower's cost and expense, such further documentation or information reasonably deemed necessary or appropriate by Lender in the exercise of its rights under the related commitment letter between Borrower and Lender or to correct patent mistakes in the Loan Documents, the Title Policy, or the funding of the Mortgage Loan.

**(c)**     **Sale of Mortgage Loan.**

Borrower shall, subject to Section 5.02(d) below:

**(1)**     comply with the reasonable requirements of Lender or any Investor of the Mortgage Loan or provide, or cause to be provided, to Lender or any Investor of the Mortgage Loan within ten (10) days of the request, at Borrower's cost and expense, such further documentation or information as Lender or Investor may reasonably require, in order to enable:

**(A)**     Lender to sell the Mortgage Loan to such Investor;

**(B)**     Lender to obtain a refund of any commitment fee from any such Investor; or

**(C)**     any such Investor to further sell or securitize the Mortgage Loan;

**(2)**     ratify and affirm in writing the representations and warranties set forth in any Loan Document as of such date specified by Lender modified as necessary to reflect changes that have occurred subsequent to the Effective Date;

**(3)**     confirm that Borrower is not in default in paying the Indebtedness or in performing or observing any of the covenants or agreements contained in this Loan Agreement or any of the other Loan Documents (or, if Borrower is in default, describing such default in reasonable detail); and

(4)    execute and deliver to Lender and/or any Investor such other documentation, including any amendments, corrections, deletions, or additions to this Loan Agreement or other Loan Document(s) as is reasonably required by Lender or such Investor.

**(d)    Limitations on Further Acts of Borrower.**

Nothing in Section 5.02(b) and Section 5.02(c) shall require Borrower to do any further act that has the effect of:

(1)    changing the economic terms of the Mortgage Loan set forth in the related commitment letter between Borrower, Affiliated Master Lessee, and Lender;

(2)    imposing on Borrower, Affiliated Master Lessee, or Guarantor greater personal liability under the Loan Documents than that set forth in the related commitment letter between Borrower and Lender; or

(3)    materially changing the rights and obligations of Borrower, Affiliated Master Lessee, or Guarantor under the commitment letter.

**(e)    Financing Statements; Record Searches.**

(1)    Borrower shall pay all costs and expenses associated with:

(A)    any filing or recording of any financing statements, including all continuation statements, termination statements, and amendments or any other filings related to security interests in or liens on collateral; and

(B)    any record searches for financing statements that Lender may require.

(2)    Borrower hereby authorizes Lender (and represents and warrants that the Master Lease authorizes Borrower) to file any financing statements, continuation statements, termination statements, and amendments (including an "all assets" or "all personal property" collateral description or words of similar import) in form and substance as Lender may require in order to protect and preserve Lender's lien priority and security interest in the Mortgaged Property (and to the extent Lender has filed any such financing statements, continuation statements, or amendments prior to the Effective Date, such filings by Lender are hereby authorized and ratified by Borrower, and are permitted under the terms of the Master Lease).

**(f)    Loan Document Taxes.**

Borrower shall pay, on demand, any transfer taxes, documentary taxes, assessments, or charges made by any Governmental Authority in connection with the execution, delivery, recordation, filing, registration, perfection, or enforcement of any of the Loan Documents, the Master Lease Documents or the Mortgage Loan.

# ARTICLE 6 - PROPERTY USE, PRESERVATION, AND MAINTENANCE

**Section 6.01** **Representations and Warranties.**

The representations and warranties made by Borrower to Lender in this Section 6.01 are made as of the Effective Date and are true and correct except as disclosed on the Exceptions to Representations and Warranties Schedule.

**(a)** **Compliance with Law; Permits and Licenses.**

(1) To Borrower's knowledge, all improvements to the Land and the use of the Mortgaged Property comply with all applicable laws, ordinances, statutes, rules, and regulations, including all applicable statutes, rules, and regulations pertaining to requirements for equal opportunity, anti-discrimination, fair housing, and rent control, and Borrower has no knowledge of any action or proceeding (or threatened action or proceeding) regarding noncompliance or nonconformity with any of the foregoing.

(2) To Borrower's knowledge, there is no evidence of any illegal activities on the Mortgaged Property.

(3) To Borrower's knowledge, no permits or approvals from any Governmental Authority, other than those previously obtained and furnished to Lender, are necessary for the commencement and completion of the Repairs or Replacements, as applicable, other than those permits or approvals which will be timely obtained in the ordinary course of business.

(4) All required permits, licenses, and certificates to comply with all zoning and land use statutes, laws, ordinances, rules, and regulations, and all applicable health, fire, safety, and building codes, and for the lawful use and operation of the Mortgaged Property, including certificates of occupancy, apartment licenses, or the equivalent, have been obtained and are in full force and effect.

(5) No portion of the Mortgaged Property has been purchased with the proceeds of any illegal activity.

**(b)** **Property Characteristics.**

(1) The Mortgaged Property contains at least:

(A) the Property Square Footage;

(B) the Total Parking Spaces; and

(C) the Total Residential Units.

(2)      No part of the Land is included or assessed under or as part of another tax lot or parcel, and no part of any other property is included or assessed under or as part of the tax lot or parcels for the Land.

**(c)      Property Ownership.**

The entire Mortgaged Property is owned by or leased to Borrower or Master Lessee.

**(d)      Condition of the Mortgaged Property.**

(1)      Borrower has not made any claims, and to Borrower's knowledge, no claims have been made, against any contractor, engineer, architect, or other party with respect to the construction or condition of the Mortgaged Property or the existence of any structural or other material defect therein; and

(2)      neither the Land nor the Improvements has sustained any damage other than damage which has been fully repaired, or is fully insured and is being repaired in the ordinary course of business.

**(e)      Personal Property.**

All Personal Property that is material to and is used in connection with the management, ownership, and operation of the Mortgaged Property is:

(1)      owned by Borrower (or, to the extent disclosed on the Exceptions to Representations and Warranties Schedule, leased by Borrower, other than as lessor pursuant to the Master Lease); or

(2)      as applicable, leased by Master Lessee pursuant to the Master Lease (except as disclosed on the Exceptions to Representations and Warranties Schedule).

**(f)      Master Lease Fees.**

Notwithstanding anything contained herein to the contrary, Borrower represents and warrants that there are no fees due and payable to the Master Lessee in connection with the operation and management of the Mortgaged Property.

**Section 6.02      Covenants**

**(a)      Use of Property.**

From and after the Effective Date, Borrower shall not, unless required by applicable law or Governmental Authority:

(1)      change the use of all or any part of the Mortgaged Property;

(2)     convert any individual dwelling units or common areas to commercial use, or convert any common area or commercial use to individual dwelling units;

(3)     initiate or acquiesce in a change in the zoning classification of the Land;

(4)     establish any condominium or cooperative regime with respect to the Mortgaged Property;

(5)     subdivide the Land; or

(6)     suffer, permit, or initiate the joint assessment of any Mortgaged Property with any other real property constituting a tax lot separate from such Mortgaged Property which could cause the part of the Land to be included or assessed under or as part of another tax lot or parcel, or any part of any other property to be included or assessed under or as part of the tax lot or parcels for the Land.

**(b)     Property Maintenance.**

Borrower shall:

(1)     pay the expenses of operating, managing, maintaining, and repairing the Mortgaged Property (including insurance premiums, utilities, Repairs, and Replacements) before the last date upon which each such payment may be made without any penalty or interest charge being added;

(2)     keep the Mortgaged Property in good repair and marketable condition (ordinary wear and tear excepted) (including the replacement of Personalty and Fixtures with items of equal or better function and quality) and subject to Section 9.03(b)(3) and Section 10.03(d) restore or repair promptly, in a good and workmanlike manner, any damaged part of the Mortgaged Property to the equivalent of its original condition or condition immediately prior to the damage (if improved after the Effective Date), whether or not any insurance proceeds or amounts received in connection with a Condemnation Action are available to cover any costs of such restoration or repair;

(3)     commence all Required Repairs, Additional Lender Repairs, and Additional Lender Replacements as follows:

(A)     with respect to any Required Repairs, promptly following the Effective Date (subject to Force Majeure, if applicable), in accordance with the timelines set forth on the Required Repair Schedule, or if no timelines are provided, as soon as practical following the Effective Date;

(B)     with respect to Additional Lender Repairs, in the event that Lender determines that Additional Lender Repairs are necessary from time to time or pursuant to Section 6.03(c), promptly following Lender's written notice of such Additional Lender Repairs (subject to Force Majeure, if applicable), commence

any such Additional Lender Repairs in accordance with Lender's timelines, or if no timelines are provided, as soon as practical;

(C)     with respect to Additional Lender Replacements, in the event that Lender determines that Additional Lender Replacements are necessary from time to time or pursuant to Section 6.03(c), promptly following Lender's written notice of such Additional Lender Replacements (subject to Force Majeure, if applicable), commence any such Additional Lender Replacements in accordance with Lender's timelines, or if no timelines are provided, as soon as practical;

(4)     make, construct, install, diligently perform, and complete all Replacements and Repairs:

(A)     in a good and workmanlike manner as soon as practicable following the commencement thereof, free and clear of any Liens, including mechanics' or materialmen's liens and encumbrances (except Permitted Encumbrances and mechanics' or materialmen's liens which attach automatically under the laws of any Governmental Authority upon the commencement of any work upon, or delivery of any materials to, the Mortgaged Property and for which Borrower is not delinquent in the payment for any such work or materials);

(B)     in accordance with all applicable laws, ordinances, rules, and regulations of any Governmental Authority, including applicable building codes, special use permits, and environmental regulations;

(C)     in accordance with all applicable insurance and bonding requirements; and

(D)     within all timeframes required by Lender, and Borrower acknowledges that it shall be an Event of Default if Borrower abandons or ceases work on any Repair at any time prior to the completion of the Repairs for a period of longer than twenty (20) days (except when Force Majeure exists and Borrower is diligently pursuing the reinstitution of such work, provided, however, any such abandonment or cessation shall not in any event allow the Repair to be completed after the Completion Period, subject to Force Majeure); and

(5)     subject to the terms of Section 6.03(a), provide for professional operation and management of the Mortgaged Property by a residential rental property manager satisfactory to Lender under a contract approved by Lender in writing;

(6)     give written notice to Lender of, and, unless otherwise directed in writing by Lender, appear in and defend any action or proceeding purporting to affect the Mortgaged Property, Lender's security for the Mortgage Loan, or Lender's rights under this Loan Agreement; and

(7)    upon Lender's written request, submit to Lender any contracts or work orders described in Section 13.02(b).

**(c)    Property Preservation.**

Borrower shall:

(1)    not commit waste or abandon or (ordinary wear and tear excepted) permit impairment or deterioration of the Mortgaged Property;

(2)    except as otherwise permitted herein in connection with Repairs and Replacements, not remove, demolish, or alter the Mortgaged Property or any part of the Mortgaged Property (or permit any tenant or any other person to do the same) except in connection with the replacement of tangible Personalty or Fixtures (provided such Personalty and Fixtures are replaced with items of equal or better function and quality);

(3)    not engage in or knowingly permit, and shall take appropriate measures to prevent and abate or cease and desist, any illegal activities at the Mortgaged Property that could endanger tenants or visitors, result in damage to the Mortgaged Property, result in forfeiture of the Land or otherwise materially impair the lien created by the Security Instrument or Lender's interest in the Mortgaged Property;

(4)    not permit any condition to exist on the Mortgaged Property that would invalidate any part of any insurance coverage required by this Loan Agreement; or

(5)    not subject the Mortgaged Property to any voluntary, elective, or non-compulsory tax lien or assessment (or opt in to any voluntary, elective, or non-compulsory special tax district or similar regime).

**(d)    Property Inspections.**

Borrower shall:

(1)    permit Lender, its agents, representatives, and designees to enter upon and inspect the Mortgaged Property (including in connection with any Replacement or Repair, or to conduct any Environmental Inspection pursuant to the Environmental Indemnity Agreement), and shall cooperate and provide access to all areas of the Mortgaged Property (subject to the rights of tenants under the Leases, other than the Master Lease):

(A)    during normal business hours;

(B)    at such other reasonable time upon reasonable notice of not less than one (1) Business Day;

(C)    at any time when exigent circumstances exist; or

(D)   at any time after an Event of Default has occurred and is continuing; and

(2)   pay for reasonable costs or expenses incurred by Lender or its agents in connection with any such inspections.

**(e)   Compliance with Laws.**

Borrower shall:

(1)   comply with all laws, ordinances, statutes, rules, and regulations of any Governmental Authority and all recorded lawful covenants and agreements relating to or affecting the Mortgaged Property, including all laws, ordinances, statutes, rules and regulations, and covenants pertaining to construction of improvements on the Land, fair housing, and requirements for equal opportunity, anti-discrimination, and Leases;

(2)   procure and maintain all required permits, licenses, charters, registrations, and certificates necessary to comply with all zoning and land use statutes, laws, ordinances, rules and regulations, and all applicable health, fire, safety, and building codes and for the lawful use and operation of the Mortgaged Property, including certificates of occupancy, apartment licenses, or the equivalent;

(3)   comply with all applicable laws that pertain to the maintenance and disposition of tenant security deposits;

(4)   at all times maintain records sufficient to demonstrate compliance with the provisions of this Section 6.02(e); and

(5)   promptly after Borrower's or Master Lessee's receipt or notification thereof, provide Lender copies of any building code or zoning violation from any Governmental Authority with respect to the Mortgaged Property.

**(f)   All Representations and Covenants Deemed Borrower Responsibility.**

(1)   Any act, action, term, condition, provision, requirement, representation, or covenant required to be made or performed, or prohibited from being made or performed, by Borrower under the Loan Documents including with respect to

(A)   the use, management or operation of the Mortgaged Property, including any licensing, repair, reporting, or insurance requirements, and

(B)   the organization, existence, good standing or other entity-level requirements, shall be interpreted as requiring Borrower either to perform such act or action directly or to cause Master Lessee, a property manager or other appropriate agent to perform such act or action. Any right or privilege assigned or delegated by Borrower or Master Lessee to any other Person shall be construed

as being accompanied by each relevant obligation or restriction set forth in the Loan Documents or the Master Lease Documents, as applicable.

(2)      Whether in the Master Lease or otherwise, as applicable, Borrower shall set forth with specificity (i) any obligation under the Loan Documents that is to be performed by another Person, and (ii) any prohibition or restriction in the Loan Documents that shall be observed by another Person.  No such Person to which any obligation is delegated nor any restriction imposed shall be entitled to make a claim against Lender, or set forth as a defense against any action by Lender (and Borrower shall include a waiver of the same in the operative instrument of delegation) (1) the fact that such operative instrument failed to include certain relevant terms and conditions of the Loan Documents, or (2) any claim or defense that is not available to Borrower nor would be available to Borrower if Borrower were the day-to-day operator of the Mortgaged Property.

(3)      In each instance that Borrower makes, or in the future renews or is deemed to renew, a representation, warranty, or covenant in this Loan Agreement or the other Loan Documents regarding the condition, knowledge, acts, or omissions of Master Lessee or any Master Lessee Business Information, or the condition of the Mortgaged Property, Borrower does and shall do so with full knowledge, after due inquiry (including the due inquiry of and by Guarantor), of such information, and Borrower shall, as appropriate (or at Lender's request), obtain corresponding representations, warranties, and certifications from Master Lessee, in the Master Lease or otherwise, or from Guarantor.  Any reporting or compliance delay caused by Master Lessee or Guarantor shall not excuse Borrower's timely performance of the terms of this Loan Agreement or the other Loan Documents.  Borrower acknowledges and agrees that Borrower's reliance upon incorrect or incomplete information received from Master Lessee or Guarantor and the reporting of the same to Lender, whether or not Borrower had actual knowledge that such information was incorrect or incomplete and whether or not Borrower is otherwise in violation of the terms of this Loan Agreement, shall not be (and none of Borrower, Master Lessee, Guarantor, nor Key Principal shall assert) a defense to Lender's determination that an Event of Default has occurred or that Borrower (or Guarantor) has incurred personal liability as set forth in Article 3 of this Loan Agreement.

**Section 6.03      Mortgage Loan Administration Matters Regarding the Property.**

**(a)      Property Management.**

From and after the Effective Date, each property manager and each property management agreement must be approved by Lender.  If, in connection with the making of the Mortgage Loan, or at any later date, Lender waives in writing the requirement for a written contract for management of the Mortgaged Property, and Borrower or Master Lessee later elects to enter into a written contract or change the management of the Mortgaged Property, such new property manager or the property management agreement must be approved by Lender.  As a condition to any approval by Lender, Lender may require that Borrower and such new property manager enter into a collateral assignment of the property management agreement on a form approved by

Lender.  For any such property management agreement entered into by Master Lessee rather than Borrower, (1) Master Lessee shall assign its rights under such property management agreement to Borrower as security for Master Lessee's obligations under the Master Lease Documents, and (2) Borrower shall collaterally assign its rights under such assignment from Master Lessee to Lender as security for Borrower's obligations under this Loan Agreement.

**(b)**    **Subordination of Fees to Affiliated Property Managers; Affiliated Master Lessee.**

(1)    If Borrower engages the property manager, any property manager that is a Borrower Affiliate or an Affiliate of Master Lessee to whom fees are payable for the management of the Mortgaged Property must enter into an assignment of management agreement or other agreement with Lender, in a form approved by Lender, providing for subordination of those fees and such other provisions as Lender may require. If Master Lessee engages the property manager, Master Lessee shall assign its rights under such property management agreement to Borrower as security for Master Lessee's obligations under the Master Lease Documents on substantially the same terms as the initial agreement entered into by Borrower, Master Lessee, and property manager in connection with the closing of the Mortgage Loan.

(2)    All fees due to an Affiliated Master Lessee in connection with the operation and management of the Mortgaged Property shall be subordinated in right to the prior payment in full of the Indebtedness.

**(c)**    **Property Condition Assessment.**

If, in connection with any inspection of the Mortgaged Property, Lender determines that the condition of the Mortgaged Property has deteriorated (ordinary wear and tear excepted) since the Effective Date, Lender may obtain, at Borrower's expense, a property condition assessment of the Mortgaged Property.  Lender's right to obtain a property condition assessment pursuant to this Section 6.03(c) shall be in addition to any other rights available to Lender under this Loan Agreement in connection with any such deterioration.  Any such inspection or property condition assessment may result in Lender requiring Additional Lender Repairs or Additional Lender Replacements as further described in Section 13.02(a)(9).

# ARTICLE 7 - LEASES AND RENTS

**Section 7.01**    **Representations and Warranties.**

The representations and warranties made by Borrower to Lender in this Section 7.01 are made as of the Effective Date and are true and correct except as disclosed on the Exceptions to Representations and Warranties Schedule.

(a)     **Prior Assignment of Rents.**

    (1)     Borrower has not executed any:

        (A)     prior assignment of Rents (other than (x) an assignment of Rents securing prior indebtedness that has been paid off and discharged or will be paid off and discharged with the proceeds of the Mortgage Loan or (y) any such assignment pursuant to the Master Lease Documents); or

        (B)     instrument which would prevent Lender from exercising its rights under this Loan Agreement or the Security Instrument.

    (2)     Master Lessee has not executed any prior assignment of Rents other than the Tenant/Landlord Subordination and Assignment Agreement or another assignment to Borrower, which assignment is being collaterally assigned to Lender in connection with this Loan Agreement.

(b)     **Prepaid Rents.**

Borrower has not accepted, and does not expect to receive prepayment of, any Rents for more than two (2) months or one (1) month for the Master Lease prior to the due dates of such Rents.

(c)     **Master Lease.**

    (1)     The Master Lease is in full force and effect and there is neither a default thereunder nor any condition that, with the passage of time or the giving of notice, or both, would constitute a default thereunder. No right or claim of rescission, offset, abatement, diminution, defense, or counterclaim has been asserted with respect to the Master Lease, and there is no existing condition that, with the passage of time or giving of notice, or both, would result in a right or claim of rescission, offset, abatement, diminution, defense, or counterclaim under the terms and provisions of the Master Lease. Borrower has performed and discharged all of the obligations on the part of Borrower to be performed and discharged pursuant to the terms set forth in the Master Lease.

    (2)     The Master Lease has not been modified, amended or supplemented by either party thereto. The Master Lessee has not been released, in whole or in part, from any of its obligations under the Master Lease. There has been no prior sale, transfer, assignment, hypothecation, or pledge of the Master Lease (other than in connection with the Loan Documents) that is outstanding.

    (3)     The Master Lease has an original term ending on or after the date ninety (90) days after the Maturity Date. Absent Lender's direction or as otherwise set forth in the Loan Documents, the Master Lessee cannot terminate the Master Lease for any reason prior to the payment in full of the Indebtedness.

(4)     There is no free rent, partial rent or rebate of rent required to be given by Borrower to Master Lessee under the Master Lease.  The Master Lease does not permit Master Lessee to accept, and Master Lessee has not accepted, prepayment of Rents more than two (2) months in advance (and Borrower has not accepted prepayment of Rents more than one (1) month in advance with respect to the Master Lease).  Each payment of Master Lease Basic Rent due under the Master Lease is sufficient to pay the Debt Service Amounts (including Monthly Debt Service Payments, Taxes, Impositions, and any Replacement Reserve Deposits) in full on or prior to the due date thereof (without giving effect to any applicable grace periods) currently and throughout the term of the Mortgage Loan.  The Master Lease Basic Rent is payable without notice or demand, and without setoff, recoupment, abatement, or reduction.

(5)     Master Lessee has no right or option pursuant to the Master Lease Documents or otherwise to purchase all or any part of the Mortgaged Property, the leased premises or the building of which the leased premises are a part.

(6)     The Master Lease contains customary and enforceable provisions that render the rights and remedies of Borrower adequate for the enforcement and satisfaction of Borrower's rights thereunder.

(7)     The Master Lease is subject and subordinate in all respects to the liens, terms, covenants and conditions of the Security Instrument and the other Loan Documents, and to all renewals, modifications, consolidations, replacements and extensions thereof, and to all advances heretofore made pursuant to the Note, this Loan Agreement, the Security Instrument and the other Loan Documents (including all sums advanced for the purposes of (A) protecting or further securing the lien of the Security Instrument, curing defaults by Borrower under the Loan Documents, or for any other purposes expressly permitted by this Loan Agreement, the Security Instrument or the other Loan Documents, or (B) constructing, renovating, repairing, furnishing, or equipping the Mortgaged Property).

(8)     Borrower represents and warrants that it is the express intent of Borrower and Master Lessee that the Master Lease constitute a lease under applicable real property laws and laws governing bankruptcy, insolvency, and creditors' rights generally, and that the sole interest of Master Lessee in the Mortgaged Property is as a tenant under the Master Lease.  The Master Lease is not intended to be deemed a guaranty.

**Section 7.02     Covenants.**

**(a)     Leases.**

Borrower shall:

(1)     comply with and observe all landlord obligations under all Leases, including landlord's obligations pertaining to the maintenance and disposition of any tenant security deposits or any other refundable fees;

(2)       surrender possession of the Mortgaged Property, including all Leases, and all security deposits and prepaid Rents, immediately upon appointment of a receiver or Lender's entry upon and taking of possession and control of the Mortgaged Property, as applicable;

(3)       require that all Residential Leases have initial lease terms of not less than six (6) months and not more than twenty-four (24) months (however, if customary in the applicable market for properties comparable to the Mortgaged Property, Residential Leases with terms of less than six (6) months (but in no case less than one (1) month) may be permitted with Lender's prior written consent); and

(4)       promptly provide Lender a copy of any non-Residential Lease at the time such Lease is executed (subject to Lender's consent rights for Material Commercial Leases in Section 7.02(b) and subject to Lender's consent rights with respect to any Master Lessee or Master Lease Documents provided for herein) and, upon Lender's written request, promptly provide Lender a copy of any Residential Lease then in effect.

**(b)       Commercial Leases.**

(1)       With respect to Material Commercial Leases, Borrower shall not:

(A)       enter into any Material Commercial Lease except with the prior written consent of Lender; or

(B)       modify the terms of, extend, or terminate any Material Commercial Lease (including any Material Commercial Lease in existence on the Effective Date) without the prior written consent of Lender.

(2)       With respect to any non-Material Commercial Lease, Borrower shall not:

(A)       enter into any non-Material Commercial Lease that materially alters the use and type of operation of the premises subject to the Lease in effect as of the Effective Date or reduces the number or size of residential units at the Mortgaged Property; or

(B)       modify the terms of any non-Material Commercial Lease (including any non-Material Commercial Lease in existence on the Effective Date) in any way that materially alters the use and type of operation of the premises subject to such non-Material Commercial Lease in effect as of the Effective Date, reduces the number or size of residential units at the Mortgaged Property, or results in such non-Material Commercial Lease being deemed a Material Commercial Lease.

(3)       With respect to any Material Commercial Lease or non-Material Commercial Lease, Borrower shall cause the applicable tenant to provide within ten (10) days after a request by Borrower, a certificate of estoppel, or if not provided by tenant

within such ten (10) day period, Borrower shall provide such certificate of estoppel certifying:

      (A)    that such Material Commercial Lease or non-Material Commercial Lease is unmodified and in full force and effect (or if there have been modifications, that such Material Commercial Lease or non-Material Commercial Lease is in full force and effect as modified and stating the modifications);

      (B)    the term of the Lease including any extensions thereto;

      (C)    the dates to which the Rent and any other charges hereunder have been paid by tenant;

      (D)    the amount of any security deposit delivered to Borrower as landlord;

      (E)    whether or not Borrower is in default (or whether any event or condition exists which, with the passage of time, would constitute an event of default) under such Lease;

      (F)    the address to which notices to tenant should be sent; and

      (G)    any other information as may be reasonably required by Lender.

**(c)**    **Payment of Rents.**

Borrower shall:

      (1)    pay to Lender upon demand all Rents after an Event of Default has occurred and is continuing;

      (2)    cooperate with Lender's efforts in connection with the assignment of Rents set forth in the Security Instrument and the enforcement of the assignment of rents from Master Lessee; and

      (3)    not accept Rent under any Lease (whether a Residential Lease or non-Residential Lease) for more than two (2) months or one (1) month for the Master Lease in advance; provided, however, that Rents for up to seven and fifty hundredths percent (7.50%) of the residential units may be paid more than two (2) months but not in excess of twelve (12) months prior to the due dates of such Rents.

**(d)    Assignment of Rents.**

Borrower shall not:

 (1)    perform any acts nor execute any instrument that would prevent Lender from exercising its rights under the assignment of Rents granted in the Security Instrument or in any other Loan Document; nor

 (2)    interfere with Lender's collection of such Rents.

**(e)    Further Assignments of Leases and Rents.**

Borrower shall execute and deliver any further assignments of Leases and Rents as Lender may reasonably require, and shall require Master Lessee to execute and deliver any corresponding assignments in support thereof.

**(f)    Options to Purchase by Tenants.**

No Lease (whether a Residential Lease or a non-Residential Lease) shall contain an option to purchase, right of first refusal to purchase, or right of first offer to purchase, except as otherwise required by applicable law.

**(g)    Special Covenants Regarding Master Lease Documents.**

**(1)    Master Lease.**

 (A)    Borrower shall:

  (i)    at all times fully perform, observe, and comply with all terms, covenants, and conditions of the Master Lease to be performed, observed, or complied with by Borrower as lessor under the Master Lease and do all things necessary to preserve and to keep unimpaired its rights thereunder;

  (ii)    deliver to Lender, within five (5) days after Borrower's receipt, a true and correct copy of each written notice, demand, complaint, or request from Master Lessee under, or with respect to, the Master Lease;

  (iii)    simultaneously deliver to Lender a true and correct copy of each written notice, demand, complaint, or request that Borrower sends to Master Lessee under, or with respect to, the Master Lease;

  (iv)    to the extent not otherwise covered in Article 8 of this Loan Agreement, upon written request from Lender, deliver to Lender a copy of all business plans received by Borrower and any other information reasonably requested by Lender;

(v)      enforce the terms, covenants and conditions contained in the Master Lease; and

(vi)     provide Master Lessee with written notice of any changes to Monthly Debt Service Payments, Imposition Deposits, Monthly Replacement Reserve Deposits, or any other amounts due under the Loan Documents.

(B)      Borrower shall not:

(i)      modify, amend, supplement, or restate the Master Lease either orally or in writing;

(ii)     waive any of Borrower's rights or fail to diligently pursue Borrower's remedies under the Master Lease; or

(iii)    violate the provisions of Section 11.02(c).

If, pursuant to the Master Lease, Master Lessee requests (1) the consent of Borrower (in its capacity as lessor under the Master Lease) or Borrower's designee to any matter as to which, pursuant to the Master Lease, Borrower has discretion as to whether or not to grant its consent, (2) a waiver of any covenant or obligation of Master Lessee under the Master Lease, or (3) a modification of the terms of the Master Lease (any of the foregoing, a "**Master Lease Request**"), Borrower shall give Lender prompt written notice of such Master Lease Request (together with such supporting information as may reasonably be required to consider such Master Lease Request, and such other information as Lender may reasonably request).  Borrower shall not approve or consent to any Master Lease Request unless Lender has approved and consented in writing to such Master Lease Request.

(C)      The Master Lease shall:

(i)      be subject and subordinate in all respects to the liens, terms, covenants and conditions of the Security Instrument and the other Loan Documents, and to all renewals, modifications, consolidations, replacements and extensions thereof, and to all advances which may hereafter be made pursuant to the Note, this Loan Agreement, the Security Instrument and the other Loan Documents (including all sums advanced for the purposes of (1) protecting or further securing the lien of the Security Instrument, curing defaults by Borrower under the Loan Documents, or for any other purposes expressly permitted by this Loan Agreement, the Security Instrument or the other Loan Documents, or (2) constructing, renovating, repairing, furnishing, fixturing, or equipping the Mortgaged Property); and

(ii)     provide that, in the event it shall be determined that the Master Lease is not a lease under applicable real property laws or under

DMEAST #23702427 v9
**Multifamily Loan and Security Agreement
(Non-Recourse) (Master Lease)**
Article 7

Form 6001.NR.ML
10-15

**Page 41**
© 2015 Fannie Mae

laws governing bankruptcy, insolvency, and creditors' rights generally, and that the interest of Master Lessee in the Mortgaged Property is other than that of tenant under the Master Lease, then the Master Lessee's interest in the Mortgaged Property, however characterized, shall continue to be subject and subordinate to the lien, terms, and conditions of the Security Instrument, and Borrower's fee interest in the Mortgaged Property, on all the same terms and conditions as contained in the Master Lease as of the Effective Date.

(D)     The Master Lease shall provide that Borrower shall continue to have complete access throughout the Loan Term to the organizational, financial, and operational information and documentation of Master Lessee in every respect as it relates to the Mortgage Loan, the Mortgaged Property, and the Master Lease Documents (collectively, the **"Master Lessee Business Information"**). Borrower shall continue to be fully informed regarding the Master Lessee Business Information to the same extent as if Borrower were the day-to-day operator of the Mortgaged Property and the business activities thereon.

**(2)     Master Lease Documents (other than the Master Lease).**

(A)     Borrower shall not allow any (other than with respect to the Master Lease, which is addressed above):

(i)     modification, amendment, supplement, or restatement any Master Lease Document;

(ii)     termination of any Master Lease Document;

(iii)     waiver of a default under any Master Lease Document;

(iv)     assignment of its rights or interests under any Master Lease Document; or

(v)     Transfer of any Master Lease Document.

(B)     Within five (5) days after Borrower receives notice, Borrower shall give Lender written notice (along with a copy of any notice or information received by Borrower) that (i) either Borrower or Master Lessee is in default under any Master Lease Document, or (ii) Master Lessee desires to amend, modify, surrender, or terminate any Master Lease Document.

(C)     After Borrower receives notice (or otherwise has actual knowledge) of an Event of Default, it will not make any payment of fees (or other amounts) under or pursuant to the Master Lease Documents without Lender's prior written consent.

DMEAST #23702427 v9
**Multifamily Loan and Security Agreement
(Non-Recourse) (Master Lease)**
Article 7

Form 6001.NR.ML
10-15

Page 42
© 2015 Fannie Mae

(3)     **Master Lease Estoppel.**

With respect to any Master Lease, Borrower shall cause Master Lessee to provide as of the Effective Date (and, after the Effective Date, within ten (10) days after a request by Borrower), a Master Lessee Estoppel Certificate, or if not provided by Master Lessee within such ten (10) day period, Borrower shall provide a certificate of estoppel (and the Master Lease shall so empower Borrower as Master Lessee's attorney-in-fact) substantially in the form of the Master Lessee Estoppel Certificate.

(4)     **Master Lease Structure Indemnification.**

Lender's agreement to permit Borrower to lease the Mortgaged Property pursuant to the Master Lease is solely as an accommodation to Borrower and Master Lessee and is at their request.  In consideration of Lender's consent to the Master Lease (A) Lender shall not incur liability to Borrower, Master Lessee, Key Principal or Guarantor as a result thereof, and (B) Borrower hereby indemnifies Lender and holds Lender harmless from and against any and all actions, suits, claims, demands, liabilities, losses, damages, obligations and costs or expenses, including litigation costs and reasonable attorneys' fees arising from or incurred in connection with Master Lessee handling all aspects of the operation of the Mortgaged Property pursuant to the Master Lease and matters related to the Mortgage Loan arising from the Master Lease, including reliance by Lender on any request or instruction from Master Lessee or any other action taken by Lender with respect to this Section 7.02(g).

**Section 7.03     Mortgage Loan Administration Regarding Leases and Rents.**

(a)     **Material Commercial Lease Requirements.**

Each Material Commercial Lease, including any renewal or extension of any Material Commercial Lease in existence as of the Effective Date, shall provide, directly or pursuant to a subordination, non-disturbance and attornment agreement approved by Lender, that:

(1)     the tenant shall, upon written notice from Lender after the occurrence of an Event of Default, pay all Rents payable under such Lease to Lender;

(2)     such Lease and all rights of the tenant thereunder are expressly subordinate to the lien of the Security Instrument;

(3)     the tenant shall attorn to Lender and any purchaser at a Foreclosure Event (such attornment to be self-executing and effective upon acquisition of title to the Mortgaged Property by any purchaser at a Foreclosure Event or by Lender in any manner);

(4)     the tenant agrees to execute such further evidences of attornment as Lender or any purchaser at a Foreclosure Event may from time to time request; and

(5)      such Lease shall not terminate as a result of a Foreclosure Event unless Lender or any other purchaser at such Foreclosure Event affirmatively elects to terminate such Lease pursuant to the terms of the subordination, non-disturbance and attornment agreement.

**(b)      Residential Lease Form.**

All Residential Leases entered into from and after the Effective Date shall be on forms approved by Lender.  Any Lease entered into by Master Lessee will be subject and subordinate to the Master Lease and will not relieve the Master Lessee of its obligations under the Master Lease.

**(c)      Master Lease Structure Consideration.**

The agreements set forth in this Loan Agreement constitute a material portion of the consideration for Lender agreeing to make the Mortgage Loan and permit the Master Lease structure described in the Master Lease Documents.

# ARTICLE 8 - BOOKS AND RECORDS; FINANCIAL REPORTING

**Section 8.01      Representations and Warranties.**

The representations and warranties made by Borrower to Lender in this Section 8.01 are made as of the Effective Date and are true and correct except as disclosed on the Exceptions to Representations and Warranties Schedule.

**(a)      Financial Information.**

All financial statements and data, including statements of cash flow and income and operating expenses, that have been delivered to Lender in respect of the Mortgaged Property:

(1)      are true, complete, and correct in all material respects; and

(2)      accurately represent the financial condition of the Mortgaged Property as of such date.

**(b)      No Change in Facts or Circumstances.**

All information in the Loan Application and in all financial statements, rent rolls, reports, certificates, and other documents submitted in connection with the Loan Application are complete and accurate in all material respects.  There has been no material adverse change in any fact or circumstance that would make any such information incomplete or inaccurate.

**Section 8.02        Covenants.**

**(a)        Obligation to Maintain Accurate Books and Records.**

Borrower shall keep and maintain at all times at the Mortgaged Property, the property management agent's offices, Borrower's General Business Address, or Master Lessee's General Business Address, as applicable, and, upon Lender's written request, shall make available to Lender at the Land:

(1)        complete and accurate books of account and records (including copies of supporting bills and invoices) adequate to reflect correctly the operation of the Mortgaged Property; and

(2)        copies of all written contracts, Leases, and other instruments that affect Borrower, Master Lessee, or the Mortgaged Property.

**(b)        Items to Furnish to Lender.**

Borrower shall furnish to Lender the following, certified as true, complete, and accurate, in all material respects, by an individual having authority to bind Borrower, Master Lessee, or Guarantor, as applicable, in such form and with such detail as Lender reasonably requires:

(1)        within forty-five (45) days after the end of each first, second, and third calendar quarter, a statement of income and expenses for Borrower and Master Lessee on a year-to-date basis as of the end of each calendar quarter; `

(2)        within one hundred twenty (120) days after the end of each calendar year:

(A)        for any Borrower, Master Lessee, and any Guarantor that is an entity, a statement of income and expenses and a statement of cash flows for such calendar year;

(B)        for any Borrower, Master Lessee, and any Guarantor that is an individual or a trust established for estate-planning purposes, a personal financial statement for such calendar year;

(C)        when requested in writing by Lender, balance sheet(s) showing all assets and liabilities of Borrower, Master Lessee, and Guarantor and a statement of all contingent liabilities as of the end of such calendar year;

(D)        if an energy consumption metric is required to be reported for the Mortgaged Property to any Governmental Authority, a statement of the energy consumption metric reported for the Mortgaged Property, as well as the ENERGY STAR® score and/or Source Energy Use Intensity (EUI) for the Mortgaged Property;

(E)        a written certification ratifying and affirming that:

(i)     neither Borrower nor Master Lessee has taken any action in violation of Section 4.02(d) regarding its single asset status;

(ii)    neither Borrower nor Master Lessee has received any notice of any building code violation, or if Borrower, or Master Lessee, has received such notice, evidence of remediation;

(iii)   neither Borrower nor Master Lessee has made any application for rezoning nor received any notice that the Mortgaged Property has been or is being rezoned; and

(iv)    neither Borrower nor Master Lessee has taken any action nor has any knowledge of any action that would violate the provisions of Section 11.02(b)(1)(F) regarding liens encumbering the Mortgaged Property;

(F)     an accounting of all security deposits held pursuant to all Leases, including the name of the institution (if any) and the names and identification numbers of the accounts (if any) in which such security deposits are held and the name of the person to contact at such financial institution, along with any authority or release necessary for Lender to access information regarding such accounts;

(G)     written confirmation of:

(i)     any changes occurring since the Effective Date (or that no such changes have occurred since the Effective Date) in (1) the direct owners of Borrower, (2) the indirect owners (and any non-member managers) of Borrower that Control Borrower (excluding any Publicly-Held Corporations or Publicly-Held Trusts), or (3) the indirect owners of Borrower that hold twenty-five percent (25%) or more of the ownership interests in Borrower (excluding any Publicly-Held Corporations or Publicly-Held Trusts), and their respective interests;

(ii)    the names of all officers and directors of (1) any Borrower which is a corporation, (2) any corporation which is a general partner of any Borrower which is a partnership, or (3) any corporation which is the managing member or non-member manager of any Borrower which is a limited liability company;

(iii)   the names of all managers who are not members of (1) any Borrower which is a limited liability company, (2) any limited liability company which is a general partner of any Borrower which is a partnership, or (3) any limited liability company which is the managing member or non-member manager of any Borrower which is a limited liability company;

(iv)     any changes occurring since the Effective Date (or that no such changes have occurred since the Effective Date) in (1) the direct owners of Affiliated Master Lessee, (2) the indirect owners (and any non-member managers) of Affiliated Master Lessee that Control Affiliated Master Lessee (excluding any Publicly-Held Corporations or Publicly-Held Trusts), or (3) the indirect owners of Affiliated Master Lessee that hold twenty-five percent (25%) or more of the ownership interests in Affiliated Master Lessee (excluding any Publicly-Held Corporations or Publicly-Held Trusts), and their respective interests;

(v)     the names of all officers and directors of (1) any Affiliated Master Lessee that is a corporation, (2) any corporation which is a general partner of any Affiliated Master Lessee which is a partnership, or (3) any corporation which is the managing member or non-member manager of any Master Lessee which is a limited liability company; and

(vi)     the names of all managers who are not members of (1) any Master Lessee which is a limited liability company, (2) any limited liability company which is a general partner of any Affiliated Master Lessee which is a partnership, or (3) any limited liability company which is the managing member or non-member manager of any Affiliated Master Lessee which is a limited liability company; and

(H)     if not already provided pursuant to Section 8.02(b)(2)(A) above, a statement of income and expenses for Borrower's and Master Lessee's operation of the Mortgaged Property on a year-to-date basis as of the end of each calendar year;

(3)     within forty-five (45) days after the end of each first, second, and third calendar quarter and within one hundred twenty (120) days after the end of each calendar year, and at any other time upon Lender's written request, a rent schedule for the Mortgaged Property showing the name of each tenant and for each tenant, the space occupied, the lease expiration date, the rent payable for the current month, the date through which rent has been paid, and any related information requested by Lender; and

(4)     upon Lender's written request (but, absent an Event of Default, no more frequently than once in any six (6) month period):

(A)     any item described in Section 8.02(b)(1) or Section 8.02(b)(2) for Borrower or Master Lessee, certified as true, complete, and accurate by an individual having authority to bind Borrower or Master Lessee, as applicable;

(B)     a property management or leasing report for the Mortgaged Property, showing the number of rental applications received from tenants or prospective tenants and deposits received from tenants or prospective tenants, and any other information requested by Lender;

(C)     a statement of income and expenses for Borrower's or Master Lessee's operation of the Mortgaged Property on a year-to-date basis as of the end of each month for such period as requested by Lender, which statement shall be delivered within thirty (30) days after the end of such month requested by Lender;

(D)     a statement of real estate owned directly or indirectly by Borrower, Affiliated Master Lessee and Guarantor for such period as requested by Lender, which statement(s) shall be delivered within thirty (30) days after the end of such month requested by Lender; and

(E)     a statement that identifies:

(i)     the direct owners of Borrower and Affiliated Master Lessee and their respective interests;

(ii)     the indirect owners (and any non-member managers) of Borrower that Control Borrower (excluding any Publicly-Held Corporations or Publicly-Held Trusts) and their respective interests; and

(iii)     the indirect owners of Borrower that hold twenty-five percent (25%) or more of the ownership interests in Borrower (excluding any Publicly-Held Corporations or Publicly-Held Trusts) and their respective interests;

(iv)     the indirect owners (and any non-member managers) of Affiliated Master Lessee that Control Affiliated Master Lessee (excluding any Publicly-Held Corporations or Publicly-Held Trusts) and their respective interests; and

(v)     the indirect owners of Affiliated Master Lessee that hold twenty-five percent (25%) or more of the ownership interests in Affiliated Master Lessee (excluding any Publicly-Held Corporations or Publicly-Held Trusts) and their respective interests.

**(c)     Audited Financials.**

In the event Borrower, Master Lessee, or Guarantor receives or obtains any audited financial statements and such financial statements are required to be delivered to Lender under Section 8.02(b), Borrower shall deliver or cause to be delivered to Lender the audited versions of such financial statements.

**(d)     Delivery of Books and Records.**

If an Event of Default has occurred and is continuing, Borrower shall deliver to Lender, upon written demand, all books and records relating to the Mortgaged Property or its operation.

**Section 8.03      Mortgage Loan Administration Matters Regarding Books and Records and Financial Reporting.**

    **(a)      Lender's Right to Obtain Audited Books and Records.**

    Lender may require that Borrower's, Master Lessee's (in connection with the operation of the Mortgaged Property), or Guarantor's books and records be audited, at Borrower's expense, by an independent certified public accountant selected by Lender in order to produce or audit any statements, schedules, and reports of Borrower, Master Lessee (in connection with the operation of the Mortgaged Property), Guarantor, or the Mortgaged Property required by Section 8.02, if:

        (1)      Borrower or Guarantor fails to provide in a timely manner the statements, schedules, and reports required by Section 8.02 and, thereafter, Borrower or Guarantor fails to provide such statements, schedules, and reports within the cure period provided in Section 14.01(c);

        (2)      the statements, schedules, and reports submitted to Lender pursuant to Section 8.02 are not full, complete, and accurate in all material respects as determined by Lender and, thereafter, Borrower or Guarantor fails to provide such statements, schedules, and reports within the cure period provided in Section 14.01(c); or

        (3)      an Event of Default has occurred and is continuing.

    Notwithstanding the foregoing, the ability of Lender to require the delivery of audited financial statements shall be limited to not more than once per Borrower's fiscal year so long as no Event of Default has occurred during such fiscal year (or any event which, with the giving of written notice or the passage of time, or both, would constitute an Event of Default has occurred and is continuing).  Borrower shall cooperate with Lender in order to satisfy the provisions of this Section 8.03(a).  All related costs and expenses of Lender shall become immediately due and payable by Borrower within ten (10) Business Days after demand therefor.

    **(b)      Credit Reports; Credit Score.**

    No more often than once in any twelve (12) month period, Lender is authorized to obtain a credit report (if applicable) on each of Borrower, Affiliated Master Lessee, and Guarantor, the cost of which report shall be paid by Borrower.  Lender is authorized to obtain a Credit Score (if applicable) for Borrower, Affiliated Master Lessee, or Guarantor at any time at Lender's expense.

## ARTICLE 9  - INSURANCE

**Section 9.01      Representations and Warranties.**

    The representations and warranties made by Borrower to Lender in this Section 9.01 are made as of the Effective Date and are true and correct except as disclosed on the Exceptions to Representations and Warranties Schedule.

(a)     **Compliance with Insurance Requirements.**

Borrower is in compliance with Lender's insurance requirements (or has obtained a written waiver from Lender for any non-compliant coverage) and has timely paid all premiums on all required insurance policies.

(b)     **Property Condition.**

(1)     The Mortgaged Property has not been damaged by fire, water, wind, or other cause of loss; or

(2)     if previously damaged, any previous damage to the Mortgaged Property has been repaired and the Mortgaged Property has been fully restored.

## Section 9.02     Covenants.

(a)     **Insurance Requirements.**

(1)     As required by Lender and applicable law, and as may be modified from time to time, Borrower shall:

(A)     keep the Improvements insured at all times against any hazards, which insurance shall include coverage against loss by fire and all other perils insured by the "special causes of loss" coverage form, general boiler and machinery coverage, business income coverage, and flood (if any of the Improvements are located in an area identified by the Federal Emergency Management Agency (or any successor) as an area having special flood hazards and to the extent flood insurance is available in that area), and may include sinkhole insurance, mine subsidence insurance, earthquake insurance, terrorism insurance, windstorm insurance and, if the Mortgaged Property does not conform to applicable building, zoning, or land use laws, ordinance and law coverage;

(B)     maintain at all times commercial general liability insurance, workmen's compensation insurance, and such other liability, errors and omissions, and fidelity insurance coverage; and

(C)     maintain builder's risk and public liability insurance, and other insurance in connection with completing the Repairs or Replacements, as applicable.

(b)     **Delivery of Policies, Renewals, Notices, and Proceeds.**

Borrower shall:

(1)     cause all insurance policies (including any policies not otherwise required by Lender) which can be endorsed with standard non-contributing, non-reporting

mortgagee clauses making loss payable to Lender (or Lender's assigns) to be so endorsed;

(2)     promptly deliver to Lender a copy of all renewal and other notices received by Borrower with respect to the policies and all receipts for paid premiums;

(3)     deliver evidence, in form and content acceptable to Lender, that each required insurance policy under this Article 9 has been renewed not less than fifteen (15) days prior to the applicable expiration date, and (if such evidence is other than an original or duplicate original of a renewal policy) deliver the original or duplicate original of each renewal policy (or such other evidence of insurance as may be required by or acceptable to Lender) in form and content acceptable to Lender within ninety (90) days after the applicable expiration date of the original insurance policy;

(4)     provide immediate written notice to the insurance company and to Lender of any event of loss;

(5)     execute such further evidence of assignment of any insurance proceeds as Lender may require; and

(6)     provide immediate written notice to Lender of Borrower's or Master Lessee's receipt of any insurance proceeds under any insurance policy required by Section 9.02(a)(1) above and, if requested by Lender, deliver to Lender all of such proceeds received by Borrower or Master Lessee to be applied by Lender in accordance with this Article 9.

**Section 9.03        Mortgage Loan Administration Matters Regarding Insurance**

**(a)      Lender's Ongoing Insurance Requirements.**

Borrower acknowledges that Lender's insurance requirements may change from time to time. All insurance policies and renewals of insurance policies required by this Loan Agreement shall be:

(1)     in the form and with the terms required by Lender;

(2)     in such amounts, with such maximum deductibles and for such periods required by Lender; and

(3)     issued by insurance companies satisfactory to Lender.

BORROWER ACKNOWLEDGES THAT ANY FAILURE OF BORROWER TO COMPLY WITH THE REQUIREMENTS SET FORTH IN SECTION 9.02(a) OR SECTION 9.02(b)(3) ABOVE SHALL PERMIT LENDER TO PURCHASE THE APPLICABLE INSURANCE AT BORROWER'S COST. SUCH INSURANCE MAY, BUT NEED NOT, PROTECT BORROWER'S INTERESTS. THE COVERAGE THAT LENDER PURCHASES MAY NOT PAY ANY CLAIM THAT BORROWER MAKES OR ANY CLAIM THAT IS

MADE AGAINST BORROWER IN CONNECTION WITH THE MORTGAGED PROPERTY. IF LENDER PURCHASES INSURANCE FOR THE MORTGAGED PROPERTY AS PERMITTED HEREUNDER, BORROWER WILL BE RESPONSIBLE FOR THE COSTS OF THAT INSURANCE, INCLUDING INTEREST AT THE DEFAULT RATE AND ANY OTHER CHARGES LENDER MAY IMPOSE IN CONNECTION WITH THE PLACEMENT OF THE INSURANCE UNTIL THE EFFECTIVE DATE OF THE CANCELLATION OR THE EXPIRATION OF THE INSURANCE.  THE COSTS OF THE INSURANCE SHALL BE ADDED TO BORROWER'S TOTAL OUTSTANDING BALANCE OR OBLIGATION AND SHALL CONSTITUTE ADDITIONAL INDEBTEDNESS.   THE COSTS OF THE INSURANCE MAY BE MORE THAN THE COST OF INSURANCE BORROWER MAY BE ABLE TO OBTAIN ON ITS OWN.   BORROWER MAY LATER CANCEL ANY INSURANCE PURCHASED BY LENDER, BUT ONLY AFTER PROVIDING EVIDENCE THAT BORROWER HAS OBTAINED INSURANCE AS REQUIRED BY THIS LOAN AGREEMENT AND THE OTHER LOAN DOCUMENTS.

    **(b)**    **Application of Proceeds on Event of Loss.**

    (1)    Upon an event of loss, Lender may, at Lender's option:

    (A)    hold such proceeds to be applied to reimburse Borrower for the cost of Restoration (in accordance with Lender's then-current policies relating to the restoration of casualty damage on similar multifamily residential properties); or

    (B)    apply such proceeds to the payment of the Indebtedness, whether or not then due; provided, however, Lender shall not apply insurance proceeds to the payment of the Indebtedness and shall permit Restoration pursuant to Section 9.03(b)(1)(A) if all of the following conditions are met:

    (i)    no Event of Default has occurred and is continuing (or any event which, with the giving of written notice or the passage of time, or both, would constitute an Event of Default has occurred and is continuing);

    (ii)    Lender determines that the combination of insurance proceeds and amounts provided by Borrower will be sufficient funds to complete the Restoration;

    (iii)    Lender determines that the net operating income generated by the Mortgaged Property after completion of the Restoration will be sufficient to support Master Lessee's Basic Rent and other financial obligations under the Master Lease, and a debt service coverage ratio not less than the debt service coverage ratio immediately prior to the event of loss, but in no event less than 1.0x (the debt service coverage ratio shall be calculated on a thirty (30) year amortizing basis (if applicable, on a *proforma* basis approved by Lender) in all events and shall include all

operating costs and other expenses, Imposition Deposits, deposits to Collateral Accounts, and Mortgage Loan repayment obligations);

(iv)    Lender determines that the Restoration will be completed before the earlier of (1) one year before the stated Maturity Date, or (2) one year after the date of the loss or casualty; and

(v)    Borrower provides Lender, upon written request, evidence of the availability during and after the Restoration of the insurance required to be maintained pursuant to this Loan Agreement.

After the completion of Restoration in accordance with the above requirements, as determined by Lender, the balance, if any, of such proceeds shall be returned to Borrower.

(2)    Notwithstanding the foregoing, if any loss is estimated to be in an amount equal to or less than $50,000, Lender shall not exercise its rights and remedies as power-of-attorney herein and shall allow Borrower to make proof of loss, to adjust and compromise any claims under policies of property damage insurance, to appear in and prosecute any action arising from such policies of property damage insurance, and to collect and receive the proceeds of property damage insurance; provided that each of the following conditions shall be satisfied:

(A)    Borrower shall immediately notify Lender of the casualty giving rise to the claim;

(B)    no Event of Default has occurred and is continuing (or any event which, with the giving of written notice or the passage of time, or both, would constitute an Event of Default has occurred and is continuing);

(C)    the Restoration will be completed before the earlier of (i) one year before the stated Maturity Date, or (ii) one year after the date of the loss or casualty;

(D)    Lender determines that the combination of insurance proceeds and amounts provided by Borrower will be sufficient funds to complete the Restoration;

(E)    all proceeds of property damage insurance shall be issued in the form of joint checks to Borrower and Lender;

(F)    all proceeds of property damage insurance shall be applied to the Restoration;

(G)    Borrower shall deliver to Lender evidence satisfactory to Lender of completion of the Restoration and obtainment of all lien releases;

(H)    Borrower shall have complied to Lender's satisfaction with the foregoing requirements on any prior claims subject to this provision, if any; and

(I)    Lender shall have the right to inspect the Mortgaged Property (subject to the rights of tenants under the Leases, other than the Master Lease).

(3)    If Lender elects to apply insurance proceeds to the Indebtedness in accordance with the terms of this Loan Agreement, Borrower shall not be obligated to restore or repair the Mortgaged Property. Rather, Borrower shall restrict access to the damaged portion of the Mortgaged Property and, at its expense and regardless of whether such costs are covered by insurance, clean up any debris resulting from the casualty event, and, if required or otherwise permitted by Lender, demolish or raze any remaining part of the damaged Mortgaged Property to the extent necessary to keep and maintain the Mortgaged Property in a safe, habitable, and marketable condition. Nothing in this Section 9.03(b) shall affect any of Lender's remedial rights against Borrower in connection with a breach by Borrower of any of its obligations under this Loan Agreement or under any Loan Document, including any failure to timely pay Monthly Debt Service Payments or maintain the insurance coverage(s) required by this Loan Agreement.

**(c)    Payment Obligations Unaffected.**

The application of any insurance proceeds to the Indebtedness shall not extend or postpone the Maturity Date, or the due date or the full payment of any Monthly Debt Service Payment, Monthly Replacement Reserve Deposit, or any other installments referred to in this Loan Agreement or in any other Loan Document. Notwithstanding the foregoing, if Lender applies insurance proceeds to the Indebtedness in connection with a casualty of less than the entire Mortgaged Property, and after such application of proceeds the debt service coverage ratio (as determined by Lender) is less than 1.25x based on the then-applicable Monthly Debt Service Payment and the anticipated on-going net operating income of the Mortgaged Property after such casualty event, then Lender may, at its discretion, permit an adjustment to the Monthly Debt Service Payments that become due and owing thereafter, based on Lender's then-current underwriting requirements. In no event shall the preceding sentence obligate Lender to make any adjustment to the Monthly Debt Service Payments. However, in the event that Lender elects to adjust the Monthly Debt Service Payments, Lender shall require a concomitant adjustment in the Master Lease Basic Rent.

**(d)    Foreclosure Sale.**

If the Mortgaged Property is transferred pursuant to a Foreclosure Event or Lender otherwise acquires title to the Mortgaged Property, Borrower acknowledges that Lender shall automatically succeed to all rights of Borrower in and to any insurance policies and unearned insurance premiums applicable to the Mortgaged Property and in and to the proceeds resulting from any damage to the Mortgaged Property prior to such Foreclosure Event or such acquisition.

**(e)**     **Appointment of Lender as Attorney-In-Fact.**

Borrower hereby authorizes and appoints Lender as attorney-in-fact pursuant to Section 14.03(c).

# ARTICLE 10 - CONDEMNATION

**Section 10.01      Representations and Warranties.**

The representations and warranties made by Borrower to Lender in this Section 10.01 are made as of the Effective Date and are true and correct except as disclosed on the Exceptions to Representations and Warranties Schedule.

**(a)**     **Prior Condemnation Action.**

No part of the Mortgaged Property has been taken in connection with a Condemnation Action.

**(b)**     **Pending Condemnation Actions.**

No Condemnation Action is pending nor, to Borrower's knowledge, is threatened for the partial or total condemnation or taking of the Mortgaged Property.

**Section 10.02      Covenants.**

**(a)**     **Notice of Condemnation.**

Borrower shall:

(1)     promptly notify Lender of any Condemnation Action of which Borrower has knowledge;

(2)     appear in and prosecute or defend, at its own cost and expense, any action or proceeding relating to any Condemnation Action, including any defense of Lender's interest in the Mortgaged Property tendered to Borrower by Lender, unless otherwise directed by Lender in writing; and

(3)     execute such further evidence of assignment of any condemnation award in connection with a Condemnation Action as Lender may require.

**(b)**     **Condemnation Proceeds.**

Borrower shall pay to Lender all awards or proceeds of a Condemnation Action promptly upon receipt.

**Section 10.03     Mortgage Loan Administration Matters Regarding Condemnation.**

    **(a)     Application of Condemnation Awards.**

    Lender may apply any awards or proceeds of a Condemnation Action, after the deduction of Lender's expenses incurred in the collection of such amounts, to:

        (1)     the restoration or repair of the Mortgaged Property, if applicable;

        (2)     the payment of the Indebtedness, with the balance, if any, paid to Borrower; or

        (3)     Borrower.

    **(b)     Payment Obligations Unaffected.**

    The application of any awards or proceeds of a Condemnation Action to the Indebtedness shall not extend or postpone the Maturity Date, or the due date or the full payment of any Monthly Debt Service Payment, Monthly Replacement Reserve Deposit, or any other installments referred to in this Loan Agreement or in any other Loan Document.

    **(c)     Appointment of Lender as Attorney-In-Fact.**

    Borrower hereby authorizes and appoints Lender as attorney-in-fact pursuant to Section 14.03(c).

    **(d)     Preservation of Mortgaged Property.**

    If a Condemnation Action results in or from damage to the Mortgaged Property and Lender elects to apply the proceeds or awards from such Condemnation Action to the Indebtedness in accordance with the terms of this Loan Agreement, Borrower shall not be obligated to restore or repair the Mortgaged Property.  Rather, Borrower shall restrict access to any portion of the Mortgaged Property which has been damaged or destroyed in connection with such Condemnation Action and, at Borrower's expense and regardless of whether such costs are covered by insurance, clean up any debris resulting in or from the Condemnation Action, and, if required by any Governmental Authority or otherwise permitted by Lender, demolish or raze any remaining part of the damaged Mortgaged Property to the extent necessary to keep and maintain the Mortgaged Property in a safe, habitable, and marketable condition.  Nothing in this Section 10.03(d) shall affect any of Lender's remedial rights against Borrower in connection with a breach by Borrower of any of its obligations under this Loan Agreement or under any Loan Document, including any failure to timely pay Monthly Debt Service Payments or maintain the insurance coverage(s) required by this Loan Agreement.

# ARTICLE 11 - LIENS, TRANSFERS, AND ASSUMPTIONS

**Section 11.01      Representations and Warranties.**

The representations and warranties made by Borrower to Lender in this Section 11.01 are made as of the Effective Date and are true and correct except as disclosed on the Exceptions to Representations and Warranties Schedule.

### (a)      No Labor or Materialmen's Claims.

All parties furnishing labor and materials on behalf of Borrower or on behalf of Master Lessee with respect to the Mortgaged Property have been paid in full.  There are no mechanics' or materialmen's liens (whether filed or unfiled) outstanding for work, labor, or materials (and no claims or work outstanding that under applicable law could give rise to any such mechanics' or materialmen's liens) affecting the Mortgaged Property, whether prior to, equal with, or subordinate to the lien of the Security Instrument.

### (b)      No Other Interests.

No Person:

(1)      other than Borrower has any possessory ownership or interest in the Mortgaged Property or right to occupy the same except under and pursuant to the provisions of the Master Lease and the other existing Leases, the material terms of all such Leases having been previously disclosed in writing to Lender; nor

(2)      has an option, right of first refusal, or right of first offer (except as required by applicable law) to purchase the Mortgaged Property, or any interest in the Mortgaged Property.

**Section 11.02      Covenants.**

### (a)      Liens; Encumbrances.

Borrower shall not permit the grant, creation, or existence of any Lien, whether voluntary, involuntary, or by operation of law, on all or any portion of the Mortgaged Property (including any voluntary, elective, or non-compulsory tax lien or assessment pursuant to a voluntary, elective, or non-compulsory special tax district or similar regime) other than:

(1)      Permitted Encumbrances;

(2)      the creation of:

(A)      any tax lien, municipal lien, utility lien, mechanics' lien, materialmen's lien, or judgment lien against the Mortgaged Property if bonded off, released of record, or otherwise remedied to Lender's satisfaction within

sixty (60) days after the earlier of the date Borrower or Master Lessee has actual notice or constructive notice of the existence of such lien; or

(B)　any mechanics' or materialmen's liens which attach automatically under the laws of any Governmental Authority upon the commencement of any work upon, or delivery of any materials to, the Mortgaged Property and for which Borrower or Master Lessee is not delinquent in the payment for any such work or materials; and

(3)　the lien created by the Loan Documents.

**(b)**　**Transfers.**

**(1)**　**Mortgaged Property.**

Borrower shall not Transfer, or cause or permit a Transfer of, all or any part of the Mortgaged Property (including any interest in the Mortgaged Property) other than:

(A)　a Transfer to which Lender has consented in writing;

(B)　Leases permitted pursuant to the Loan Documents, including the Master Lease between Borrower and Master Lessee and the subordination thereof to the terms, provisions, and lien of this Loan Agreement, the Security Instrument, and the other Loan Documents;

(C)　[reserved];

(D)　a Transfer of obsolete or worn out Personalty or Fixtures that are contemporaneously replaced by items of equal or better function and quality which are free of Liens (other than those created by the Loan Documents);

(E)　the grant of an easement, servitude, or restrictive covenant to which Lender has consented, and Borrower has paid to Lender, upon demand, all costs and expenses incurred by Lender in connection with reviewing Borrower's request;

(F)　a lien permitted pursuant to Section 11.02(a) of this Loan Agreement; or

(G)　the conveyance of the Mortgaged Property following a Foreclosure Event.

**(2)**　**Interests in Borrower, Affiliated Master Lessee, Key Principal, or Guarantor.**

Other than a Transfer to which Lender has consented in writing, Borrower shall not Transfer, or cause or permit to be Transferred:

(A)    any direct or indirect ownership interest in Borrower, Affiliated Master Lessee, Key Principal, or Guarantor (if applicable) if such Transfer would cause a change in Control except that, in connection with any Springing Transaction, the Person holding a direct Restricted Ownership Interest in Borrower immediately prior to such Springing Transaction may receive, in place of its Restricted Ownership Interest in Borrower, a Restricted Ownership Interest of a corresponding nature in the Springing LLC;

(B)    a direct or indirect Restricted Ownership Interest in Borrower, Affiliated Master Lessee, Key Principal, or Guarantor (if applicable) except in connection with a Springing Transfer;

(C)    fifty percent (50%) or more of Key Principal's or Guarantor's direct or indirect ownership interests in Borrower or Affiliated Master Lessee that existed on the Effective Date (individually or on an aggregate basis), excluding the transfer of the beneficial interests in Borrower held by NB VUE MAC IB, LLC, a Delaware limited liability company on the Effective Date to third-party investors in accordance with Borrower's Trust Agreement, provided the Key Principals shall continue to (i) hold, in the aggregate, directly or indirectly, at least five percent (5%) of the ownership interest in the Borrower and (ii) Control the Borrower;

(D)    the economic benefits or rights to cash flows attributable to any ownership interests in Borrower, Affiliated Master Lessee, Key Principal, or Guarantor (if applicable) separate from the Transfer of the underlying ownership interests if the Transfer of the underlying ownership interest is prohibited by this Loan Agreement; or

(E)    a Transfer to a new key principal or new guarantor (if such new key principal or guarantor is an entity), which entity has an organizational existence termination date that ends before the Maturity Date.

Notwithstanding the foregoing, if a Publicly-Held Corporation or a Publicly-Held Trust Controls Borrower, Affiliated Master Lessee, Key Principal, or Guarantor, or owns a direct or indirect Restricted Ownership Interest in Borrower, Affiliated Master Lessee, Key Principal, or Guarantor, a Transfer of any ownership interests in such Publicly-Held Corporation or Publicly-Held Trust shall not be prohibited under this Loan Agreement as long as (i) such Transfer does not result in a conversion of such Publicly-Held Corporation or Publicly-Held Trust to a privately held entity, and (ii) Borrower provides written notice to Lender not later than thirty (30) days thereafter of any such Transfer that results in any Person owning ten percent (10%) or more of the ownership interests in such Publicly-Held Corporation or Publicly-Held Trust.

**(2)     Name Change or Entity Conversion.**

Lender shall consent to Borrower or Master Lessee changing its name, changing its jurisdiction of organization, or converting from one type of legal entity into another type of legal entity for any lawful purpose, provided that:

(A)     Lender receives written notice at least thirty (30) days prior to such change or conversion, which notice shall include organizational charts that reflect the structure of Borrower or Master Lessee, as applicable, both prior to and subsequent to such name change or entity conversion;

(B)     such Transfer is not otherwise prohibited under the provisions of Section 11.02(b)(2);

(C)     Borrower executes an amendment to this Loan Agreement and any other Loan Documents required by Lender documenting the name change or entity conversion and, if applicable, Master Lessee executes any amendment to the Master Lease Documents required by Lender;

(D)     Borrower agrees and acknowledges, at Borrower's expense, that (i) Borrower, or Master Lessee if applicable, will execute and record in the land records any instrument required by the Property Jurisdiction to be recorded to evidence such name change or entity conversion (or provide Lender with written confirmation from the title company (via electronic mail or letter) that no such instrument is required), (ii) Borrower, or Master Lessee if applicable, will execute any additional documents required by Lender, including the amendment to this Loan Agreement, and, if applicable, amendment to the Master Lease Documents, and, if applicable, allow such documents to be recorded or filed in the land records of the Property Jurisdiction, (iii) except in connection with a name change or entity conversion solely related to Master Lessee, Lender will obtain a "date down" endorsement to the Lender's Title Policy (or obtain a new Title Policy if a "date down" endorsement is not available in the Property Jurisdiction), evidencing title to the Mortgaged Property being in the name of the successor entity and the Lien of the Security Instrument against the Mortgaged Property, and (iv) Lender will file any required UCC-3 financing statement and make any other filing deemed necessary to maintain the priority of its Liens on the Mortgaged Property; and

(E)     no later than ten (10) days subsequent to such name change or entity conversion, Borrower shall provide Lender (i) the documentation filed with the appropriate office in Borrower's or Master Lessee's, as applicable, state of formation evidencing such name change or entity conversion, (ii) copies of the organizational documents of Borrower or Master Lessee, as applicable, including any amendments, filed with the appropriate office in Borrower's or Master Lessee's, as applicable, state of formation reflecting the post-conversion Borrower or Master Lessee, as applicable, name, form of organization, and

structure, and (iii) if available, new certificates of good standing or valid formation for Borrower or Master Lessee, as applicable.

### (3)   No Series LLC Conversion.

Notwithstanding any provisions herein to the contrary, no Borrower, Master Lessee, Guarantor, or Key Principal shall convert to a series limited liability company.

### (c)   Master Lease.

Subject to the provisions of this Article 11, Borrower shall not:

(1)   Transfer its rights or interests in the Master Lease, or Transfer the responsibility for the operation of the Mortgaged Property, from Master Lessee to any other Person;

(2)   permit Affiliated Master Lessee to Transfer its interest in the Master Lease, or to Transfer the responsibility for the operation of the Mortgaged Property, from Master Lessee to any other Person;

(3)   surrender or accept a surrender of the Master Lease;

(4)   cancel or terminate the Master Lease; or

(5)   permit a merger of Borrower's fee interest estate in the Mortgaged Property with Affiliated Master Lessee's leasehold interest in the Mortgaged Property.

Borrower agrees, and the Master Lease shall provide, that Lender shall have the right to terminate the Master Lease and remove any Master Lessee upon the occurrence and continuance of an Event of Default.

### (d)   No Other Indebtedness.

Other than the Mortgage Loan, neither Borrower nor Affiliated Master Lessee shall incur or be obligated at any time with respect to any loan or other indebtedness (except trade payables as otherwise permitted in this Loan Agreement), including any indebtedness secured by a Lien on, or the cash flows from, the Mortgaged Property.

### (e)   No Mezzanine Financing or Preferred Equity.

Neither Borrower, any Affiliated Master Lessee nor any direct or indirect owner of Borrower or any Affiliated Master Lessee shall: (1) incur any Mezzanine Debt other than Permitted Mezzanine Debt; (2) issue any Preferred Equity other than Permitted Preferred Equity; or (3) incur any similar indebtedness or issue any similar equity. Notwithstanding anything herein to the contrary, Borrower has disclosed to Lender and Lender acknowledges that Pacific Premier Bank made a loan to Nelson Brothers Professional Real Estate, LLC, a California limited liability company ("**Nelson Brothers**") on September 13, 2013 in the original principal

amount of $200,000.00 ("Pacific Loan") secured by, among other things, all of Nelson Brothers' general intangibles. The outstanding principal balance of the Pacific Loan is $112,137.58. Lender agrees to permit the Pacific Loan to remain outstanding during the term of the Loan, provided the Pacific Loan shall not be amended, restated, supplemented or otherwise modified without the prior written consent of Lender.

**Section 11.03     Mortgage Loan Administration Matters Regarding Liens, Transfers, and Assumptions.**

    **(a)     Assumption of Mortgage Loan.**

Lender shall consent to a Transfer of the Mortgaged Property to and an assumption of the Mortgage Loan by a new borrower if each of the following conditions is satisfied prior to the Transfer:

    (1)     Borrower has submitted to Lender all information required by Lender to make the determination required by this Section 11.03(a);

    (2)     no Event of Default has occurred and is continuing, and no event which, with the giving of written notice or the passage of time, or both, would constitute an Event of Default has occurred and is continuing;

    (3)     Lender determines that:

        (A)     the proposed new borrower, new key principal, and any other new guarantor fully satisfy all of Lender's then-applicable borrower, master lessee, key principal, or guarantor eligibility, credit, management, and other loan underwriting standards, which shall include an analysis of (i) the previous relationships between Lender and the proposed new borrower, new key principal, new guarantor, and any Person in Control of them, and the organization of the new borrower, new key principal, and new guarantor (if applicable), and (ii) the operating and financial performance of the Mortgaged Property, including physical condition and occupancy;

        (B)     none of the proposed new borrower, new key principal, and any new guarantor, or any owners of the proposed new borrower, new key principal, and any new guarantor, are a Prohibited Person; and

        (C)     none of the proposed new borrower, new key principal, and any new guarantor (if any of such are entities) shall have an organizational existence termination date that ends before the Maturity Date;

    (4)     [reserved];

    (5)     the proposed new borrower has:

(A) executed an assumption agreement acceptable to Lender that, among other things, requires the proposed new borrower to assume and perform all obligations of Borrower (or any other transferor), and that may require that the new borrower comply with any provisions of any Loan Document or Master Lease Document that previously may have been waived by Lender for Borrower, subject to the terms of Section 11.03(g);

(B) executed a new "Tenant/Landlord Subordination and Assignment Agreement" acceptable to Lender;

(C) if required by Lender, delivered to the Title Company for filing and/or recording in all applicable jurisdictions, all applicable Loan Documents including the assumption agreement to correctly evidence the assumption and the confirmation, continuation, perfection, and priority of the Liens created hereunder and under the other Loan Documents; and

(D) delivered to Lender a "date-down" endorsement to the Title Policy acceptable to Lender (or a new title insurance policy if a "date-down" endorsement is not available);

(6) one or more individuals or entities acceptable to Lender as new guarantors have executed and delivered to Lender:

(A) an assumption agreement acceptable to Lender that requires the new guarantor to assume and perform all obligations of Guarantor under any Guaranty given in connection with the Mortgage Loan; or

(B) a substitute Non-Recourse Guaranty and other substitute guaranty in a form acceptable to Lender;

(7) Lender has reviewed and approved the Transfer documents; and

(8) Lender has received the fees described in Section 11.03(g).

**(b)  Transfers to Key Principal-Owned Affiliates or Guarantor-Owned Affiliates.**

(1) Except as otherwise covered in Section 11.03(b)(2) below, Transfers of direct or indirect ownership interests in Borrower or Affiliated Master Lessee to Key Principal or Guarantor, or to a transferee through which Key Principal or Guarantor (as applicable) Controls Borrower or Affiliated Master Lessee, with the same rights and abilities as Key Principal or Guarantor (as applicable) Controls Borrower or Affiliated Master Lessee, immediately prior to the date of such Transfer, shall be consented to by Lender if:

(A) such Transfer satisfies the applicable requirements of Section 11.03(a), other than Section 11.03(a)(5); and

(B)    after giving effect to any such Transfer, each Key Principal or Guarantor (as applicable) continues to own not less than fifty percent (50%) of such Key Principal's or Guarantor's (as applicable) direct or indirect ownership interests in Borrower and Affiliated Master Lessee that existed on the Effective Date.

(2)    Transfers of direct or indirect interests in Borrower or Affiliated Master Lessee held by a Key Principal or Guarantor to other Key Principals or Guarantors, as applicable, shall be consented to by Lender if such Transfer satisfies the following conditions:

(A)    the Transfer does not cause a change in the Control of Borrower or Affiliated Master Lessee; and

(B)    the transferor Key Principal or Guarantor maintains the same right and ability to Control Borrower and Affiliated Master Lessee as existed prior to the Transfer.

If the conditions set forth in this Section 11.03(b) are satisfied, the Transfer Fee shall be waived provided Borrower shall pay the Review Fee and out-of-pocket costs set forth in Section 11.03(g).

**(c)    Estate Planning.**

Notwithstanding the provisions of Section 11.02(b)(2), so long as (1) the Transfer does not cause a change in the Control of Borrower or Affiliated Master Lessee, and (2) Key Principal and Guarantor, as applicable, maintain the same right and ability to Control Borrower and Affiliated Master Lessee as existed prior to the Transfer, Lender shall consent to Transfers of direct or indirect ownership interests in Borrower or Affiliated Master Lessee, and Transfers of direct or indirect ownership interests, in an entity Key Principal or entity Guarantor to:

(A)    Immediate Family Members of such transferor each of whom must have obtained the legal age of majority;

(B)    United States domiciled trusts established for the benefit of the transferor, or Immediate Family Members of the transferor; or

(C)    partnerships or limited liability companies of which the partners or members, respectively, are comprised entirely of (i) such transferor and Immediate Family Members (each of whom must have obtained the legal age of majority) of such transferor, (ii) Immediate Family Members (each of whom must have obtained the legal age of majority) of such transferor, or (iii) United States domiciled trusts established for the benefit of the transferor, or Immediate Family Members of the transferor.

If the conditions set forth in this Section 11.03(c) are satisfied, the Transfer Fee shall be waived provided Borrower shall pay the Review Fee and out-of-pocket costs set forth in Section 11.03(g).

**(d)   Termination or Revocation of Trust.**

If any of Borrower, Affiliated Master Lessee, Guarantor, or Key Principal is a trust, or if Control of Borrower, Affiliated Master Lessee, Guarantor, or Key Principal is Transferred or if a Restricted Ownership Interest in Borrower, Affiliated Master Lessee, Guarantor, or Key Principal would be Transferred due to the termination or revocation of a trust, except in connection with a Springing Transfer, the termination or revocation of such trust is an unpermitted Transfer; provided that the termination or revocation of the trust due to the death of an individual trustor shall not be considered an unpermitted Transfer so long as:

(1)   Lender is notified within thirty (30) days of the death; and

(2)   such Borrower, Affiliated Master Lessee, Guarantor, Key Principal, or other Person, as applicable, is replaced with an individual or entity acceptable to Lender, in accordance with the provisions of Section 11.03(a) within ninety (90) days of the date of the death causing the termination or revocation.

If the conditions set forth in this Section 11.03(d) are satisfied, the Transfer Fee shall be waived; provided Borrower shall pay the Review Fee and out-of-pocket costs set forth in Section 11.03(g).

**(e)   Death of Key Principal or Guarantor; Transfer Due to Death.**

(1)   If a Key Principal or Guarantor that is a natural person dies, or if Control of Borrower, Affiliated Master Lessee, Guarantor, or Key Principal is Transferred, or if a Restricted Ownership Interest in Borrower, Affiliated Master Lessee, Guarantor, or Key Principal would be Transferred, as a result of the death of a Person (except in the case of trusts which is addressed in Section 11.03(d)), Borrower must notify Lender in writing within ninety (90) days in the event of such death.  Unless waived in writing by Lender, the deceased shall be replaced by an individual or entity within one hundred eighty (180) days, subject to Borrower's satisfaction of the following conditions:

(A)   Borrower has submitted to Lender all information required by Lender to make the determination required by this Section 11.03(e);

(B)   Lender determines that, if applicable:

(i)   any proposed new key principal and any other new guarantor (or Person Controlling such new key principal or new guarantor) fully satisfies all of Lender's then-applicable key principal or guarantor eligibility, credit, management, and other loan underwriting standards (including any standards with respect to previous relationships between

Lender and the proposed new key principal and new guarantor (or Person Controlling such new key principal or new guarantor) and the organization of the new key principal and new guarantor);

(ii)    none of any proposed new key principal or any new guarantor, or any owners of the proposed new key principal or any new guarantor, is a Prohibited Person; and

(iii)    none of any proposed new key principal or any new guarantor (if any of such are entities) shall have an organizational existence termination date that ends before the Maturity Date; and

(C)    if applicable, one or more individuals or entities acceptable to Lender as new guarantors have executed and delivered to Lender:

(i)    an assumption agreement acceptable to Lender that requires the new guarantor to assume and perform all obligations of Guarantor under any Guaranty given in connection with the Mortgage Loan; or

(ii)    a substitute Non-Recourse Guaranty and other substitute guaranty in a form acceptable to Lender.

(2)    In the event a replacement Key Principal, Guarantor, or other Person is required by Lender due to the death described in this Section 11.03(e), and such replacement has not occurred within such period, the period for replacement may be extended by Lender to a date not more than one year from the date of such death; however, Lender may require as a condition to any such extension that:

(A)    the then-current property manager be replaced with a property manager reasonably acceptable to Lender (or if a property manager has not been previously engaged, a property manager reasonably acceptable to Lender be engaged); or

(B)    a lockbox agreement or similar cash management arrangement (with the property manager) reasonably acceptable to Lender during such extended replacement period be instituted.

If the conditions set forth in this Section 11.03(e) are satisfied, the Transfer Fee shall be waived, provided Borrower shall pay the Review Fee and out-of-pocket costs set forth in Section 11.03(g).

**(f)    Bankruptcy of Guarantor.**

(1)    Upon the occurrence of any Guarantor Bankruptcy Event, unless waived in writing by Lender, the applicable Guarantor shall be replaced by an individual or entity

within ninety (90) days of such Guarantor Bankruptcy Event, subject to Borrower's satisfaction of the following conditions:

> (A)     Borrower has submitted to Lender all information required by Lender to make the determination required by this Section 11.03(f);

> (B)     Lender determines that:

>> (i)     the proposed new guarantor fully satisfies all of Lender's then-applicable guarantor eligibility, credit, management, and other loan underwriting standards (including any standards with respect to previous relationships between Lender and the proposed new guarantor and the organization of the new guarantor (if applicable));

>> (ii)     no new guarantor is a Prohibited Person; and

>> (iii)     no new guarantor (if any of such are entities) shall have an organizational existence termination date that ends before the Maturity Date; and

> (C)     one or more individuals or entities acceptable to Lender as new guarantors have executed and delivered to Lender:

>> (i)     an assumption agreement acceptable to Lender that requires the new guarantor to assume and perform all obligations of Guarantor under any Guaranty given in connection with the Mortgage Loan; or

>> (ii)     a substitute Non-Recourse Guaranty and other substitute guaranty in a form acceptable to Lender.

> (2)     In the event a replacement Guarantor is required by Lender due to the Guarantor Bankruptcy Event described in this Section 11.03(f), and such replacement has not occurred within such period, the period for replacement may be extended by Lender in its discretion; however, Lender may require as a condition to any such extension that:

>> (A)     the then-current property manager be replaced with a property manager reasonably acceptable to Lender (or if a property manager has not been previously engaged, a property manager reasonably acceptable to Lender be engaged); or

>> (B)     a lockbox agreement or similar cash management arrangement (with the property manager) reasonably acceptable to Lender during such extended replacement period be instituted.

If the conditions set forth in this Section 11.03(f) are satisfied, the Transfer Fee shall be waived, provided Borrower shall pay the Review Fee and out-of-pocket costs set forth in Section 11.03(g).

**(g)     Further Conditions to Transfers and Assumption.**

(1)     In connection with any Transfer of the Mortgaged Property, or an ownership interest in Borrower, Affiliated Master Lessee, Key Principal, or Guarantor for which Lender's approval is required under this Loan Agreement (including Section 11.03(a)), Lender may, as a condition to any such approval, require:

(A)     additional collateral, guaranties, or other credit support to mitigate any risks concerning the proposed transferee or the performance or condition of the Mortgaged Property;

(B)     amendment of the Loan Documents to delete or modify any specially negotiated terms or provisions previously granted for the exclusive benefit of original Borrower, Affiliated Master Lessee, Key Principal, or Guarantor and to restore the original provisions of the standard Fannie Mae form multifamily loan documents, to the extent such provisions were previously modified; or

(C)     a modification to the amounts required to be deposited into the Reserve/Escrow Account pursuant to the terms of Section 13.02(a)(3).

(2)     In connection with any request by Borrower for consent to a Transfer, Borrower shall pay to Lender upon demand:

(A)     the Transfer Fee (to the extent charged by Lender);

(B)     the Review Fee (regardless of whether Lender approves or denies such request); and

(C)     all of Lender's out-of-pocket costs (including reasonable attorneys' fees) incurred in reviewing the Transfer request, regardless of whether Lender approves or denies such request.

**(h)     Additional Permitted Transfers.**

Notwithstanding the foregoing, Borrower may effect a Springing Transfer provided that:

(1)     the provisions of Section 11.02(b)(2), Section 11.02(b)(2)(A), and Section 11.02(b)(2)(B) are satisfied;

(2)     Borrower provides Lender with at least thirty (30) days prior written notice of such Springing Transfer;

(3)     the Springing LLC executes an assumption agreement acceptable to Lender that, among other things, requires the Springing LLC to assume and perform all obligations of Borrower;

(4)      the ownership interests in Borrower immediately prior to the Springing Transfer are identical to the ownership interests in Borrower immediately following the Springing Transfer; and

(5)      Borrower (or the Springing LLC) shall pay the Review Fee and all of Lender's out-of-pocket costs (including reasonable attorneys' fees) incurred in reviewing the documents executed and delivered in connection with such Springing Transfer.

If the conditions set forth in this Section 11.03(h) are satisfied, then the Transfer Fee shall be waived; however Borrower shall pay the Review Fee and out-of-pocket costs set forth in Section 11.03(g).

# ARTICLE 12  - IMPOSITIONS

## Section 12.01      Representations and Warranties.

The representations and warranties made by Borrower to Lender in this Section 12.01 are made as of the Effective Date and are true and correct except as disclosed on the Exceptions to Representations and Warranties Schedule.

**(a)      Payment of Taxes, Assessments, and Other Charges.**

Borrower has:

(1)      paid (or with the approval of Lender, established an escrow fund sufficient to pay when due and payable) all amounts and charges relating to the Mortgaged Property that have become due and payable before any fine, penalty interest, lien, or costs may be added thereto, including Impositions, leasehold payments and ground rents;

(2)      paid all Taxes for the Mortgaged Property that have become due before any fine, penalty interest, lien, or costs may be added thereto pursuant to any notice of assessment received by Borrower and any and all taxes that have become due against Borrower before any fine, penalty interest, lien, or costs may be added thereto;

(3)      no knowledge of any basis for any additional assessments;

(4)      no knowledge of any presently pending special assessments against all or any part of the Mortgaged Property, or any presently pending special assessments against Borrower; and

(5)      not received any written notice of any contemplated special assessment against the Mortgaged Property, or any contemplated special assessment against Borrower.

## Section 12.02     Covenants.

**(a)     Imposition Deposits, Taxes, and Other Charges.**

Borrower shall:

(1)     deposit the Imposition Deposits with Lender on each Payment Date (or on another day designated in writing by Lender) in amount sufficient, in Lender's discretion, to enable Lender to pay each Imposition before the last date upon which such payment may be made without any penalty or interest charge being added, plus an amount equal to no more than one-sixth (1/6) (or the amount permitted by applicable law) of the Impositions for the trailing twelve (12) months (calculated based on the aggregate annual Imposition costs divided by twelve (12) and multiplied by two (2));

(2)     deposit with Lender, within ten (10) days after written notice from Lender (subject to applicable law), such additional amounts estimated by Lender to be reasonably necessary to cure any deficiency in the amount of the Imposition Deposits held for payment of a specific Imposition;

(3)     except as set forth in Section 12.03(c) below, pay all Impositions, leasehold payments, ground rents, and Taxes when due and before any fine, penalty, interest, lien, or costs may be added thereto;

(4)     promptly deliver to Lender a copy of all notices of, and invoices for, Impositions, and, if any Imposition is paid directly, Borrower shall promptly furnish to Lender receipts evidencing such payments; and

(5)     promptly deliver to Lender a copy of all notices of any special assessments and contemplated special assessments against the Mortgaged Property or Borrower.

**(b)     Trust Reserve**

**(1)     Trust Reserve Deposit.**

(A)     Borrower agrees to deposit with Lender the sum of $97,071.50 Dollars (the "**Trust Reserve Deposit**") upon execution of this Loan Agreement.

(B)     Lender shall deposit the Trust Reserve Deposit in an account (the "**Trust Reserve Account**") which meets the standards for custodial accounts as required by Lender from time to time.  Lender shall not be responsible for any losses resulting from investment of the Trust Reserve Account or for obtaining any specific level or percentage of earnings on such investment. The Trust Reserve Deposit, and all other funds from time to time in the Trust Reserve Account, which may include all investment earnings on funds held therein, are collectively referred to as the "**Trust Reserve Account Funds**".

(C)     The Trust Reserve Deposit shall be held in an institution (which may be Lender, if Lender is such an institution) whose deposits or accounts are insured or guaranteed by a federal agency and which accounts meet the standards for custodial accounts as required by Lender from time to time. Lender shall not be obligated to open additional accounts, or deposit the Trust Reserve Deposit in additional institutions, when the amount of the Trust Reserve Deposit exceeds the maximum amount of the federal deposit insurance or guaranty.  No interest, earnings, or profits on the Trust Reserve Deposit shall be paid to Borrower unless applicable law so requires.  The Trust Reserve Deposit shall not be trust funds, nor shall it operate to reduce the Indebtedness, unless applied by Lender for that purpose in accordance with this Loan Agreement.  For the purposes of 9-104(a)(3) of the UCC, Lender is the owner of the Trust Reserve Deposit and shall be deemed a "customer" with sole control of the account holding the Trust Reserve Deposit.

(2)     **Additional Security.**   Borrower hereby assigns to Lender all of Borrower's interest in the Trust Reserve Deposit, the Trust Reserve Account Funds and the Trust Reserve Account as additional security for all of Borrower's obligations under the Loan Documents; provided, however Lender shall make disbursement from the Trust Reserve Account in accordance with the terms of this Section 12.02(b).

(3)     **Disbursement from the Trust Reserve Account.** Except to the extent otherwise provided in this Section, the Trust Reserve Account Funds shall be held by Lender until payment in full of all sums secured by the Security Instrument and release by Lender of the lien of the Security Instrument, at which time Lender shall disburse to Borrower all amounts remaining in the Trust Reserve Account.  In addition to the foregoing, Borrower shall be entitled to receive periodic disbursements from the Trust Reserve Account Funds to be used by Borrower for the sole purpose of funding unanticipated operation or capital expenses of the Mortgaged Property.  Any request for distributions from the Trust Reserve Account Funds shall include supporting documentation in form and content acceptable to Lender. In no event shall Lender be obligated to disburse Trust Reserve Account Funds if an Event of Default exists under this Loan Agreement or if an event shall have occurred and then be existing that with notice and/or the lapse of time would constitute an Event of Default under any of the Loan Documents.

(4)     **Application of Trust Reserve Account Funds Upon Default.**

(A)     If any Event of Default shall occur under any of the Loan Documents, Borrower shall immediately lose all of its rights to receive disbursements of the Trust Reserve Account Funds while such Event of Default shall continue.  Upon any such Event of Default, Lender may apply any of the Trust Reserve Account Funds as permitted under the Loan Documents, including but not limited to (i) repayment of any indebtedness secured by the Security Instrument, and the prepayment premium applicable upon a full or partial

prepayment (as applicable); provided, however, that such application of funds shall not cure or be deemed to cure any Event of Default; (ii) reimbursement of Lender for any losses or expenses (including, without limitation, legal fees) suffered or incurred by Lender as a result of such Event of Default; or (iii) applying the funds in connection with exercising any and all rights and remedies available to Lender, as the case may be, at law or in equity pursuant to any of the Loan Documents.

  (B) Nothing in this Section 12.02(b) or the Loan Documents shall obligate Lender to apply all or any portion of the Trust Reserve Account Funds on account of any Event of Default by Borrower or to repayment of the indebtedness evidenced by the Note or in any specific order of priority.

  (5) **Borrower's Other Obligations.** Nothing contained in this Section 12.02(b) shall in any manner whatsoever alter, impair or affect the obligations of Borrower, or relieve Borrower of any of its obligations to make payments and perform all of its other obligations required under the Loan Documents.

  (6) **Indemnification.** Borrower agrees to indemnify and hold Lender harmless from and against any and all actions, suits, claims, demands, liabilities, losses, damages, obligations and costs or expenses, including litigation costs and reasonable attorneys' fees, arising from or in any way connected with the investment of the Trust Reserve Account Funds.

  (7) **Fees and Costs.**

  (A) Borrower shall pay Lender a reasonable monthly administrative fee not to exceed $0 for its services in administering the Trust Reserve Account. Borrower shall pay such fee no later than the date specified in a bill sent to Borrower.

  (B) Borrower shall reimburse Lender within 10 days after demand, all reasonable fees, charges, costs and expenses incurred by Lender in connection with collecting, holding and disbursing the funds in the Trust Reserve Account pursuant to this Section 12.02(b) and in connection with all inspections made by Lender or Lender's representatives in carrying out Lender's responsibility to make certain determinations under this Section 12.02(b).

**Section 12.03**  **Mortgage Loan Administration Matters Regarding Impositions.**

**(a)**  **Maintenance of Records by Lender.**

Lender shall maintain records of the monthly and aggregate Imposition Deposits held by Lender for the purpose of paying Taxes, insurance premiums, and each other obligation of Borrower for which Imposition Deposits are required.

**(b)     Imposition Accounts.**

All Imposition Deposits shall be held in an institution (which may be Lender, if Lender is such an institution) whose deposits or accounts are insured or guaranteed by a federal agency and which accounts meet the standards for custodial accounts as required by Lender from time to time.  Lender shall not be obligated to open additional accounts, or deposit Imposition Deposits in additional institutions, when the amount of the Imposition Deposits exceeds the maximum amount of the federal deposit insurance or guaranty.  No interest, earnings, or profits on the Imposition Deposits shall be paid to Borrower unless applicable law so requires.  Imposition Deposits shall not be trust funds, nor shall they operate to reduce the Indebtedness, unless applied by Lender for that purpose in accordance with this Loan Agreement.  For the purposes of 9-104(a)(3) of the UCC, Lender is the owner of the Imposition Deposits and shall be deemed a "customer" with sole control of the account holding the Imposition Deposits.

**(c)     Payment of Impositions; Sufficiency of Imposition Deposits.**

Lender may pay an Imposition according to any bill, statement, or estimate from the appropriate public office or insurance company without inquiring into the accuracy of the bill, statement, or estimate or into the validity of the Imposition.  Imposition Deposits shall be required to be used by Lender to pay Taxes, insurance premiums and any other individual Imposition only if:

(1)     no Event of Default exists;

(2)     Borrower has timely delivered to Lender all applicable bills or premium notices that it has received; and

(3)     sufficient Imposition Deposits are held by Lender for each Imposition at the time such Imposition becomes due and payable.

Lender shall have no liability to Borrower or any other Person for failing to pay any Imposition if any of the conditions are not satisfied.  If at any time the amount of the Imposition Deposits held for payment of a specific Imposition exceeds the amount reasonably deemed necessary by Lender to be held in connection with such Imposition, the excess may be credited against future installments of Imposition Deposits for such Imposition.

**(d)     Imposition Deposits Upon Event of Default.**

If an Event of Default has occurred and is continuing, Lender may apply any Imposition Deposits, in such amount and in such order as Lender determines, to pay any Impositions or as a credit against the Indebtedness.

**(e)     Contesting Impositions.**

Other than insurance premiums, Borrower may contest, at its expense, by appropriate legal proceedings, the amount or validity of any Imposition if:

(1)     Borrower notifies Lender of the commencement or expected commencement of such proceedings;

(2)     Lender determines that the Mortgaged Property is not in danger of being sold or forfeited;

(3)     Borrower deposits with Lender (or the applicable Governmental Authority if required by applicable law) reserves sufficient to pay the contested Imposition, if required by Lender (or the applicable Governmental Authority);

(4)     Borrower furnishes whatever additional security is required in the proceedings or is reasonably requested in writing by Lender; and

(5)     Borrower commences, and at all times thereafter diligently prosecutes, such contest in good faith until a final determination is made by the applicable Governmental Authority.

**(f)     Release to Borrower.**

Upon payment in full of all sums secured by the Security Instrument and this Loan Agreement and release by Lender of the lien of the Security Instrument, Lender shall disburse to Borrower the balance of any Imposition Deposits then on deposit with Lender.

## ARTICLE 13 - REPLACEMENT RESERVE AND REPAIRS

**Section 13.01     Covenants.**

**(a)     Initial Deposits to Replacement Reserve Account and Repairs Escrow Account.**

On the Effective Date, Borrower shall pay to Lender:

(1)     the Initial Replacement Reserve Deposit for deposit into the Replacement Reserve Account; and

(2)     the Repairs Escrow Deposit for deposit into the Repairs Escrow Account.

**(b)     Monthly Replacement Reserve Deposits.**

Borrower shall deposit the applicable Monthly Replacement Reserve Deposit into the Replacement Reserve Account on each Payment Date.

**(c)     Payment for Replacements and Repairs.**

Borrower shall:

(1) pay all invoices for the Replacements and Repairs, regardless of whether funds on deposit in the Replacement Reserve Account or the Repairs Escrow Account, as applicable, are sufficient, prior to any request by Borrower for disbursement from the Replacement Reserve Account or the Repairs Escrow Account, as applicable (unless Lender has agreed to issue joint checks in connection with a particular Replacement or Repair);

(2) pay all applicable fees and charges of any Governmental Authority on account of the Replacements and Repairs, as applicable; and

(3) provide evidence satisfactory to Lender of completion of the Replacements and any Required Repairs (within the Completion Period or within such other period or by such other date set forth in the Required Repair Schedule and any Borrower Requested Repairs and Additional Lender Repairs (by the date specified by Lender for any such Borrower Requested Repairs or Additional Lender Repairs)).

**(d)     Assignment of Contracts for Replacements and Repairs.**

Borrower shall collaterally assign to Lender as additional security any contract or subcontract for Replacements or Repairs, upon Lender's written request, on a form of assignment approved by Lender.

**(e)     Indemnification.**

If Lender elects to exercise its rights under Section 14.03 due to Borrower's failure to timely commence or complete any Replacements or Repairs, Borrower shall indemnify and hold Lender harmless from and against any and all actions, suits, claims, demands, liabilities, losses, damages, obligations, and costs or expenses, including litigation costs and reasonable attorneys' fees, arising from or in any way connected with the performance by Lender of the Replacements or Repairs or investment of the Reserve/Escrow Account Funds; provided that Borrower shall have no indemnity obligation if such actions, suits, claims, demands, liabilities, losses, damages, obligations, and costs or expenses, including litigation costs and reasonable attorneys' fees, arise as a result of the willful misconduct or gross negligence of Lender, Lender's agents, employees, or representatives as determined by a court of competent jurisdiction pursuant to a final non-appealable court order.

**(f)     Amendments to Loan Documents.**

Subject to Section 5.02, Borrower shall execute and deliver to Lender, upon written request, an amendment to this Loan Agreement, the Security Instrument, and any other Loan Document deemed necessary or desirable to perfect Lender's lien upon any portion of the Mortgaged Property for which Reserve/Escrow Account Funds were expended.

**(g)     Administrative Fees and Expenses.**

Borrower shall pay to Lender:

DMEAST #23702427 v9
**Multifamily Loan and Security Agreement**
**(Non-Recourse) (Master Lease)**
Article 13

Form 6001.NR.ML
10-15

Page 75
© 2015 Fannie Mae

(1)     by the date specified in the applicable invoice, the Repairs Escrow Account Administrative Fee and the Replacement Reserve Account Administration Fee for Lender's services in administering the Repairs Escrow Account and Replacement Reserve Account and investing the funds on deposit in the Repairs Escrow Account and the Replacement Reserve Account, respectively;

(2)     upon demand, a reasonable inspection fee, not exceeding the Maximum Inspection Fee, for each inspection of the Mortgaged Property by Lender in connection with a Repair or Replacement, plus all other reasonable costs and out-of-pocket expenses relating to such inspections; and

(3)     upon demand, all reasonable fees charged by any engineer, architect, inspector or other person inspecting the Mortgaged Property on behalf of Lender for each inspection of the Mortgaged Property in connection with a Repair or Replacement, plus all other reasonable costs and out-of-pocket expenses relating to such inspections.

**Section 13.02     Mortgage Loan Administration Matters Regarding Reserves.**

**(a)     Accounts, Deposits, and Disbursements.**

**(1)     Custodial Accounts.**

(A)     The Replacement Reserve Account shall be an interest-bearing account that meets the standards for custodial accounts as required by Lender from time to time.  Lender shall not be responsible for any losses resulting from the investment of the Replacement Reserve Deposits or for obtaining any specific level or percentage of earnings on such investment.  All interest, if any, earned on the Replacement Reserve Deposits shall be added to and become part of the Replacement Reserve Account; provided, however, if applicable law requires, and so long as no Event of Default has occurred and is continuing under any of the Loan Documents, Lender shall pay to Borrower, the interest earned on the Replacement Reserve Account not less frequently than the Replacement Reserve Account Interest Disbursement Frequency.  In no event shall Lender be obligated to disburse funds from the Reserve/Escrow Account if an Event of Default has occurred and is continuing.

(B)     Lender shall not be obligated to deposit the Repairs Escrow Deposits into an interest-bearing account.

**(2)     Disbursements by Lender Only.**

Only Lender or a designated representative of Lender may make disbursements from the Replacement Reserve Account and the Repairs Escrow Account.  Except as provided in Section 13.02(a)(8), disbursements shall only be made upon Borrower request and after satisfaction of all conditions for disbursement.

(3)      **Adjustment to Deposits.**

(A)      **Mortgage Loan Terms Exceeding Ten (10) Years.**

If the Loan Term exceeds ten (10) years (or five (5) years in the case of any Mortgaged Property that is an "affordable housing property" as indicated on the Summary of Loan Terms), a property condition assessment shall be ordered by Lender for the Mortgaged Property at the expense of Borrower (which expense may be paid out of the Replacement Reserve Account if excess funds are available). The property condition assessment shall be performed no earlier than the sixth (6th) month and no later than the ninth (9th) month of the tenth (10th) Loan Year and every tenth (10th) Loan Year thereafter if the Loan Term exceeds twenty (20) years (or the fifth (5th) Loan Year in the case of any Mortgaged Property that is an "affordable housing property" as indicated on the Summary of Loan Terms and every fifth (5th) Loan Year thereafter if the Loan Term exceeds ten (10) years). After review of the property condition assessment, the amount of the Monthly Replacement Reserve Deposit may be adjusted by Lender for the remaining Loan Term by written notice to Borrower so that the Monthly Replacement Reserve Deposits are sufficient to fund the Replacements as and when required and/or the amount to be held in the Repairs Escrow Account may be adjusted by Lender so that the Repairs Escrow Deposit is sufficient to fund the Repairs as and when required.

(B)      **Transfers.**

In connection with any Transfer of the Mortgaged Property, the Master Lease, or any Transfer of an ownership interest in Borrower, Affiliated Master Lessee, Guarantor, or Key Principal that requires Lender's consent, Lender may review the amounts on deposit, if any, in the Replacement Reserve Account or the Repairs Escrow Account, the amount of the Monthly Replacement Reserve Deposit and the likely repairs and replacements required by the Mortgaged Property, and the related contingencies which may arise during the remaining Loan Term. Based upon that review, Lender may require an additional deposit to the Replacement Reserve Account or the Repairs Escrow Account, or an increase in the amount of the Monthly Replacement Reserve Deposit as a condition to Lender's consent to such Transfer.

(4)      **Insufficient Funds.**

Lender may, upon thirty (30) days' prior written notice to Borrower, require an additional deposit(s) to the Replacement Reserve Account or Repairs Escrow Account, or an increase in the amount of the Monthly Replacement Reserve Deposit, if Lender determines that the amounts on deposit in either the Replacement Reserve Account or the Repairs Escrow Account are not sufficient to cover the costs for Required Repairs or Required Replacements or, pursuant to the terms of Section 13.02(a)(9), not sufficient to cover the costs for Borrower Requested Repairs, Additional Lender Repairs, Borrower

Requested Replacements, or Additional Lender Replacements. Borrower's agreement to complete the Replacements or Repairs as required by this Loan Agreement shall not be affected by the insufficiency of any balance in the Replacement Reserve Account or the Repairs Escrow Account, as applicable.

**(5)     Disbursements for Replacements and Repairs.**

(A)     Disbursement requests may only be made after completion of the applicable Replacements and only to reimburse Borrower for the actual approved costs of the Replacements. Lender shall not disburse from the Replacement Reserve Account the costs of routine maintenance to the Mortgaged Property or for costs which are to be reimbursed from the Repairs Escrow Account or any similar account. Disbursement from the Replacement Reserve Account shall not be made more frequently than the Maximum Replacement Reserve Disbursement Interval. Other than in connection with a final request for disbursement, disbursements from the Replacement Reserve Account shall not be less than the Minimum Replacement Reserve Disbursement Amount.

(B)     Disbursement requests may only be made after completion of the applicable Repairs and only to reimburse Borrower for the actual cost of the Repairs, up to the Maximum Repair Cost. Lender shall not disburse any amounts which would cause the funds remaining in the Repairs Escrow Account after any disbursement (other than with respect to the final disbursement) to be less than the Maximum Repair Cost of the then-current estimated cost of completing all remaining Repairs. Lender shall not disburse from the Repairs Escrow Account the costs of routine maintenance to the Mortgaged Property or for costs which are to be reimbursed from the Replacement Reserve Account or any similar account. Disbursement from the Repairs Escrow Account shall not be made more frequently than the Maximum Repair Disbursement Interval. Other than in connection with a final request for disbursement, disbursements from the Repairs Escrow Account shall not be less than the Minimum Repairs Disbursement Amount.

**(6)     Disbursement Requests.**

Each request by Borrower for disbursement from the Replacement Reserve Account or the Repairs Escrow Account must be in writing, must specify the Replacement or Repair for which reimbursement is requested (provided that for any Borrower Requested Replacements, Borrower Requested Repairs, Additional Lender Replacements, and Additional Lender Repairs, Lender shall have approved the use of the Reserve/Escrow Account Funds for such replacements or repairs pursuant to the terms of Section 13.02(a)(9)), and must:

(A)     if applicable, specify the quantity and price of the items or materials purchased, grouped by type or category;

(B)    if applicable, specify the cost of all contracted labor or other services involved in the Replacement or Repair for which such request for disbursement is made;

(C)    if applicable, include copies of invoices for all items or materials purchased and all contracted labor or services provided;

(D)    include evidence of payment of such Replacement or Repair satisfactory to Lender (unless Lender has agreed to issue joint checks in connection with a particular Repair or Replacement as provided in this Loan Agreement); and

(E)    contain a certification by Borrower and, if applicable (and if reasonably requested by Lender), from Master Lessee that the Repair or Replacement has been completed lien free and in a good and workmanlike manner, in accordance with any plans and specifications previously approved by Lender (if applicable) and in compliance with all applicable laws, ordinances, rules, and regulations of any Governmental Authority having jurisdiction over the Mortgaged Property, and otherwise in accordance with the provisions of this Loan Agreement.

**(7)    Conditions to Disbursement.**

Lender may require any or all of the following at the expense of Borrower as a condition to disbursement of funds from the Replacement Reserve Account or the Repairs Escrow Account (provided that for any Borrower Requested Replacements, Borrower Requested Repairs, Additional Lender Replacements, and Additional Lender Repairs, Lender shall have approved the use of the Reserve/Escrow Account Funds for such replacements or repairs pursuant to the terms of Section 13.02(a)(9)):

(A)    an inspection by Lender of the Mortgaged Property and the applicable Replacement or Repair;

(B)    an inspection or certificate of completion by an appropriate independent qualified professional (such as an architect, engineer or property inspector, depending on the nature of the Repair or Replacement) selected by Lender;

(C)    either:

(i)    a search of title to the Mortgaged Property effective to the date of disbursement; or

(ii)    a "date-down" endorsement to Lender's Title Policy (or a new Lender's Title Policy if a "date-down" is not available) extending the effective date of such policy to the date of disbursement, and showing no

Liens other than (1) Permitted Encumbrances, (2) liens which Borrower is diligently contesting in good faith that have been bonded off to the satisfaction of Lender, or (3) mechanics' or materialmen's liens which attach automatically under the laws of any Governmental Authority upon the commencement of any work upon, or delivery of any materials to, the Mortgaged Property and for which Borrower is not delinquent in the payment for any such work or materials; and

(D)       an acknowledgement of payment, waiver of claims, and release of lien for work performed and materials supplied from each contractor, subcontractor or materialman in accordance with the requirements of applicable law and covering all work performed and materials supplied (including equipment and fixtures) for the Mortgaged Property by that contractor, subcontractor, or materialman through the date covered by the disbursement request (or, in the event that payment to such contractor, subcontractor, or materialman is to be made by a joint check, the release of lien shall be effective through the date covered by the previous disbursement).

**(8)     Joint Checks for Periodic Disbursements.**

Lender may, upon Borrower's written request, issue joint checks, payable to Borrower and the applicable supplier, materialman, mechanic, contractor, subcontractor, or other similar party, if:

(A)       the cost of the Replacement or Repair exceeds the Replacement Threshold or the Repair Threshold, as applicable, and the contractor performing such Replacement or Repair requires periodic payments pursuant to the terms of the applicable written contract;

(B)       the contract for such Repair or Replacement requires payment upon completion of the applicable portion of the work;

(C)       Borrower makes the disbursement request after completion of the applicable portion of the work required to be completed under such contract;

(D)       the materials for which the request for disbursement has been made are on site at the Mortgaged Property and are properly secured or installed;

(E)       Lender determines that the remaining funds in the Replacement Reserve Account designated for such Replacement, or in the Repairs Escrow Account designated for such Repair, as applicable, are sufficient to pay such costs and the then-current estimated cost of completing all remaining Required Replacements or Required Repairs (at the Maximum Repair Cost), as applicable, and any other Borrower Requested Replacements, Borrower Requested Repairs, Additional Lender Replacements, or Additional Lender Repairs that have been previously approved by Lender;

(F)     each supplier, materialman, mechanic, contractor, subcontractor, or other similar party receiving payments shall have provided, if requested in writing by Lender, a waiver of liens with respect to amounts which have been previously paid to them; and

(G)     all other conditions for disbursement have been satisfied.

(9)     **Replacements and Repairs Other than Required Replacements or Required Repairs.**

(A)     **Borrower Requested Replacements and Borrower Requested Repairs.**

Borrower may submit a disbursement request from the Replacement Reserve Account or the Repairs Escrow Account to reimburse Borrower for any Borrower Requested Replacement or Borrower Requested Repair.   The disbursement request must be in writing and include an explanation for such request.  Lender shall make disbursements for Borrower Requested Replacements or Borrower Requested Repairs if:

(i)     they are of the type intended to be covered by the Replacement Reserve Account or the Repairs Escrow Account, as applicable;

(ii)     the costs are commercially reasonable;

(iii)     the amount of funds in the Replacement Reserve Account or Repairs Escrow Account, as applicable, is sufficient to pay such costs and the then-current estimated cost of completing all remaining Required Replacements or Required Repairs (at the Maximum Repair Cost), as applicable, and any other Borrower Requested Replacements, Borrower Requested Repairs, Additional Lender Replacements or Additional Lender Repairs that have been previously approved by Lender; and

(iv)     all conditions for disbursement from the Replacement Reserve Account or Repairs Escrow Account, as applicable, have been satisfied.

Nothing in this Loan Agreement shall limit Lender's right to require an additional deposit to the Replacement Reserve Account or an increase to the Monthly Replacement Reserve Deposit in connection with any such Borrower Requested Replacements, or an additional deposit to the Repairs Escrow Account for any such Borrower Requested Repairs.

**(B)** **Additional Lender Replacements and Additional Lender Repairs.**

Lender may require, as set forth in Section 6.02(b)(3), Section 6.03(c), or otherwise from time to time, upon written notice to Borrower, that Borrower make Additional Lender Replacements or Additional Lender Repairs. Lender shall make disbursements from the Replacement Reserve Account for Additional Lender Replacements or from the Repairs Escrow Account for Additional Lender Repairs, as applicable, if:

(i)      the costs are commercially reasonable;

(ii)      the amount of funds in the Replacement Reserve Account or the Repairs Escrow Account, as applicable, is sufficient to pay such costs and the then-current estimated cost of completing all remaining Required Replacements or Required Repairs (at the Maximum Repair Cost), as applicable, and any other Borrower Requested Replacements, Borrower Requested Repairs, Additional Lender Replacements, or Additional Lender Repairs that have been previously approved by Lender; and

(iii)      all conditions for disbursement from the Replacement Reserve Account or Repairs Escrow Account, as applicable, have been satisfied.

Nothing in this Loan Agreement shall limit Lender's right to require an additional deposit to the Replacement Reserve Account or an increase to the Monthly Replacement Reserve Deposit for any such Additional Lender Replacements or an additional deposit to the Repairs Escrow Account for any such Additional Lender Repair.

**(10)** **Excess Costs.**

In the event any Replacement or Repair exceeds the approved cost set forth on the Required Replacement Schedule for Replacements, or the Maximum Repair Cost for Repairs, Borrower may submit a disbursement request to reimburse Borrower for such excess cost. The disbursement request must be in writing and include an explanation for such request. Lender shall make disbursements from the Replacement Reserve Account or the Repairs Escrow Account, as applicable, if:

(A)      the excess cost is commercially reasonable;

(B)      the amount of funds in the Replacement Reserve Account or the Repairs Escrow Account, as applicable, is sufficient to pay such costs and the then-current estimated cost of completing all remaining Required Replacements or Required Repairs (at the Maximum Repair Cost), as applicable, and any other

Borrower Requested Replacements, Borrower Requested Repairs, Additional Lender Replacements, or Additional Lender Repairs that have been previously approved by Lender; and

      (C)    all conditions for disbursement from the Replacement Reserve Account or the Repairs Escrow Account have been satisfied.

**(11)    Final Disbursements.**

Upon completion of all Repairs in accordance with this Loan Agreement and so long as no Event of Default has occurred and is continuing, Lender shall disburse to Borrower any amounts then remaining in the Repairs Escrow Account.  Upon payment in full of the Indebtedness and release by Lender of the lien of the Security Instrument, Lender shall disburse to Borrower any and all amounts then remaining in the Replacement Reserve Account and the Repairs Escrow Account (if not previously released).

**(b)    Approvals of Contracts; Assignment of Claims.**

Lender retains the right to approve all contracts or work orders with materialmen, mechanics, suppliers, subcontractors, contractors, or other parties providing labor or materials in connection with the Replacements or Repairs.  Notwithstanding Borrower's assignment in the Security Instrument (or Master Lessee's assignment pursuant to the Master Lease Documents) of its rights and claims against all Persons supplying labor or materials in connection with the Replacement or Repairs, Lender will not pursue any such right or claim unless an Event of Default has occurred and is continuing or as otherwise provided in Section 14.03(c).

**(c)    Delays and Workmanship.**

If any work for any Replacement or Repair has not timely commenced, has not been timely performed in a workmanlike manner, or has not been timely completed in a workmanlike manner, Lender may, without notice to Borrower:

      (1)    withhold disbursements from the Replacement Reserve Account or Repairs Escrow Account for such unsatisfactory Replacement or Repair, as applicable;

      (2)    proceed under existing contracts or contract with third parties to make or complete such Replacement or Repair;

      (3)    apply the funds in the Replacement Reserve Account or Repairs Escrow Account toward the labor and materials necessary to make or complete such Replacement or Repair, as applicable; or

      (4)    exercise any and all other remedies available to Lender under this Loan Agreement or any other Loan Document, including any remedies otherwise available upon an Event of Default pursuant to the terms of Section 14.02.

To facilitate Lender's completion or making of such Replacements or Repairs, Lender shall have the right to enter onto the Mortgaged Property and perform any and all work and labor necessary to make or complete the Replacements or Repairs and employ watchmen to protect the Mortgaged Property from damage. All funds so expended by Lender shall be deemed to have been advanced to Borrower, shall be part of the Indebtedness and shall be secured by the Security Instrument and this Loan Agreement.

**(d)    Appointment of Lender as Attorney-In-Fact.**

Borrower hereby authorizes and appoints Lender as attorney-in-fact pursuant to Section 14.03(c).

**(e)    No Lender Obligation.**

Nothing in this Loan Agreement shall:

(1)    make Lender responsible for making or completing the Replacements or Repairs;

(2)    require Lender to expend funds, whether from the Replacement Reserve Account, the Repairs Escrow Account, or otherwise, to make or complete any Replacement or Repair;

(3)    obligate Lender to proceed with the Replacements or Repairs; or

(4)    obligate Lender to demand from Borrower additional sums to make or complete any Replacement or Repair.

**(f)    No Lender Warranty.**

Lender's approval of any plans for any Replacement or Repair, release of funds from the Replacement Reserve Account or Repairs Escrow Account, inspection of the Mortgaged Property by Lender or its agents, representatives, or designees, or other acknowledgment of completion of any Replacement or Repair in a manner satisfactory to Lender shall not be deemed an acknowledgment or warranty to any person that the Replacement or Repair has been completed in accordance with applicable building, zoning, or other codes, ordinances, statutes, laws, regulations, or requirements of any Governmental Authority, such responsibility being at all times exclusively that of Borrower.

# ARTICLE 14  - DEFAULTS/REMEDIES

**Section 14.01    Events of Default.**

The occurrence of any one or more of the following in this Section 14.01 shall constitute an Event of Default under this Loan Agreement.

**(a)**      **Automatic Events of Default.**

Any of the following shall constitute an automatic Event of Default:

(1)      any failure by Borrower to pay or deposit when due any amount required by the Note, this Loan Agreement or any other Loan Document;

(2)      any failure to maintain the insurance coverage required by any Loan Document;

(3)      any failure by Borrower or Affiliated Master Lessee to comply with the provisions of Section 4.02(d) relating to its respective single asset status;

(4)      if any warranty, representation, certification, or statement of Borrower, Guarantor, or Key Principal in this Loan Agreement or any of the other Loan Documents is false, inaccurate, or misleading in any material respect when made;

(5)      fraud, gross negligence, willful misconduct, or material misrepresentation or material omission by or on behalf of Borrower, Affiliated Master Lessee, Guarantor, or Key Principal or any of their officers, directors, trustees, partners, members, or managers in connection with:

(A)      the application for, or creation of, the Indebtedness or the Master Lease;

(B)      any financial statement, rent roll, or other report or information provided to Lender during the term of the Mortgage Loan; or

(C)      any request for Lender's consent to any proposed action, including a request for disbursement of Reserve/Escrow Account Funds or Collateral Account Funds;

(6)      the occurrence of any Transfer not permitted by the Loan Documents;

(7)      the occurrence of a Bankruptcy Event;

(8)      the commencement of a forfeiture action or proceeding, whether civil or criminal, which, in Lender's reasonable judgment, could result in a forfeiture of the Mortgaged Property or otherwise materially impair the lien created by this Loan Agreement or the Security Instrument or Lender's interest in the Mortgaged Property;

(9)      if Borrower, Affiliated Master Lessee, Guarantor, or Key Principal is a trust, or if Control of Borrower, Affiliated Master Lessee, Guarantor, or Key Principal is Transferred or if a Restricted Ownership Interest in Borrower, Affiliated Master Lessee, Guarantor, or Key Principal would be Transferred due to the termination or revocation of a trust, the termination or revocation of such trust, except as set forth in Section 11.03(d) or Section 11.03(h);

(10)    any failure by Borrower to complete any Repair related to fire, life, or safety issues in accordance with the terms of this Loan Agreement within the Completion Period (or such other date set forth on the Required Repair Schedule or otherwise required by Lender in writing for such Repair);

(11)    any exercise by the holder of any other debt instrument secured by a mortgage, deed of trust, or deed to secure debt on the Mortgaged Property or any interest therein of a right to declare all amounts due under that debt instrument immediately due and payable;

(12)    a termination, amendment, or modification of any Master Lease Document not permitted by the Loan Documents;

(13)    a default by either Borrower or Master Lessee which continues beyond any applicable cure period under the Master Lease Documents; or

**(b)    Events of Default Subject to a Specified Cure Period.**

Any of the following shall constitute an Event of Default subject to the cure period set forth in the Loan Documents:

(1)    if Key Principal or Guarantor is a natural person, the death of such individual, unless all requirements of Section 11.03(e) are met;

(2)    the occurrence of a Guarantor Bankruptcy Event, unless requirements of Section 11.03(f) are met;

(3)    any failure by Borrower, Affiliated Master Lessee, Key Principal, or Guarantor to comply with the provisions of Section 5.02(b) and Section 5.02(c); or

(4)    any failure by Borrower to perform any obligation under this Loan Agreement or any Loan Document that is subject to a specified written notice and cure period, which failure continues beyond such specified written notice and cure period as set forth herein or in the applicable Loan Document.

**(c)    Events of Default Subject to Extended Cure Period.**

The following shall constitute an Event of Default if the existence of such condition or event, or such failure to perform or default in performance continues for a period of thirty (30) days after written notice by Lender to Borrower of the existence of such condition or event, or of such failure to perform or default in performance, provided, however, such period may be extended for up to an additional thirty (30) days if Borrower, in the discretion of Lender, is diligently pursuing a cure of such; provided, further, however, no such written notice, grace period, or extension shall apply if, in Lender's discretion, immediate exercise by Lender of a right or remedy under this Loan Agreement or any Loan Document is required to avoid harm to

Lender or impairment of the Mortgage Loan (including the Loan Documents), the Mortgaged Property or any other security given for the Mortgage Loan:

(1)    any failure by Borrower to perform any of its obligations under this Loan Agreement or any Loan Document (other than those specified in Section 14.01(a) or Section 14.01(b) above) as and when required.

### Section 14.02    Remedies.

(a)    **Acceleration; Foreclosure.**

If an Event of Default has occurred and is continuing, the entire unpaid principal balance of the Mortgage Loan, any Accrued Interest, interest accruing at the Default Rate, the Prepayment Premium (if applicable), and all other Indebtedness, at the option of Lender, shall immediately become due and payable, without any prior written notice to Borrower, unless applicable law requires otherwise (and in such case, after any required written notice has been given).  Lender may exercise this option to accelerate regardless of any prior forbearance.  In addition, Lender shall have all rights and remedies afforded to it hereunder and under the other Loan Documents, including, termination of the Master Lease and removal of the Master Lessee, foreclosure on and/or the power of sale of the Mortgaged Property, as provided in the Security Instrument, and any rights and remedies available to Lender at law or in equity (subject to Borrower's statutory rights of reinstatement, if any).  Any proceeds of a foreclosure or other sale under this Loan Agreement or any other Loan Document may be held and applied by Lender as additional collateral for the Indebtedness pursuant to this Loan Agreement.  Notwithstanding the foregoing, the occurrence of any Bankruptcy Event shall automatically accelerate the Mortgage Loan and all obligations and Indebtedness shall be immediately due and payable without written notice or further action by Lender.

(b)    **Loss of Right to Disbursements from Collateral Accounts.**

If an Event of Default has occurred and is continuing, Borrower shall immediately lose all of its rights to receive disbursements from the Reserve/Escrow Accounts and any Collateral Accounts.  During the continuance of any such Event of Default, Lender may use the Reserve/Escrow Account Funds and any Collateral Account Funds (or any portion thereof) for any purpose, including:

(1)    repayment of the Indebtedness, including principal prepayments and the Prepayment Premium applicable to such full or partial prepayment, as applicable (however, such application of funds shall not cure or be deemed to cure any Event of Default);

(2)    reimbursement of Lender for all losses and expenses (including reasonable legal fees) suffered or incurred by Lender as a result of such Event of Default;

(3)    completion of the Replacement or Repair or for any other replacement or repair to the Mortgaged Property; and

(4)    payment of any amount expended in exercising (and the exercise of) all rights and remedies available to Lender at law or in equity or under this Loan Agreement or under any of the other Loan Documents.

Nothing in this Loan Agreement shall obligate Lender to apply all or any portion of the Reserve/Escrow Account Funds or Collateral Account Funds on account of any Event of Default or to repayment of the Indebtedness or in any specific order of priority.

**(c)    Remedies Cumulative.**

Each right and remedy provided in this Loan Agreement is distinct from all other rights or remedies under this Loan Agreement or any other Loan Document or afforded by applicable law, and each shall be cumulative and may be exercised concurrently, independently, or successively, in any order.  Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of additional default by Borrower in order to exercise any of its remedies with respect to an Event of Default.

**Section 14.03     Additional Lender Rights; Forbearance.**

**(a)    No Effect Upon Obligations.**

Lender may, but shall not be obligated to, agree with Borrower, from time to time, and without giving notice to, or obtaining the consent of, or having any effect upon the obligations of, any Master Lessee, Guarantor, Key Principal, or other third party obligor, to take any of the following actions:

(1)    the time for payment of the principal of or interest on the Indebtedness may be extended, or the Indebtedness may be renewed in whole or in part;

(2)    the rate of interest on or period of amortization of the Mortgage Loan or the amount of the Monthly Debt Service Payments payable under the Loan Documents may be modified;

(3)    the time for Borrower's performance of or compliance with any covenant or agreement contained in any Loan Document, whether presently existing or hereinafter entered into, may be extended or such performance or compliance may be waived;

(4)    any or all payments due under this Loan Agreement or any other Loan Document may be reduced;

(5)    any Loan Document may be modified or amended by Lender and Borrower in any respect, including an increase in the principal amount of the Mortgage Loan;

(6)    any amounts under this Loan Agreement or any other Loan Document may be released;

(7)     any security for the Indebtedness may be modified, exchanged, released, surrendered, or otherwise dealt with, or additional security may be pledged or mortgaged for the Indebtedness;

(8)     the payment of the Indebtedness or any security for the Indebtedness, or both, may be subordinated to the right to payment or the security, or both, of any other present or future creditor of Borrower; or

(9)     any other terms of the Loan Documents may be modified.

**(b)     No Waiver of Rights or Remedies.**

Any waiver of an Event of Default or forbearance by Lender in exercising any right or remedy under this Loan Agreement or any other Loan Document or otherwise afforded by applicable law, shall not be a waiver of any other Event of Default or preclude the exercise or failure to exercise of any other right or remedy.  The acceptance by Lender of payment of all or any part of the Indebtedness after the due date of such payment, or in an amount which is less than the required payment, shall not be a waiver of Lender's right to require prompt payment when due of all other payments on account of the Indebtedness or to exercise any remedies for any failure to make prompt payment.  Enforcement by Lender of any security for the Indebtedness shall not constitute an election by Lender of remedies so as to preclude the exercise or failure to exercise of any other right available to Lender.  Lender's receipt of any insurance proceeds or amounts in connection with a Condemnation Action shall not operate to cure or waive any Event of Default.

**(c)     Appointment of Lender as Attorney-In-Fact.**

Borrower hereby irrevocably makes, constitutes, and appoints Lender (and any officer of Lender or any Person designated by Lender for that purpose) as Borrower's true and lawful proxy and attorney-in-fact (and agent-in-fact) in Borrower's name, place, and stead, with full power of substitution, to:

(1)     use any of the funds in the Replacement Reserve Account or Repairs Escrow Account for the purpose of making or completing the Replacements or Repairs;

(2)     make such additions, changes, and corrections to the Replacements or Repairs as shall be necessary or desirable to complete the Replacements or Repairs;

(3)     employ such contractors, subcontractors, agents, architects, and inspectors as shall be required for such purposes;

(4)     pay, settle, or compromise all bills and claims for materials and work performed in connection with the Replacements or Repairs, or as may be necessary or desirable for the completion of the Replacements or Repairs, or for clearance of title;

DMEAST #23702427 v9
**Multifamily Loan and Security Agreement**
**(Non-Recourse) (Master Lease)**
Article 14

Form 6001.NR.ML
10-15

**Page 89**
© 2015 Fannie Mae

(5)     adjust and compromise any claims under any and all policies of insurance required pursuant to this Loan Agreement and any other Loan Document, subject only to Borrower's rights under this Loan Agreement;

(6)     appear in and prosecute any action arising from any insurance policies;

(7)     collect and receive the proceeds of insurance, and to deduct from such proceeds Lender's expenses incurred in the collection of such proceeds;

(8)     commence, appear in, and prosecute, in Lender's or Borrower's name, any Condemnation Action;

(9)     settle or compromise any claim in connection with any Condemnation Action;

(10)    execute all applications and certificates in the name of Borrower which may be required by any of the contract documents;

(11)    prosecute and defend all actions or proceedings in connection with the Mortgaged Property or the rehabilitation and repair of the Mortgaged Property;

(12)    take such actions as are permitted in this Loan Agreement and any other Loan Documents;

(13)    execute such financing statements and other documents and to do such other acts as Lender may require to perfect and preserve Lender's security interest in, and to enforce such interests in, the collateral; and

(14)    carry out any remedy provided for in this Loan Agreement and any other Loan Documents, including endorsing Borrower's name to checks, drafts, instruments and other items of payment and proceeds of the collateral, executing change of address forms with the postmaster of the United States Post Office serving the address of Borrower, changing the address of Borrower to that of Lender, opening all envelopes addressed to Borrower, and applying any payments contained therein to the Indebtedness.

**(d)     Borrower Waivers.**

If more than one Person signs this Loan Agreement as Borrower, each Borrower, with respect to any other Borrower, hereby agrees that Lender, in its discretion, may:

(1)     bring suit against Borrower, or any one or more of Borrower, jointly and severally, or against any one or more of them;

(2)     compromise or settle with any one or more of the persons constituting Borrower, for such consideration as Lender may deem proper;

(3)     release one or more of the persons constituting Borrower, from liability; or

(4)    otherwise deal with Borrower, or any one or more of them, in any manner, and no such action shall impair the rights of Lender to collect from any Borrower the full amount of the Indebtedness.

**Section 14.04    Waiver of Marshaling.**

Notwithstanding the existence of any other security interests in the Mortgaged Property held by Lender or by any other party, Lender shall have the right to determine the order in which any or all of the Mortgaged Property shall be subjected to the remedies provided in this Loan Agreement, any other Loan Document or applicable law.    Lender shall have the right to determine the order in which all or any part of the Indebtedness is satisfied from the proceeds realized upon the exercise of such remedies.    Borrower and any party who now or in the future acquires a security interest in the Mortgaged Property and who has actual or constructive notice of this Loan Agreement waives any and all right to require the marshaling of assets or to require that any of the Mortgaged Property be sold in the inverse order of alienation or that any of the Mortgaged Property be sold in parcels or as an entirety in connection with the exercise of any of the remedies permitted by applicable law or provided in this Loan Agreement or any other Loan Documents.

Lender shall account for any moneys received by Lender in respect of any foreclosure on or disposition of collateral hereunder and under the other Loan Documents provided that Lender shall not have any duty as to any collateral, and Lender shall be accountable only for amounts that it actually receives as a result of the exercise of such powers.    NONE OF LENDER OR ITS AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, OR REPRESENTATIVES SHALL BE RESPONSIBLE TO BORROWER (a) FOR ANY ACT OR FAILURE TO ACT UNDER ANY POWER OF ATTORNEY OR OTHERWISE, EXCEPT IN RESPECT OF DAMAGES ATTRIBUTABLE SOLELY TO THEIR OWN GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AS FINALLY DETERMINED PURSUANT TO A FINAL, NON-APPEALABLE COURT ORDER BY A COURT OF COMPETENT JURISDICTION, NOR (b) FOR ANY PUNITIVE, EXEMPLARY, INDIRECT OR CONSEQUENTIAL DAMAGES.

# ARTICLE 15 - MISCELLANEOUS

**Section 15.01    Governing Law; Consent to Jurisdiction and Venue.**

**(a)    Governing Law.**

This Loan Agreement and any other Loan Document which does not itself expressly identify the law that is to apply to it, shall be governed by the laws of the Property Jurisdiction without regard to the application of choice of law principles.

**(b)    Venue.**

Any controversy arising under or in relation to this Loan Agreement or any other Loan Document shall be litigated exclusively in the Property Jurisdiction without regard to conflicts of laws principles.    The state and federal courts and authorities with jurisdiction in the Property

Jurisdiction shall have exclusive jurisdiction over all controversies which shall arise under or in relation to this Loan Agreement or any other Loan Document. Borrower irrevocably consents to service, jurisdiction, and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence, or otherwise.

**Section 15.02    Notice.**

**(a)    Process of Serving Notice.**

Except as otherwise set forth herein or in any other Loan Document, all notices under this Loan Agreement and any other Loan Document shall be:

(1)    in writing and shall be:

(A)    delivered, in person;

(B)    mailed, postage prepaid, either by registered or certified delivery, return receipt requested;

(C)    sent by overnight courier; or

(D)    sent by electronic mail with originals to follow by overnight courier;

(2)    addressed to the intended recipient at Borrower's Notice Address and Lender's Notice Address, as applicable; and

(3)    deemed given on the earlier to occur of:

(A)    the date when the notice is received by the addressee; or

(B)    if the recipient refuses or rejects delivery, the date on which the notice is so refused or rejected, as conclusively established by the records of the United States Postal Service or such express courier service.

**(b)    Change of Address.**

Any party to this Loan Agreement may change the address to which notices intended for it are to be directed by means of notice given to the other parties identified on the Summary of Loan Terms in accordance with this Section 15.02.

**(c)    Default Method of Notice.**

Any required notice under this Loan Agreement or any other Loan Document which does not specify how notices are to be given shall be given in accordance with this Section 15.02.

Neither Borrower nor Lender shall refuse or reject delivery of any notice given in accordance with this Loan Agreement. Each party is required to acknowledge, in writing, the receipt of any notice upon request by the other party.

### (e) Master Lessee Notices.

Borrower acknowledges and agrees that Borrower solely shall be responsible for (1) causing Master Lessee to comply with any notice received by Borrower from Lender, and (2) promptly providing Lender with copies of notices received by Borrower from Master Lessee. Borrower's compliance with or failure to act as an intermediary as described in this Section 15.02(e) shall not relieve Borrower from its obligations under this Loan Agreement, nor shall it constitute a defense or excuse for nonperformance by Borrower, Master Lessee, or any Guarantor, as applicable. Lender shall have no obligation to provide any notice to Master Lessee unless and until Lender has taken ownership or control of the Mortgaged Property, or in connection with Lender's exercise of the power of attorney granted herein, and then only as required by the Loan Documents or the Master Lease Documents.

## Section 15.03    Successors and Assigns Bound; Sale of Mortgage Loan.

### (a) Binding Agreement.

This Loan Agreement shall bind, and the rights granted by this Loan Agreement shall inure to, the successors and assigns of Lender and the permitted successors and assigns of Borrower. However, a Transfer not permitted by this Loan Agreement shall be an Event of Default and shall be void ab initio.

### (b) Sale of Mortgage Loan; Change of Servicer.

Nothing in this Loan Agreement shall limit Lender's (including its successors and assigns) right to sell or transfer the Mortgage Loan or any interest in the Mortgage Loan. The Mortgage Loan or a partial interest in the Mortgage Loan (together with this Loan Agreement and the other Loan Documents) may be sold one or more times without prior written notice to Borrower. A sale may result in a change of the Loan Servicer.

## Section 15.04    Counterparts.

This Loan Agreement may be executed in any number of counterparts with the same effect as if the parties hereto had signed the same document and all such counterparts shall be construed together and shall constitute one instrument.

## Section 15.05    Joint and Several (or Solidary) Liability.

If more than one Person signs this Loan Agreement as Borrower, the obligations of such Persons shall be joint and several (solidary instead for purposes of Louisiana law).

**Section 15.06     Relationship of Parties; No Third Party Beneficiary.**

    **(a)     Solely Creditor and Debtor.**

    The relationship between Lender and Borrower shall be solely that of creditor and debtor, respectively, and nothing contained in this Loan Agreement shall create any other relationship between Lender and Borrower, nor between Lender and Master Lessee. Nothing contained in this Loan Agreement shall constitute Lender as a joint venturer, partner, or agent of Borrower or Master Lessee, or render Lender liable for any debts, obligations, acts, omissions, representations, or contracts of Borrower or Master Lessee.

    **(b)     No Third Party Beneficiaries.**

    No creditor of any party to this Loan Agreement and no other Person shall be a third party beneficiary of this Loan Agreement or any other Loan Document or any account created or contemplated under this Loan Agreement or any other Loan Document. Nothing contained in this Loan Agreement shall be deemed or construed to create an obligation on the part of Lender to any third party nor shall any third party have a right to enforce against Lender any right that Borrower may have under this Loan Agreement. Without limiting the foregoing:

        (1)     any Servicing Arrangement between Lender and any Loan Servicer shall constitute a contractual obligation of such Loan Servicer that is independent of the obligation of Borrower for the payment of the Indebtedness;

        (2)     Borrower shall not be a third party beneficiary of any Servicing Arrangement; and

        (3)     no payment by the Loan Servicer under any Servicing Arrangement will reduce the amount of the Indebtedness.

**Section 15.07     Severability; Entire Agreement; Amendments.**

    The invalidity or unenforceability of any provision of this Loan Agreement or any other Loan Document shall not affect the validity or enforceability of any other provision of this Loan Agreement or of any other Loan Document, all of which shall remain in full force and effect, including the Guaranty. This Loan Agreement contains the complete and entire agreement among the parties as to the matters covered, rights granted, and the obligations assumed in this Loan Agreement. This Loan Agreement may not be amended or modified except by written agreement signed by the parties hereto.

**Section 15.08     Construction.**

    (a)     The captions and headings of the sections of this Loan Agreement and the Loan Documents are for convenience only and shall be disregarded in construing this Loan Agreement and the Loan Documents.

(b)     Any reference in this Loan Agreement to an "Exhibit" or "Schedule" or a "Section" or an "Article" shall, unless otherwise explicitly provided, be construed as referring, respectively, to an Exhibit or Schedule attached to this Loan Agreement or to a Section or Article of this Loan Agreement.

(c)     Any reference in this Loan Agreement to a statute or regulation shall be construed as referring to that statute or regulation as amended from time to time.

(d)     Use of the singular in this Loan Agreement includes the plural and use of the plural includes the singular.

(e)     As used in this Loan Agreement, the term "including" means "including, but not limited to" or "including, without limitation," and is for example only and not a limitation.

(f)     Whenever Borrower's knowledge is implicated in this Loan Agreement or the phrase "to Borrower's knowledge" or a similar phrase is used in this Loan Agreement, Borrower's knowledge or such phrase(s) shall be interpreted to mean to the best of Borrower's knowledge after reasonable and diligent inquiry and investigation.

(g)     Unless otherwise provided in this Loan Agreement, if Lender's approval, designation, determination, selection, estimate, action, or decision is required, permitted, or contemplated hereunder, such approval, designation, determination, selection, estimate, action, or decision shall be made in Lender's sole and absolute discretion.

(h)     All references in this Loan Agreement to a separate instrument or agreement shall include such instrument or agreement as the same may be amended or supplemented from time to time pursuant to the applicable provisions thereof.

(i)     "Lender may" shall mean at Lender's discretion, but shall not be an obligation.

(j)     If the Mortgage Loan proceeds are disbursed on a date that is later than the Effective Date, as described in Section 2.02(a)(1), the representations and warranties in the Loan Documents with respect to the ownership and operation of the Mortgaged Property shall be deemed to be made as of the disbursement date.

(k)     Each reference to "tenant" or "tenants" in the Loan Documents shall be interpreted to mean "subtenant" or "subtenants" where the context so indicates.

**Section 15.09     Mortgage Loan Servicing.**

All actions regarding the servicing of the Mortgage Loan, including the collection of payments, the giving and receipt of notice, inspections of the Mortgaged Property, inspections of books and records, and the granting of consents and approvals, may be taken by the Loan Servicer unless Borrower receives notice to the contrary. If Borrower receives conflicting notices regarding the identity of the Loan Servicer or any other subject, any such written notice from Lender shall govern. The Loan Servicer may change from time to time (whether related or

unrelated to a sale of the Mortgage Loan).  If there is a change of the Loan Servicer, Borrower will be given written notice of the change.

## Section 15.10    Disclosure of Information.

Lender may furnish information regarding Borrower, Master Lessee, Key Principal, or Guarantor, or the Mortgaged Property to third parties with an existing or prospective interest in the servicing, enforcement, evaluation, performance, purchase, or securitization of the Mortgage Loan, including trustees, master servicers, special servicers, rating agencies, and organizations maintaining databases on the underwriting and performance of multifamily mortgage loans. Borrower irrevocably waives any and all rights it may have under applicable law to prohibit such disclosure, including any right of privacy.

## Section 15.11    Waiver; Conflict.

No specific waiver of any of the terms of this Loan Agreement shall be considered as a general waiver.  If any provision of this Loan Agreement is in conflict with any provision of any other Loan Document, the provision contained in this Loan Agreement shall control.

## Section 15.12    No Reliance.

Borrower acknowledges, represents, and warrants that:

(a)    it understands the nature and structure of the transactions contemplated by this Loan Agreement and the other Loan Documents;

(b)    it is familiar with the provisions of all of the documents and instruments relating to such transactions;

(c)    it understands the risks inherent in such transactions, including the risk of loss of all or any part of the Mortgaged Property;

(d)    it has had the opportunity to consult counsel; and

(e)    it has not relied on Lender for any guidance or expertise in analyzing the financial or other consequences of the transactions contemplated by this Loan Agreement or any other Loan Document or otherwise relied on Lender in any manner in connection with interpreting, entering into, or otherwise in connection with this Loan Agreement, any other Loan Document, or any of the matters contemplated hereby or thereby.

## Section 15.13    Subrogation.

If, and to the extent that, the proceeds of the Mortgage Loan are used to pay, satisfy, or discharge any obligation of Borrower or Master Lessee for the payment of money that is secured by a pre-existing mortgage, deed of trust, or other lien encumbering the Mortgaged Property, such Mortgage Loan proceeds shall be deemed to have been advanced by Lender at Borrower's request, and Lender shall automatically, and without further action on its part, be subrogated to

the rights, including lien priority, of the owner or holder of the obligation secured by such prior lien, whether or not such prior lien is released.

## Section 15.14    Counting of Days.

Except where otherwise specifically provided, any reference in this Loan Agreement to a period of "days" means calendar days, not Business Days. If the date on which Borrower is required to perform an obligation under this Loan Agreement is not a Business Day, Borrower shall be required to perform such obligation by the Business Day immediately preceding such date; provided, however, in respect of any Payment Date, or if the Maturity Date is other than a Business Day, Borrower shall be obligated to make such payment by the Business Day immediately following such date.

## Section 15.15    Revival and Reinstatement of Indebtedness.

If the payment of all or any part of the Indebtedness by Borrower, Master Lessee, any Guarantor, or any other Person, or the transfer to Lender of any collateral or other property should for any reason subsequently be declared to be void or voidable under any state or federal law relating to creditors' rights, including provisions of the Insolvency Laws relating to a Voidable Transfer, and if Lender is required to repay or restore, in whole or in part, any such Voidable Transfer, or elects to do so upon the advice of its counsel, then the amount of such Voidable Transfer or the amount of such Voidable Transfer that Lender is required or elects to repay or restore, including all reasonable costs, expenses, and attorneys' fees incurred by Lender in connection therewith, and the Indebtedness shall automatically shall be revived, reinstated, and restored by such amount and shall exist as though such Voidable Transfer had never been made.

## Section 15.16    Time is of the Essence.

Borrower agrees that, with respect to each and every obligation and covenant contained in this Loan Agreement and the other Loan Documents, time is of the essence.

## Section 15.17    Final Agreement.

THIS LOAN AGREEMENT ALONG WITH ALL OF THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES. All prior or contemporaneous agreements, understandings, representations, and statements, oral or written, are merged into this Loan Agreement and the other Loan Documents. This Loan Agreement, the other Loan Documents, and any of their provisions may not be waived, modified, amended, discharged, or terminated except by an agreement in writing signed by the party against which the enforcement of the waiver, modification, amendment, discharge, or termination is sought, and then only to the extent set forth in that agreement.

**Section 15.18      WAIVER OF TRIAL BY JURY.**

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH OF BORROWER AND LENDER (a) COVENANTS AND AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS LOAN AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR THE RELATIONSHIP BETWEEN THE PARTIES AS BORROWER AND LENDER, THAT IS TRIABLE OF RIGHT BY A JURY, AND (b) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH PARTY, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.

**[Remainder of Page Intentionally Blank]**

**IN WITNESS WHEREOF**, Borrower and Lender have signed and delivered this Loan Agreement under seal (where applicable) or have caused this Loan Agreement to be signed and delivered under seal (where applicable) by their duly authorized representatives.   Where applicable law so provides, Borrower and Lender intend that this Loan Agreement shall be deemed to be signed and delivered as a sealed instrument.

**BORROWER:**

NB VUE MAC, DST,
a Delaware statutory trust

By:    NB Vue Mac ST, LLC,
        a Delaware limited liability company,
        its Statutory Trustee

        By:    Nelson Brothers Professional Real Estate, LLC
                a California limited liability company,
                its sole member

                By:    _____
                Name: Patrick Nelson
                Title:  Manager

**LENDER:**

**BERKELEY POINT CAPITAL LLC**, a Delaware limited liability company

By: _____ (SEAL)
    Name: Heidi Marrin
    Title: Director

By: _____ (SEAL)
    Name: Deborah Demoney
    Title: Vice President

Multifamily Loan and Security Agreement
(Non-Recourse) (Master Lease)
Signature Page

Form 6001.NR.ML
10-15

Page S-2
© 2015 Fannie Mae

# SCHEDULE 1
## TO MULTIFAMILY LOAN AND SECURITY AGREEMENT

**Definitions Schedule**
**(Interest Rate Type – Fixed Rate)**
**(Master Lease)**

Capitalized terms used in the Loan Agreement have the meanings given to such terms in this Definitions Schedule.

"**Accrued Interest**" means unpaid interest, if any, on the Mortgage Loan that has not been added to the unpaid principal balance of the Mortgage Loan pursuant to Section 2.02(b) (Capitalization of Accrued But Unpaid Interest) of the Loan Agreement.

"**Additional Lender Repairs**" means repairs of the type listed on the Required Repair Schedule but not otherwise identified thereon that are determined advisable by Lender to keep the Mortgaged Property in good order and repair (ordinary wear and tear excepted) and in good marketable condition or to prevent deterioration of the Mortgaged Property.

"**Additional Lender Replacements**" means replacements of the type listed on the Required Replacement Schedule but not otherwise identified thereon that are determined advisable by Lender to keep the Mortgaged Property in good order and repair (ordinary wear and tear excepted) and in good marketable condition or to prevent deterioration of the Mortgaged Property.

"**Affiliate**" means:

      (a)      any Person that owns any direct ownership interest in such Person;

      (b)      any Person that indirectly owns, with the power to vote, twenty percent (20%) or more of the ownership interests in such Person;

      (c)      any Person Controlled by, under common Control with, or which Controls such Person;

      (d)      any entity in which such Person directly or indirectly owns, with the power to vote, twenty percent (20%) or more of the ownership interests in such entity; or

      (e)      any other individual that is related (to the third degree of consanguinity) by blood or marriage to such Person.

"**Affiliated Master Lessee**" means a Master Lessee that is a Borrower Affiliate. For the purposes of this Loan Agreement and the Loan Documents, the Master Lessee shall be deemed an Affiliated Master Lessee.

DMEAST #23702427 v9
**Schedule 1 to Multifamily Loan and**
**Security Agreement - Definitions Schedule**
**(Interest Rate Type - Fixed Rate) (Master**
**Lease)**
**Fannie Mae**

Form 6101.FR.ML
10-15

Page 1
© 2015 Fannie Mae

"**Amortization Period**" has the meaning set forth in the Summary of Loan Terms.

"**Amortization Type**" has the meaning set forth in the Summary of Loan Terms.

"**Bank Secrecy Act**" means the Bank Secrecy Act of 1970, as amended (e.g., 31 U.S.C. Sections 5311-5330).

"**Bankruptcy Event**" means any one or more of the following:

      (a)    the commencement, filing or continuation of a voluntary case or proceeding under one or more of the Insolvency Laws by Borrower or Affiliated Master Lessee;

      (b)    the acknowledgment in writing by Borrower or Affiliated Master Lessee (other than to Lender in connection with a workout) that it is unable to pay its debts generally as they mature;

      (c)    the making of a general assignment for the benefit of creditors by Borrower or Affiliated Master Lessee;

      (d)    the commencement, filing or continuation of an involuntary case or proceeding under one or more Insolvency Laws against Borrower or Affiliated Master Lessee; or

      (e)    the appointment of a receiver (other than a receiver appointed at the direction or request of Lender under the terms of the Loan Documents), liquidator, custodian, sequestrator, trustee or other similar officer who exercises control over Borrower or Affiliated Master Lessee or any substantial part of the assets of Borrower or Affiliated Master Lessee;

provided, however, that any proceeding or case under (d) or (e) above shall not be a Bankruptcy Event until the ninetieth (90th) day after filing (if not earlier dismissed) so long as such proceeding or case occurred without the consent, encouragement or active participation of (1) Borrower, Affiliated Master Lessee, Guarantor, or Key Principal, (2) any Person Controlling Borrower, Affiliated Master Lessee, Guarantor, or Key Principal, or (3) any Person Controlled by or under common Control with Borrower, Affiliated Master Lessee, Guarantor, or Key Principal (in which event such case or proceeding shall be a Bankruptcy Event immediately).

"**Borrower**" means, individually (and jointly and severally (solidarily instead for purposes of Louisiana law) if more than one), the entity (or entities) identified as "Borrower" in the first paragraph of the Loan Agreement.

"**Borrower Affiliate**" means, as to Borrower, Guarantor, Key Principal, or Affiliated Property Operator:

      (a) any Person that owns any direct ownership interest in Borrower, Guarantor, Key Principal, or Affiliated Property Operator;

DMEAST #23702427 v9
**Schedule 1 to Multifamily Loan and Security Agreement - Definitions Schedule (Interest Rate Type - Fixed Rate) (Master Lease)**
**Fannie Mae**

Form 6101.FR.ML
10-15

Page 2
© 2015 Fannie Mae

(b)     any Person that indirectly owns, with the power to vote, twenty percent (20%) or more of the ownership interests in Borrower, Guarantor, Key Principal, or Affiliated Property Operator;

(c)     any Person Controlled by, under common Control with, or which Controls, Borrower, Guarantor, Key Principal, or Affiliated Property Operator;

(d)     any entity in which Borrower, Guarantor, Key Principal, or Affiliated Property Operator directly or indirectly owns, with the power to vote, twenty percent (20%) or more of the ownership interests in such entity; or

(e)     any other individual that is related (to the third degree of consanguinity) by blood or marriage to Borrower, Guarantor, Key Principal, or Affiliated Property Operator.

**"Borrower Requested Repairs"** means repairs not listed on the Required Repair Schedule requested by Borrower to be reimbursed from the Repairs Escrow Account and determined advisable by Lender to keep the Mortgaged Property in good order and repair and in a good marketable condition or to prevent deterioration of the Mortgaged Property.

**"Borrower Requested Replacements"** means replacements not listed on the Required Replacement Schedule requested by Borrower to be reimbursed from the Replacement Reserve Account and determined advisable by Lender to keep the Mortgaged Property in good order and repair and in a good marketable condition or to prevent deterioration of the Mortgaged Property.

**"Borrower's General Business Address"** has the meaning set forth in the Summary of Loan Terms.

**"Borrower's Notice Address"** has the meaning set forth in the Summary of Loan Terms.

**"Business Day"** means any day other than (a) a Saturday, (b) a Sunday, (c) a day on which Lender is not open for business, or (d) a day on which the Federal Reserve Bank of New York is not open for business.

**"Collateral Account Funds"** means, collectively, the funds on deposit in any or all of the Collateral Accounts, including the Reserve/Escrow Account Funds.

**"Collateral Accounts"** means any account designated as such by Lender pursuant to a Collateral Agreement or as established pursuant to this Loan Agreement, including the Reserve/Escrow Account.

**"Collateral Agreement"** means any separate agreement between Borrower and Lender or Borrower and Master Lessee, as applicable, for the establishment of any other fund, reserve or account.

**"Completion Period"** has the meaning set forth in the Summary of Loan Terms.

DMEAST #23702427 v9
**Schedule 1 to Multifamily Loan and
Security Agreement - Definitions Schedule
(Interest Rate Type - Fixed Rate) (Master
Lease)**                                    **Form 6101.FR.ML**                          **Page 3**
**Fannie Mae**                               **10-15**                          **© 2015 Fannie Mae**

"**Condemnation Action**" has the meaning set forth in the Security Instrument.

"**Control**" (including with correlative meanings, such as "Controlling," "Controlled by" and "under common Control with") means, as applied to any entity, the possession, directly or indirectly, of the power to direct or cause the direction of the management and operations of such entity, whether through the ownership of voting securities or other ownership interests, by contract or otherwise.

"**Credit Score**" means a numerical value or a categorization derived from a statistical tool or modeling system used to measure credit risk and predict the likelihood of certain credit behaviors, including default.

"**Debt Service Amounts**" means the Monthly Debt Service Payments and all other amounts payable under the Loan Agreement, the Note, the Security Instrument or any other Loan Document.

"**Default Rate**" means an interest rate equal to the lesser of:

> (a)     the sum of the Interest Rate plus four (4) percentage points; or

> (b)     the maximum interest rate which may be collected from Borrower under applicable law.

"**Definitions Schedule**" means this Schedule 1 (Definitions Schedule) to the Loan Agreement.

"**DST Conversion**" means the conversion of Borrower from a Delaware statutory trust into a Delaware limited liability company in accordance with the terms and conditions of the DST Trust Agreement and applicable law.

"**DST Trust Agreement**" means the TRUST AGREEMENT OF NB VUE MAC, DST A DELAWARE STATUTORY TRUST dated December 18, 2015.

"**Effective Date**" has the meaning set forth in the Summary of Loan Terms.

"**Employee Benefit Plan**" means a plan described in Section 3(3) of ERISA, regardless of whether the plan is subject to ERISA.

"**Enforcement Costs**" has the meaning set forth in the Security Instrument.

"**Environmental Indemnity Agreement**" means that certain Environmental Indemnity Agreement dated as of the Effective Date made by Borrower to and for the benefit of Lender, as the same may be amended, restated, replaced, supplemented, or otherwise modified from time to time.

DMEAST #23702427 v9
Schedule 1 to Multifamily Loan and
Security Agreement - Definitions Schedule
(Interest Rate Type - Fixed Rate) (Master
Lease)                                    Form 6101.FR.ML                      Page 4
Fannie Mae                                    10-15                      © 2015 Fannie Mae

"**Environmental Inspections**" has the meaning set forth in the Environmental Indemnity Agreement.

"**Environmental Laws**" has the meaning set forth in the Environmental Indemnity Agreement.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" shall mean, with respect to Borrower and Affiliated Master Lessee, as applicable, any entity that, together with Borrower or Affiliated Master Lessee, would be treated as a single employer under Section 414(b) or (c) of the Internal Revenue Code, or Section 4001(a)(14) of ERISA, or the regulations thereunder.

"**ERISA Plan**" means any employee pension benefit plan within the meaning of Section 3(2) of ERISA (or related trust) that is subject to the requirements of Title IV of ERISA, Sections 430 or 431 of the Internal Revenue Code, or Sections 302, 303, or 304 of ERISA, which is maintained or contributed to by Borrower, Affiliated Master Lessee or their respective ERISA Affiliates.

"**Event of Default**" means the occurrence of any event listed in Section 14.01 (Events of Default) of the Loan Agreement.

"**Exceptions to Representations and Warranties Schedule**" means that certain Schedule 7 (Exceptions to Representations and Warranties Schedule) to the Loan Agreement.

"**First Payment Date**" has the meaning set forth in the Summary of Loan Terms.

"**First Principal and Interest Payment Date**" has the meaning set forth in the Summary of Loan Terms, if applicable.

"**Fixed Rate**" has the meaning set forth in the Summary of Loan Terms.

"**Fixtures**" has the meaning set forth in the Security Instrument.

"**Force Majeure**" shall mean acts of God, acts of war, civil disturbance, governmental action (including the revocation or refusal to grant licenses or permits, where such revocation or refusal is not due to the fault of Borrower or Master Lessee), strikes, lockouts, fire, unavoidable casualties or any other causes beyond the reasonable control of Borrower and Master Lessee (other than lack of financing), and of which Borrower shall have notified Lender in writing within ten (10) days after its occurrence.

"**Foreclosure Event**" means:

  (a) foreclosure under the Security Instrument;

  (b) any other exercise by Lender of rights and remedies (whether under the Security Instrument or under applicable law, including Insolvency Laws) as holder of the Mortgage Loan

DMEAST #23702427 v9
**Schedule 1 to Multifamily Loan and
Security Agreement - Definitions Schedule
(Interest Rate Type - Fixed Rate) (Master
Lease)**
**Fannie Mae**

Form 6101.FR.ML
10-15

Page 5
© 2015 Fannie Mae

and/or the Security Instrument, as a result of which Lender (or its designee or nominee) or a third party purchaser becomes owner of the Mortgaged Property;

      (c)    delivery by Borrower to Lender (or its designee or nominee) of a deed or other conveyance of Borrower's interest in the Mortgaged Property in lieu of any of the foregoing; or

      (d)    in Louisiana, any dation en paiement.

"**Governmental Authority**" means any court, board, commission, department or body of any municipal, county, state or federal governmental unit, or any subdivision of any of them, that has or acquires jurisdiction over Borrower, Master Lessee or the Mortgaged Property or the use, operation or improvement of the Mortgaged Property.

"**Guarantor**" means, individually and collectively, (i) any guarantor of the Indebtedness or any other obligation of Borrower under any Loan Document Lender and (ii) any guarantor of the obligations of Master Lessee under the Master Lease Documents.

"**Guarantor Bankruptcy Event**" means any one or more of the following:

      (a)    the commencement, filing or continuation of a voluntary case or proceeding under one or more of the Insolvency Laws by Guarantor;

      (b)    the acknowledgment in writing by Guarantor (other than to Lender in connection with a workout) that it is unable to pay its debts generally as they mature;

      (c)    the making of a general assignment for the benefit of creditors by Guarantor;

      (d)    the commencement, filing or continuation of an involuntary case or proceeding under one or more Insolvency Laws against Guarantor; or

      (e)    the appointment of a receiver, liquidator, custodian, sequestrator, trustee or other similar officer who exercises control over Guarantor or any substantial part of the assets of Guarantor, as applicable;

provided, however, that any proceeding or case under (d) or (e) above shall not be a Guarantor Bankruptcy Event until the ninetieth (90th) day after filing (if not earlier dismissed) so long as such proceeding or case occurred without the consent, encouragement or active participation of (1) Borrower, Affiliated Master Lessee, Guarantor, or Key Principal, (2) any Person Controlling Borrower, Affiliated Master Lessee, Guarantor, or Key Principal, or (3) any Person Controlled by or under common Control with Borrower, Affiliated Master Lessee, Guarantor, or Key Principal (in which event such case or proceeding shall be a Guarantor Bankruptcy Event immediately).

"**Guarantor's General Business Address**" has the meaning set forth in the Summary of Loan Terms.

DMEAST #23702427 v9
**Schedule 1 to Multifamily Loan and
Security Agreement - Definitions Schedule
(Interest Rate Type - Fixed Rate) (Master
Lease)**
**Fannie Mae**
        **Form 6101.FR.ML
10-15**
        **Page 6
© 2015 Fannie Mae**

"**Guarantor's Notice Address**" has the meaning set forth in the Summary of Loan Terms.

"**Guaranty**" means, individually and collectively, any Payment Guaranty, Non-Recourse Guaranty or other guaranty executed by Guarantor in connection with the Mortgage Loan.

"**Immediate Family Members**" means a child, stepchild, grandchild, spouse, sibling, or parent, each of whom is not a Prohibited Person.

"**Imposition Deposits**" has the meaning set forth in the Security Instrument.

"**Impositions**" has the meaning set forth in the Security Instrument.

"**Improvements**" has the meaning set forth in the Security Instrument.

"**Indebtedness**" has the meaning set forth in the Security Instrument.

"**Initial Replacement Reserve Deposit**" has the meaning set forth in the Summary of Loan Terms.

"**Insolvency Laws**" means the United States Bankruptcy Code, 11 U.S.C. Section 101, et seq., together with any other federal or state law affecting debtor and creditor rights or relating to the bankruptcy, insolvency, reorganization, arrangement, moratorium, readjustment of debt, dissolution, liquidation or similar laws, proceedings, or equitable principles affecting the enforcement of creditors' rights, as amended from time to time.

"**Insolvent**" means:

> (a) that the sum total of all of a specified Person's liabilities (whether secured or unsecured, contingent or fixed, or liquidated or unliquidated) is in excess of the value of such Person's non-exempt assets, i.e., all of the assets of such Person that are available to satisfy claims of creditors; or

> (b) such Person's inability to pay its debts as they become due.

"**Intended Prepayment Date**" means the date upon which Borrower intends to make a prepayment on the Mortgage Loan, as set forth in the Prepayment Notice.

"**Interest Accrual Method**" has the meaning set forth in the Summary of Loan Terms.

"**Interest Only Term**" has the meaning set forth in the Summary of Loan Terms.

"**Interest Rate**" means the Fixed Rate.

"**Interest Rate Type**" has the meaning set forth in the Summary of Loan Terms.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended.

DMEAST #23702427 v9
Schedule 1 to Multifamily Loan and
Security Agreement - Definitions Schedule
(Interest Rate Type - Fixed Rate) (Master
Lease)                                  Form 6101.FR.ML                    Page 7
Fannie Mae                                   10-15                   © 2015 Fannie Mae

"**Investor**" means any Person to whom Lender intends to (a) sell, transfer, deliver or assign the Mortgage Loan in the secondary mortgage market, or (b) sell an MBS backed by the Mortgage Loan.

"**Key Principal**" means, collectively:

(a) the natural person(s) or entity that Lender determines is critical to the successful operation and management of the Mortgaged Property, as identified as such in the Summary of Loan Terms; or

(b) any natural person or entity who becomes a Key Principal after the date of the Loan Agreement and is identified as such in an assumption agreement, or another amendment or supplement to the Loan Agreement.

"**Key Principal's General Business Address**" has the meaning set forth in the Summary of Loan Terms.

"**Key Principal's Notice Address**" has the meaning set forth in the Summary of Loan Terms.

"**Land**" means the land described in <u>Exhibit A</u> to the Security Instrument.

"**Last Interest Only Payment Date**" has the meaning set forth in the Summary of Loan Terms, if applicable.

"**Late Charge**" means an amount equal to the delinquent amount then due under the Loan Documents multiplied by five percent (5%).

"**Leases**" has the meaning set forth in the Security Instrument.

"**Lender**" means the entity identified as "Lender" in the first paragraph of the Loan Agreement and its transferees, successors and assigns, or any subsequent holder of the Note.

"**Lender's General Business Address**" has the meaning set forth in the Summary of Loan Terms.

"**Lender's Notice Address**" has the meaning set forth in the Summary of Loan Terms.

"**Lender's Payment Address**" has the meaning set forth in the Summary of Loan Terms.

"**Lien**" has the meaning set forth in the Security Instrument.

"**Loan Agreement**" means the Multifamily Loan and Security Agreement dated as of the Effective Date executed by and between Borrower and Lender to which this Definitions Schedule is attached, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

DMEAST #23702427 v9
**Schedule 1 to Multifamily Loan and
Security Agreement - Definitions Schedule
(Interest Rate Type - Fixed Rate) (Master
Lease)**                                    **Form 6101.FR.ML**                    **Page 8**
**Fannie Mae**                                  **10-15**                     **© 2015 Fannie Mae**

"**Loan Amount**" has the meaning set forth in the Summary of Loan Terms.

"**Loan Application**" means the application for the Mortgage Loan submitted by Borrower to Lender.

"**Loan Documents**" means the Note, the Loan Agreement, the Security Instrument, the Environmental Indemnity Agreement, the Guaranty, all guaranties, all indemnity agreements, all Collateral Agreements, all O&M Plans, and any other documents now or in the future executed by Borrower, Guarantor, Key Principal, any other guarantor or any other Person in connection with the Mortgage Loan, as such documents may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Loan Servicer**" means the entity that from time to time is designated by Lender to collect payments and deposits and receive notices under the Note, the Loan Agreement, the Security Instrument and any other Loan Document, and otherwise to service the Mortgage Loan for the benefit of Lender.  Unless Borrower receives notice to the contrary, the Loan Servicer shall be the Lender originally named on the Summary of Loan Terms.

"**Loan Term**" has the meaning set forth in the Summary of Loan Terms.

"**Loan Year**" has the meaning set forth in the Summary of Loan Terms.

"**Master Lease**" means that certain Master Lease dated December 18, 2015, between Borrower, as lessor, and Master Lessee, as lessee, or any subsequent master lease of the Mortgaged Property entered into in accordance with the Loan Documents.

"**Master Lease Basic Rent**" means any amounts required to be paid to Borrower under the Master Lease or included in "rent" payable by Master Lessee under the Master Lease.

"**Master Lease Documents**" means the Master Lease, and any other documents executed in connection with the Master Lease, as each have been approved by Lender.

"**Master Lease Request**" has the meaning set forth in Section 7.02(g) (Special Covenants Regarding Master Lease Documents).

"**Master Lessee**" means NB VUE MAC LEASECO, LLC, a Delaware limited liability company.

"**Master Lessee Business Information**" has the meaning set forth in Section 7.02(g) (Special Covenants Regarding Master Lease Documents).

"**Master Lessee Estoppel Certificate**" means a certificate of estoppel from Master Lessee to Lender in a form required by Lender pursuant to the terms of Section 7.03(g)(3) (Master Lessee Estoppel) of the Loan Agreement.

DMEAST #23702427 v9
**Schedule 1 to Multifamily Loan and
Security Agreement - Definitions Schedule
(Interest Rate Type - Fixed Rate) (Master
Lease)
Fannie Mae**                 **Form 6101.FR.ML
10-15**                                   **Page 9
© 2015 Fannie Mae**

"**Master Lessee's General Business Address**" has the meaning set forth in the Summary of Loan Terms.

"**Master Lessee's Notice Address**" has the meaning set forth in the Summary of Loan Terms.

"**Material Commercial Lease**" means any non-Residential Lease other than:

(a)     a non-Residential Lease that comprises less than five percent (5%) of total gross income of the Mortgaged Property on an annualized basis, so long as the lease is not a cell tower lease, a solar (power) lease or a solar power purchase agreement;

(b)     a cable television lease, or broadband network lease with a lessee that is not a Borrower Affiliate, an Affiliate of Master Lessee, or Key Principal or Guarantor;

(c)     storage units leased pursuant to any Residential Lease; and

(d)     a laundry lease, so long as:

(1)     the lessee is not a Borrower Affiliate, an Affiliate of Master Lessee, or Key Principal or Guarantor;

(2)     the rent payable is not below-market (as determined by Lender); and

(3)     such laundry lease is terminable for cause by lessor.

For purposes of the Loan Documents, no Master Lease on the Mortgaged Property shall be deemed either a "Material Commercial Lease" or a "non-Material Commercial Lease."

"**Maturity Date**" has the meaning set forth in the Summary of Loan Terms.

"**Maximum Inspection Fee**" has the meaning set forth in the Summary of Loan Terms.

"**Maximum Repair Cost**" shall be the amount(s) set forth in the Required Repair Schedule, if any.

"**Maximum Repair Disbursement Interval**" has the meaning set forth in the Summary of Loan Terms.

"**Maximum Replacement Reserve Disbursement Interval**" has the meaning set forth in the Summary of Loan Terms.

"**Mezzanine Debt**" means a loan to a direct or indirect owner of Borrower or Affiliated Master Lessee secured by a pledge of such owner's interest in an entity owning a direct or indirect interest in Borrower.

DMEAST #23702427 v9
**Schedule 1 to Multifamily Loan and
Security Agreement - Definitions Schedule
(Interest Rate Type - Fixed Rate) (Master
Lease)**
**Fannie Mae**

**Form 6101.FR.ML**
**10-15**

**Page 10**
**© 2015 Fannie Mae**

"**Minimum Repairs Disbursement Amount**" has the meaning set forth in the Summary of Loan Terms.

"**Minimum Replacement Reserve Disbursement Amount**" has the meaning set forth in the Summary of Loan Terms.

"**Monthly Debt Service Payment**" has the meaning set forth in the Summary of Loan Terms.

"**Monthly Replacement Reserve Deposit**" has the meaning set forth in the Summary of Loan Terms.

"**Mortgage Loan**" means the mortgage loan made by Lender to Borrower in the principal amount of the Note made pursuant to the Loan Agreement, evidenced by the Note and secured by the Loan Documents that are expressly stated to be security for the Mortgage Loan.

"**Mortgaged Property**" has the meaning set forth in the Security Instrument.

"**Multifamily Project**" has the meaning set forth in the Summary of Loan Terms.

"**Multifamily Project Address**" has the meaning set forth in the Summary of Loan Terms.

"**Non-Recourse Guaranty**" means, if applicable, that certain Guaranty of Non-Recourse Obligations of even date herewith executed by Guarantor to and for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Note**" means that certain Multifamily Note of even date herewith in the original principal amount of the stated Loan Amount made by Borrower in favor of Lender, and all schedules, riders, allonges and addenda attached thereto, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**O&M Plan**" has the meaning set forth in the Environmental Indemnity Agreement.

"**OFAC**" means the United States Treasury Department, Office of Foreign Assets Control, and any successor thereto.

"**Payment Date**" means the First Payment Date and the first day of each month thereafter until the Mortgage Loan is fully paid.

"**Payment Guaranty**" means, if applicable, that certain Guaranty (Payment) of even date herewith executed by Guarantor to and for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Permitted Encumbrance**" has the meaning set forth in the Security Instrument.

DMEAST #23702427 v9
Schedule 1 to Multifamily Loan and
Security Agreement - Definitions Schedule
(Interest Rate Type - Fixed Rate) (Master
Lease)                                    Form 6101.FR.ML                                Page 11
Fannie Mae                                      10-15                                © 2015 Fannie Mae

**"Permitted Mezzanine Debt"** means Mezzanine Debt incurred by a direct or indirect owner or owners of Borrower or Affiliated Master Lessee where the exercise of any of the rights and remedies by the holder or holders of the Mezzanine Debt would not in any circumstance cause (a) a change in Control in Borrower, Affiliated Master Lessee, Key Principal, or Guarantor, or (b) a Transfer of a direct or indirect Restricted Ownership Interest in Borrower, Affiliated Master Lessee, Key Principal, or Guarantor.

**"Permitted Preferred Equity"** means Preferred Equity that does not (a) require mandatory dividends, distributions, payments or returns (including at maturity or in connection with a redemption), or (b) provide the Preferred Equity owner with rights or remedies on account of a failure to receive any preferred dividends, distributions, payments or returns (or, if such rights are provided, the exercise of such rights do not violate the Loan Documents or are otherwise exercised with the prior written consent of Lender in accordance with Article 11 (Liens, Transfers and Assumptions) of the Loan Agreement and the payment of all applicable fees and expenses as set forth in Section 11.03(g) (Further Conditions to Transfers and Assumption)).

**"Permitted Prepayment Date"** means the last Business Day of a calendar month.

**"Permitted Transfer"** has the meaning set forth in Section 11.03(h) (Additional Permitted Transfers).

**"Person"** means an individual, an estate, a trust, a corporation, a partnership, a limited liability company or any other organization or entity (whether governmental or private).

**"Personal Property"** means the goods, accounts, choses of action, chattel paper, documents, general intangibles (including Software), payment intangibles, instruments, investment property, letter of credit rights, supporting obligations, computer information, source codes, object codes, records and data, all telephone numbers or listings, claims (including claims for indemnity or breach of warranty), deposit accounts and other property or assets of any kind or nature related to the Land or the Improvements, including operating agreements, surveys, plans and specifications and contracts for architectural, engineering and construction services relating to the Land or the Improvements, and all other intangible property and rights relating to the operation of, or used in connection with, the Land or the Improvements, including all governmental permits relating to any activities on the Land.

**"Personalty"** has the meaning set forth in the Security Instrument.

**"Preferred Equity"** means a direct or indirect equity ownership interest in, economic interests in, or rights with respect to, Borrower or Affiliated Master Lessee that provide an equity owner preferred dividend, distribution, payment, or return treatment relative to other equity owners.

**"Prepayment Lockout Period"** has the meaning set forth in the Summary of Loan Terms.

DMEAST #23702427 v9
Schedule 1 to Multifamily Loan and
Security Agreement - Definitions Schedule
(Interest Rate Type - Fixed Rate) (Master
Lease)                                    Form 6101.FR.ML                    Page 12
Fannie Mae                                   10-15                      © 2015 Fannie Mae

"**Prepayment Notice**" means the written notice that Borrower is required to provide to Lender in accordance with Section 2.03 (Lockout/Prepayment) of the Loan Agreement in order to make a prepayment on the Mortgage Loan, which shall include, at a minimum, the Intended Prepayment Date.

"**Prepayment Premium**" means the amount payable by Borrower in connection with a prepayment of the Mortgage Loan, as provided in Section 2.03 (Lockout/Prepayment) of the Loan Agreement and calculated in accordance with the Prepayment Premium Schedule.

"**Prepayment Premium Period End Date**" or "**Yield Maintenance Period End Date**" has the meaning set forth in the Summary of Loan Terms.

"**Prepayment Premium Period Term**" or "**Yield Maintenance Period Term**" has the meaning set forth in the Summary of Loan Terms.

"**Prepayment Premium Schedule**" means that certain Schedule 4 (Prepayment Premium Schedule) to the Loan Agreement.

"**Prohibited Person**" means:

      (a)    any Person with whom Lender or Fannie Mae is prohibited from doing business pursuant to any law, rule, regulation, judicial proceeding or administrative directive; or

      (b)    any Person identified on the United States Department of Housing and Urban Development's "Limited Denial of Participation, HUD Funding Disqualifications and Voluntary Abstentions List," or on the General Services Administration's "System for Award Management (SAM)" exclusion list, each of which may be amended from time to time, and any successor or replacement thereof; or

      (c)    any Person that is determined by Fannie Mae to pose an unacceptable credit risk due to the aggregate amount of debt of such Person owned or held by Fannie Mae; or

      (d)    any Person that has caused any unsatisfactory experience of a material nature with Fannie Mae or Lender, such as a default, fraud, intentional misrepresentation, litigation, arbitration or other similar act.

"**Property Jurisdiction**" has the meaning set forth in the Security Instrument.

"**Property Square Footage**" has the meaning set forth in the Summary of Loan Terms.

"**Publicly-Held Corporation**" means a corporation, the outstanding voting stock of which is registered under Sections 12(b) or 12(g) of the Securities Exchange Act of 1934, as amended.

DMEAST #23702427 v9
**Schedule 1 to Multifamily Loan and
Security Agreement - Definitions Schedule
(Interest Rate Type - Fixed Rate) (Master
Lease)
Fannie Mae**

**Form 6101.FR.ML
10-15**

**Page 13
© 2015 Fannie Mae**

**"Publicly-Held Trust"** means a real estate investment trust, the outstanding voting shares or beneficial interests of which are registered under Sections 12(b) or 12(g) of the Securities Exchange Act of 1934, as amended.

**"Rents"** has the meaning set forth in the Security Instrument.

**"Repair Threshold"** has the meaning set forth in the Summary of Loan Terms.

**"Repairs"** means, individually and collectively, the Required Repairs, Borrower Requested Repairs, and Additional Lender Repairs.

**"Repairs Escrow Account"** means the account established by Lender into which the Repairs Escrow Deposit is deposited to fund the Repairs.

**"Repairs Escrow Account Administrative Fee"** has the meaning set forth in the Summary of Loan Terms.

**"Repairs Escrow Deposit"** has the meaning set forth in the Summary of Loan Terms.

**"Replacement Reserve Account"** means the account established by Lender into which Replacement Reserve Deposits are deposited to fund the Replacements.

**"Replacement Reserve Account Administration Fee"** has the meaning set forth in the Summary of Loan Terms.

**"Replacement Reserve Account Interest Disbursement Frequency"** has the meaning set forth in the Summary of Loan Terms.

**"Replacement Reserve Deposits"** means the Initial Replacement Reserve Deposit, Monthly Replacement Reserve Deposits and any other deposits to the Replacement Reserve Account required by the Loan Agreement.

**"Replacement Threshold"** has the meaning set forth in the Summary of Loan Terms.

**"Replacements"** means, individually and collectively, the Required Replacements, Borrower Requested Replacements and Additional Lender Replacements.

**"Required Repair Schedule"** means that certain <u>Schedule 6</u> (Required Repair Schedule) to the Loan Agreement.

**"Required Repairs"** means those items listed on the Required Repair Schedule.

**"Required Replacement Schedule"** means that certain <u>Schedule 5</u> (Required Replacement Schedule) to the Loan Agreement.

DMEAST #23702427 v9
**Schedule 1 to Multifamily Loan and
Security Agreement - Definitions Schedule
(Interest Rate Type - Fixed Rate) (Master
Lease)
Fannie Mae**

**Form 6101.FR.ML
10-15**

**Page 14
© 2015 Fannie Mae**

"**Required Replacements**" means those items listed on the Required Replacement Schedule.

"**Reserve/Escrow Account Funds**" means, collectively, the funds on deposit in the Reserve/Escrow Accounts.

"**Reserve/Escrow Accounts**" means, together, the Replacement Reserve Account and the Repairs Escrow Account.

"**Residential Lease**" means a leasehold interest in an individual dwelling unit and shall not include any master lease.

"**Restoration**" means restoring and repairing the Mortgaged Property to the equivalent of its physical condition immediately prior to the casualty or to a condition approved by Lender following a casualty.

"**Restricted Ownership Interest**" means, with respect to any entity, the following:

(a)     if such entity is a general partnership or a joint venture, fifty percent (50%) or more of all general partnership or joint venture interests in such entity;

(b)     if such entity is a limited partnership:

      (1)     the interest of any general partner; or

      (2)     fifty percent (50%) or more of all limited partnership interests in such entity;

(c)     if such entity is a limited liability company or a limited liability partnership:

      (1)     the interest of any managing member or the contractual rights of any non-member manager; or

      (2)     fifty percent (50%) or more of all membership or other ownership interests in such entity;

(d)     if such entity is a corporation (other than a Publicly-Held Corporation) with only one class of voting stock, fifty percent (50%) or more of voting stock in such corporation;

(e)     if such entity is a corporation (other than a Publicly-Held Corporation) with more than one class of voting stock, the amount of shares of voting stock sufficient to have the power to elect the majority of directors of such corporation; or

(f)     if such entity is a trust (other than a land trust or a Publicly-Held Trust), the power to Control such trust vested in the trustee of such trust or the ability to remove, appoint or

DMEAST #23702427 v9
**Schedule 1 to Multifamily Loan and
Security Agreement - Definitions Schedule
(Interest Rate Type - Fixed Rate) (Master
Lease)**
**Fannie Mae**

**Form 6101.FR.ML
10-15**

**Page 15
© 2015 Fannie Mae**

substitute the trustee of such trust (unless the trustee of such trust after such removal, appointment or substitution is a trustee identified in the trust agreement approved by Lender).

"**Review Fee**" means the non-refundable fee of Three Thousand Dollars ($3,000) payable to Lender.

"**Schedule of Interest Rate Type Provisions**" means that certain Schedule 3 (Schedule of Interest Rate Type Provisions) to the Loan Agreement.

"**Security Instrument**" means that certain multifamily mortgage, deed to secure debt or deed of trust executed and delivered by Borrower as security for the Mortgage Loan and encumbering the Mortgaged Property, including all riders or schedules attached thereto, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Servicing Arrangement**" means any arrangement between Lender and the Loan Servicer for loss sharing or interim advancement of funds.

"**Springing LLC**" means, as applicable, the limited liability company into which Borrower is converted pursuant to a DST Conversion or to which the Mortgaged Property is transferred pursuant to a Springing Transfer.

"**Springing LLC Agreement**" means the limited liability company agreement of the Springing LLC, in substantially the form attached as an exhibit to the DST Trust Agreement or in such other form as may be approved by Lender in writing.

"**Springing Transaction**" means, as applicable, a DST Conversion or a Springing Transfer.

"**Springing Transfer**" means a Transfer of the Mortgaged Property to a Springing LLC in accordance with the terms and conditions of the DST Trust Agreement and applicable law.

"**Summary of Loan Terms**" means that certain Schedule 2 (Summary of Loan Terms) to the Loan Agreement.

"**Taxes**" has the meaning set forth in the Security Instrument.

"**Tenant/Landlord Subordination and Assignment Agreement**" means that certain Tenant/Landlord Subordination and Assignment dated as of even date herewith, by and between Borrower and Master Lessee as amended, restated, replaced, supplemented, or otherwise modified from time to time.

"**Title Policy**" means the mortgagee's loan policy of title insurance issued in connection with the Mortgage Loan and insuring the lien of the Security Instrument as set forth therein, as approved by Lender.

"**Total Parking Spaces**" has the meaning set forth in the Summary of Loan Terms.

DMEAST #23702427 v9
Schedule 1 to Multifamily Loan and
Security Agreement - Definitions Schedule
(Interest Rate Type - Fixed Rate) (Master
Lease)                                    Form 6101.FR.ML                    Page 16
Fannie Mae                                    10-15                    © 2015 Fannie Mae

**"Total Residential Units"** has the meaning set forth in the Summary of Loan Terms.

**"Transfer"** means:

(a)     a sale, assignment, transfer or other disposition (whether voluntary, involuntary, or by operation of law), other than Residential Leases, Material Commercial Leases or non-Material Commercial Leases permitted by this Loan Agreement;

(b)     a granting, pledging, creating or attachment of a lien, encumbrance or security interest (whether voluntary, involuntary, or by operation of law);

(c)     an issuance or other creation of a direct or indirect ownership interest;

(d)     a withdrawal, retirement, removal or involuntary resignation of any owner or manager of a legal entity; or

(e)     a merger, consolidation, dissolution or liquidation of a legal entity.

**"Transfer Fee"** means a fee equal to one percent (1%) of the unpaid principal balance of the Mortgage Loan payable to Lender.

**"UCC"** has the meaning set forth in the Security Instrument.

**"UCC Collateral"** has the meaning set forth in the Security Instrument.

**"Voidable Transfer"** means any fraudulent conveyance, preference or other voidable or recoverable payment of money or transfer of property.

**"Yield Maintenance Period End Date"** or **"Prepayment Premium Period End Date"** has the meaning set forth in the Summary of Loan Terms.

**"Yield Maintenance Period Term"** or **"Prepayment Premium Period Term"** has the meaning set forth in the Summary of Loan Terms.

DMEAST #23702427 v9
**Schedule 1 to Multifamily Loan and
Security Agreement - Definitions Schedule
(Interest Rate Type - Fixed Rate) (Master
Lease)
Fannie Mae**

**Form 6101.FR.ML
10-15**

**Page 17
© 2015 Fannie Mae**

# SCHEDULE 1
## TO MULTIFAMILY LOAN AND SECURITY AGREEMENT

**Definitions Schedule**
**(Interest Rate Type – Fixed Rate)**
**(Master Lease)**

_____
Borrower Initials

**SCHEDULE 2**
**TO MULTIFAMILY LOAN AND SECURITY AGREEMENT**

**Summary of Loan Terms**
**(Interest Rate Type - Fixed Rate)**
**(Master Lease)**

| I.    GENERAL PARTY AND MULTIFAMILY PROJECT INFORMATION | |
| --- | --- |
| **Borrower** | NB VUE MAC, DST, a Delaware statutory trust |
| **Lender** | BERKELEY POINT CAPITAL LLC, a Delaware limited liability company |
| **Master Lessee** | NB Vue Mac LeaseCo, LLC, a Delaware limited liability company |
| **Key Principal** | Patrick Nelson<br>Brian Nelson<br>Nelson Brothers Professional Real Estate, LLC |
| **Guarantor** | Patrick Nelson<br>Brian Nelson<br>Nelson Brothers Professional Real Estate, LLC |
| **Multifamily Project** | The Vue on MacGregor Apartments |
| ADDRESSES | |
| **Borrower's General Business Address** | 16B Journey, Suite 200<br>Aliso Viejo, CA 92656<br>Attention: Blake Wettengel |
| **Borrower's Notice Address** | 16B Journey, Suite 200<br>Aliso Viejo, CA 92656<br>Attention: Blake Wettengel<br>blake@nelson-brothers.com |
| **Multifamily Project Address** | 4460 South MacGregor Way, Houston, TX 77021 |
| **Multifamily Project County** | Harris County |
| **Key Principal's General Business Address** | 16B Journey, Suite 200<br>Aliso Viejo, CA 92656<br>Attention: Blake Wettengel |
| **Key Principal's Notice Address** | 16B Journey, Suite 200<br>Aliso Viejo, CA 92656 |

Schedule 2 to Multifamily Loan and
Security Agreement - Summary of Loan
Terms (Interest Rate Type - Fixed Rate)
(Master Lease)
Fannie Mae
DMEAST #23702427 v9

Form 6102.FR.ML
06-14

Page 1
© 2014 Fannie Mae

| | Attention: Blake Wettengel<br>blake@nelson-brothers.com |
|---|---|
| **Guarantor's General Business Address** | 16B Journey, Suite 200<br>Aliso Viejo, CA 92656<br>Attention: Blake Wettengel |
| **Guarantor's Notice Address** | 16B Journey, Suite 200<br>Aliso Viejo, CA 92656<br>Attention: Blake Wettengel<br>blake@nelson-brothers.com |
| **Master Lessee's General Business Address** | 16B Journey, Suite 200<br>Aliso Viejo, CA 92656<br>Attention: Blake Wettengel |
| **Master Lessee's Notice Address** | 16B Journey, Suite 200<br>Aliso Viejo, CA 92656<br>Attention: Blake Wettengel<br>blake@nelson-brothers.com |
| **Lender's General Business Address** | 4550 Montgomery Avenue, Suite 1100<br>Bethesda, Maryland 20814 |
| **Lender's Notice Address** | Attention:  Director Loan Servicing<br>One Beacon Street, 14th Floor<br>Boston, Massachusetts  02108<br>email address: servicing.requests@berkpoint.com |
| **Lender's Payment Address** | <u>Regular Mail</u>:<br>Berkeley Point Capital LLC<br>Lockbox<br>Box 773194<br>3194 Solutions Center<br>Chicago, IL  60677-3001<br><br><u>Overnight Delivery</u>:<br>Berkeley Point Capital LLC<br>Lockbox<br>Box 773194<br>350 East Devon Avenue<br>Itasca, Illinois  60143<br><br><u>Wire Transfer</u>:<br>████████████████ |

**Schedule 2 to Multifamily Loan and Security Agreement - Summary of Loan Terms (Interest Rate Type - Fixed Rate) (Master Lease)**
Fannie Mae
DMEAST #23702427 v9

Form 6102.FR.ML
06-14

Page 2
© 2014 Fannie Mae

|  |  |
|---|---|
|  |  |

| II.   MULTIFAMILY PROJECT INFORMATION | |
|---|---|
| **Property Square Footage** | 80,244 square feet |
| **Total Parking Spaces** | 291 |
| **Total Residential Units** | 115 units |
| **Affordable Housing Property** | ☐ Yes<br>☒ No |

| III.   MORTGAGE LOAN INFORMATION | |
|---|---|
| **Amortization Period** | Three hundred sixty (360) months |
| **Amortization Type** | ☐ Amortizing<br>☐ Full Term Interest Only<br>☒ Partial Interest Only |
| **Effective Date** | December 18, 2015 |
| **First Payment Date** | The first day of February 1, 2016. |
| **First Principal and Interest Payment Date** | The first day of February, 2019. |
| **Fixed Rate** | 4.59% |

**Schedule 2 to Multifamily Loan and Security Agreement - Summary of Loan Terms (Interest Rate Type - Fixed Rate) (Master Lease)**
Fannie Mae
DMEAST #23702427 v9

Form 6102.FR.ML
06-14

Page 3
© 2014 Fannie Mae

| | |
|---|---|
| **Interest Accrual Method** | ☐ 30/360 (computed on the basis of a three hundred sixty (360) day year consisting of twelve (12) thirty (30) day months).<br><br>or<br><br>☒ Actual/360 (computed on the basis of a three hundred sixty (360) day year and the actual number of calendar days during the applicable month, calculated by multiplying the unpaid principal balance of the Mortgage Loan by the Interest Rate, dividing the product by three hundred sixty (360), and multiplying the quotient obtained by the actual number of days elapsed in the applicable month). |
| **Interest Only Term** | 36 months |
| **Interest Rate** | The Fixed Rate |
| **Interest Rate Type** | Fixed Rate |
| **Last Interest Only Payment Date** | The first day of January, 2019. |
| **Loan Amount** | $23,265,000.00 |
| **Loan Term** | 120 months |
| **Loan Year** | The period beginning on the Effective Date and ending on the last day December, 2016, and each successive twelve (12) month period thereafter. |
| **Maturity Date** | The first day of January, 2026, or any earlier date on which the unpaid principal balance of the Mortgage Loan becomes due and payable by acceleration or otherwise. |

**Schedule 2 to Multifamily Loan and Security Agreement - Summary of Loan Terms (Interest Rate Type - Fixed Rate) (Master Lease)**
Fannie Mae
DMEAST #23702427 v9

Form 6102.FR.ML
06-14

Page 4
© 2014 Fannie Mae

| | |
|---|---|
| **Monthly Debt Service Payment** | (i)    $91,954.91 for the First Payment Date;<br><br>(ii)   for each Payment Date thereafter through and including the Last Interest Only Payment Date:<br><br>    (a)   $83,056.05 if the prior month was a 28-day month;<br><br>    (b)   $86,022.34 if the prior month was a 29-day month;<br><br>    (c)   $88,988.63 if the prior month was a 30-day month; and<br><br>    (d)   $91,954.91 if the prior month was a 31-day month; and<br><br>(iii)  $119,127.71 for the First Principal and Interest Payment Date and each Payment Date thereafter until the Mortgage Loan is fully paid. |
| **Prepayment Lockout Period** | Zero year(s) from the Effective Date |

| **IV.** | **YIELD MAINTENANCE/PREPAYMENT PREMIUM INFORMATION** |
|---|---|
| **Yield Maintenance Period End Date** | The last day of June, 2025. |
| **Yield Maintenance Period Term** | 114 months |

| **V.** | **RESERVE INFORMATION** |
|---|---|
| **Completion Period** | Within six (6) months after the Effective Date or as otherwise shown on the Required Repair Schedule. |

Schedule 2 to Multifamily Loan and
Security Agreement - Summary of Loan
Terms (Interest Rate Type - Fixed Rate)
(Master Lease)
Fannie Mae
DMEAST #23702427 v9

Form 6102.FR.ML
06-14

Page 5
© 2014 Fannie Mae

| | |
|---|---|
| **Initial Replacement Reserve Deposit** | $0.00 |
| **Maximum Inspection Fee** | $1,000.00 |
| **Maximum Repair Disbursement Interval** | One time per calendar month |
| **Maximum Replacement Reserve Disbursement Interval** | One time per calendar month |
| **Minimum Repairs Disbursement Amount** | $5,000.00 |
| **Minimum Replacement Reserve Disbursement Amount** | $5,000.00 |
| **Monthly Replacement Reserve Deposit** | $4,044.65 |
| **Repair Threshold** | $10,000.00 |
| **Repairs Escrow Account Administrative Fee** | $0.00, payable one time |
| **Repairs Escrow Deposit** | $5,000.00 |
| **Replacement Reserve Account Administration Fee** | $0.00, payable annually |
| **Replacement Reserve Account Interest Disbursement Frequency** | Quarterly |
| **Replacement Threshold** | $10,000.00 |

**Schedule 2 to Multifamily Loan and Security Agreement - Summary of Loan Terms (Interest Rate Type - Fixed Rate) (Master Lease)**
**Fannie Mae**
DMEAST #23702427 v9

Form 6102.FR.ML
06-14

Page 6
© 2014 Fannie Mae

## SCHEDULE 2
## TO MULTIFAMILY LOAN AND SECURITY AGREEMENT

**Summary of Loan Terms**
**(Interest Rate Type - Fixed Rate)**

_____
Borrower Initials

**Schedule 2 to Multifamily Loan and Security Agreement - Summary of Loan Terms (Interest Rate Type - Fixed Rate) (Master Lease)**
**Fannie Mae**

**Form 6102.FR.ML**
**06-14**

**Initial Page**
**© 2014 Fannie Mae**

## SCHEDULE 3
## TO MULTIFAMILY LOAN AND SECURITY AGREEMENT

### Schedule of Interest Rate Type Provisions
### (Fixed Rate)

**1.      Defined Terms.**

Capitalized terms not otherwise defined in this Schedule have the meanings given to such terms in the Definitions Schedule to the Loan Agreement.

**2.      Interest Accrual.**

Except as otherwise provided in the Loan Agreement, interest shall accrue at the Interest Rate until fully paid.

DMEAST #23702427 v9
**Schedule 3 to Multifamily Loan and
Security Agreement - Interest Rate Type
Provisions (Fixed Rate)
Fannie Mae**

**Form 6103.FR
01-11**

**Page 1
© 2011 Fannie Mae**

## SCHEDULE 3
## TO MULTIFAMILY LOAN AND SECURITY AGREEMENT

**Schedule of Interest Rate Type Provisions**
**(Fixed Rate)**

_____
Borrower Initials

**SCHEDULE 4 TO**
**MULTIFAMILY LOAN AND SECURITY AGREEMENT**

**Prepayment Premium Schedule**
**(Standard Yield Maintenance – Fixed Rate)**

**1.      Defined Terms.**

All capitalized terms used but not defined in this Prepayment Premium Schedule shall have the meanings assigned to them in the Loan Agreement.

**2.      Prepayment Premium.**

Any Prepayment Premium payable under Section 2.03 (Lockout/Prepayment) of the Loan Agreement shall be computed as follows:

(a)      If the prepayment is made at any time after the Effective Date and before the Yield Maintenance Period End Date, the Prepayment Premium shall be the greater of:

(1)      one percent (1%) of the amount of principal being prepaid; or

(2)      the product obtained by multiplying:

(A)      the amount of principal being prepaid,

*by*

(B)      the difference obtained by subtracting from the Fixed Rate on the Mortgage Loan, the Yield Rate (as defined below) on the twenty-fifth (25th) Business Day preceding (i) the Intended Prepayment Date, or (ii) the date Lender accelerates the Mortgage Loan or otherwise accepts a prepayment pursuant to Section 2.03(d) (Application of Collateral) of the Loan Agreement,

*by*

(C)      the present value factor calculated using the following formula:

$$\frac{1 - (1 + r)^{-n/12}}{r}$$

r =      Yield Rate

n =      the number of months remaining between (i) either of the following: (x) in the case of a voluntary prepayment, the last day of the month in which the prepayment is made, or

DMEAST #23702427 v9
Schedule 4 to Multifamily Loan and
Security Agreement (Prepayment Premium
Schedule – Standard Yield Maintenance –
Fixed Rate)                                          Form 6104.01                              Page 1
Fannie Mae                                          08-13                              © 2013 Fannie Mae

(y) in any other case, the date on which Lender accelerates the unpaid principal balance of the Mortgage Loan and (ii) the Yield Maintenance Period End Date.

For purposes of this clause (2), the "**Yield Rate**" means the yield calculated by interpolating the yields for the immediately shorter and longer term U.S. "Treasury constant maturities" (as reported in the Federal Reserve Statistical Release H.15 Selected Interest Rates (the "**Fed Release**") under the heading "U.S. government securities") closest to the remaining term of the Yield Maintenance Period Term, as follows (rounded to three (3) decimal places):

$$\left( \frac{(a-b)}{(x-y)} \times (z-y) \right) + b$$

a = the yield for the longer U.S. Treasury constant maturity

b = the yield for the shorter U.S. Treasury constant maturity

x = the term of the longer U.S. Treasury constant maturity

y = the term of the shorter U.S. Treasury constant maturity

z = "n" (as defined in the present value factor calculation above) divided by twelve (12).

Notwithstanding any provision to the contrary, if "z" equals a term reported under the U.S. "Treasury constant maturities" subheading in the Fed Release, the yield for such term shall be used, and interpolation shall not be necessary. If publication of the Fed Release is discontinued by the Federal Reserve Board, Lender shall determine the Yield Rate from another source selected by Lender. Any determination of the Yield Rate by Lender will be binding absent manifest error.

(b) If the prepayment is made on or after the Yield Maintenance Period End Date but before the last calendar day of the fourth (4th) month prior to the month in which the Maturity

DMEAST #23702427 v9
Schedule 4 to Multifamily Loan and
Security Agreement (Prepayment Premium
Schedule – Standard Yield Maintenance –
Fixed Rate)                          Form 6104.01                      Page 2
Fannie Mae                           08-13                    © 2013 Fannie Mae

Date occurs, the Prepayment Premium shall be one percent (1%) of the amount of principal being prepaid.

(c)     Notwithstanding the provisions of Section 2.03 (Lockout/Prepayment) of the Loan Agreement, no Prepayment Premium shall be payable with respect to any prepayment made on or after the last calendar day of the fourth (4th) month prior to the month in which the Maturity Date occurs.

DMEAST #23702427 v9
**Schedule 4 to Multifamily Loan and Security Agreement (Prepayment Premium Schedule – Standard Yield Maintenance – Fixed Rate)**
**Fannie Mae**

**Form 6104.01**
**08-13**

**Page 3**
**© 2013 Fannie Mae**

# SCHEDULE 4
# TO MULTIFAMILY LOAN AND SECURITY AGREEMENT

**Prepayment Premium Schedule
(Standard Yield Maintenance – Fixed Rate)**

_____
Borrower Initials

# SCHEDULE 4
## TO MULTIFAMILY LOAN AND SECURITY AGREEMENT

**Prepayment Premium Schedule**
**(Standard Yield Maintenance – Fixed Rate)**

_____
Borrower Initials

Schedule 4 to Multifamily Loan and
Security Agreement (Prepayment Premium
Schedule – Standard Yield Maintenance –
Fixed Rate)
Fannie Mae

Form 6104.01
08-13

Initial Page
© 2013 Fannie Mae

## SCHEDULE 5 TO
## MULTIFAMILY LOAN AND SECURITY AGREEMENT

### Required Replacement Schedule

A.  Initial Deposit to the Reserve Account:  $0

B.  Monthly Deposit to the Reserve Account

| Loan Year 1 | $4,044.65 | Loan Year 6 | $4,044.65 |
|---|---|---|---|
| Loan Year 2 | $4,044.65 | Loan Year 7 | $4,044.65 |
| Loan Year 3 | $4,044.65 | Loan Year 8 | $4,044.65 |
| Loan Year 4 | $4,044.65 | Loan Year 9 | $4,044.65 |
| Loan Year 5 | $4,044.65 | Loan Year 10 | $4,044.65 |

C.  The following outlines the Replacement Components for which a release from the Replacement Reserve Account may be requested:

**Item:**

Painting, Exterior

Unit Level Domestic Hot Water Heater

Resilient Flooring

Carpet

Kitchen: Dishwasher

Kitchen: Refrigerator

Kitchen: Microwave

Unit FF&E

Pool/ spa plaster liner

Pool/ spa heat and filtration equipment

Requests for reimbursement of costs may only be made for the replacement of the components specified above.  Releases will not be allowed for parts or ongoing repairs and maintenance of these items. Labor costs for in-house personnel may not be included.

**SCHEDULE 5 TO**
**MULTIFAMILY LOAN AND SECURITY AGREEMENT**

**Required Replacement Schedule**

_____
Borrower Initials

### SCHEDULE 6 TO
### MULTIFAMILY LOAN AND SECURITY AGREEMENT

### Required Repair Schedule

| REPAIR ITEM/SCOPE (DETAIL) | TOTAL COST | BPC Use |
|---|---|---|
| **Items to be completed within one month of Closing:** | | |
| 1. Areas of microbial growth was observed in unit 119c. Remediate the growth at this time and alleveate any water leakage issues. | $1,000 | ☐ |
| **Items to be completed within six months of Closing:** | | |
| 1. Several residential apartment unit bathrooms including 116 (Room A), 122 (Room A), 119 (Room C), 415 (Room A), 414 (Room B) and 426 (Room B) were observed with several square inches of water stains on the painted drywall wall surrounding the bathroom shower head. This staining included sagging and bubbling paint, discoloration, and uneven drywall. According to Mr. Gary Perkins, construction manager and representative for the property owner, the water stains were the result of loose connections at the threaded joint between the shower head and water supply piping, which caused water leaks and spray against the drywall. Mr. Perkins further explained that he instructed maintenance staff several months ago to reinforce the threaded connections with teflon tape to prevent further leaking. Repair all affected drywall at this time. | $3,000 | ☐ |

| | | |
|---|---|---|
| TOTAL: | $4,000 | |
| 25% FACTOR: | $1,000 | |
| TOTAL ESCROW AMOUNT: | $5,000 | |

## SCHEDULE 6 TO
## MULTIFAMILY LOAN AND SECURITY AGREEMENT

**Required Repair Schedule**

_____
Borrower Initials

**Multifamily Loan and Security Agreement**
**(Non-Recourse) (Master Lease)**
**Schedule 6**

**Form 6001.NR.ML**
**10-15**

**Initial Page**
**© 2015 Fannie Mae**

## SCHEDULE 7 TO
## MULTIFAMILY LOAN AND SECURITY AGREEMENT

**Exceptions to Representations and Warranties Schedule**

**NONE**

DMEAST #23702427 v9
**Multifamily Loan and Security Agreement**
**(Non-Recourse) (Master Lease)**
**Schedule 7**

Form 6001.NR.ML
10-15

Page 1
© 2015 Fannie Mae

**SCHEDULE 7 TO**
**MULTIFAMILY LOAN AND SECURITY AGREEMENT**

**Exceptions to Representations and Warranties Schedule**

_____
Borrower Initials

## SCHEDULE 8 TO
## MULTIFAMILY LOAN AND SECURITY AGREEMENT

### MASTER LESSEE ESTOPPEL CERTIFICATE

[DATE]

| | |
|---|---|
| PROPERTY NAME: | The Vue on MacGregor Apartments |
| PROPERTY ADDRESS:<br>(include county) | 4460 South MacGregor Way<br>Houston, Harris County, TX 77021<br>(the "**Property**"), |
| MASTER LEASE DATE: | December 18, 2015 |
| LESSOR:<br>(include address) | NB Vue Mac, DST<br>16B Journey, Suite 200<br>Aliso Viejo, CA 92656<br>Attention: Blake Wettengel<br>("**Lessor**") |
| MASTER LESSEE:<br>(include address) | NB Vue Mac LeaseCo, LLC<br>16B Journey, Suite 200<br>Aliso Viejo, CA 92656<br>Attention: Blake Wettengel<br>("**Master Lessee**") |

**[NOTE TO DRAFTER: Use for estoppel running to Lender]** [Master Lessee acknowledges that (a) BERKELEY POINT CAPITAL LLC, a Delaware limited liability company ("**Lender**") has agreed, subject to the satisfaction of certain terms and conditions, to **[make a loan][modify that certain loan]** (the "**Mortgage Loan**") to Lessor, which loan is or will be secured by a lien on the Property which is leased in its entirety by Master Lessee, and (b) Lender is requiring this Master Lessee Estoppel Certificate as a condition to its **[making the Mortgage Loan][agreeing to any modification of the Mortgage Loan]**. Accordingly, Master Lessee hereby certifies and confirms (except as set forth on Schedule I) to Lender and its transferees, successors and assigns, as follows:]

**[NOTE TO DRAFTER: Use for estoppel running to Lessor]** [Master Lessee acknowledges that Lessor is requiring this Master Lessee Estoppel Certificate in connection with that certain Tenant/Landlord Subordination and Assignment Agreement (the "**Assignment**"). Accordingly, Master Lessee hereby certifies and confirms (except as set forth on Schedule I) to Lessor and its transferees, successors and assigns, as follows:]

      1.    A true, complete and correct copy of the master lease between Lessor and Master Lessee with respect to the Property, together with any other amendment, supplement, or agreement related thereto, is attached hereto as Exhibit A (collectively, the "**Master Lease**"). Other than as attached on Exhibit A, the Master Lease has not been modified, changed, altered,

assigned, supplemented or amended in any respect.  The Master Lease is not in default and is valid and in full force and effect on the date hereof.  The Master Lease represents the entire agreement between Lessor and Master Lessee with respect to the Property.

2.     The Master Lease provides for an original term of ten (10) years, commencing on December 18, 2015 and expiring on December 18, 2025.

3.     The Master Lease makes the following provision for extension of its term beyond the original term:  (initial one)

(___)   the Master Lease does not contain an option(s) or other right to extend for any additional term or terms.

(X)     the Master Lease contains an option for three (3) additional term(s) of five (5) years each; Master Lessee has exercised _____ such options.

4.     Master Lessee is in full and complete possession of the Property and has commenced full occupancy and use thereof.  Master Lessee is operating at the Property under the name of NB Vue Mac LeaseCo, LLC.

5.     The rent and other charges payable in connection with the Master Lease are as follows:

(a)     the fixed monthly rent equal to the sum of the monthly aggregate payments falling due under that certain Multifamily Note dated as of December __, 2015 from Lessor in favor of Lender in the original principal amount of $23,265,000.00 and the monthly gross stated rent payments in the amount of $_____ has been paid through and including _____;

(b)     no advance rent or other payment has been made in connection with the Master Lease, except rent for the current month;

(c)     there is no "free rent" or other rent concession or adjustments to which Master Lessee is entitled under the remaining term of the Master Lease;

(d)     if applicable, all additional charges payable under the terms of the Master Lease have been paid through and including _____; and

Other than as set forth in this Section 5, there are no amounts due and owing from Master Lessee to Lessor under the Master Lease.

6.     All obligations, commitments, deliveries, payments, repairs, build out allowances, inducements, other sums and conditions under the Master Lease to be performed to date by Lessor have been satisfied, free of defenses and set-offs including all construction work on the Property.

7.     There is no existing default or unfulfilled obligations on the part of Master Lessee or Lessor in paying the amounts due, or in performing or observing any of the covenants or

agreements contained in the Master Lease or other Master Lease Documents (as defined in **[the Assignment][that certain Multifamily Loan and Security Agreement]**), and no event has occurred or condition exists that, with the passing of time or giving of notice or both, would constitute an event of default under the Master Lease or other Master Lease Documents.

8.      Master Lessee claims no offsets, set-offs, rebates, adjustments, concessions, abatements or defenses against or with respect to rent, additional rent, security deposits or other sums payable under the terms of the Master Lease or the enforcement of any right or remedy of **[NOTE TO DRAFTER: Use for estoppel running to Lender] [Lender or]** Lessor under the Master Lease, nor is Master Lessee aware of any such claims or defenses on the part of **[Lender or]** Lessor.  Master Lessee agrees not to invoke any of its remedies under the Master Lease during the period in which **[Lender or]** Lessor is proceeding to cure any default on the part of Lessor under the Master Lease, as long as **[Lender or]** Lessor is acting with due diligence to cure the default.

9.      There is no option or right of first refusal or first offer to lease additional space or obligations to lease additional space.

10.     Master Lessee has no right to terminate the Master Lease or other Master Lease Documents.  Neither Master Lessee nor Lessor has commenced any action or given or received any notice for the purpose of terminating the Master Lease or other Master Lease Documents.

11.     Master Lessee has no option or right of first refusal or first offer to purchase the Property or any part thereof other than as set forth in Article 22 of the Master Lease, whereby Master Lessee has the right, commencing at the end of the fifth (5th) lease year and continuing through the remainder of the term of the Master Lease, to purchase the Mortgaged Property (the "**Purchase Right**"); however, the Purchase Right (a) is fully subordinate to the Security Instrument and all of the Lender's rights and benefits under the Security Instrument, (b) does not apply to any foreclosure under the Security Instrument, and (c) does not apply to any sale of the Mortgaged Property by the Lender or its designee in connection with a foreclosure.

12.     Neither Master Lessee nor Lessor has exercised any option or right of first refusal or first offer to purchase the Property or any part thereof or received or sent any notice regarding the same.

13.     No violation of any environmental law or regulation has occurred or currently exists with respect to the Property.

14.     There are no unpaid or outstanding claims, bills or invoices for any labor performed upon or materials furnished to either Master Lessee or the Property for which any lien or encumbrance including, without limitation, materialmen, suppliers' or mechanics' liens, have been asserted or may be asserted against either Master Lessee or the Property.

15.     There are no actions, voluntary or involuntary, pending against Master Lessee under the bankruptcy laws of the United States or equivalent laws for debtor relief of any state thereof.

16.     There are no existing, pending or threatened lawsuits affecting the Property, Master Lessee, or the Master Lease, or between Master Lessee and Lessor.

17.     Master Lessee has all applicable permits, licenses, certificates of occupancy and other documentation required by the applicable governmental authorities in order to operate its business in full accordance with the law.

18.     **[Lender][Lessor]** will rely on the representations and agreements made by Master Lessee herein in connection with **[Lender's][Lessor's]** agreement to **[make the Mortgage Loan][modify the Mortgage Loan][enter into the Assignment]** and Master Lessee agrees that **[Lender][Lessor]** may so rely on such representations and agreements.

19.     Notices to Master Lessee should be sent to the address for Master Lessee listed on the first page of this Master Lessee Estoppel Certificate.

**[Remainder of Page Intentionally Blank]**

IN WITNESS WHEREOF, the undersigned has signed and delivered this Master Lessee Estoppel Certificate under seal (where applicable) or has caused this Master Lessee Estoppel Certificate to be signed and delivered under seal (where applicable) by its duly authorized representative.  Where applicable law so provides, the undersigned intend(s) that this Master Lessee Estoppel Certificate shall be deemed to be signed and delivered as a sealed instrument.

**MASTER LESSEE:**

**NB VUE MAC LEASECO, LLC**, a Delaware limited liability company

By: _____(SEAL)
Name: _____
Title:   Authorized Signatory

**Master Lessee Estoppel Certificate**
**Fannie Mae**
Error! Unknown document property name.

Form 6469.ML
08-14

Page 6
© 2014 Fannie Mae

# SCHEDULE I TO MASTER LESSEE ESTOPPEL CERTIFICATE

**(Exceptions to Master Lessee Estoppel Certificate)**

**[IF NONE, SO STATE]**

DMEAST #23702427 v9

**Master Lessee Estoppel Certificate**
**Fannie Mae**
Error! Unknown document property name.

**Form 6469.ML**
**08-14**

**Page 1**
**© 2014 Fannie Mae**

Error! U

**EXHIBIT A TO MASTER LESSEE ESTOPPEL CERTIFICATE**
**(Copy of Master Lease)**

**SCHEDULE 8 TO**
**MULTIFAMILY LOAN AND SECURITY AGREEMENT**

**MASTER LESSEE ESTOPPEL CERTIFICATE**

_____
Borrower Initials

## SCHEDULE 8 TO
## <u>MULTIFAMILY LOAN AND SECURITY AGREEMENT</u>

### MASTER LESSEE ESTOPPEL CERTIFICATE

_____

Borrower Initials

## MULTIFAMILY NOTE

US \$23,265,000.00                                                              As of December 18, 2015

FOR VALUE RECEIVED, the undersigned ("**Borrower**") promises to pay to the order of BERKELEY POINT CAPITAL LLC, a Delaware limited liability company ("**Lender**"), the principal amount of TWENTY THREE MILLION TWO HUNDRED SIXTY FIVE THOUSAND AND 00/100 DOLLARS (US \$23,265,000.00) (the "**Mortgage Loan**"), together with interest thereon accruing at the Interest Rate on the unpaid principal balance from the date the Mortgage Loan proceeds are disbursed until fully paid in accordance with the terms hereof and of that certain Multifamily Loan and Security Agreement dated as of the date hereof, by and between Borrower and Lender (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**").

### 1.    Defined Terms.

Capitalized terms used and not specifically defined in this Multifamily Note (this "**Note**") have the meanings given to such terms in the Loan Agreement.

### 2.    Repayment.

Borrower agrees to pay the principal amount of the Mortgage Loan and interest on the principal amount of the Mortgage Loan from time to time outstanding at the Interest Rate or such other rate or rates and at the times specified in the Loan Agreement, together with all other amounts due to Lender under the Loan Documents. The outstanding balance of the Mortgage Loan and all accrued and unpaid interest thereon shall be due and payable on the Maturity Date, together with all other amounts due to Lender under the Loan Documents.

### 3.    Security.

The Mortgage Loan evidenced by this Note, together with all other Indebtedness is secured by, among other things, the Security Instrument, the Loan Agreement and the other Loan Documents. All of the terms, covenants and conditions contained in the Loan Agreement, the Security Instrument and the other Loan Documents are hereby made part of this Note to the same extent and with the same force as if they were fully set forth herein. In the event of a conflict or inconsistency between the terms of this Note and the Loan Agreement, the terms and provisions of the Loan Agreement shall govern.

### 4.    Acceleration.

In accordance with the Loan Agreement, if an Event of Default has occurred and is continuing, the entire unpaid principal balance of the Mortgage Loan, any accrued and unpaid interest, including interest accruing at the Default Rate, the Prepayment Premium (if applicable), and all other amounts payable under this Note, the Loan Agreement and any other Loan Document shall at once become due and payable, at the option of Lender, without any prior

EXHIBIT A-2

notice to Borrower, unless applicable law requires otherwise (and in such case, after satisfactory notice has been given).

**5.      Personal Liability.**

The provisions of Article 3 (Personal Liability) of the Loan Agreement are hereby incorporated by reference into this Note to the same extent and with the same force as if fully set forth herein.

**6.      Governing Law.**

This Note shall be governed in accordance with the terms and provisions of Section 15.01 (Governing Law; Consent to Jurisdiction and Venue) of the Loan Agreement.

**7.      Waivers.**

Presentment, demand for payment, notice of nonpayment and dishonor, protest and notice of protest, notice of acceleration, notice of intent to demand or accelerate payment or maturity, presentment for payment, notice of nonpayment, grace and diligence in collecting the Indebtedness are waived by Borrower, for and on behalf of itself, Guarantor and Key Principal, and all endorsers and guarantors of this Note and all other third party obligors or others who may become liable for the payment of all or any part of the Indebtedness.

**8.      Commercial Purpose.**

Borrower represents that the Indebtedness is being incurred by Borrower solely for the purpose of carrying on a business or commercial enterprise or activity, and not for agricultural, personal, family or household purposes.

**9.      Construction; Joint and Several (or Solidary, as applicable) Liability.**

Section 15.08 (Construction) of the Loan Agreement is hereby incorporated herein as if fully set forth in the body of this Note.

If more than one Person executes this Note as Borrower, the obligations of such Person shall be joint and several (solidary instead for purposes of Louisiana law).

**10.     Notices.**

All Notices required or permitted to be given by Lender to Borrower pursuant to this Note shall be given in accordance with Section 15.02 (Notice) of the Loan Agreement.

**11.     Time is of the Essence.**

Borrower agrees that, with respect to each and every obligation and covenant contained in this Note, time is of the essence.

12.     **Loan Charges Savings Clause.**

Borrower agrees to pay an effective rate of interest equal to the sum of the Interest Rate and any additional rate of interest resulting from any other charges of interest or in the nature of interest paid or to be paid in connection with the Mortgage Loan and any other fees or amounts to be paid by Borrower pursuant to any of the other Loan Documents. Neither this Note, the Loan Agreement nor any of the other Loan Documents shall be construed to create a contract for the use, forbearance or detention of money requiring payment of interest at a rate greater than the maximum interest rate permitted to be charged under applicable law. It is expressly stipulated and agreed to be the intent of Borrower and Lender at all times to comply with all applicable laws governing the maximum rate or amount of interest payable on the Indebtedness evidenced by this Note and the other Loan Documents. If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower is interpreted so that any interest or other charge or amount provided for in any Loan Document, whether considered separately or together with other charges or amounts provided for in any other Loan Document, or otherwise charged, taken, reserved or received in connection with the Mortgage Loan, or on acceleration of the maturity of the Mortgage Loan or as a result of any prepayment by Borrower or otherwise, violates that law, and Borrower is entitled to the benefit of that law, that interest or charge is hereby reduced to the extent necessary to eliminate any such violation. Amounts, if any, previously paid to Lender in excess of the permitted amounts shall be applied by Lender to reduce the unpaid principal balance of the Mortgage Loan without the payment of any prepayment premium (or, if the Mortgage Loan has been or would thereby be paid in full, shall be refunded to Borrower), and the provisions of the Loan Agreement and any other Loan Documents immediately shall be deemed reformed and the amounts thereafter collectible under the Loan Agreement and any other Loan Documents reduced, without the necessity of the execution of any new documents, so as to comply with any applicable law, but so as to permit the recovery of the fullest amount otherwise payable under the Loan Documents. For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower has been violated, all Indebtedness that constitutes interest, as well as all other charges made in connection with the Indebtedness that constitute interest, and any amount paid or agreed to be paid to Lender for the use, forbearance or detention of the Indebtedness, shall be deemed to be allocated and spread ratably over the stated term of the Mortgage Loan. Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of the Mortgage Loan.

13.     **WAIVER OF TRIAL BY JURY.**

**TO THE MAXIMUM EXTENT PERMITTED BY LAW, EACH OF BORROWER AND LENDER (A) AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS NOTE OR THE RELATIONSHIP BETWEEN THE PARTIES AS LENDER AND BORROWER THAT IS TRIABLE OF RIGHT BY A JURY AND (B) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN**

BY EACH PARTY, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.

**14.      Receipt of Loan Documents**.

Borrower acknowledges receipt of a copy of each of the Loan Documents.

**15.      Incorporation of Schedules**.

The schedules, if any, attached to this Note are incorporated fully into this Note by this reference and each constitutes a substantive part of this Note.

**16.      Defined Terms.**

(a)      As used hereunder, the term "**Maximum Lawful Rate**" shall mean the maximum lawful rate of interest which may be contracted for, charged, taken, received or reserved by Lender in accordance with the applicable laws of the State of Texas (or applicable United States federal law to the extent that such law permits Lender to contract for, charge, take, receive or reserve a greater amount of interest than under Texas law), taking into account all Charges (as defined below) made in connection with the transaction evidenced by this Note and the other Loan Documents.

(b)      As used hereunder, the term "**Charges**" shall mean all fees, charges and/or any other things of value, if any, contracted for, charged, taken, received or reserved by Lender in connection with the transactions relating to this Note and the other Loan Documents, which are treated as interest under applicable law.

**17.      Procedural Obligations of Borrower.**

(a)      In addition to the provisions of Section 12 above, Borrower hereby agrees that as a condition precedent to any claim seeking usury penalties against Lender, Borrower will provide written notice to Lender, advising Lender in reasonable detail of the nature and amount of the violation, and Lender shall have sixty (60) days after receipt of such notice in which to correct such usury violation, if any, by either refunding such excess interest to Borrower or crediting such excess interest against this Note and/or the Indebtedness then owing by Borrower to Lender.  All calculations of the rate of interest contracted for, charged, taken, reserved or received by Lender for the use, forbearance or detention of any debt evidenced by this Note and/or any other Loan Documents, that are made for the purpose of determining whether such rate exceeds the Maximum Lawful Rate, shall be made, to the extent permitted by applicable law, by amortizing, prorating, allocating and spreading, using the actuarial method, all interest contracted for, charged, taken, reserved or received by Lender throughout the full term of this Note and/or any other Loan Documents (including any and all renewal and extension periods).

(b)      In no event shall the provisions of Chapter 346 of the Texas Finance Code (which regulates certain revolving credit loan accounts and revolving triparty accounts) apply to this Note and/or any Indebtedness.

(c)      Not later than the sixty-first (61st) day before the date Borrower files suit seeking penalties for Lender's violation of the usury law (or not later than the time of Borrower filing a counterclaim in an original action by Lender), Borrower is required to give Lender written notice stating in reasonable detail the nature and amount of the violation.   Lender is then entitled to correct such violation within the sixty (60) day period beginning with the date such notice is received.   If the usury violation is raised on a counterclaim, Lender can petition the court to abate the proceedings for sixty (60) days to allow Lender to cure the violation.   If Lender timely corrects such violation, Lender will not be liable to Borrower for such violation, except to reimburse Borrower for reasonable attorneys' fees in the event the issue is raised by Borrower in a counterclaim. Lender is also not liable to Borrower for a violation of the usury penalty statute if Lender gives written notice to Borrower of Lender's usury violation before Borrower itself gives written notice of the violation or files an action alleging the violation, and provided Lender corrects such violation not later than the sixtieth (60th) day after the date Lender actually discovered the violation that applies to the Note and/or any of the Indebtedness. Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, it is not the intention of Lender to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

## 18.      Ceiling Election.

To the extent that Lender is relying on Chapter 303 of the Texas Finance Code to determine the Maximum Lawful Rate payable on the Note and/or any other portion of the Indebtedness, Lender will utilize the weekly ceiling from time to time in effect as provided in such Chapter 303, as amended.   To the extent United States federal law permits Lender to contract for, charge, take, receive or reserve a greater amount of interest than under Texas law, Lender will rely on United States federal law instead of such Chapter 303 for the purpose of determining the Maximum Lawful Rate. Additionally, to the extent permitted by applicable law now or hereafter in effect, Lender may, at its option and from time to time, utilize any other method of establishing the Maximum Lawful Rate under such Chapter 303 or under other applicable law by giving notice, if required, to Borrower as provided by applicable law now or hereafter in effect.

**ATTACHED SCHEDULE.**   The following Schedule is attached to this Note:

☐      Schedule 1      Modifications to Note

[REMAINDER OF PAGE INTENTIONALLY BLANK]

**IN WITNESS WHEREOF**, Borrower has signed and delivered this Note under seal (where applicable) or has caused this Note to be signed and delivered under seal (where applicable) by its duly authorized representative.  Where applicable law so provides, Borrower intends that this Note shall be deemed to be signed and delivered as a sealed instrument.

**BORROWER:**

NB VUE MAC, DST,
a Delaware statutory trust

By:     NB Vue Mac ST, LLC,
        a Delaware limited liability company,
        its Statutory Trustee

        By:     Nelson Brothers Professional Real Estate, LLC
                a California limited liability company,
                its sole member

        By:     _____
        Name: Patrick Nelson
        Title:   Manager

ENDORSEMENT PAGE TO MULTIFAMILY NOTE

Pay to the order of FANNIE MAE,
without recourse.

**BERKELEY    POINT    CAPITAL    LLC,    a**
Delaware limited liability company

By: _____ (SEAL)
     Name: Heidi Marrin
     Title: Director

By: _____ (SEAL)
     Name: Deborah Demoney
     Title: Vice President

Berkeley Point Loan No.:
Fannie Mae No.:                    ████████

DT
K

ER 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

Prepared by, and after recording
return to:

Anna A. Mahaney, Esquire
Ballard Spahr LLP
300 East Lombard Street, 18th Floor
Baltimore, MD 21202

## MULTIFAMILY DEED OF TRUST,
## ASSIGNMENT OF LEASES AND RENTS,
## SECURITY AGREEMENT
## AND FIXTURE FILING

### (TEXAS)

EXHIBIT A-3

## MULTIFAMILY DEED OF TRUST,
## ASSIGNMENT OF LEASES AND RENTS,
## SECURITY AGREEMENT
## AND FIXTURE FILING

This MULTIFAMILY DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING (as amended, restated, replaced, supplemented, or otherwise modified from time to time, the "**Security Instrument**") dated as of December 18, 2015, is executed by NB VUE MAC, DST, a statutory trust organized and existing under the laws of Delaware, as grantor ("**Borrower**"), to REBECCA S. CONRAD, as trustee ("**Trustee**"), for the benefit of BERKELEY POINT CAPITAL LLC, a limited liability company, organized and existing under the laws of Delaware, as beneficiary ("**Lender**").

Borrower, in consideration of (i) the loan (the "**Mortgage Loan**") evidenced by that certain Multifamily Note dated as of the date of this Security Instrument, executed by Borrower and made payable to the order of Lender (as amended, restated, replaced, supplemented, or otherwise modified from time to time, the "**Note**"), (ii) that certain Multifamily Loan and Security Agreement dated as of the date of this Security Instrument, executed by and between Borrower and Lender (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), and (iii) the trust created by this Security Instrument, and to secure to Lender the repayment of the Indebtedness (as defined in this Security Instrument), and all renewals, extensions and modifications thereof, and the performance of the covenants and agreements of Borrower contained in the Loan Documents (as defined in the Loan Agreement), excluding the Environmental Indemnity Agreement (as defined in this Security Instrument), irrevocably and unconditionally mortgages, grants, warrants, conveys, bargains, sells, and assigns to Trustee, in trust, for benefit of Lender, with power of sale and right of entry and possession, the Mortgaged Property (as defined in this Security Instrument), including the real property located in Harris County, State of Texas, and described in Exhibit A attached to this Security Instrument and incorporated by reference (the "**Land**"), to have and to hold such Mortgaged Property unto Trustee and Trustee's successors and assigns, forever; Borrower hereby releasing, relinquishing and waiving, to the fullest extent allowed by law, all rights and benefits, if any, under and by virtue of the homestead exemption laws of the Property Jurisdiction (as defined in this Security Instrument), if applicable.

Borrower represents and warrants that Borrower is lawfully seized of the Mortgaged Property and has the right, power and authority to mortgage, grant, warrant, convey, bargain, sell, and assign the Mortgaged Property, and that the Mortgaged Property is not encumbered by any Lien (as defined in this Security Instrument) other than Permitted Encumbrances (as defined in this Security Instrument). Borrower covenants that Borrower will warrant and defend the title to the Mortgaged Property against all claims and demands other than Permitted Encumbrances.

Borrower, and by their acceptance hereof, each of Trustee and Lender covenants and agrees as follows:

1.    **Defined Terms.**

Capitalized terms used and not specifically defined herein have the meanings given to such terms in the Loan Agreement. All terms used and not specifically defined herein, but which are

otherwise defined by the UCC, shall have the meanings assigned to them by the UCC. The following terms, when used in this Security Instrument, shall have the following meanings:

"**Condemnation Action**" means any action or proceeding, however characterized or named, relating to any condemnation or other taking, or conveyance in lieu thereof, of all or any part of the Mortgaged Property, whether direct or indirect.

"**Enforcement Costs**" means all expenses and costs, including reasonable attorneys' fees and expenses, fees and out-of-pocket expenses of expert witnesses and costs of investigation, incurred by Lender as a result of any Event of Default under the Loan Agreement or in connection with efforts to collect any amount due under the Loan Documents, or to enforce the provisions of the Loan Agreement or any of the other Loan Documents, including those incurred in post-judgment collection efforts and in any bankruptcy or insolvency proceeding (including any action for relief from the automatic stay of any bankruptcy proceeding or Foreclosure Event) or judicial or non-judicial foreclosure proceeding, to the extent permitted by law.

"**Environmental Indemnity Agreement**" means that certain Environmental Indemnity Agreement dated as of the date of this Security Instrument, executed by Borrower to and for the benefit of Lender, as the same may be amended, restated, replaced, supplemented, or otherwise modified from time to time.

"**Environmental Laws**" has the meaning set forth in the Environmental Indemnity Agreement.

"**Event of Default**" has the meaning set forth in the Loan Agreement.

"**Fixtures**" means all Goods that are so attached or affixed to the Land or the Improvements as to constitute a fixture under the laws of the Property Jurisdiction.

"**Goods**" means all of Borrower's present and hereafter acquired right, title and interest in all goods which are used now or in the future in connection with the ownership, management, or operation of the Land or the Improvements or are located on the Land or in the Improvements, including inventory; furniture; furnishings; machinery, equipment, engines, boilers, incinerators, and installed building materials; systems and equipment for the purpose of supplying or distributing heating, cooling, electricity, gas, water, air, or light; antennas, cable, wiring, and conduits used in connection with radio, television, security, fire prevention, or fire detection, or otherwise used to carry electronic signals; telephone systems and equipment; elevators and related machinery and equipment; fire detection, prevention and extinguishing systems and apparatus; security and access control systems and apparatus; plumbing systems; water heaters, ranges, stoves, microwave ovens, refrigerators, dishwashers, garbage disposers, washers, dryers, and other appliances; light fixtures, awnings, storm windows, and storm doors; pictures, screens, blinds, shades, curtains, and curtain rods; mirrors, cabinets, paneling, rugs, and floor and wall coverings; fences, trees, and plants; swimming pools; exercise equipment; supplies; tools; books and records (whether in written or electronic form); websites, URLs, blogs, and social network pages; computer equipment (hardware and software); and other tangible personal property which is used now or in the future in connection with the ownership, management, or operation of the Land or the Improvements or are located on the Land or in the Improvements.

Fannie Mae Multifamily Security Instrument          Form 6025.TX                    Page 2
Texas                                               06-12                    © 2012 Fannie Mae
DMEAST #23702410 v3

"**Imposition Deposits**" means deposits in an amount sufficient to accumulate with Lender the entire sum required to pay the Impositions when due.

"**Impositions**" means

      (a)    any water and sewer charges which, if not paid, may result in a lien on all or any part of the Mortgaged Property;

      (b)    the premiums for fire and other casualty insurance, liability insurance, rent loss insurance and such other insurance as Lender may require under the Loan Agreement;

      (c)    Taxes; and

      (d)    amounts for other charges and expenses assessed against the Mortgaged Property which Lender at any time reasonably deems necessary to protect the Mortgaged Property, to prevent the imposition of liens on the Mortgaged Property, or otherwise to protect Lender's interests, all as reasonably determined from time to time by Lender.

"**Improvements**" means the buildings, structures, improvements, and alterations now constructed or at any time in the future constructed or placed upon the Land, including any future replacements, facilities, and additions and other construction on the Land.

"**Indebtedness**" means the principal of, interest on, and all other amounts due at any time under the Note, the Loan Agreement, this Security Instrument or any other Loan Document (other than the Environmental Indemnity Agreement and Guaranty), including Prepayment Premiums, late charges, interest charged at the Default Rate, and accrued interest as provided in the Loan Agreement and this Security Instrument, advances, costs and expenses to perform the obligations of Borrower or to protect the Mortgaged Property or the security of this Security Instrument, all other monetary obligations of Borrower under the Loan Documents (other than the Environmental Indemnity Agreement), including amounts due as a result of any indemnification obligations, and any Enforcement Costs.

"**Land**" means the real property described in <u>Exhibit A</u>.

"**Leases**" means all present and future leases, subleases, licenses, concessions or grants or other possessory interests now or hereafter in force, whether oral or written, covering or affecting the Mortgaged Property, or any portion of the Mortgaged Property (including proprietary leases or occupancy agreements if Borrower is a cooperative housing corporation), and all modifications, extensions or renewals thereof.

"**Lien**" means any claim or charge against property for payment of a debt or an amount owed for services rendered, including any mortgage, deed of trust, deed to secure debt, security interest, tax lien, any materialman's or mechanic's lien, or any lien of a Governmental Authority, including any lien in connection with the payment of utilities, or any other encumbrance.

ER 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

"**Mortgaged Property**" means all of Borrower's present and hereafter acquired right, title and interest, if any, in and to all of the following:

(a)     the Land;

(b)     the Improvements;

(c)     the Personalty;

(d)     current and future rights, including air rights, development rights, zoning rights and other similar rights or interests, easements, tenements, rights-of-way, strips and gores of land, streets, alleys, roads, sewer rights, waters, watercourses, and appurtenances related to or benefitting the Land or the Improvements, or both, and all rights-of-way, streets, alleys and roads which may have been or may in the future be vacated;

(e)     insurance policies relating to the Mortgaged Property (and any unearned premiums) and all proceeds paid or to be paid by any insurer of the Land, the Improvements, the Personalty, or any other part of the Mortgaged Property, whether or not Borrower obtained the insurance pursuant to Lender's requirements;

(f)     awards, payments and other compensation made or to be made by any municipal, state or federal authority with respect to the Land, the Improvements, the Personalty, or any other part of the Mortgaged Property, including any awards or settlements resulting from (1) Condemnation Actions, (2) any damage to the Mortgaged Property caused by governmental action that does not result in a Condemnation Action, or (3) the total or partial taking of the Land, the Improvements, the Personalty, or any other part of the Mortgaged Property under the power of eminent domain or otherwise and including any conveyance in lieu thereof;

(g)     contracts, options and other agreements for the sale of the Land, the Improvements, the Personalty, or any other part of the Mortgaged Property entered into by Borrower now or in the future, including cash or securities deposited to secure performance by parties of their obligations;

(h)     Leases and Lease guaranties, letters of credit and any other supporting obligation for any of the Leases given in connection with any of the Leases, and all Rents;

(i)     earnings, royalties, accounts receivable, issues and profits from the Land, the Improvements or any other part of the Mortgaged Property, and all undisbursed proceeds of the Mortgage Loan and, if Borrower is a cooperative housing corporation, maintenance charges or assessments payable by shareholders or residents;

(j)     Imposition Deposits;

(k)     refunds or rebates of Impositions by any municipal, state or federal authority or insurance company (other than refunds applicable to periods before the real property tax year in which this Security Instrument is dated);

ER 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

(l)     tenant security deposits;

(m)     names under or by which any of the above Mortgaged Property may be operated or known, and all trademarks, trade names, and goodwill relating to any of the Mortgaged Property;

(n)     Collateral Accounts and all Collateral Account Funds;

(o)     products, and all cash and non-cash proceeds from the conversion, voluntary or involuntary, of any of the above into cash or liquidated claims, and the right to collect such proceeds; and

(p)     all of Borrower's right, title and interest in the oil, gas, minerals, mineral interests, royalties, overriding royalties, production payments, net profit interests and other interests and estates in, under and on the Mortgaged Property and other oil, gas and mineral interests with which any of the foregoing interests or estates are pooled or unitized.

"**Permitted Encumbrance**" means only the easements, restrictions and other matters listed in a schedule of exceptions to coverage in the Title Policy and Taxes for the current tax year that are not yet due and payable.

"**Personalty**" means all of Borrower's present and hereafter acquired right, title and interest in all Goods, accounts, choses of action, chattel paper, documents, general intangibles (including Software), payment intangibles, instruments, investment property, letter of credit rights, supporting obligations, computer information, source codes, object codes, records and data, all telephone numbers or listings, claims (including claims for indemnity or breach of warranty), deposit accounts and other property or assets of any kind or nature related to the Land or the Improvements now or in the future, including operating agreements, surveys, plans and specifications and contracts for architectural, engineering and construction services relating to the Land or the Improvements, and all other intangible property and rights relating to the operation of, or used in connection with, the Land or the Improvements, including all governmental permits relating to any activities on the Land.

"**Prepayment Premium**" has the meaning set forth in the Loan Agreement.

"**Property Jurisdiction**" means the jurisdiction in which the Land is located.

"**Rents**" means all rents (whether from residential or non-residential space), revenues and other income from the Land or the Improvements, including subsidy payments received from any sources, including payments under any "Housing Assistance Payments Contract" or other rental subsidy agreement (if any), parking fees, laundry and vending machine income and fees and charges for food, health care and other services provided at the Mortgaged Property, whether now due, past due, or to become due, and tenant security deposits.

"**Software**" means a computer program and any supporting information provided in connection with a transaction relating to the program. The term does not include any computer program that is included in the definition of Goods.

ER 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

"**Taxes**" means all taxes, assessments, vault rentals and other charges, if any, general, special or otherwise, including assessments for schools, public betterments and general or local improvements, which are levied, assessed or imposed by any public authority or quasi-public authority, and which, if not paid, may become a lien, on the Land or the Improvements or any taxes upon any Loan Document.

"**Title Policy**" has the meaning set forth in the Loan Agreement.

"**UCC**" means the Uniform Commercial Code in effect in the Property Jurisdiction, as amended from time to time.

"**UCC Collateral**" means any or all of that portion of the Mortgaged Property in which a security interest may be granted under the UCC and in which Borrower has any present or hereafter acquired right, title or interest.

2.     **Security Agreement; Fixture Filing.**

(a)     To secure to Lender, the repayment of the Indebtedness, and all renewals, extensions and modifications thereof, and the performance of the covenants and agreements of Borrower contained in the Loan Documents, Borrower hereby pledges, assigns, and grants to Lender a continuing security interest in the UCC Collateral. This Security Instrument constitutes a security agreement and a financing statement under the UCC. This Security Instrument also constitutes a financing statement pursuant to the terms of the UCC with respect to any part of the Mortgaged Property that is or may become a Fixture under applicable law, and will be recorded as a "fixture filing" in accordance with the UCC. Borrower hereby authorizes Lender to file financing statements, continuation statements and financing statement amendments in such form as Lender may require to perfect or continue the perfection of this security interest without the signature of Borrower. If an Event of Default has occurred and is continuing, Lender shall have the remedies of a secured party under the UCC or otherwise provided at law or in equity, in addition to all remedies provided by this Security Instrument and in any Loan Document. Lender may exercise any or all of its remedies against the UCC Collateral separately or together, and in any order, without in any way affecting the availability or validity of Lender's other remedies. For purposes of the UCC, the debtor is Borrower and the secured party is Lender. The name and address of the debtor and secured party are set forth after Borrower's signature below which are the addresses from which information on the security interest may be obtained.

(b)     Borrower represents and warrants that: (1) Borrower maintains its chief executive office at the location set forth after Borrower's signature below, and Borrower will notify Lender in writing of any change in its chief executive office within five (5) days of such change; (2) Borrower is the record owner of the Mortgaged Property; (3) Borrower's state of incorporation, organization, or formation, if applicable, is as set forth on Page 1 of this Security Instrument; (4) Borrower's exact legal name is as set forth on Page 1 of this Security Instrument; (5) Borrower's organizational identification number, if applicable, is as set forth after Borrower's signature below; (6) Borrower is the owner of the UCC Collateral subject to no liens, charges or encumbrances other than the lien hereof; (7) except as expressly provided in the Loan Agreement, the UCC Collateral will not be removed from the Mortgaged Property without the

ER 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

consent of Lender; and (8) no financing statement covering any of the UCC Collateral or any proceeds thereof is on file in any public office except pursuant hereto.

(c)     All property of every kind acquired by Borrower after the date of this Security Instrument which by the terms of this Security Instrument shall be subject to the lien and the security interest created hereby, shall immediately upon the acquisition thereof by Borrower and without further conveyance or assignment become subject to the lien and security interest created by this Security Instrument. Nevertheless, Borrower shall execute, acknowledge, deliver and record or file, as appropriate, all and every such further deeds of trust, mortgages, deeds to secure debt, security agreements, financing statements, assignments and assurances as Lender shall require for accomplishing the purposes of this Security Instrument and to comply with the rerecording requirements of the UCC.

**3.     Assignment of Leases and Rents; Appointment of Receiver; Lender in Possession.**

(a)     As part of the consideration for the Indebtedness, Borrower absolutely and unconditionally assigns and transfers to Lender all Leases and Rents. It is the intention of Borrower to establish present, absolute and irrevocable transfers and assignments to Lender of all Leases and Rents and to authorize and empower Lender to collect and receive all Rents without the necessity of further action on the part of Borrower. Borrower and Lender intend the assignments of Leases and Rents to be effective immediately and to constitute absolute present assignments, and not assignments for additional security only. Only for purposes of giving effect to these absolute assignments of Leases and Rents, and for no other purpose, the Leases and Rents shall not be deemed to be a part of the Mortgaged Property. However, if these present, absolute and unconditional assignments of Leases and Rents are not enforceable by their terms under the laws of the Property Jurisdiction, then each of the Leases and Rents shall be included as part of the Mortgaged Property, and it is the intention of Borrower, in such circumstance, that this Security Instrument create and perfect a lien on each of the Leases and Rents in favor of Lender, which liens shall be effective as of the date of this Security Instrument.

(b)     Until an Event of Default has occurred and is continuing, but subject to the limitations set forth in the Loan Documents, Borrower shall have a revocable license to exercise all rights, power and authority granted to Borrower under the Leases (including the right, power and authority to modify the terms of any Lease, extend or terminate any Lease, or enter into new Leases, subject to the limitations set forth in the Loan Documents), and to collect and receive all Rents, to hold all Rents in trust for the benefit of Lender, and to apply all Rents to pay the Monthly Debt Service Payments and the other amounts then due and payable under the other Loan Documents, including Imposition Deposits, and to pay the current costs and expenses of managing, operating and maintaining the Mortgaged Property, including utilities and Impositions (to the extent not included in Imposition Deposits), tenant improvements and other capital expenditures. So long as no Event of Default has occurred and is continuing (and no event which, with the giving of notice or the passage of time, or both, would constitute an Event of Default has occurred and is continuing), the Rents remaining after application pursuant to the preceding sentence may be retained and distributed by Borrower free and clear of, and released from, Lender's rights with respect to Rents under this Security Instrument.

ER 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

(c)     If an Event of Default has occurred and is continuing, without the necessity of Lender entering upon and taking and maintaining control of the Mortgaged Property directly, by a receiver, or by any other manner or proceeding permitted by the laws of the Property Jurisdiction, the revocable license granted to Borrower pursuant to Section 3(b) shall automatically terminate, and Lender shall immediately have all rights, powers and authority granted to Borrower under any Lease (including the right, power and authority to modify the terms of any such Lease, or extend or terminate any such Lease) and, without notice, Lender shall be entitled to all Rents as they become due and payable, including Rents then due and unpaid. During the continuance of an Event of Default, Borrower authorizes Lender to collect, sue for and compromise Rents and directs each tenant of the Mortgaged Property to pay all Rents to, or as directed by, Lender, and Borrower shall, upon Borrower's receipt of any Rents from any sources, pay the total amount of such receipts to Lender. Although the foregoing rights of Lender are self-effecting, at any time during the continuance of an Event of Default, Lender may make demand for all Rents, and Lender may give, and Borrower hereby irrevocably authorizes Lender to give, notice to all tenants of the Mortgaged Property instructing them to pay all Rents to Lender. No tenant shall be obligated to inquire further as to the occurrence or continuance of an Event of Default, and no tenant shall be obligated to pay to Borrower any amounts that are actually paid to Lender in response to such a notice. Any such notice by Lender shall be delivered to each tenant personally, by mail or by delivering such demand to each rental unit.

(d)     If an Event of Default has occurred and is continuing, Lender may, regardless of the adequacy of Lender's security or the solvency of Borrower, and even in the absence of waste, enter upon, take and maintain full control of the Mortgaged Property, and may exclude Borrower and its agents and employees therefrom, in order to perform all acts that Lender, in its discretion, determines to be necessary or desirable for the operation and maintenance of the Mortgaged Property, including the execution, cancellation or modification of Leases, the collection of all Rents (including through use of a lockbox, at Lender's election), the making of repairs to the Mortgaged Property and the execution or termination of contracts providing for the management, operation or maintenance of the Mortgaged Property, for the purposes of enforcing this assignment of Rents, protecting the Mortgaged Property or the security of this Security Instrument and the Mortgage Loan, or for such other purposes as Lender in its discretion may deem necessary or desirable.

(e)     Notwithstanding any other right provided Lender under this Security Instrument or any other Loan Document, if an Event of Default has occurred and is continuing, and regardless of the adequacy of Lender's security or Borrower's solvency, and without the necessity of giving prior notice (oral or written) to Borrower, Lender may apply to any court having jurisdiction for the appointment of a receiver for the Mortgaged Property to take any or all of the actions set forth in Section 3. If Lender elects to seek the appointment of a receiver for the Mortgaged Property at any time after an Event of Default has occurred and is continuing, Borrower, by its execution of this Security Instrument, expressly consents to the appointment of such receiver, including the appointment of a receiver *ex parte*, if permitted by applicable law. Borrower consents to shortened time consideration of a motion to appoint a receiver. Lender or the receiver, as applicable, shall be entitled to receive a reasonable fee for managing the Mortgaged Property and such fee shall become an additional part of the Indebtedness. Immediately upon appointment of a receiver or Lender's entry upon and taking possession and

control of the Mortgaged Property, possession of the Mortgaged Property and all documents, records (including records on electronic or magnetic media), accounts, surveys, plans, and specifications relating to the Mortgaged Property, and all security deposits and prepaid Rents, shall be surrendered to Lender or the receiver, as applicable. If Lender or receiver takes possession and control of the Mortgaged Property, Lender or receiver may exclude Borrower and its representatives from the Mortgaged Property.

(f)     The acceptance by Lender of the assignments of the Leases and Rents pursuant to this Section 3 shall not at any time or in any event obligate Lender to take any action under any Loan Document or to expend any money or to incur any expense. Lender shall not be liable in any way for any injury or damage to person or property sustained by any Person in, on or about the Mortgaged Property. Prior to Lender's actual entry upon and taking possession and control of the Land and Improvements, Lender shall not be:

(1)     obligated to perform any of the terms, covenants and conditions contained in any Lease (or otherwise have any obligation with respect to any Lease);

(2)     obligated to appear in or defend any action or proceeding relating to any Lease or the Mortgaged Property; or

(3)     responsible for the operation, control, care, management or repair of the Mortgaged Property or any portion of the Mortgaged Property.

The execution of this Security Instrument shall constitute conclusive evidence that all responsibility for the operation, control, care, management and repair of the Mortgaged Property is and shall be that of Borrower, prior to such actual entry and taking possession and control by Lender of the Land and Improvements.

(g)     Lender shall be liable to account only to Borrower and only for Rents actually received by Lender. Lender shall not be liable to Borrower, anyone claiming under or through Borrower or anyone having an interest in the Mortgaged Property by reason of any act or omission of Lender under this Section 3, and Borrower hereby releases and discharges Lender from any such liability to the fullest extent permitted by law, provided that Lender shall not be released from liability that occurs as a result of Lender's gross negligence or willful misconduct as determined by a court of competent jurisdiction pursuant to a final, non-appealable court order. If the Rents are not sufficient to meet the costs of taking control of and managing the Mortgaged Property and collecting the Rents, any funds expended by Lender for such purposes shall be added to, and become a part of, the principal balance of the Indebtedness, be immediately due and payable, and bear interest at the Default Rate from the date of disbursement until fully paid. Any entering upon and taking control of the Mortgaged Property by Lender or the receiver, and any application of Rents as provided in this Security Instrument, shall not cure or waive any Event of Default or invalidate any other right or remedy of Lender under applicable law or provided for in this Security Instrument or any Loan Document.

ER 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

### 4.    Protection of Lender's Security.

If Borrower fails to perform any of its obligations under this Security Instrument or any other Loan Document, or any action or proceeding is commenced that purports to affect the Mortgaged Property, Lender's security, rights or interests under this Security Instrument or any Loan Document (including eminent domain, insolvency, code enforcement, civil or criminal forfeiture, enforcement of Environmental Laws, fraudulent conveyance or reorganizations or proceedings involving a debtor or decedent), Lender may, at its option, make such appearances, disburse or pay such sums and take such actions, whether before or after an Event of Default or whether directly or to any receiver for the Mortgaged Property, as Lender reasonably deems necessary to perform such obligations of Borrower and to protect the Mortgaged Property or Lender's security, rights or interests in the Mortgaged Property or the Mortgage Loan, including:

(a)    paying fees and out-of-pocket expenses of attorneys, accountants, inspectors and consultants;

(b)    entering upon the Mortgaged Property to make repairs or secure the Mortgaged Property;

(c)    obtaining (or force-placing) the insurance required by the Loan Documents; and

(d)    paying any amounts required under any of the Loan Documents that Borrower has failed to pay.

Any amounts so disbursed or paid by Lender shall be added to, and become part of, the principal balance of the Indebtedness, be immediately due and payable and bear interest at the Default Rate from the date of disbursement until fully paid.  The provisions of this Section 4 shall not be deemed to obligate or require Lender to incur any expense or take any action.

### 5.    Default; Acceleration; Remedies.

(a)    If an Event of Default has occurred and is continuing, Lender, at its option, may declare the Indebtedness to be immediately due and payable without further demand, and may either with or without entry or taking possession as herein provided or otherwise, proceed by suit or suits at law or in equity or any other appropriate proceeding or remedy (1) to enforce payment of the Mortgage Loan; (2) to foreclose this Security Instrument judicially or non-judicially by the power of sale granted herein; (3) to enforce or exercise any right under any Loan Document; and (4) to pursue any one (1)or more other remedies provided in this Security Instrument or in any other Loan Document or otherwise afforded by applicable law.  Each right and remedy provided in this Security Instrument or any other Loan Document is distinct from all other rights or remedies under this Security Instrument or any other Loan Document or otherwise afforded by applicable law, and each shall be cumulative and may be exercised concurrently, independently, or successively, in any order.  Borrower has the right to bring an action to assert the nonexistence of an Event of Default or any other defense of Borrower to acceleration and sale.

(b)    Borrower acknowledges that the power of sale granted in this Security Instrument may be exercised or directed by Lender without prior judicial hearing.  In the event Lender invokes the power of sale:

ER 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

(1)     Lender may, by and through the Trustee, or otherwise, sell or offer for sale the Mortgaged Property in such portions, order and parcels as Lender may determine, with or without having first taken possession of the Mortgaged Property, to the highest bidder for cash at public auction.  Such sale shall be made at the courthouse door of the county in which all or any part of the Mortgaged Property to be sold is situated (whether the parts or parcel, if any, situated in different counties are contiguous or not, and without the necessity of having any Personalty present at such sale) on the first Tuesday of any month between the hours of 10:00 a.m. and 4:00 p.m., after advertising the time, place and terms of sale and that portion of the Mortgaged Property to be sold by posting or causing to be posted written or printed notice of sale at least twenty-one (21) days before the date of the sale at the courthouse door of the county in which the sale is to be made and at the courthouse door of any other county in which a portion of the Mortgaged Property may be situated, and by filing such notice with the County Clerk(s) of the county(s) in which all or a portion of the Mortgaged Property may be situated, which notice may be posted and filed by the Trustee acting, or by any person acting for the Trustee, and Lender has, at least twenty-one (21) days before the date of the sale, served written or printed notice of the proposed sale by certified mail on each debtor obligated to pay the Indebtedness according to Lender's records by the deposit of such notice, enclosed in a postpaid wrapper, properly addressed to such debtor at debtor's most recent address as shown by Lender's records, in a post office or official depository under the care and custody of the United States Postal Service.  The affidavit of any person having knowledge of the facts to the effect that such service was completed shall be prima facie evidence of the fact of service;

(2)     Trustee shall deliver to the purchaser at the sale, within a reasonable time after the sale, a deed conveying the Mortgaged Property so sold in fee simple with covenants of general warranty.  Borrower covenants and agrees to defend generally the purchaser's title to the Mortgaged Property against all claims and demands.  The recitals in Trustee's deed shall be prima facie evidence of the truth of the statements contained in those recitals;

(3)     Trustee shall be entitled to receive fees and expenses from such sale not to exceed the amount permitted by applicable law; and

(4)     Lender shall have the right to become the purchaser at any sale made under or by virtue of this Security Instrument and Lender so purchasing at any such sale shall have the right to be credited upon the amount of the bid made therefor by Lender with the amount payable to Lender out of the net proceeds of such sale.  In the event of any such sale, the outstanding principal amount of the Mortgage Loan and the other Indebtedness, if not previously due, shall be and become immediately due and payable without demand or notice of any kind.  If the Mortgaged Property is sold for an amount less than the amount outstanding under the Indebtedness, the deficiency shall be determined by the purchase price at the sale or sales.  Borrower waives all rights, claims, and defenses with respect to Lender's ability to obtain a deficiency judgment.

ER 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

(c)     Borrower acknowledges and agrees that the proceeds of any sale shall be applied as determined by Lender unless otherwise required by applicable law.

(d)     In connection with the exercise of Lender's rights and remedies under this Security Instrument and any other Loan Document, there shall be allowed and included as Indebtedness:  (1) all expenditures and expenses authorized by applicable law and all other expenditures and expenses which may be paid or incurred by or on behalf of Lender for reasonable legal fees, appraisal fees, outlays for documentary and expert evidence, stenographic charges and publication costs; (2) all expenses of any environmental site assessments, environmental audits, environmental remediation costs, appraisals, surveys, engineering studies, wetlands delineations, flood plain studies, and any other similar testing or investigation deemed necessary or advisable by Lender incurred in preparation for, contemplation of or in connection with the exercise of Lender's rights and remedies under the Loan Documents; and (3) costs (which may be reasonably estimated as to items to be expended in connection with the exercise of Lender's rights and remedies under the Loan Documents) of procuring all abstracts of title, title searches and examinations, title insurance policies, and similar data and assurance with respect to title as Lender may deem reasonably necessary either to prosecute any suit or to evidence the true conditions of the title to or the value of the Mortgaged Property to bidders at any sale which may be held in connection with the exercise of Lender's rights and remedies under the Loan Documents.  All expenditures and expenses of the nature mentioned in this Section 5, and such other expenses and fees as may be incurred in the protection of the Mortgaged Property and rents and income therefrom and the maintenance of the lien of this Security Instrument, including the fees of any attorney employed by Lender in any litigation or proceedings affecting this Security Instrument, the Note, the other Loan Documents, or the Mortgaged Property, including bankruptcy proceedings, any Foreclosure Event, or in preparation of the commencement or defense of any proceedings or threatened suit or proceeding, or otherwise in dealing specifically therewith, shall be so much additional Indebtedness and shall be immediately due and payable by Borrower, with interest thereon at the Default Rate until paid.

(e)     If all or any part of the Mortgaged Property is sold pursuant to this Section 5, Borrower will be divested of any and all interest and claim to the Mortgaged Property, including any interest or claim to all insurance policies, utility deposits, bonds, loan commitments and other intangible property included as a part of the Mortgaged Property.  Additionally, after a sale of all or any part of the Land, Improvements, Fixtures and Personalty, Borrower will be considered a tenant at sufferance of the purchaser of the same, and the purchaser shall be entitled to immediate possession of such property.  If Borrower shall fail to vacate the Mortgaged Property immediately, the purchaser may and shall have the right, without further notice to Borrower, to go into any justice court in any precinct or county in which the Mortgaged Property is located and file an action in forcible entry and detainer, which action shall lie against Borrower or its assigns or legal representatives, as a tenant at sufferance.  This remedy is cumulative of any and all remedies the purchaser may have under this Security Instrument or otherwise.

(f)     In any action for a deficiency after a foreclosure under this Security Instrument, if any person against whom recovery is sought requests the court in which the action is pending to determine the fair market value of the Mortgaged Property, as of the date of the foreclosure sale,

the following shall be the basis of the court's determination of fair market value; provided that Borrower and any guarantor hereby waive any rights to contest the amount of the deficiency claim afforded to Borrower and such guarantor under Tex. Prop. Code Sections 51.003; 51.004 and 51.005; in the event the waiver of such provision is held invalid, that the valuation method as currently set forth below shall be used;

(1)     the Mortgaged Property shall be valued "as is" and in its condition as of the date of foreclosure, and no assumption of increased value because of post-foreclosure repairs, refurbishment, restorations or improvements shall be made;

(2)     any adverse effect on the marketability of title because of the foreclosure or because of any other title condition not existing as of the date of this Security Instrument shall be considered;

(3)     the valuation of the Mortgaged Property shall be based upon an assumption that the foreclosure purchaser desires a prompt resale of the Mortgaged Property for cash within a six (6) month period after foreclosure;

(4)     although the Mortgaged Property may be disposed of more quickly by the foreclosure purchaser, the gross valuation of the Mortgaged Property as of the date of foreclosure shall be discounted for a hypothetical reasonable holding period (not to exceed six (6) months) at a monthly rate equal to the average monthly interest rate on the Note for the twelve (12) months before the date of foreclosure;

(5)     the gross valuation of the Mortgaged Property as of the date of foreclosure shall be further discounted and reduced by reasonable estimated costs of disposition, including brokerage commissions, title policy premiums, environmental assessment and clean-up costs, tax and assessment, prorations, costs to comply with legal requirements, and attorneys' fees;

(6)     expert opinion testimony shall be considered only from a licensed appraiser certified by the State of Texas and, to the extent permitted under Texas law, a member of the Appraisal Institute, having at least five (5) years' experience in appraising property similar to the Mortgaged Property in the county where the Mortgaged Property is located, and who has conducted and prepared a complete written appraisal of the Mortgaged Property taking into considerations the factors set forth in this Security Instrument; no expert opinion testimony shall be considered without such written appraisal;

(7)     evidence of comparable sales shall be considered only if also included in the expert opinion testimony and written appraisal referred to in the preceding paragraph; and

(8)     an affidavit executed by Lender to the effect that the foreclosure bid accepted by Trustee was equal to or greater than the value of the Mortgaged Property determined by Lender based upon the factors and methods set forth in subparagraphs (1) through (7) above before the foreclosure shall constitute prima facie evidence that the

ER 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

foreclosure bid was equal to or greater than the fair market value of the Mortgaged Property on the foreclosure date.

(g)     Lender may, at Lender's option, comply with these provisions in the manner permitted or required by Title 5, Section 51.002 of the Texas Property Code (relating to the sale of real estate) or by Chapter 9 of the Texas Business and Commerce Code (relating to the sale of collateral after default by a debtor), as those titles and chapters now exist or may be amended or succeeded in the future, or by any other present or future articles or enactments relating to same subject. Unless expressly excluded, the Mortgaged Property shall include Rents collected before a foreclosure sale, but attributable to the period following the foreclosure sale, and Borrower shall pay such Rents to the purchaser at such sale. At any such sale:

(1)     whether made under the power contained in this Security Instrument, Section 51.002, the Texas Business and Commerce Code, any other legal requirement or by virtue of any judicial proceedings or any other legal right, remedy or recourse, it shall not be necessary for Trustee to have physically present, or to have constructive possession of, the Mortgaged Property (Borrower shall deliver to Trustee any portion of the Mortgaged Property not actually or constructively possessed by Trustee immediately upon demand by Trustee) and the title to and right of possession of any such Mortgaged Property shall pass to the purchaser as completely as if the Mortgaged Property had been actually present and delivered to the purchaser at the sale;

(2)     each instrument of conveyance executed by Trustee shall contain a general warranty of title, binding upon Borrower;

(3)     the recitals contained in any instrument of conveyance made by Trustee shall conclusively establish the truth and accuracy of the matters recited in the Instrument, including nonpayment of the Indebtedness and the advertisement and conduct of the sale in the manner provided in this Security Instrument and otherwise by law and the appointment of any successor Trustee;

(4)     all prerequisites to the validity of the sale shall be conclusively presumed to have been satisfied;

(5)     the receipt of Trustee or of such other party or officer making the sale shall be sufficient to discharge to the purchaser or purchasers for such purchaser(s)' purchase money, and no such purchaser or purchasers, or such purchaser(s)' assigns or personal representatives, shall thereafter be obligated to see to the application of such purchase money or be in any way answerable for any loss, misapplication or nonapplication of such purchase money; and

(6)     to the fullest extent permitted by law, Borrower shall be completely and irrevocably divested of all of Borrower's right, title, interest, claim and demand whatsoever, either at law or in equity, in and to the Mortgaged Property sold, and such sale shall be a perpetual bar to any claim to all or any part of the Mortgaged Property

ER 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

sold, both at law and in equity, against Borrower and against any person claiming by, through or under Borrower.

(h)     Any action taken by Trustee or Lender pursuant to the provisions of this Section 5 shall comply with the laws of the Property Jurisdiction.   Such applicable laws shall take precedence over the provisions of this Section 5, but shall not invalidate or render unenforceable any other provision of any Loan Document that can be construed in a manner consistent with any applicable law.  If any provision of this Security Instrument shall grant to Lender (including Lender acting as a mortgagee-in-possession), Trustee or a receiver appointed pursuant to the provisions of this Security Instrument any powers, rights or remedies prior to, upon, during the continuance of or following an Event of Default that are more limited than the powers, rights, or remedies that would otherwise be vested in such party under any applicable law in the absence of said provision, such party shall be vested with the powers, rights, and remedies granted in such applicable law to the full extent permitted by law.

6.     **Waiver of Statute of Limitations and Marshaling.**

Borrower hereby waives the right to assert any statute of limitations as a bar to the enforcement of the lien of this Security Instrument or to any action brought to enforce any Loan Document. Notwithstanding the existence of any other security interests in the Mortgaged Property held by Lender or by any other party, Lender shall have the right to determine the order in which any or all of the Mortgaged Property shall be subjected to the remedies provided in this Security Instrument and/or any other Loan Document or by applicable law.  Lender shall have the right to determine the order in which any or all portions of the Indebtedness are satisfied from the proceeds realized upon the exercise of such remedies.  Borrower, for itself and all who may claim by, through, or under it, and any party who now or in the future acquires a security interest in the Mortgaged Property and who has actual or constructive notice of this Security Instrument waives any and all right to require the marshaling of assets or to require that any of the Mortgaged Property be sold in the inverse order of alienation or that any of the Mortgaged Property be sold in parcels (at the same time or different times) in connection with the exercise of any of the remedies provided in this Security Instrument or any other Loan Document, or afforded by applicable law.

7.     **Waiver of Redemption; Rights of Tenants.**

(a)     Borrower hereby covenants and agrees that it will not at any time apply for, insist upon, plead, avail itself, or in any manner claim or take any advantage of, any appraisement, stay, exemption or extension law or any so-called "Moratorium Law" now or at any time hereafter enacted or in force in order to prevent or hinder the enforcement or foreclosure of this Security Instrument. Without limiting the foregoing:

(1)     Borrower for itself and all Persons who may claim by, through, or under Borrower, hereby expressly waives any so-called "Moratorium Law" and any and all rights of reinstatement and redemption, if any, under any order or decree of foreclosure of this Security Instrument, it being the intent hereof that any and all such "Moratorium Laws," and all rights of reinstatement and redemption of Borrower and of all other

ER 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

Persons claiming by, through, or under Borrower are and shall be deemed to be hereby waived to the fullest extent permitted by applicable law;

(2)    Borrower shall not invoke or utilize any such law or laws or otherwise hinder, delay or impede the execution of any right, power remedy herein or otherwise granted or delegated to Lender but will suffer and permit the execution of every such right, power and remedy as though no such law or laws had been made or enacted; and

(3)    if Borrower is a trust, Borrower represents that the provisions of this Section 7 (including the waiver of reinstatement and redemption rights) were made at the express direction of Borrower's beneficiaries and the persons having the power of direction over Borrower, and are made on behalf of the trust estate of Borrower and all beneficiaries of Borrower, as well as all other persons mentioned above.

(b)    Lender shall have the right to foreclose subject to the rights of any tenant or tenants of the Mortgaged Property having an interest in the Mortgaged Property prior to that of Lender. The failure to join any such tenant or tenants of the Mortgaged Property as party defendant or defendants in any such civil action or the failure of any decree of foreclosure and sale to foreclose their rights shall not be asserted by Borrower as a defense in any civil action instituted to collect the Indebtedness, or any part thereof or any deficiency remaining unpaid after foreclosure and sale of the Mortgaged Property, any statute or rule of law at any time existing to the contrary notwithstanding.

**8.    Notice.**

(a)    All notices under this Security Instrument shall be:

(1)    in writing, and shall be (A) delivered, in person, (B) mailed, postage prepaid, either by registered or certified delivery, return receipt requested, or (C) sent by overnight express courier;

(2)    addressed to the intended recipient at its respective address set forth at the end of this Security Instrument; and

(3)    deemed given on the earlier to occur of:

(A)    the date when the notice is received by the addressee; or

(B)    if the recipient refuses or rejects delivery, the date on which the notice is so refused or rejected, as conclusively established by the records of the United States Postal Service or such express courier service.

(b)    Any party to this Security Instrument may change the address to which notices intended for it are to be directed by means of notice given to the other party in accordance with this Section 8.

ER 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

(c)     Any required notice under this Security Instrument which does not specify how notices are to be given shall be given in accordance with this Section 8.

## 9.     Mortgagee-in-Possession.

Borrower acknowledges and agrees that the exercise by Lender of any of the rights conferred in this Security Instrument shall not be construed to make Lender a mortgagee-in-possession of the Mortgaged Property so long as Lender has not itself entered into actual possession of the Land and Improvements.

## 10.     Release.

Upon payment in full of the Indebtedness, Lender shall cause the release of this Security Instrument and Borrower shall pay Lender's costs incurred in connection with such release.

## 11.     Trustee.

(a)     Trustee may resign by giving of notice of such resignation in writing to Lender. If Trustee shall die, resign or become disqualified from acting under this Security Instrument or shall fail or refuse to act in accordance with this Security Instrument when requested by Lender or if for any reason and without cause Lender shall prefer to appoint a substitute trustee to act instead of the original Trustee named in this Security Instrument or any prior successor or substitute trustee, Lender shall have full power to appoint a substitute trustee and, if preferred, several substitute trustees in succession who shall succeed to all the estate, rights, powers and duties of the original Trustee named in this Security Instrument.  Such appointment may be executed by an authorized officer, agent or attorney-in-fact of Lender (whether acting pursuant to a power of attorney or otherwise), and such appointment shall be conclusively presumed to be executed with authority and shall be valid and sufficient without proof of any action by Lender.

(b)     Any successor Trustee appointed pursuant to this Section 11 shall, without any further act, deed or conveyance, become vested with all the estates, properties, rights, powers and trusts of the predecessor Trustee with like effect as if originally named as Trustee in this Security Instrument; but, nevertheless, upon the written request of Lender or such successor Trustee, the Trustee ceasing to act shall execute and deliver an instrument transferring to such successor Trustee, all the estates, properties, rights, powers and trusts of the Trustee so ceasing to act, and shall duly assign, transfer and deliver any of the Mortgaged Property and monies held by the Trustee ceasing to act to the successor Trustee.

(c)     Trustee may authorize one (1) or more parties to act on Trustee's behalf to perform the ministerial functions required of Trustee under this Security Instrument, including the transmittal and posting of any notices.

## 12.     No Fiduciary Duty.

Lender owes no fiduciary or other special duty to Borrower.

ER 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

13.     **Additional Provisions Regarding Assignment of Leases and Rents.**

In no event shall the assignment of Rents or Leases in Section 3 cause the Indebtedness to be reduced by an amount greater than the Rents actually received by Lender and applied by Lender to the Indebtedness, whether before, during or after (a) an Event of Default, or (b) a suspension or revocation of the license granted to Borrower in Section 3 with regard to the Rents. Borrower and Lender specifically intend that the assignment of Rents and Leases in Section 3 is not intended to result in a pro tanto reduction of the Indebtedness. The assignment of Rents and Leases in Section 3 is not intended to constitute a payment of, or with respect to, the Indebtedness and, therefore, Borrower and Lender specifically intend that the Indebtedness shall not be reduced by the value of the Rents and Leases assigned. Such reduction shall occur only if, and to the extent that, Lender actually receives Rents pursuant to Section 3 and applies such Rents to the Indebtedness. Borrower agrees that the value of the license granted with regard to the Rents equals the value of the absolute assignment of Rents to Lender. The assignment of Rents contained in Section 3 shall terminate upon the release of this Security Instrument.

14.     **Loan Charges.**

Borrower agrees to pay an effective rate of interest equal to the sum of the Interest Rate and any additional rate of interest resulting from any other charges of interest or in the nature of interest paid or to be paid in connection with the Mortgage Loan and any other fees or amounts to be paid by Borrower pursuant to any of the other Loan Documents. Neither this Security Instrument, the Note, the Loan Agreement, nor any of the other Loan Documents shall be construed to create a contract for the use, forbearance or detention of money requiring payment of interest at a rate greater than the maximum interest rate permitted to be charged under applicable law. It is expressly stipulated and agreed to be the intent of Borrower and Lender at all times to comply with all applicable laws governing the maximum rate or amount of interest payable on the indebtedness evidenced by this Security Instrument, the Note and the other Loan Documents. If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower is interpreted so that any interest or other charge or amount provided for in any Loan Document, whether considered separately or together with other charges or amounts provided for in any other Loan Document, or otherwise charged, taken, reserved or received in connection with the Mortgage Loan, or on acceleration of the maturity of the Mortgage Loan or as a result of any prepayment by Borrower or otherwise, violates that law, and Borrower is entitled to the benefit of that law, that interest or charge is hereby reduced to the extent necessary to eliminate any such violation. Amounts, if any, previously paid to Lender in excess of the permitted amounts shall be applied by Lender to reduce the unpaid principal balance of the Mortgage Loan without the payment of any Prepayment Premium (or, if the Mortgage Loan has been or would thereby be paid in full, shall be refunded to Borrower), and the provisions of the Loan Agreement and any other Loan Documents immediately shall be deemed reformed and the amounts thereafter collectible under the Loan Agreement and any other Loan Documents reduced, without the necessity of the execution of any new documents, so as to comply with any applicable law, but so as to permit the recovery of the fullest amount otherwise payable under the Loan Documents. For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower has been violated, all Indebtedness that constitutes interest, as well as all other charges

made in connection with the Indebtedness that constitute interest, and any amount paid or agreed to be paid to Lender for the use, forbearance or detention of the Indebtedness, shall be deemed to be allocated and spread ratably over the stated term of the Mortgage Loan. Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of the Mortgage Loan.

## 15.   ENTIRE AGREEMENT.

**THIS SECURITY INSTRUMENT, THE NOTE, THE LOAN AGREEMENT, AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

## 16.   Governing Law; Consent to Jurisdiction and Venue.

This Security Instrument shall be governed by the laws of the Property Jurisdiction without giving effect to any choice of law provisions thereof that would result in the application of the laws of another jurisdiction. Borrower agrees that any controversy arising under or in relation to this Security Instrument shall be litigated exclusively in the Property Jurisdiction. The state and federal courts and authorities with jurisdiction in the Property Jurisdiction shall have exclusive jurisdiction over all controversies that arise under or in relation to any security for the Indebtedness. Borrower irrevocably consents to service, jurisdiction, and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise.

## 17.   Miscellaneous Provisions.

(a)      This Security Instrument shall bind, and the rights granted by this Security Instrument shall benefit, the successors and assigns of Lender. This Security Instrument shall bind, and the obligations granted by this Security Instrument shall inure to, any permitted successors and assigns of Borrower under the Loan Agreement. If more than one (1) person or entity signs this Security Instrument as Borrower, the obligations of such persons and entities shall be joint and several. The relationship between Lender and Borrower shall be solely that of creditor and debtor, respectively, and nothing contained in this Security Instrument shall create any other relationship between Lender and Borrower. No creditor of any party to this Security Instrument and no other person shall be a third party beneficiary of this Security Instrument or any other Loan Document.

(b)      The invalidity or unenforceability of any provision of this Security Instrument or any other Loan Document shall not affect the validity or enforceability of any other provision of this Security Instrument or of any other Loan Document, all of which shall remain in full force and effect. This Security Instrument contains the complete and entire agreement among the parties as to the matters covered, rights granted and the obligations assumed in this Security Instrument. This Security Instrument may not be amended or modified except by written agreement signed by the parties hereto.

(c)      The following rules of construction shall apply to this Security Instrument:

ER 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

(1)     The captions and headings of the sections of this Security Instrument are for convenience only and shall be disregarded in construing this Security Instrument.

(2)     Any reference in this Security Instrument to an "Exhibit" or "Schedule" or a "Section" or an "Article" shall, unless otherwise explicitly provided, be construed as referring, respectively, to an exhibit or schedule attached to this Security Instrument or to a Section or Article of this Security Instrument.

(3)     Any reference in this Security Instrument to a statute or regulation shall be construed as referring to that statute or regulation as amended from time to time.

(4)     Use of the singular in this Security Instrument includes the plural and use of the plural includes the singular.

(5)     As used in this Security Instrument, the term "including" means "including, but not limited to" or "including, without limitation," and is for example only, and not a limitation.

(6)     Whenever Borrower's knowledge is implicated in this Security Instrument or the phrase "to Borrower's knowledge" or a similar phrase is used in this Security Instrument, Borrower's knowledge or such phrase(s) shall be interpreted to mean to the best of Borrower's knowledge after reasonable and diligent inquiry and investigation.

(7)     Unless otherwise provided in this Security Instrument, if Lender's approval, designation, determination, selection, estimate, action or decision is required, permitted or contemplated hereunder, such approval, designation, determination, selection, estimate, action or decision shall be made in Lender's sole and absolute discretion.

(8)     All references in this Security Instrument to a separate instrument or agreement shall include such instrument or agreement as the same may be amended or supplemented from time to time pursuant to the applicable provisions thereof.

(9)     "Lender may" shall mean at Lender's discretion, but shall not be an obligation.

**18.     Time is of the Essence.**

Borrower agrees that, with respect to each and every obligation and covenant contained in this Security Instrument and the other Loan Documents, time is of the essence.

**19.     WAIVER OF TRIAL BY JURY.**

**TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH OF BORROWER AND LENDER (BY ITS ACCEPTANCE HEREOF) (A) COVENANTS AND AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS SECURITY INSTRUMENT OR THE RELATIONSHIP**

ER 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

BETWEEN THE PARTIES AS BORROWER AND LENDER THAT IS TRIABLE OF RIGHT BY A JURY AND (B) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH OF BORROWER AND LENDER, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.

**ATTACHED EXHIBITS.**   The following Exhibits are attached to this Security Instrument and incorporated fully herein by reference:

| |X| | Exhibit A | Description of the Land (required) |
| |X| | Exhibit B | Modifications to Security Instrument |

**[Remainder of Page Intentionally Blank]**

ER 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

**IN WITNESS WHEREOF**, Borrower has signed and delivered this Security Instrument under seal (where applicable) or has caused this Security Instrument to be signed and delivered by its duly authorized representative under seal (where applicable).  Where applicable law so provides, Borrower intends that this Security Instrument shall be deemed to be signed and delivered as a sealed instrument.

**BORROWER:**

NB VUE MAC, DST,
a Delaware statutory trust

**2OR**

By:    NB Vue Mac ST, LLC,
a Delaware limited liability company,
its Statutory Trustee

        By:    Nelson Brothers Professional Real Estate, LLC
a California limited liability company,
its sole member

        By:    _____
Name: Patrick Nelson
Title:  Manager

        Address:    16B Journey, Suite 200
Aliso Viejo, CA 92656

ER 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

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**   CIVIL CODE § 1189

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California  )
County of _Orange_  )

On _12|14|2015_ before me, _Camila O. Granados_,
Date   Here Insert Name and Title of the Officer

personally appeared _Patrick Nelson_
Name(s) of Signer(s)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) (s)are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

CAMILA O. GRANADOS
Commission # 2087324
Notary Public - California
Orange County
My Comm. Expires Oct 24, 2018

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____
Signature of Notary Public

*Place Notary Seal Above*

———————————— OPTIONAL ————————————
*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**
Title or Type of Document: _____ Document Date: _____
Number of Pages: _____ Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

| Signer's Name: _____ | Signer's Name: _____ |
|---|---|
| ☐ Corporate Officer — Title(s): _____ | ☐ Corporate Officer — Title(s): _____ |
| ☐ Partner — ☐ Limited  ☐ General | ☐ Partner — ☐ Limited  ☐ General |
| ☐ Individual       ☐ Attorney in Fact | ☐ Individual       ☐ Attorney in Fact |
| ☐ Trustee       ☐ Guardian or Conservator | ☐ Trustee       ☐ Guardian or Conservator |
| ☐ Other: _____ | ☐ Other: _____ |
| Signer Is Representing: _____ | Signer Is Representing: _____ |

©2014 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)   Item #5907

**Fannie Mae Multifamily Security Instrument**   Form 6025.TX        **Notary Page**
**Texas**                06-12             **© 2012 Fannie Mae**

ER 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

The name, chief executive office and organizational identification number of Borrower (as Debtor under any applicable Uniform Commercial Code) are:

Debtor Name/Record Owner:
NB Vue Mac, DST, a Delaware statutory trust

Debtor Chief Executive Office Address:

Debtor Chief Executive Office Address:
16B Journey, Suite 200
Aliso Viejo, CA 92656
Attention: Blake Wettengel

Debtor Organizational ID Number:
5810861

Trustee Notice Address:
Rebecca S. Conrad
2828 Routh Street, Suite 800
Dallas, TX 75201

The name and chief executive office of Lender (as Secured Party) are:

Secured Party Name:
Berkeley Point Capital LLC, a Delaware limited liability company

Secured Party Chief Executive Office Address:
300 Spectrum Center Drive
Suite 650
Irvine, CA 92618

ER 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

## EXHIBIT A

## DESCRIPTION OF THE LAND

All of Unrestricted Reserve "A", in Block One (1), of Valhalla Subdivision, a subdivision in Harris County, Texas, according to the map or plat thereof, recorded in Film Code No. 654196 of the Map Records of Harris County, Texas

D

ER 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

EXHIBIT B

MODIFICATIONS TO SECURITY INSTRUMENT
(Master Lease Transactions)

The foregoing Security Instrument is hereby modified as follows:

1.     Capitalized terms used and not specifically defined herein have the meanings given to such terms in the Security Instrument.

2.     Section 1 of the Security Instrument (Defined Terms) is hereby amended by deleting and restating in their entirety the definitions of "**Goods**," "**Indebtedness**," "**Leases**," "**Mortgaged Property**," "**Personalty**," and "**Rents**" to read as follows:

"**Goods**" means all of Borrower's present and hereafter acquired right, title and interest in all goods which are used now or in the future in connection with the ownership, management, or operation of the Land or the Improvements or are located on the Land or in the Improvements, including inventory; furniture; furnishings; machinery, equipment, engines, boilers, incinerators and installed building materials; systems and equipment for the purpose of supplying or distributing heating, cooling, electricity, gas, water, air or light; antennas, cable, wiring and conduits used in connection with radio, television, security, fire prevention or fire detection, or otherwise used to carry electronic signals; telephone systems and equipment; elevators and related machinery and equipment; fire detection, prevention and extinguishing systems and apparatus; security and access control systems and apparatus; plumbing systems; water heaters, ranges, stoves, microwave ovens, refrigerators, dishwashers, garbage disposers, washers, dryers and other appliances; light fixtures, awnings, storm windows and storm doors; pictures, screens, blinds, shades, curtains and curtain rods; mirrors, cabinets, paneling, rugs and floor and wall coverings; fences, trees and plants; swimming pools; exercise equipment; supplies; tools; books and records (whether in written or electronic form); websites, URLs, blogs and social network pages; computer equipment (hardware and software); leasehold improvements or related furniture and equipment, including all present and future parts, additions, accessories, replacements, attachments, accessions, replacement parts and substitutions of the foregoing, and the proceeds thereof (cash and non-cash, including insurance proceeds) and any other equipment, supplies or furniture owned by Borrower and leased to any third party service provider or any operator or manager of the Land or the Improvements; and other tangible personal property which is used now or in the future in connection with the ownership, management, or operation of the Land or the Improvements or are located on the Land or in the Improvements.

"**Indebtedness**" means the principal of, interest on, and all other amounts due at any time under the Note, the Loan Agreement, this Security Instrument, or any other Loan Document (other than the Environmental Indemnity Agreement and

ER 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

Guaranty), including Prepayment Premiums, late charges, interest charged at the Default Rate, and accrued interest as provided in the Loan Agreement and this Security Instrument, advances, costs and expenses to perform the obligations of Borrower or Master Lessee or to protect the Mortgaged Property or the security of this Security Instrument, all other monetary obligations of Borrower or Master Lessee under the Loan Documents (other than the Environmental Indemnity Agreement), including amounts due as a result of any indemnification obligations, and any Enforcement Costs.

"**Leases**" means all present and future leases, subleases, licenses, concessions or grants or other possessory interests now or hereafter in force, whether oral or written, covering or affecting the Mortgaged Property, or any portion of the Mortgaged Property (including proprietary leases or occupancy agreements if Borrower is a cooperative housing corporation), any residency or occupancy agreements pertaining to residents of the Mortgaged Property and any Master Lease, and all modifications, extensions or renewals thereof.

"**Mortgaged Property**" means all of Borrower's present and hereafter acquired right, title and interest, if any, in and to all of the following:

(a)     the Land;

(b)     the Improvements;

(c)     the Personalty;

(d)     current and future rights, including air rights, development rights, zoning rights and other similar rights or interests, easements, tenements, rights-of-way, strips and gores of land, streets, alleys, roads, sewer rights, waters, watercourses, and appurtenances related to or benefitting the Land or the Improvements, or both, and all rights-of-way, streets, alleys and roads which may have been or may in the future be vacated;

(e)     insurance policies relating to the Mortgaged Property (and any unearned premiums) and all proceeds paid or to be paid by any insurer of the Land, the Improvements, the Personalty, or any other part of the Mortgaged Property, whether or not Borrower obtained the insurance pursuant to Lender's requirements;

(f)     awards, payments and other compensation made or to be made by any municipal, state or federal authority with respect to the Land, the Improvements, the Personalty, or any other part of the Mortgaged Property, including any awards or settlements resulting from (1) Condemnation Actions, (2) any damage to the Mortgaged Property caused by governmental action that does not result in a Condemnation Action, or (3) the total or partial taking of the Land, the Improvements, the Personalty, or any other part of the Mortgaged

ER 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

Property under the power of eminent domain or otherwise and including any conveyance in lieu thereof;

(g)     contracts, options and other agreements for the sale of the Land, the Improvements, the Personalty, or any other part of the Mortgaged Property entered into by Borrower now or in the future, including cash or securities deposited to secure performance by parties of their obligations;

(h)     Leases and Lease guaranties, letters of credit and any other supporting obligation for any of the Leases given in connection with any of the Leases, and all Rents;

(i)     earnings, royalties, accounts receivable, issues and profits from the Land, the Improvements or any other part of the Mortgaged Property, and all undisbursed proceeds of the Mortgage Loan and, if Borrower is a cooperative housing corporation, maintenance charges or assessments payable by shareholders or residents;

(j)     Imposition Deposits;

(k)     refunds or rebates of Impositions by any municipal, state or federal authority or insurance company (other than refunds applicable to periods before the real property tax year in which this Security Instrument is dated);

(l)     resident and tenant security deposits;

(m)     names under or by which any of the above Mortgaged Property may be operated or known, and all trademarks, trade names, and goodwill relating to any of the Mortgaged Property;

(n)     Collateral Accounts and all Collateral Account Funds;

(o)     products, and all cash and non-cash proceeds from the conversion, voluntary or involuntary, of any of the above into cash or liquidated claims, and the right to collect such proceeds;

(p)     all of Borrower's right, title and interest in the oil, gas, minerals, mineral interests, royalties, overriding royalties, production payments, net profit interests and other interests and estates in, under and on the Mortgaged Property and other oil, gas and mineral interests with which any of the foregoing interests or estates are pooled or unitized;

(q)     the Master Lease; and

(r)     the Tenant/Landlord Subordination and Assignment Agreement.

ER 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

"**Personalty**" means all of Borrower's present and hereafter acquired right, title and interest in all Goods, accounts, choses of action, chattel paper, documents, general intangibles (including Software), payment intangibles, instruments, investment property, letter of credit rights, supporting obligations, computer information, source codes, object codes, records and data, all telephone numbers or listings, claims (including claims for indemnity or breach of warranty), deposit accounts and other property or assets of any kind or nature related to the Land or the Improvements now or in the future, including operating agreements, surveys, plans and specifications and contracts for architectural, engineering and construction services relating to the Land or the Improvements, and all other intangible property and rights relating to the operation of, or used in connection with, the Land or the Improvements, including all governmental permits relating to any activities on the Land, all leasehold improvements, or related furniture and equipment, together with all present and future parts, additions, accessories, replacements, attachments, accessions, replacement parts and substitutions therefor, and the proceeds thereof (cash and non-cash including insurance proceeds) and any other equipment, supplies or furniture owned by Borrower and leased to any third party service provider or any property manager, including replacements and additions to any of the foregoing.

"**Rents**" means all rents (whether from residential or non-residential space), revenues and other income from the Land or the Improvements, including rent paid under any Master Lease, subsidy payments received from any sources, including payments under any "Housing Assistance Payments Contract" or other rental subsidy agreement (if any), parking fees, laundry and vending machine income and fees and charges for food, health care and other services provided at the Mortgaged Property, whether now due, past due, or to become due, and tenant security deposits.

3.    A new Section 20 is hereby added to the Security Instrument as follows:

**20.    Subordination of Master Lease.**

The Master Lease is and shall be subject and subordinate in all respects to the liens, terms, covenants and conditions of this Security Instrument and the other Loan Documents, and to all renewals, modifications, consolidations, replacements and extensions thereof, and to all advances heretofore made or which may hereafter be made pursuant to this Security Instrument (including all sums advanced for the purposes of (a) protecting or further securing the lien of this Security Instrument, curing defaults by Borrower under the Loan Documents or for any other purposes expressly permitted by this Security Instrument or (b) constructing, renovating, repairing, furnishing, fixturing or equipping the Mortgaged Property).

ER 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

# EXHIBIT B

## MODIFICATIONS TO SECURITY INSTRUMENT
### (Master Lease Transactions)

_____
Borrower Initials

ER 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

ER 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

20150570034

\# Pages 32

12/21/2015 11:31 AM

e-Filed & e-Recorded in the

Official Public Records of

HARRIS COUNTY

STAN STANART

COUNTY CLERK

Fees   $136.00

RECORDERS MEMORANDUM
This instrument was received and recorded electronically
and any blackouts, additions or changes were present
at the time the instrument was filed and recorded.

Any provision herein which restricts the sale, rental, or
use of the described real property because of color or
race is invalid and unenforceable under federal law.
THE STATE OF TEXAS
COUNTY OF HARRIS
I hereby certify that this instrument was FILED in
File Number Sequence on the date and at the time stamped
hereon by me; and was duly RECORDED in the Official
Public Records of Real Property of Harris County, Texas.

COUNTY CLERK
HARRIS COUNTY, TEXAS

20150570035
12/21/2015   ER   $28.00

ASSGN
K

SPACE ABOVE THIS LINE FOR RECORDER'S USE

**Prepared by:**
Anna A. Mahaney, Esquire
Ballard Spahr LLP
300 East Lombard Street, 18th Floor
Baltimore, MD 21202

**WHEN RECORDED MAIL TO:**
Berkeley Point Capital LLC
300 Spectrum Center Drive, Suite 650
Irvine, CA 92618

Attn: Director Loan Servicing
Loan No.:
Fannie Mae Commitment No.: 

## ASSIGNMENT OF SECURITY INSTRUMENT

FOR VALUABLE CONSIDERATION, BERKELEY POINT CAPITAL LLC, a Delaware limited liability company (the "**Assignor**"), having its principal office at 300 Spectrum Center Drive, Suite 650, Irvine, CA 92618, hereby assigns, grants, sells and transfers to the **FANNIE MAE**, a corporation duly organized under the Federal National Mortgage Association Charter Act, as amended, 12 U.S.C. Section 1716 et seq. and duly organized and existing under the laws of the United States (the "**Assignee**") and the Assignee's successors, transferees and assigns forever, all of the right, title and interest of the Assignor in and to the Multifamily Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of December 18, 2015 entered into by NB VUE MAC, DST, a Delaware statutory trust (the "**Borrower**") for the benefit of the Assignor, securing an indebtedness of the Borrower to the Assignor and recorded immediately prior hereto in the Official Records of Harris County, Texas (the "**Security Instrument**"), which indebtedness is secured by the property described in Exhibit A, attached to this Assignment and incorporated into it by this reference.

Together with the note or other obligation described in the Security Instrument and all obligations secured by the Security Instrument now or in the future.

DMEAST #23752130 v2                                                      Page 1

**1EE**

EXHIBIT A-4

ER 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

IN WITNESS WHEREOF, the Assignor has executed this Assignment this __15th__ day of December, 2015, to be effective as of December 18, 2015.

ASSIGNOR:

**BERKELEY POINT CAPITAL LLC,** a Delaware limited liability company

By: _____ (SEAL)
Name: Heidi Marrin
Title: Director

By: _____ (SEAL)
Name: Deborah Demoney
Title: Vice President

1OR

ER 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

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**          CIVIL CODE § 1189

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California                                   )
County of _Orange_____                         )

On _December 15, 2015_ before me, _Karen Lea Schoenholtz, notary public_
     *Date*                 *Here Insert Name and Title of the Officer*

personally appeared _Heidi Marrin and Deborah Demoney_
                             *Name(s) of Signer(s)*

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

KAREN LEA SCHOENHOLTZ
Commission # 2084292
Notary Public - California
Orange County
My Comm. Expires Oct 28, 2018

Signature _Karen _____
             *Signature of Notary Public*

*Place Notary Seal Above*

━━━━━━━━━━━━━━━━━━ OPTIONAL ━━━━━━━━━━━━━━━━━━
*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**
Title or Type of Document: _____ Document Date: _____
Number of Pages: _____ Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _____
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited  ☐ General
☐ Individual        ☐ Attorney in Fact
☐ Trustee           ☐ Guardian or Conservator
☐ Other: _____
Signer Is Representing: _____

Signer's Name: _____
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited  ☐ General
☐ Individual        ☐ Attorney in Fact
☐ Trustee           ☐ Guardian or Conservator
☐ Other: _____
Signer Is Representing: _____

©2014 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)   Item #5907

Assignment of Security Instrument                                    **Notary Page**

ER 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

## EXHIBIT A

## DESCRIPTION OF THE PROPERTY

All of Unrestricted Reserve "A", in Block One (1), of Valhalla Subdivision, a subdivision in Harris County, Texas, according to the map or plat thereof, recorded in Film Code No. 654196 of the Map Records of Harris County, Texas

D

ER 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

Page A-1

20150570035
# Pages 5

12/21/2015 11:31 AM

e-Filed & e-Recorded in the

Official Public Records of

HARRIS COUNTY

STAN STANART

COUNTY CLERK

Fees  $28.00

ER 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

RECORDERS MEMORANDUM
This instrument was received and recorded electronically
and any blackouts, additions or changes were present
at the time the instrument was filed and recorded.

Any provision herein which restricts the sale, rental, or
use of the described real property because of color or
race is invalid and unenforceable under federal law.
THE STATE OF TEXAS
COUNTY OF HARRIS
I hereby certify that this instrument was FILED in
File Number Sequence on the date and at the time stamped
hereon by me; and was duly RECORDED in the Official
Public Records of Real Property of Harris County, Texas.



*Stan Stanart*

COUNTY CLERK
HARRIS COUNTY, TEXAS

## ASSIGNMENT OF COLLATERAL AGREEMENTS
## AND OTHER LOAN DOCUMENTS

Pursuant to that certain Multifamily Loan and Security Agreement dated as of the date hereof, executed by and between NB VUE MAC, DST, a Delaware statutory trust ("**Borrower**") and BERKELEY POINT CAPITAL LLC, a Delaware limited liability company ("**Lender**") (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), Lender has agreed to make a loan to Borrower in the original principal amount of TWENTY THREE MILLION TWO HUNDRED SIXTY FIVE THOUSAND AND 00/100 DOLLARS (US $23,265,000.00) (the "**Mortgage Loan**"), as evidenced by that certain Multifamily Note dated as of the date hereof, executed by Borrower and made payable to Lender in the amount of the Mortgage Loan.

Lender hereby assigns to Fannie Mae, a corporation duly organized under the Federal National Mortgage Association Charter Act, as amended, 12 U.S.C. Section 1716 et seq. and duly organized and existing under the laws of the United States ("**Fannie Mae**") all right, title and interest of Lender in the Loan Documents, including but not limited to the Loan Documents listed on Exhibit A hereto, executed in connection with the Mortgage Loan.

This Assignment is given in connection with, and in consideration of, Fannie Mae's purchase of the Mortgage Loan made by Lender to Borrower, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged.

Capitalized terms used and not specifically defined herein shall have the meanings given to such terms in the Loan Agreement.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

**IN WITNESS WHEREOF**, Lender has signed and delivered this Assignment under seal (where applicable) or has caused this Assignment to be signed and delivered under seal (where applicable) by its duly authorized representative as of December 18, 2015. Where applicable law so provides, Lender intends that this Assignment shall be deemed to be signed and delivered as a sealed instrument.

**LENDER:**

**BERKELEY POINT CAPITAL LLC,** a Delaware limited liability company

By: _____ (SEAL)
    Name: Heidi Marrin
    Title: Director

By: _____ (SEAL)
    Name: Deborah Demoney
    Title: Vice President

Assignment of Collateral Agreements and
Other Loan Documents
Fannie Mae

Form 6402
01-11

S 2
© 2011 Fannie Mae

**EXHIBIT A**
**TO**
**ASSIGNMENT OF COLLATERAL AGREEMENTS**
**AND OTHER LOAN DOCUMENTS**

1.      Multifamily Loan and Security Agreement dated as of the date hereof, by and between Borrower and Lender.

2.      Assignment of Management Agreement dated as of the date hereof, by and among Borrower, Lender and Nelson Brothers Property Management, Inc., a California corporation.

3.      Master Lessee Estoppel Certificate dated as of the date hereof, by NB Vue Mac LeaseCo, LLC, a Delaware limited liability company for the benefit of Lender.

5.      Environmental Indemnity Agreement dated as of the date hereof, from Borrower to Lender.

6.      Any other documents executed in connection with the Mortgage Loan.

DocuSign Envelope ID: 62AE3D18-F9F6-4BC0-83DB-B2E99936694T



Newmark
Knight Frank

8 Springhouse Innovation Park
Suite 200
Lower Gwynedd, PA 19002
T 215.902.9660
ngkf.com

May 5, 2020

**VIA EMAIL AND
OVERNIGHT DELIVERY**

NB Vue Mac, DST
c/o Nelson Brothers Professional Real Estate
180 Avenida La Pata, 2nd Floor
San Clemente, California 92673
Attention: Patrick Nelson
Email:  patrick@nelsonpartners.com

Re:     Fannie Mae Loan No. ███████████
        The Vue on MacGregor Apartments (the **"Property"**)
        Forbearance and Non-Waiver

Dear Patrick:

Reference is hereby made to the $23,265,000.00 Multifamily Note dated December 18, 2015 (the **"Note"**), executed by NB Vue Mac, DST, a Delaware statutory trust (**"Borrower"**), payable to the order of Berkeley Point Capital LLC, d/b/a Newmark Knight Frank, a Delaware limited liability company (the **"Servicer"**). Servicer assigned, negotiated and transferred the Note to Fannie Mae, the current owner and holder of the Note. Capitalized terms not defined herein shall have the meaning ascribed to such term in the Loan Documents.

1.      On March 11, 2020, the World Health Organization Director-General characterized the spread of the COVID-19 virus as a pandemic (the "Health Crisis"). On March 13, 2020, the President of the United States of America declared a federal emergency in response to the Health Crisis. Because of the Health Crisis, Borrower has failed to make or reasonably foresees its inability to make the required monthly payment under the Note. Accordingly, the Loan and Note are currently delinquent for the month of April, 2020. Borrower's obligation to make these monthly payments under the Note has not been waived by Fannie Mae but continue to be due and payable, subject to the terms and conditions described herein.

2.      Borrower represents to Fannie Mae and Servicer the operations and financial performance of the Property have suffered a hardship as a result of the Health Crisis such that short-term relief from Borrower's obligations is needed. As an accommodation to Borrower to allow

Forbearance Agreement (Health Crisis Relief – Servicer Delegated)                    Page 1
© 2020 Fannie Mae. Trademarks of Fannie Mae.                                        (Revised 4/1/2020)

EXHIBIT A-5

Borrower the opportunity to stabilize the operations of the Property, and to commence processing applicable insurance claims or other claims for relief from available resources, and notwithstanding the defaults as a result of the delinquent monthly payments and/or other defaults that may exist, Fannie Mae has agreed to forbear from exercising its rights and remedies under the Note and other Loan Documents on the terms set forth herein.

3.      Fannie Mae will continue to forbear from exercising its rights and remedies until June 30, 2020 ("Forbearance Expiration Date"); conditioned, however, on Borrower's cooperation with and providing monthly rent rolls, monthly rent collection reports, monthly operating statements, and such other information as requested by Servicer to determine the on-going nature of the hardship, the extent of the operational needs of the Property and such other action or relief that may be necessary.

4.      Borrower will be required to bring the Loan current at the Forbearance Expiration Date or through the payment of the outstanding forbearance amounts due in equal monthly installments to be repaid on a schedule not to exceed twelve (12) months following the Forbearance Expiration Date and to be repaid in addition to the then current monthly obligation due under the Note and other Loan Documents. If Borrower elects to repay the outstanding forbearance amounts due in monthly installments, Borrower may prepay the outstanding forbearance amounts due at any time without a prepayment premium. Notwithstanding the foregoing, Borrower shall bring the Loan current upon receipt of Business Income (business interruption/rent loss) insurance proceeds by Borrower or Servicer or upon receipt of any other financial relief or assistance available to Borrower from any other source, including, but not limited to, any local, state, or federal government assistance or relief program.

In the event Borrower fails to timely perform any of its obligations under this paragraph 3, Fannie Mae's agreement to forbear from exercising its rights and remedies under the Note and other Loan Documents shall immediately terminate, without further notice or demand, and Fannie Mae may, at its option, accelerate the Note and/or exercise any and all other rights and remedies available to it under the Loan Documents, at law or in equity.

5.      If Servicer is in receipt of Borrower's insurance proceeds, these insurance proceeds and any other insurance proceeds with respect to the Property (including business income/business interruption/rent loss insurance) will be held in escrow by Servicer, on behalf of Fannie Mae, pending Borrower's completion and delivery of those items described in the Loan Documents, with respect to the use of the insurance proceeds. Such insurance proceeds shall continue to be held in escrow by Servicer in an Insurance Proceeds Collateral Account for reimbursement to Borrower for costs of stabilizing the Property and/or applied to the Loan, as provided by the Loan Documents.

6.      Monthly installments under the Note are due on the first day of each month and are subject to a late fee if received after the tenth (10th) day of each month. In addition, the Note and other Loan Documents provide for the charging of interest at a default rate of eight and fifty-nine hundredths percent (8.59%) during the period that Borrower is in default.

© 2020 Fannie Mae. Trademarks of Fannie Mae.                                              (Revised 4/1/2020)

7.      As additional consideration for the relief granted herein by Fannie Mae, Borrower expressly agrees to not pursue or initiate, and agrees to defer, halt, cease, and abate, any eviction or similar action against any tenant solely on the basis of such tenant's inability to pay his or her rent obligation to Borrower. Borrower agrees to be bound by the eviction suspension until the longer of (i) the moratorium imposed under Sec. 4024 of the CARES Act, (ii) the Forbearance Expiration Date, or (iii) any longer period otherwise mandated by law.

8.      Until Borrower is current on its obligations to Fannie Mae, Borrower agrees any revenue or income generated by the Property, whether from rents or other sources, will be used solely for allowable normal and customary operating expenses and approved capital expenditures. Borrower further agrees no fees, charges, or compensation, except as provided herein for management fees, shall be paid or distributed to Borrower, its general partners, limited partners, members, or other related persons or entities, if any, or to any affiliates thereof, until Borrower is current on its obligations to Fannie Mae.

For each month through the Forbearance Expiration Date, Borrower agrees to remit to Servicer, no less frequently than monthly, all net operating income from the Property ("NOI"), as defined below. Borrower's remittance of NOI does not replace or waive Borrower's obligation to make the required installments on the Loan.

NOI shall mean all revenue or income generated by operations of the Property, including, but not limited to, rental receipts, late fees, application fees, forfeited deposits, laundry and vending income, furniture rental, and insurance proceeds, less only those allowable expenses and approved capital expenditures relative to the operation of the Property. Allowable expenses shall include a management fee not to exceed the lower of the current contract fee or five percent (5.0%) of the actual collections (which collections do not include insurance proceeds or condemnation awards) per month.

Each month, the tender of NOI is to be accompanied and supported by a statement of monthly income and expenses which has been certified by an appropriate representative of Borrower as entirely true, correct and complete. This statement is to be prepared on a cash basis, in such detail as may be requested by Fannie Mae or Servicer, and must be received by Servicer with such cash payments no later than the 10th calendar day of the month following the month reported for. For example, the NOI and statement for the period ending April 2020, must be received by Servicer on or before May 10, 2020.

Fannie Mae may use the funds provided by Borrower in any order and for any purpose which is related directly or indirectly to the Loan Documents or to the Property including, without limitation, the payment of attorneys' fees or other charges incurred by Fannie Mae, application to principal or interest due under the note evidencing the Loan, payment for repairs or capital expenditures for the Property, or any other purpose determined by Fannie Mae in its sole and absolute discretion and in accordance with the Loan Documents. The receipt and application of such funds by Fannie Mae shall not constitute a waiver of any amounts due under the Loan Documents or of any default in connection therewith.

© 2020 Fannie Mae. Trademarks of Fannie Mae.                    (Revised 4/1/2020)

9.      Notwithstanding Fannie Mae's agreement to forbear from exercising its rights and remedies, and the acceptance of any partial payments at any time by the Servicer, the Note remains in default, and Fannie Mae does not waive any defaults set forth in this letter, or any other defaults which may exist or arise under the Note and any Loan Document executed in connection with the Note. This letter is to evidence Fannie Mae's and Borrower's agreement for forbearance and does not, and should not be deemed to, amend or modify the Note, the other Loan Documents or Borrower's obligations thereunder. Acceptance of late payments does not imply that any future late payments will be accepted by Fannie Mae or Servicer, and shall not be deemed a waiver of Fannie Mae's right to reject late payments, assess late charges, charge a default rate of interest, or prevent Fannie Mae from exercising any right, remedy, or power available to Fannie Mae, including, without limitation, all rights, remedies, and powers granted under the Note and any Loan Documents and at law or in equity.

10.     By signing the Acceptance included herein, Borrower unconditionally acknowledges to be indebted to Fannie Mae for all amounts presently unpaid and outstanding under the Note, in principal, interest, and other amounts, without defense, setoff, deduction or counterclaim of any kind whatsoever, all of which are forever waived and released.

11.     By signing the Acceptance included herein, Borrower additionally unconditionally acknowledges and agrees that no act, event or circumstance occurring since the date of the Note and the other Loan Documents shall give rise to any claim or cause of action (regardless of whether based on common or civil law, equity, statute, regulation, or other grounds) against Fannie Mae or Servicer, or against any of their respective officers, directors, employees, successors, assigns, agents, and attorneys (collectively, the "Released Parties"), with Borrower hereby unconditionally and fully releasing and forever discharging the Released Parties from all actions, causes of action, claims and/or demands or every nature whatsoever, whether at law or in equity, in tort or in contract, or otherwise, and whether known or unknown, or present or contingent, including release of any rights to recover consequential or punitive damages, that Borrower may now have as against any Released Party, further including any and all claims in connection with the Loan, this forbearance agreement, or any extension of credit, refusal to extend credit, waiver, acquiescence, or any other act or failure to act in connection with any matter pertaining to the Note, the Security Instrument, and/or the Loan Documents. Borrower expressly acknowledges this paragraph is intended to include any claim or action Borrower may assert now or in the future against Fannie Mae or Servicer arising out of or from the Borrower's agreement to the eviction suspension described herein.

12.     Borrower represents: (i) it is a sophisticated commercial real estate investor that has had the opportunity to be represented by independent counsel of its own choosing, (ii) it or its authorized parties have carefully read and fully understand this agreement in its entirety, and (iii) it is fully aware of the contents herein and its meaning, including any risks related thereto. Borrower further represents the individual executing this letter has been duly authorized to act on behalf of Borrower, has executed this agreement free from coercion, duress or undue influence, and that the agreements set forth herein are part of

an arms-length transaction. Borrower affirms it has not relied upon any guidance from Fannie Mae or Servicer in its decision to enter into this agreement. Borrower agrees it is not a third-party beneficiary of any certification of Servicer to Fannie Mae related to this agreement or of any contract or agreement between Servicer and Fannie Mae.

13.    This Agreement may be signed or executed using electronic signatures. This Agreement may be executed in as many counterparts as necessary or convenient, including both counterparts that are executed on paper and counterparts that are electronic records and executed electronically. Each executed counterpart (and any copy of an executed counterpart that is an electronic record) shall be deemed an original, and all such counterparts shall constitute one and the same agreement. An electronic or other copy of a signed document shall be considered as effective as an original. By signing this Agreement, Borrower agrees that Fannie Mae and Servicer may deliver communications electronically, that this Agreement, other Loan Documents, and any communications may, at Fannie Mae and Servicer's option, be signed or executed using electronic signatures, and that the use of electronic records and signatures will be in place of written documents and handwritten signatures. If Borrower executes this Agreement electronically, Borrower agrees that the electronic mark affixed to this Agreement constitutes the signature of an individually legally authorized to act on behalf of Borrower and will be enforceable as and to the full extent of a hand-written signature.

**[NO FURTHER TEXT ON THIS PAGE. SIGNATURES FOLLOW.]**

If you have any questions regarding this matter, please do not hesitate to contact Matthew Minegar at 949-754-6339 or vie email at matthew.minegar@ngkf.com.

Sincerely,

**BERKELEY POINT CAPITAL LLC, D/B/A**
   **NEWMARK KNIGHT FRANK**, a Delaware
limited liability company

Laura Smith
Digitally signed by Laura Smith
Date: 2020.05.08 22:17:55 -04'00'

By: _____
   Name:
   Title:

By the signature above, Servicer represents and certifies to Fannie Mae Servicer has acted as a prudent commercial real estate lender and conducted sufficient due diligence and reviewed the information and documents necessary to document the Borrower's hardship and determine the relief granted herein for the Borrower is necessary.

**BORROWER ACCEPTANCE:**

ACCEPTED AND AGREED this __8__ day of
_____May_____, 2020.

**NB VUE MAC, DST**, a Delaware statutory trust

By: NB Vue Mac ST, LLC, a Delaware limited
   liability company, its Signatory Trustee

   By: Nelson Brothers Professional Real Estate,
     LLC, a California limited liability
     company, its sole member

     DocuSigned by:
     Patrick Nelson
     C16F7125F59E424...
   By: _____
     Patrick Nelson
     Authorized Signatory

     5/8/2020

# BAKER DONELSON
BEARMAN, CALDWELL & BERKOWITZ, PC

1301 MCKINNEY STREET
SUITE 3700
HOUSTON, TEXAS 77010

PHONE:   713.650.9700
FAX:        713.650.9701

www.bakerdonelson.com

DANIEL J. FERRETTI, SHAREHOLDER
**Direct Dial**: 713.210.7436
**E-Mail Address**: dferretti@bakerdonelson.com

August 24, 2020

*Via Federal Express (Next Business Day Delivery) and*
*U.S. Mail – Certified (Return Receipt Requested)*

NB Vue Mac, DST
c/o Nelson Brothers Professional Real Estate
180 Avenida La Pata, 2nd Floor
San Clemente, CA 92673
Attention: Patrick Nelson

Nelson Brothers Professional Real Estate, LLC
180 Avenida La Pata, 2nd Floor
San Clemente, CA 92673
Attention: Patrick Nelson

Patrick Nelson
104 Via Almodovar,
San Clemente, CA 92672

Patrick Nelson
16B Journey, Suite 200
Aliso Viejo, CA 92656
Attn: Blake Wettengel

Brian Nelson
7657 S Debra Dr.
Gilbert, AZ 85298

Brian Nelson
16B Journey, Suite 200
Aliso Viejo, CA 92656
Attn: Blake Wettengel

Re:    Lender:              Fannie Mae
        Mortgaged Property: The Vue at MacGregor Apartments, 4460 S. MacGregor Way,
                                    Houston, TX 77021 (Harris County)
        Loan Number:
        Servicer:           Berkeley Point Capital, LLC d/b/a Newmark Knight Frank

> *Loan and Security Agreement* (the "Loan Agreement") dated as of December 18,
> 2015, (the "Loan Date") executed by NB Vue Mac, DST, a Delaware statutory
> trust (the "Borrower") and Berkeley Point Capital, LLC, a Delaware limited
> liability company (the "Original Lender" or "Servicer") with respect to the Loan
> defined therein, which Loan is evidenced by the *Multifamily Note* (the "Note"),
> dated as of the Loan Date, executed by Borrower to the order of Original Lender,
> in the original principal amount of $23,265,000.00, and is secured by, *inter alia,*
> the lien of that certain *Multifamily Deed of Trust, Assignment of Rents, Security*

EXHIBIT A-6

NB Vue Mac, DST, *et al.*
August 24, 2020
Page 2

*Agreement and Fixture Filing* (the "Security Instrument"), dated as of the Loan Date, recorded at Instrument Number 20150570034, in the official records of Tarrant County, Texas (the "Recording Office"), covering certain real and personal property (collectively, the "Property") located in Houston, Texas, and more particularly described in the Security Instrument; said Loan Agreement, Note and Security Instrument having been endorsed, transferred and assigned from Original Lender to Fannie Mae ("Fannie Mae" or "Lender") as of the Loan Date, pursuant to that certain *Assignment of Security Instrument* recorded at Instrument Number 20150570035, in the Recording Office.

To Whom It May Concern:

Our firm has been retained by Fannie Mae in connection with the Loan Agreement, the Note, the Security Instrument and all other documents (collectively, the "Loan Documents") executed in connection with the above-described loan (the "Loan").

At Borrower's request, Borrower and Fannie Mae entered into that certain Forbearance and Non-Waiver letter agreement dated as of May 5, 2020 (the "Forbearance Agreement"). The Forbearance Agreement provided that, as a result of hardship that Borrower represented it had undergone due to the Health Crisis defined in the Forbearance Agreement, Fannie Mae would agree, during the period from the date of the Forbearance Agreement through June 30, 2020 (the "Forbearance Period"), to forbear from exercising its rights under the Loan Documents due to Borrower's failure to make payments required under the Loan Documents. The Forbearance Period has expired; however, Borrower has failed to commence making any required installment payments under the Loan Documents or otherwise engage with Fannie Mae to resolve the arrearage due under the Loan Documents.

As a result of Borrower's failure to commence making monthly payments after the expiration of the Forbearance Period, an "Event of Default" has occurred pursuant to Section 14.01(a)(1) of the Loan Agreement, which entitles Fannie Mae to, among other things, declare the entire indebtedness of the Loan to be immediately due and payable and to invoke the power of sale and any other remedies permitted by Texas law or provided in the Security Instrument or in any other Loan Document. Under Section 7 of the Note, Borrower has waived notice of intent to accelerate and notice of acceleration of the maturity of the Loan.

This letter hereby constitutes a formal notice that the maturity date of the Note **has been accelerated** as a result of the occurrence and present continuation of such Events of Default. Demand is hereby made for immediate payment in full of the entire unpaid principal balance of the Note, plus (to the extent lawful) accrued and unpaid interest thereon and the costs and attorneys' fees of Fannie Mae. In order to determine the exact payoff figure currently owing to Fannie Mae pursuant to the Note, please contact Matthew Minegar of the Servicer at 949-754-6339 or via email at matthew.minegar@ngkf.com, or, if you have counsel, you may have your counsel contact me at the direct dial telephone number set forth above.

You are further notified that, by reason of such default and acceleration of said indebtedness of the Loan, Fannie Mae may immediately institute foreclosure proceedings under

NB Vue Mac, DST, *et al.*
August 24, 2020
Page 3

the Security Instrument and may otherwise exercise any and all other rights and remedies enumerated in the Loan Documents or otherwise available at law or in equity (including, without limitation, the appointment of a receiver over the Property, applications of escrow deposits, reserves and/or other funds held by Servicer toward payment of Borrower's obligations under the Loan Documents in the manner set forth therein).

Please be advised that the demand made hereby is being given pursuant to the terms and provisions of the Loan Documents.  By making this demand, Fannie Mae does not waive any of the rights or remedies available to Fannie Mae under the Loan Documents or otherwise.  No failure to exercise any rights or remedies available to Fannie Mae and no delay in exercising any such rights or remedies shall operate as a waiver of any rights which Fannie Mae may have pursuant to the terms of the Loan Documents or otherwise.  Further, any reference by Fannie Mae or Servicer to any Event of Default or default shall in no way constitute, or be construed to be, a waiver of any other Event of Default or default which may now exist or hereafter arise under the Loan Documents.

UNDER THE SECURITY INSTRUMENT EXECUTED BY BORROWER IN FAVOR OF FANNIE MAE, BORROWER'S LICENSE TO COLLECT RENTS HAS TERMINATED, AND FANNIE MAE IS NOW ENTITLED TO ALL RENTS AS THEY BECOME DUE AND PAYABLE, INCLUDING RENTS CURRENTLY DUE AND UNPAID.  UNTIL FURTHER NOTICE, ANY RENTS BORROWER RECEIVED OR RECEIVES AFTER THE OCCURRENCE OF THE EVENTS OF DEFAULT SHALL BE RECEIVED AND HELD BY BORROWER IN TRUST FOR THE BENEFIT OF FANNIE MAE.  UNTIL FURTHER NOTICE, ALL SUCH RENTS SHALL BE APPLIED ONLY TO BONA FIDE CURRENT OPERATING EXPENSES TO THIRD PARTIES IN CONNECTION WITH THE OPERATION OF THE PROPERTY WITH ANY AND ALL EXCESS PAID TO FANNIE MAE, TO BE APPLIED IN ACCORDANCE WITH THE LOAN DOCUMENTS.

Also, please be advised that pursuant to that certain *Guaranty of Non-Recourse Obligations* (the "Guaranty"), dated as of December 18, 2015, executed by Patrick Nelson, Brian Nelson, and Nelson Brothers Professional Real Estate, LLC (the "Guarantors"), the Guarantors are liable to Fannie Mae for, among other things under Section 3.02(a) of the Loan Agreement, (x) all Rents to which Fannie Mae is entitled under the Loan Documents, and (y) Borrower's failure, following a default under any of the Loan Documents, to deliver to Fannie Mae on demand all Rents and security deposits relating to the Property.  Specification of certain bases for exceptions to non-recourse liability on the part of the Borrower or the Guarantors in no way constitutes a waiver of any other bases for exceptions to non-recourse liability that the Borrower or the Guarantors may have under the Loan Documents.

Please be advised that any discussions that may have occurred or may occur in the future between representatives of Borrower and of Fannie Mae and/or the Servicer regarding the Property, the Note, the Security Instrument or any of the other Loan Documents do not constitute modifications, waivers or extensions of the provisions of the governing Loan Documents that relate to the Loan.  Borrower may not rely upon any such discussions in any manner or fashion. Unless and until a binding, written agreement has been fully executed by and between all parties, Fannie Mae's rights and remedies are and will continue to be governed by and fully enforceable

NB Vue Mac, DST, *et al.*
August 24, 2020
Page 4

under the terms of the Loan Documents.

For your information, this letter is also being sent to the Guarantors as notice of Borrower's default under the operative Loan Documents. Fannie Mae, at its sole option and in addition to any other remedies available to Fannie Mae, may seek to recover from the Guarantors any indebtedness and any other obligations owing by Guarantors pursuant to and consistent with the Loan Documents.

Notwithstanding any previous action or inaction by or on behalf of Servicer or Fannie Mae to the contrary, if any, you are hereby notified that Fannie Mae will hereafter require strict compliance with the terms and conditions of the Note and other Loan Documents, and Fannie Mae does not in any manner waive any rights or remedies available against the Borrower or the Guarantors pursuant to the Note or other Loan Documents or applicable law, including without limitation the rights described in this letter.

**THIS LAW FIRM, FANNIE MAE AND SERVICER ARE ATTEMPTING TO COLLECT THE INDEBTEDNESS EVIDENCED BY THE NOTE AND/OR SECURED BY THE LIENS, SECURITY INTERESTS, AND TERMS AND PROVISIONS CONTAINED WITHIN THE LOAN DOCUMENTS, AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

Neither Fannie Mae, the Servicer, nor undersigned counsel have been advised and have no knowledge of any pending bankruptcy proceeding involving the Borrower or Guarantors. To the extent the Borrower's or Guarantors' obligations may have been discharged, dismissed, or are subject to an automatic stay of a bankruptcy order under Title 11 of the United States Code, this notice is for compliance and informational purposes only and does not constitute a demand for payment or any attempt to collect any such obligation. This notice is given pursuant to 11 U.S.C. Section 362(b)(11), if applicable.

Your immediate attention to this matter is encouraged.

Sincerely,

BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC

Daniel J. Ferretti, Shareholder

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Patrick Nelson
16 B Journey, Ste 200
Aliso Viejo, CA 92656
Attn: Blake Wettengel

9590 9402 5086 9092 4435 07

2. Article Number (Transfer from service label)

7019 1120 0000 4411 0915

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X M. C72 C-19   ☒ Agent
☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery
Nelson   9/8

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:   ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☒ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053   Domestic Return Receipt

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Brian Nelson
16 B Journey, Ste 200
Aliso Viejo, CA 92656
Attn: Blake Wettengel

9590 9402 5086 9092 4434 84

2. Article Number (Transfer from service label)

7019 1120 0000 4411 0700

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X M. C72 C-19   ☒ Agent
☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery
Nelson   9/8

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:   ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☒ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053   Domestic Return Receipt

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Nelson Brothers Prof. Real Estate
180 Avenida La Pata, 2nd Fl.
San Clemente, CA 92673
Attn: Patrick Nelson

9590 9402 5086 9092 4435 21

2. Article Number (Transfer from service label)
7019 1120 0000 4411 0892

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _C 22 C-19_   ☒ Agent   ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery
Nelson   8/31

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:   ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery ($500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☒ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053   Domestic Return Receipt

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

WB Due Mac, DST
c/o Nelson Bros Prof. Real Estate
180 Avenida La Pata, 2nd Fl.
San Clemente, CA 92673

9590 9402 5086 9092 4434 77

2. Article Number (Transfer from service label)
7019 1120 0000 4411 0717

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _C 22 C-19_   ☒ Agent   ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery
Nelson   8/31

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:   ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery ($500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☒ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053   Domestic Return Receipt



**CERTIFIED MAIL**

NEOPOST
08/25/2020
US POSTAGE **$006.90**
FIRST-CLASS MAIL
ZIP 77010
041M11464968

7019 1120 0000 4411 0731

Patrick Nelson
104 Via Almodovar
San Clemente, CA 92672

NIXIE   911   DE 1   0009/24/20

RETURN TO SENDER
UNCLAIMED
UNABLE TO FORWARD

BC: 77010303425   *0933-03928-25-46

UNC

BAKER DONELSON

U.S. Postal Service™
CERTIFIED MAIL® RECEIPT
*Domestic Mail Only*

For delivery information, visit our website at www.usps.com®.

OFFICIAL USE

Certified Mail Fee
$

Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)           $
☐ Return Receipt (electronic)         $
☐ Certified Mail Restricted Delivery  $
☐ Adult Signature Required            $
☐ Adult Signature Restricted Delivery $

Postage
$

Total Postage and Fees
$

Sent To  Patrick Nelson
Street and Apt. No., or PO Box No. 104 Via Almodovar
City, State, ZIP+4® San Clemente CA 92672

PS Form 3800, April 2015 PSN 7530-02-000-9047   See Reverse for Instructions

---

**CERTIFIED MAIL**

NEOPOST
08/25/2020
US POSTAGE **$006.90**
FIRST-CLASS MAIL
ZIP 77010
041M11464968

7019 1120 0000 4411 0762

Brian Nelson
7657 S Debra Dr.
Gilbert, AZ 85298

NIXIE   850   DE 1   0008/29/20

RETURN TO SENDER
NO SUCH NUMBER
UNABLE TO FORWARD

BC: 77010303425   *0933-03925-25-46

BAKER DONELSON

U.S. Postal Service™
CERTIFIED MAIL® RECEIPT
*Domestic Mail Only*

For delivery information, visit our website at www.usps.com®.

OFFICIAL USE

Certified Mail Fee
$

Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)           $
☐ Return Receipt (electronic)         $
☐ Certified Mail Restricted Delivery  $
☐ Adult Signature Required            $
☐ Adult Signature Restricted Delivery $

Postage
$

Total Postage and Fees
$

Sent To  Brian Nelson
Street and Apt. No., or PO Box No. 7657 S Debra Dr.
City, State, ZIP+4® Gilbert AZ 85298

PS Form 3800, April 2015 PSN 7530-02-000-9047   See Reverse for Instructions

7019 1120 0000 4411 0762

---

**LOAN MODIFICATION AGREEMENT**

---

**THIS LOAN MODIFICATION AGREEMENT** (this "<u>Agreement</u>") is entered into as of November 1, 2020 (the "<u>Effective Date</u>"), by and among **FANNIE MAE**, a corporation organized and existing under the laws of the United States ("<u>Holder</u>"), **NB VUE MAC, DST**, a Delaware statutory trust ("<u>Borrower</u>"), **NELSON BROTHERS PROFESSIONAL REAL ESTATE, LLC**, a California limited liability company ("<u>Nelson Brothers</u>"), **PATRICK NELSON**, an individual ("<u>P Nelson</u>"), and **BRIAN NELSON**, an individual ("<u>B. Nelson</u>" and together with Nelson Brothers and P. Nelson, collectively, the "<u>Guarantors</u>"; Borrower and Guarantors are referred to herein, collectively, as the "<u>Obligors</u>").

<u>RECITALS</u>

A.     Borrower is indebted to Holder for a loan in the original principal amount of $23,265,000.00 (the "<u>Loan</u>") pursuant to that certain Multifamily Loan and Security Agreement dated December 18, 2015 (the "<u>Loan Agreement</u>"), executed by Borrower and Berkeley Point Capital, LLC, d/b/a Newmark Knight Frank (in its capacity as the original lender of the Loan, the "<u>Original Lender</u>", and in its capacity as the servicer on behalf of Holder, the "<u>Loan Servicer</u>"). The Loan is evidenced by that certain Multifamily Note dated December 18, 2015, made by Borrower payable to Original Lender in the original principal amount of $23,265,000.00 (the "<u>Note</u>"). The Loan is secured by the Loan Agreement and by that certain Multifamily Deed of Trust, Assignment of Leases and Rents, Security Agreement, and Fixture Filing dated December 18, 2015, executed by Borrower in favor of Original Lender, recorded in the real property records of Harris County, Texas on December 21, 2015, as Instr. No. 20150570034 (the "<u>Security Instrument</u>") and encumbering the "<u>Mortgaged Property</u>" more particularly described therein. Borrower agreed to indemnify Original Lender and successor holders of the Loan for certain environmental liabilities pursuant to, and as more particularly described in, that certain Environmental Indemnity Agreement dated December 18, 2015, executed by Borrower in favor of Original Lender (the "<u>Environmental Indemnity</u>"). Guarantors agreed to guarantee certain of Borrower's obligations under the Loan Agreement, Note, Security Instrument, Environmental Indemnity, and other Loan Documents described in the Loan Agreement by that certain Guaranty of Non-Recourse Obligations dated December 18, 2015, executed by Guarantors in favor of Original Lender (the "<u>Guaranty</u>").

B.     The Loan Agreement, Note, Security Instrument, Environmental Indemnity, Guaranty, Forbearance Agreement (as herein defined), all prior amendments or modifications of the foregoing, and all other documents evidencing or securing the Loan are referred to herein collectively as the "<u>Loan Documents</u>". All collateral granted by Obligors as security for the Loan, including, without limitation, the property described in the Loan Agreement and the Security Instrument, is referred to herein, collectively, as the "<u>Collateral</u>".

C.     Original Lender transferred and assigned the Loan Documents to Holder pursuant to, among other agreements, that certain Assignment of Security Instrument dated December 18, 2015, executed by Original Lender in favor of Holder and recorded in the real property records of Harris County, Texas on December 21, 2015, as Instr. No. 20150570035.

D.     Borrower was unable to make payments due under the Loan Documents as a result of the Health Crisis described in that certain Forbearance Agreement dated May 8, 2020, between Borrower and Loan Servicer (the "<u>Forbearance Agreement</u>"). At the end of the

EXHIBIT A-7

Forbearance Agreement's forbearance period, Borrower was not able to cure the existing defaults under the Loan Documents, and Borrower and Holder were not able to agree to an extension of the Forbearance Agreement.  As a result, Holder, through counsel, gave notice of the acceleration of the Loan's maturity date by letter dated August 24, 2020 (the "Acceleration Letter").

E.     The outstanding indebtedness due under the Loan Documents and all of Obligors' other obligations under the Loan Documents are referred to herein as the "Loan Obligations".

F.     Obligors have requested that Holder reinstate the original maturity date of the Loan and make other modifications to the Loan Documents as more particularly described in this Agreement.  Holder is willing to do so, but only on the terms hereinafter provided.

## AGREEMENT

**NOW, THEREFORE,** in consideration of the Recitals, the mutual agreements herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Obligors agree with Holder, and represent and warrant to Holder, and Holder agrees with Obligors, and the Loan Documents are modified as follows:

1.     **Definitions.**  Capitalized terms used, but not defined, in this Agreement shall have the meanings set forth in the Loan Documents.

2.     **Acknowledgement of Obligations by Obligors.**  Obligors acknowledge and agree that the Recitals set forth above are true and correct and are incorporated by reference into the body of this Agreement.  Obligors acknowledge and agree that Obligors are indebted to Holder for repayment of the Loan Obligations, including all accrued interest, costs, fees (including attorneys' fees) and expenses.  Obligors hereby reaffirm and ratify the terms of the Loan Documents, as amended herein, and acknowledge that they are enforceable in accordance with their terms.  The Guaranty remain in full force and effect and the Guarantor, by signing below, hereby ratifies and affirms all terms and conditions of the Guaranty and hereby consents to all modifications and amendments to the Loan Documents described herein.

3.     **Acknowledgment of Security Interests.**  Obligors acknowledge the validity and enforceability of the security interests granted in favor of Holder in the Collateral, that the security interests are properly recorded or perfected, as the case may be, and that Holder holds a first-priority security interest in all of the Collateral.  Obligors agree, at the request of Holder, to execute and consent to the filing of any new or additional security agreements, mortgages or UCC-1 financing statements or any other documents, as Holder may require to perfect or to continue the perfection of such security interests, consistent with Article 9 of the Uniform Commercial Code and other applicable law.  Obligors acknowledge and agree that Holder will require strict compliance with the terms of the Loan Documents, as amended herein, with time being strictly of the essence.

4.     **Acknowledgement of Lack of Defenses.**  Obligors acknowledge that as of the Effective Date each has no defense, counterclaim, offset, cross complaint, claim or demand of any kind or nature whatsoever (collectively, the "Defenses") that can be asserted to reduce or eliminate all or any part of their liability to repay any indebtedness to Holder or seek affirmative relief for damages of any kind or nature from Holder, which Defenses arise out of or are related to the Loan Documents or, more generally, Obligors' relationship with Holder.  To the extent that any such Defenses exist as of the Effective Date, Obligors acknowledge and agree that they have been fully, forever and irrevocably released pursuant to Section 12 hereto.

EXHIBIT 13

5.      **Conditions Precedent.**  As conditions precedent to the Holder's obligation to reinstate the Maturity Date and otherwise modify the Loan Documents hereunder, Obligors agree as follows:

(a)      On or before 3:00PM Eastern time on November 2, 2020, Obligors shall have made payment to Holder in the amount of $201,254.00, representing the installment payment under the Loan Documents originally scheduled for October 1, 2020;

(b)      On or before 3:00PM Eastern time on November 2, 2020, Obligors shall have made payment to Holder an amount equal to $251,207.00, which amount Holder shall apply first to the Expenses described in Section 10 below, and second to fully fund the Imposition Deposits and Replacement Reserve Deposits due as of the Effective Date, according to the records of the Loan Servicer;

(c)      Obligors shall have executed and delivered to Holder this Agreement; and

(d)      All representations of Obligors in this Agreement shall be true and correct as of the Effective Date.

6.      **Reinstatement of Maturity Date.**  Holder agrees to the reinstatement of the original maturity date of January 1, 2026 (the "Maturity Date").  The acceleration of the Maturity Date pursuant to the Acceleration Letter is rescinded. If Holder, in its absolute discretion, deems necessary, Borrower agrees to execute and deliver to Holder an agreement, in recordable form, and in form and substance acceptable to Holder in its sole discretion, to reflect the reinstatement of the Maturity Date in the public records where the Security Instrument is filed or recorded. Borrower further agrees to pay any recording cost associated with such reinstatement agreement. By agreeing to reinstate the Maturity Date, Holder is not committing to any future extensions, renewals, or modifications of the Loan or Loan Documents.

7.      **Additional Modifications to Loan Documents.** The Loan Documents are hereby amended as follows:

(a)      Payments.  From and after the Effective Date, the Monthly Debt Service Payments as defined in the Loan Agreement are hereby amended, and the outstanding principal and interest due with respect to the Loan shall be due and payable, as follows:

(1) Obligors acknowledge and agree that an arrearage of deferred principal and interest payments, in the aggregate amount of $714,766.00, has accrued for the months of April, May, June, July, August, and September 2020 (the "Arrearage"). Beginning on November 1, 2020, and continuing on the same day of each month thereafter through and including October 1, 2022, Borrower shall pay the Arrearage to Holder in equal monthly installments of $29,782.00.

(2) Additionally, beginning on November 1, 2020, and continuing on the same day of each month thereafter through and including October 1, 2021, Borrower shall make monthly interest only payments as follows: (i) $83,056.05 if the prior month was a 28-day month; (ii) $86,022.34 if the prior month was a 29-day month; (iii) $88,988.63 if the prior month was a 30-day month; and (iv) $91,954.91 if the prior month was a 31-day month.

(3) Beginning on November 1, 2021, and continuing on the same day of each month thereafter through the Maturity Date, Borrower shall make monthly payments of principal and interest equal to $119,127.71.

(4) Additionally, beginning on November 1, 2020, and continuing on the same day of each month thereafter through the Maturity Date, Borrower shall make all Imposition Deposits, Monthly Replacement Reserve Deposits, and any other required escrow or reserve deposits as the same become due and payable under the Loan Documents. As of the Effective Date, the estimated monthly amounts for such deposits are as follows: (i) Monthly Replacement Reserve Deposit: $4,044.65; (ii) monthly Imposition Deposit for Taxes: $70,001.97; and (iii) monthly Imposition Deposit for insurance: $8,078.67. Obligors acknowledge that the amount of any monthly deposits may change in accordance with the terms of the Loan Documents.

(5) In any event, all outstanding principal, accrued but unpaid interest, and all other Loan Obligations shall be due and payable in full on the Maturity Date.

(6) Obligors agree that Borrower's failure to pay any amounts or perform any obligations described in this Section 7(a) shall be an Event of Default under the Loan Documents that shall entitle Holder to exercise any and all rights and remedies under the Loan Documents, including without limitation, accelerating the Maturity Date and noticing the Mortgaged Property for foreclosure sale.  Obligors acknowledge that they previously waived in the Loan Documents, and further agree to waive, notice of intent to accelerate the Maturity Date and notice of acceleration of the Maturity Date.

(b)    <u>Additional Required Repairs Deposit.</u>  The Loan Agreement is amended as follows:

(1) The Loan Agreement is hereby amended to add the following definition: "**Additional Required Repairs**" means those items listed on <u>Schedule 6A</u> (Additional Required Repairs) attached to the Loan Modification Agreement dated as of October 30, 2020, between Borrower, Guarantors, and Fannie Mae.

(2) The Loan Agreement is hereby amended to add the following definition: "**Additional Required Repairs Deposit**" means an amount equal to $9,950.00.

(3) The definition of "**Repairs**" in the Loan Agreement is hereby amended to provide as follows: "**Repairs**" means, individually and collectively, the Required Repairs, Borrower Requested Repairs, Additional Lender Repairs, and Additional Required Repairs.

(4) The Loan Agreement is hereby amended to add the following provision as Section 13.01(h): **Additional Required Repairs.**  Not later than 3:00PM Eastern time on November 25, 2020, Borrower agrees to pay to Loan Servicer the Additional Repairs Deposit for deposit into the Repairs Escrow Account. Disbursements from the Repairs Escrow Account for payment of the Additional Repairs shall be governed by the terms of the Loan Agreement, including without limitation, Article 13 thereof.

(5) Obligors agree that Borrower's failure to pay any amounts or perform any obligations described in this Section 7(b) shall be an Event of

Default under the Loan Documents that shall entitle Holder to exercise any and all rights and remedies under the Loan Documents, including without limitation, accelerating the Maturity Date and noticing the Mortgaged Property for foreclosure sale.  Obligors acknowledge that they previously waived in the Loan Documents, and further agree to waive, notice of intent to accelerate the Maturity Date and notice of acceleration of the Maturity Date.

(c)      Debt Service Reserve.  Obligors agree to establish with Loan Servicer a debt service reserve account (the "Debt Service Reserve Account"). The Debt Service Reserve Account shall be administered as follows:

(1) Not later than 3:00PM Eastern time on November 25, 2020, Borrower agrees to pay to Loan Servicer an amount equal to $245,025.00 for deposit into the Debt Service Reserve Account.  Not later than January 15, 2021, Borrower agrees to pay to Loan Servicer an additional amount equal to $245,025.00 for deposit into the Debt Service Reserve Account.

(2) Loan Servicer shall hold the funds on deposit in the Debt Service Reserve Account as additional security for the payment of the Loan and the performance of Obligors' other obligations under the Loan Documents and this Agreement. Obligors acknowledge and agree that the Debt Service Reserve Account shall be a Collateral Account as that term is defined in the Loan Agreement and that all funds on deposit in the Debt Service Reserve Account shall be considered Collateral Account Funds as that term is defined in the Loan Agreement.  Borrower grants to Holder a continuing security interest in the Debt Service Reserve Account and all funds on deposit therein as additional security for the payment and performance of the Loan Obligations.

(3) Loan Servicer shall release funds on deposit in the Debt Service Reserve Account to pay any monthly payment required under Section 7(a) above if the following conditions have first been satisfied: (i) No default or Event of Default (as defined in the Loan Agreement) shall then have occurred and be continuing; (ii) the Debt Service Coverage Ratio of the Mortgaged Property on the applicable Payment Date does not exceed 1.0:1.0; and (iii) on or prior to the applicable Payment Date, Borrower requests in writing that Loan Servicer pay such debt service payment from the Debt Service Reserve Account. As used in this paragraph, the term "Debt Service Coverage Ratio" shall mean the ratio, as determined by Loan Servicer, based on the trailing twelve (12) calendar month period immediately preceding the date of such determination, of the Net Operating Income of the Mortgaged Property to the aggregate Debt Service Amounts that Borrower is required to pay under the Loan Documents (as modified by this Agreement) for such trailing twelve (12) calendar month period.  As used in this paragraph, the term "Net Operating Income" shall mean the gross lease income from Borrower's operation of the Mortgaged Property for the applicable period, less the expenditures during such period relating to the operation, maintenance and management of the Mortgaged   Property, including actual

management fees incurred in connection with the operation of the Mortgaged Property, that are incurred on a regular monthly or other periodic basis, including, without limitation, utilities, ordinary repairs and maintenance, insurance, license fees, property taxes and assessments, advertising expenses, management fees, payroll and related taxes, computer processing charges, operational equipment or other lease payments as approved by Loan Servicer, and other similar costs, but excluding depreciation and amortization, Debt Service Amounts, capital expenditures, and contributions to the Reserve/Escrow Account, all computed in accordance with generally accepted accounting principles or such other accounting basis reasonably acceptable to Loan Servicer in all cases, consistently applied, which accounting basis Borrower and Guarantor use for purposes of financial reporting in accordance with this Agreement and the other Loan Documents.

(4) Obligors acknowledge and agree that, regardless of the sufficiency of any balance in the Debt Service Reserve Account, Borrower remains obligated for payment of all Debt Service Amounts under the terms of the Loan Documents and this Agreement.   Obligors further acknowledge and agree that any insufficiency in the amount on deposit in the Debt Service Reserve Account shall not relieve Borrower from the obligation to make any payments, as and when due pursuant to this Agreement, the Note and the other Loan Documents, and any such obligation shall be separate and independent, and not conditioned on any event or circumstance whatsoever. Likewise, Obligors shall not be entitled to any release of funds from the Debt Service Reserve Account for payment of Debt Service Amounts or otherwise absent satisfaction of the conditions to such release as provided above. Upon payment in full of all Loan Obligations, any amount remaining on deposit in the Debt Service Reserve Account, if any, shall be returned to Borrower.

(5) Obligors agree that Borrower's failure to pay any amounts or perform any obligations described in this Section 7(c) shall be an Event of Default under the Loan Documents that shall entitle Holder to exercise any and all rights and remedies under the Loan Documents, including without limitation, accelerating the Maturity Date and noticing the Mortgaged Property for foreclosure sale.  Obligors acknowledge that they previously waived in the Loan Documents, and further agree to waive, notice of intent to accelerate the Maturity Date and notice of acceleration of the Maturity Date.

(d)     <u>Springing Cash Management.</u>  Borrower and Holder agree to implement a springing cash management system, as follows:

(1) Not later than November 25, 2020, Borrower shall (i) enter into a deposit account agreement (the "<u>Deposit Account Control Agreement</u>") with Holder and a bank selected by Holder and reasonably approved by Borrower ("<u>Depository Bank</u>") in form and substance reasonably satisfactory to Holder that provides, among other things, that an account to which Borrower has no access (the "<u>Deposit Account</u>") shall be maintained by Depository Bank in the

name of Borrower for the benefit of Holder and that all funds in the Deposit Account (subject to any applicable minimum balance requirement) shall be transferred on a monthly basis by Depository Bank (x) so long as no Cash Trap Event Period is then continuing, to an account designated by Borrower in writing or (y) during the continuation of a Cash Trap Event Period (as herein defined), to an account established by Holder or Loan Servicer on behalf of Holder pursuant to the Cash Management Agreement (as defined below) (the "<u>Cash Management Account</u>"), (ii) enter into Holder's then-standard form of Cash Management Agreement, which shall in all events be consistent with the terms of this Agreement, executed by Borrower, the Master Lessee (as defined in the Loan Agreement) the property manager of the Mortgaged Property (the "<u>Manager</u>"), and Holder and acknowledged by the Depository Bank, as cash management bank (the "<u>Cash Management Agreement</u>"), with such changes thereto as may be acceptable to Holder in its reasonable discretion, and (iii) provide such other, documents and instruments as Holder may reasonably request to grant to Holder a security interest in the Deposit Account and the Cash Management Account and to otherwise establish the cash management system required pursuant to the terms of this Agreement.  Upon the execution of the Deposit Account Control Agreement and the Cash Management Agreement, such documents shall thereafter be considered "Loan Documents" for all purposes under the Loan Documents.  During the continuation of a Cash Trap Event Period, Holder may apply all Rents received to fund any Imposition Deposits, Replacement Reserve Deposits, or other required reserve deposits, or to reduce the balance of the Loan Obligations, in such order as Holder may elect in Holder's discretion. After the termination of a Cash Trap Event Period, so long as no other Cash Trap Event Period commences and is then continuing, Holder shall promptly direct Depository Bank to transfer funds on deposit in the Deposit Account to an account designated by Borrower on a monthly basis.

(2)   Upon execution of the Deposit Account Control Agreement, Borrower, Master Lessee, and Manager shall cause all Rents received to be deposited directly into the Deposit Account.  Without limitation of the foregoing, simultaneously with the execution of the Deposit Account Control Agreement, Borrower shall cause to be delivered to each tenant of the Mortgaged Property an instruction letter (a "<u>Tenant Direction Letter</u>"), notifying and advising such tenant to send directly to the Deposit Account or to a post office lockbox governed by the Deposit Account Control Agreement all payments of Rent.  Borrower further agrees to promptly execute and deliver (x) additional Tenant Direction Letters for tenants entering into Leases after the date of execution of the Deposit Account Control Agreement and (y) any replacement Tenant Direction Letters that Holder may reasonably request from time to time.

(3)   As used in this Section 7(d), the term "<u>Cash Trap Event Period</u>" shall mean the period after the occurrence of an Event of Default, as

defined herein or in the Loan Agreement, and while such Event of Default is continuing and remains uncured.

(4)  So long as Borrower has fully complied with the terms of this Agreement, the Cash Management Agreement, the Deposit Account Control Agreement, and the other Loan Documents, and so long as no Event of Default, or event or circumstance that shall become an Event of Default after giving effect to any grace or cure period, has occurred and is continuing, upon completion of all payments required under Section 7(a)(1) above, the springing cash management system described in this Section 7(d) shall terminate, and Obligors and Holder shall execute such modifications or terminations of the Cash Management Agreement and Deposit Account Control Agreement as may be necessary, in Holder's judgment, to implement the termination of the springing cash management system.

(5)  Obligors agree that Borrower's failure to pay any amounts or perform any obligations described in this Section 7(d) shall be an Event of Default under the Loan Documents that shall entitle Holder to exercise any and all rights and remedies under the Loan Documents, including without limitation, accelerating the Maturity Date and noticing the Mortgaged Property for foreclosure sale.  Obligors acknowledge that they previously waived in the Loan Documents, and further agree to waive, notice of intent to accelerate the Maturity Date and notice of acceleration of the Maturity Date.

8.  **Additional Affirmative Covenants.**  Obligors agree with and covenant unto Holder that until the Loan Obligations have been paid in full, Obligors shall, in addition to, and not in limitation of, any other agreements or covenants contained in this Agreement or the Loan Documents:

(a)  Pay to Holder in full all principal and interest as the same becomes due under this Agreement and the Loan Documents;

(b)  Pay all taxes as they come due and owing on the Collateral, including without limitation, real and personal property taxes;

(c)  Maintain insurance on the Collateral as required by the Loan Documents, including without limitation, naming Holder as insured mortgagee or loss payee, as applicable, and providing satisfactory proof of same to Holder upon Holder's request; and

(d)  Provide to Holder such financial information as Holder may request.

9.  **Other Terms and Conditions.**  Except as hereby expressly modified, the Loan Documents and all terms and conditions of the Loan Documents remain in full force and effect, and the terms and conditions of the Loan Documents, as so modified, are hereby ratified and affirmed in all respects.  The Loan continues to be secured by the Collateral.

10.  **Holder's Expenses**.  Obligors shall pay to Holder an amount sufficient to reimburse Holder for the costs, fees, and expenses it has incurred in connection with the Loan, including, without limitation, Holder's legal expenses, title update and title policy expenses, appraisal expenses, recording expenses, and UCC search expenses (collectively, the "Expenses").

11.  **No Novation.**  Nothing contained in this Agreement shall be construed to waive any rights that Holder may have against Obligors except as expressly set forth herein.  The

execution and delivery of this Agreement shall not be interpreted or construed as, and in fact does not constitute, a novation, waiver, payment, or satisfaction of all or any portion of the Loan. Obligors acknowledge and agree that anything herein to the contrary notwithstanding, this Agreement is not intended to be, and shall not be deemed or construed to be, a limitation, novation or release of the rights and remedies which Holder has under applicable law, or the Loan Documents, respectively, or any of them.

      12.    **Release of Holder.**  In consideration of the agreements of Holder contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Obligors hereby agree as follows:

      (a)    Each of the Obligors, on behalf of themselves, and each of their heirs, successors, assigns, directors, officers, employees, agents, and other legal representatives, as applicable (collectively, the "<u>Releasors</u>"), hereby absolutely, unconditionally and irrevocably release, remise and forever discharge Holder, and its successors and assigns, and its present and former members, shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, managers, attorneys, employees, agents and other representatives (Holder and all such other persons being hereinafter referred to collectively as the "<u>Releasees</u>" and individually as a "<u>Releasee</u>"), of and from all actions, causes of action, suits, covenants, contracts, controversies, agreements, promises, accounts, bills, reckonings, damages and any and all other claims, counterclaims, defenses, rights of set-off, demands and liabilities whatsoever (individually, a "<u>Claim</u>" and collectively, "<u>Claims</u>") of every name and nature, known or unknown, suspected or unsuspected, both at law and in equity, which Releasors may now or hereafter own, hold, have or claim to have against the Releasees or any of them for, upon, or by reason of any circumstance, action, cause or thing whatsoever which arises at any time on or prior to the Effective Date of this Agreement, including, without limitation, for or on account of, or in relation to, or in any way in connection with any of the Loan Documents or transactions thereunder or related thereto.

      (b)    Obligors understand, acknowledge, and agree that the release set forth above may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit, or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such release.

      (c)    Obligors agree that no fact, event, circumstance, evidence, or transaction, which could now be asserted or which may hereafter be discovered shall affect in any manner the final, absolute, and unconditional nature of the release set forth above.

      13.    **Obligors' Representations and Warranties.**

      (a)    As a material inducement to Holder to enter into this Agreement, Obligors represent and warrant to Holder that (1) this Agreement has been duly authorized, executed and delivered pursuant to all necessary legal action and constitutes a valid and legally binding obligation of Obligors, enforceable in accordance with its terms; (2) the persons executing this Agreement on behalf of each Obligor have the capacity, power and authority to execute and deliver and to perform his, her or its respective obligations under this Agreement and to consummate all the transactions contemplated hereby and thereby; (3) this Agreement does not violate, conflict with, or constitute any default under any law or regulation binding on or applicable to Obligors, or any mortgage, security agreement, assignment, lease, credit or loan agreement, contract, corporate, organizational or operational document, or other instrument binding upon or affecting Obligors; (4) no Default or Event of Default exists as of the date hereof; (5) Obligors have no setoff, defense, claim, or counterclaim with respect to the Loan Documents, as so modified, or the payment or performance of the obligations evidenced by the Loan Documents; and (6) Holder's agreed modification of the Loan Documents constitutes full

and adequate consideration for the execution and delivery by Obligors of this Agreement, and any other document executed in connection or as required by this Agreement.

(b)     Obligors hereby reaffirm all of the representations and warranties contained in the Loan Documents and warrant that such representations and warranties, are true and correct as of the date of this Agreement (it being understood that any representation or warranty made as of a specific date shall be true and correct in all material respects as of such specified date).

(c)     All representations and warranties of Obligors contained in this Agreement and in all other documents and instruments executed in connection herewith or otherwise relating to this Agreement shall survive the execution of this Agreement and are material and have been or will be relied upon by the parties hereto, notwithstanding any investigation made by any person, entity or organization.   No implied representations or warranties are created or arise as a result of this Agreement or the documents comprising or relating to this Agreement.

**14.     Adequate Consideration.**   Holder and Obligors hereby acknowledge and agree that prior to giving effect to this Agreement, (a) Obligors requested Holder to modify the terms of the Loan Documents; (b) Holder and Obligors had an opportunity to consult counsel of their own choosing and have reviewed directly the terms and conditions of this Agreement; and (c) Holder's agreed modification of the Loan Documents constitutes full and adequate consideration for the execution and delivery by Obligors of this Agreement, and any other document executed in connection or as required by this Agreement.

**15.     Indemnification.**   If, after receipt of any payment from Obligors for any indebtedness owed by Obligors, Holder is compelled to surrender such payment to any person or entity for any reason (including, without limitation, a determination that such payment is void or voidable as a preference or fraudulent conveyance, an impermissible setoff, or a diversion of trust funds), then Obligors shall be liable for, and shall indemnify, defend and hold harmless Holder with respect to the full amount so surrendered relating to Obligors, including any fees and costs incurred by Holder in connection therewith, **regardless of cause or the fault or negligence of Holder**.   The provisions of this section shall survive the termination of this Agreement and the other Loan Documents and shall be and remain effective notwithstanding the repayment of the Loan, the cancellation of any Loan Document, the release of any lien, security interest, or other encumbrance securing the Loan, or any other action that Holder may have taken in reliance upon the receipt of such payment.  Any cancellation of a note, release of any such encumbrance, or other such action shall be deemed to have been conditioned upon any payment having become final and irrevocable.

**16.     Cooperation; Other Documents.**   At all times following the execution of this Agreement, Obligors shall execute and deliver, or shall cause to be executed and delivered, and shall do or cause to be done all such other acts and things as Holder may reasonably deem to be necessary or desirable to assure Holder of the benefit of this Agreement and the documents comprising or relating to this Agreement.

**17.     Remedies Cumulative; No Waiver.**    The respective rights, powers and remedies of Holder in this Agreement and in the Loan Documents are cumulative and not exclusive of any right, power or remedy provided by law or equity, and no failure or delay on the part of Holder in the exercise of any right, power or remedy shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or remedy preclude any other or further exercise thereof, or the exercise of any other right, power or remedy.  Nothing contained in this Agreement or in any prior communications between Obligors and Holder shall constitute a waiver or modification of any rights or remedies that Holder may have under the Loan

Documents or applicable law.  Holder expressly reserves and preserves all of its rights and remedies.

      18.    **Waiver of Marshaling.**  Obligors further acknowledge and agree that all of the Collateral described in the Loan Documents will continue to secure the Obligations, and Obligors have heretofore and do hereby waive any right for a marshaling of the respective Collateral now or hereafter subject to the liens and security interests of the Loan Documents.

      19.    **Notices.**  All notices, demands, or other communications under this Agreement (collectively, "Notices") shall be in writing and shall be delivered to the appropriate recipient at the address set forth below (subject to change from time to time by written notice to all other parties to this Agreement). All Notices shall be deemed to have been given (a) upon delivery, if delivered in person, (b) upon delivery, if by sent by electronic mail with receipt acknowledged by the recipient thereof, (c) one (1) business day after having been deposited for overnight delivery with any reputable overnight courier service and addressed to the appropriate recipient at the address specified below, or (d) three (3) business days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, addressed to the appropriate recipient at the address specified below; provided, however, that non-receipt of any Notice as the result of any change of address of which the sending party was not notified or as the result of a refusal to accept delivery shall be deemed receipt of such notice or communication.  For purposes of notice, the address of the parties shall be:

Obligors:     NB Vue Mac, DST
              Nelson Brothers Professional Real Estate, LLC
              180 Avenida La Pata, 2nd Floor
              San Clemente, California 92673
              Attention: Patrick Nelson
              Email: patrick@nelsonpartners.com

              Patrick Nelson
              104 Via Almodovar,
              San Clemente, CA 92672
              Email: patrick@nelsonpartners.com

              Brian Nelson
              7657 S Debra Dr.
              Gilbert, AZ 85298

Holder:       Fannie Mae
              c/o Berkley Point Capital LLC, d/b/a Newmark Knight Frank
              7700 Wisconsin Ave, Suite 1100
              Bethesda, MD 20814
              Attention: Josephine Ajayi
              Email: josephine.ajayi@ngkf.com

     with a copy to:

              Daniel J. Ferretti
              Baker Donelson, Bearman, Caldwell, & Berkowitz, PC
              1301 McKinney St., Suite 3700
              Houston, TX 77010
              Email: dferretti@bakerdonelson.com

20.     **Severability; Interpretation.**   Any provision in this Agreement that may be unenforceable or invalid under any law shall be ineffective to the extent of such unenforceability or invalidity without affecting the enforceability or validity or any other provision hereof.   All masculine, feminine, and neuter pronouns used herein shall be interpreted to include the masculine, feminine, or neuter where the context so requires.   Likewise, the singular shall include the plural, and vice versa.   The terms and conditions set forth in this Agreement are the product of joint draftsmanship by all parties, each being represented or having the opportunity to be represented by counsel, and any ambiguities in this Agreement or any documentation prepared pursuant to or in connection with this Agreement shall not be construed against any of the parties because of draftsmanship.   This Agreement is not intended to modify and does not modify the rights, remedies and obligations of Holder and Obligors pursuant to any of the Loan Documents except to the extent expressly set forth herein.

21.     **Integration.**   This Agreement constitutes the entire agreement of the parties pertaining to the subject matter hereof and all prior negotiations and representations relating thereto are merged herein.   **THE WRITTEN LOAN AGREEMENT, AS MODIFIED BY THIS AGREEMENT, REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

22.     **Counterparts.**   This Agreement may be executed in counterparts, each of which shall be an original, but all of which when taken together shall constitute one and the same instrument.   Signatures transmitted by email or facsimile shall have the same force and effect as originals.

23.     **Review of Agreement.**   Obligors and Holder acknowledge and agree that each has had an opportunity to review and consider the terms and provisions of this Agreement and each of the other Loan Documents, to consult with counsel of each party's choice, if desired, and to suggest changes to the structure and terms of this Agreement and the other Loan Documents. Obligors and Holder represent and warrant to the other that each is a sophisticated business party and that the execution of this Agreement and any related Loan Documents is made voluntarily and with full knowledge of the significance and effect of such agreements.

24.     **Successors and Assigns.**   This Agreement shall inure to the benefit of, and be binding upon, the representatives, successors and assigns of the parties hereto, respectively; provided, however, Obligors may not assign the Loan Documents, as modified herein, or any rights under the Loan Documents, as modified herein, or delegate any duties or obligations under the Loan Documents, as modified herein, without the express written consent of Holder, which consent shall be in Holder's sole and absolute discretion.   Obligors acknowledge and agree that Holder may sell or transfer all or part of the Loan and Loan Documents to one or more purchasers, whether related or unrelated to Holder, without notice and without the consent of the parties.

25.     **Governing Law**.   This Agreement shall be governed by and be construed in accordance with the laws of the State of Texas (without regard to conflicts of laws).

26.     **WAIVER OF JURY TRIAL.   TO THE EXTENT PERMITTED BY APPLICABLE LAW, OBLIGORS AND HOLDER HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING OUT OF OR IN ANY WAY PERTAINING OR RELATING TO THIS AGREEMENT, THE LOAN DOCUMENTS OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION WITH THE LOAN OR (B) IN ANY WAY CONNECTED WITH OR PERTAINING OR RELATED TO OR INCIDENTAL TO ANY**

**DEALINGS OF THE PARTIES HERETO WITH RESPECT TO THIS AGREEMENT, THE LOAN DOCUMENTS, OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION WITH THIS AGREEMENT OR THE LOAN DOCUMENTS OR IN CONNECTION WITH THE TRANSACTIONS RELATED THERETO OR CONTEMPLATED THEREBY OR THE EXERCISE OF ANY PARTY'S RIGHTS AND REMEDIES THEREUNDER, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.**

**- Remainder of Page Intentionally Left Blank -**

**IN WITNESS WHEREOF**, Obligors and Holder have hereunto caused these presents to be executed on the date first written above.

**BORROWER:**

**NB VUE MAC, DST,**
a Delaware statutory trust

By: NB Vue Mac ST, LLC,
    a Delaware limited liability company,
    its Signatory Trustee

    By: Nelson   Brothers   Professional   Real
        Estate, LLC,
        a California limited liability company,
        its sole member

        By: _____
        Name: Brian Nelson
        Title: Manager

**GUARANTOR:**

**NELSON BROTHERS PROFESSIONAL REAL
ESTATE, LLC,**
a California limited liability company

By: _____
Print Name: Brian Nelson
Title: Manager

_____
**PATRICK NELSON**

_____
**BRIAN NELSON**

**HOLDER:**

**FANNIE MAE**

By:

Print Name:  Roy E. Miller

Title:  Assistant Vice President

## SCHEDULE 6A

### (Additional Required Repairs)

| Item | Total Cost | Brief Description |
|---|---|---|
| Fire Extinguishers | $2,500 | Type ABC fire extinguishers are installed in cabinets throughout the interior hallways/breezeways. The inspection tags are out of date (see Photo 45). f3 recommends the fire extinguishers be inspected by a licensed fire equipment inspection firm to insure proper operation and eliminate potential life safety hazards. |
| Down Unit | $5,000 | Unit 119 (3 bedrooms) is "down" (unleasable) reportedly due to microbial growth from a previous plumbing leak. f3 recommends a licensed mold remediation firm be contracted to remediate the mold. In addition the unit should be renovated and returned to rent ready condition. Renovation should include replacement of flooring, drywall repairs, duck cleaning, unit cleaning and painting as needed. |
| Moisture Management Plan | $650 | Mold was reported in "down" Unit 119 (3 bedrooms) due to a past plumbing leak. Based on observed/reported evidence of water intrusion and/or mold, a Moisture Management Plan should be developed and implemented. At a minimum, the MMP must contain a provision for (i) staff training, (ii) information to be provided to tenants, (iii) documentation of the plan, (iv) the appropriate protocol for incident response and remediation and (v) routine, scheduled inspections of common space and unit interiors. |
| Parking | $1,800 | Parking for the Property is provided by a five-story concrete parking garage attached to the building. The garage is in good condition; however, the parking stall markings are faded (see Photo 6). f3 recommends the parking stall and fire lane markings be restriped. |
| **Total Additional Required Repairs** | **$9,950** | |



BEARMAN, CALDWELL & BERKOWITZ, PC

1301 MCKINNEY STREET
SUITE 3700
HOUSTON  TEXAS 77010

PHONE:   713.650.9700
FAX:        713.650.9701

www.bakerdonelson.com

DANIEL J. FERRETTI, SHAREHOLDER
**Direct Dial**: 713.210.7436
**E-Mail Address**: dferretti@bakerdonelson.com

December 4, 2020

***Via Federal Express (Next Business Day Delivery) and
U.S. Mail – Certified (Return Receipt Requested)***

NB Vue Mac, DST                                   NB Vue Mac, DST
c/o Nelson Brothers Professional Real Estate      c/o Tucker Ellis LLP
180 Avenida La Pata, 2nd Floor                    233 South Wacker Drive, Suite 6950
San Clemente, CA 92673                            Chicago, IL 60606
Attention: Patrick Nelson                         Attention: Thomas R. Fawkes

Patrick Nelson                                    Brian Nelson
104 Via Almodovar,                                130 Vantis Drive, Suite 160
San Clemente, CA 92672                            Aliso Viejo, CA  92656

Re:  <u>Holder</u>:              Fannie Mae
     <u>Mortgaged Property</u>:  The Vue at MacGregor Apartments, 4460 S. MacGregor Way,
                                 Houston, TX 77021 (Harris County)

     <u>Loan Number</u>:        ███████████
     <u>Servicer</u>:           Berkeley Point Capital, LLC d/b/a Newmark Knight Frank

    *Loan and Security Agreement* (the "<u>Loan Agreement</u>") dated as of December 18,
2015, (the "<u>Loan Date</u>") executed by NB Vue Mac, DST, a Delaware statutory
trust (the "<u>Borrower</u>") and Berkeley Point Capital, LLC, a Delaware limited
liability company (the "<u>Original Lender</u>" or "<u>Servicer</u>") with respect to the Loan
defined therein, which Loan is evidenced by the *Multifamily Note* (the "<u>Note</u>"),
dated as of the Loan Date, executed by Borrower to the order of Original Lender,
in the original principal amount of $23,265,000.00, and is secured by, *inter alia,*
the lien of that certain *Multifamily Deed of Trust, Assignment of Rents, Security
Agreement and Fixture Filing* (the "<u>Security Instrument</u>"), dated as of the Loan
Date, recorded at Instrument Number 20150570034, in the official records of
Harris County, Texas (the "<u>Recording Office</u>"), covering certain real and personal
property (collectively, the "<u>Property</u>") located in Houston, Texas, and more
particularly described in the Security Instrument, and is also supported by, *inter
alia*, that certain *Guaranty of Non-Recourse Obligations* (the "<u>Guaranty</u>"), dated
as of the Loan Date, executed by Patrick Nelson, Brian Nelson, and Nelson
Brothers Professional Real Estate, LLC (collectively, "<u>Guarantors</u>") in favor of

# EXHIBIT A-8

NB Vue Mac, DST, *et al.*
December 4, 2020
Page 2

Original Lender; said Loan Agreement, Note, Security Instrument and Guaranty having been endorsed, transferred and assigned from Original Lender to Fannie Mae ("<u>Fannie Mae</u>" or "<u>Holder</u>") as of the Loan Date, pursuant to that certain *Assignment of Security Instrument* recorded at Instrument Number 20150570035, in the Recording Office.

To Whom It May Concern:

As you are aware, our firm has been retained by Fannie Mae in connection with the Loan Agreement, the Note, the Security Instrument, the Guaranty and all other documents (collectively, the "<u>Loan Documents</u>") executed in connection with the above-described loan (the "<u>Loan</u>").

Borrower, Guarantors, and Fannie Mae entered into that certain Loan Modification Agreement dated as of November 1, 2020 (the "<u>Modification Agreement</u>").  Among other provisions, Borrower agreed in the Modification Agreement to pay monthly payments to Fannie Mae beginning on November 1, 2020, and to deposit funds on or before November 25, 2020 with the Servicer to be placed in an Additional Repair Reserve and a Debt Service Reserve.  Borrower has failed to make any monthly payments under the Modification Agreement or to deposit the required Additional Repair Reserve or Debt Service Reserve funds with the Servicer.

As a result of Borrower's failure to commence making monthly payments after the expiration of the Forbearance Period, an "Event of Default" has occurred pursuant to Section 14.01(a)(1) of the Loan Agreement and Sections 7(a)(6), 7(b)(5) and 7(c)(5) of the Modification Agreement, which entitles Fannie Mae to, among other things, declare the entire indebtedness of the Loan to be immediately due and payable and to invoke the power of sale and any other remedies permitted by Texas law or provided in the Security Instrument or in any other Loan Document.  Under Section 7 of the Note and Sections 7(a)(6), 7(b)(5) and 7(c)(5) of the Modification Agreement, Borrower and Guarantors have waived notice of intent to accelerate and notice of acceleration of the maturity of the Loan.

This letter hereby constitutes a formal notice that the maturity date of the Note **has been accelerated** as a result of the occurrence and present continuation of such Events of Default. Demand is hereby made for immediate payment in full of the entire unpaid principal balance of the Note, plus (to the extent lawful) accrued and unpaid interest thereon and the costs and attorneys' fees of Fannie Mae.  In order to determine the exact payoff figure currently owing to Fannie Mae pursuant to the Note, please contact Josephine Ajayi of the Servicer at 301-347-4902 or via email at josephine.ajayi@ngkf.com, or, if you have counsel, you may have your counsel contact me at the direct dial telephone number set forth above.

You are further notified that, by reason of such default and acceleration of said indebtedness of the Loan, Fannie Mae will immediately institute foreclosure proceedings under the Security Instrument and may otherwise exercise any and all other rights and remedies enumerated in the Loan Documents or otherwise available at law or in equity (including, without limitation, the appointment of a receiver over the Property, applications of escrow deposits, reserves and/or other funds held by Servicer toward payment of Borrower's obligations under the

NB Vue Mac, DST, *et al.*
December 4, 2020
Page 3

Loan Documents in the manner set forth therein). The foreclosure notice to be posted and filed in accordance with Texas foreclosure law will be forwarded to you by separate correspondence.

Please be advised that the demand made hereby is being given pursuant to the terms and provisions of the Loan Documents. By making this demand, Fannie Mae does not waive any of the rights or remedies available to Fannie Mae under the Loan Documents or otherwise. No failure to exercise any rights or remedies available to Fannie Mae and no delay in exercising any such rights or remedies shall operate as a waiver of any rights which Fannie Mae may have pursuant to the terms of the Loan Documents or otherwise. Further, any reference by Fannie Mae or Servicer to any Event of Default or default shall in no way constitute, or be construed to be, a waiver of any other Event of Default or default which may now exist or hereafter arise under the Loan Documents.

UNDER THE SECURITY INSTRUMENT EXECUTED BY BORROWER IN FAVOR OF FANNIE MAE, BORROWER'S LICENSE TO COLLECT RENTS HAS TERMINATED, AND FANNIE MAE IS NOW ENTITLED TO ALL RENTS AS THEY BECOME DUE AND PAYABLE, INCLUDING RENTS CURRENTLY DUE AND UNPAID. UNTIL FURTHER NOTICE, ANY RENTS BORROWER RECEIVED OR RECEIVES AFTER THE OCCURRENCE OF THE EVENTS OF DEFAULT SHALL BE RECEIVED AND HELD BY BORROWER IN TRUST FOR THE BENEFIT OF FANNIE MAE. UNTIL FURTHER NOTICE, ALL SUCH RENTS SHALL BE APPLIED ONLY TO BONA FIDE CURRENT OPERATING EXPENSES TO THIRD PARTIES IN CONNECTION WITH THE OPERATION OF THE PROPERTY WITH ANY AND ALL EXCESS PAID TO FANNIE MAE, TO BE APPLIED IN ACCORDANCE WITH THE LOAN DOCUMENTS.

Also, please be advised that pursuant to the Guaranty, the Guarantors are liable to Fannie Mae for, among other things under Section 3.02(a) of the Loan Agreement, (x) all Rents to which Fannie Mae is entitled under the Loan Documents, and (y) Borrower's failure, following a default under any of the Loan Documents, to deliver to Fannie Mae on demand all Rents and security deposits relating to the Property. Specification of certain bases for exceptions to non-recourse liability on the part of the Borrower or the Guarantors in no way constitutes a waiver of any other bases for exceptions to non-recourse liability that the Borrower or the Guarantors may have under the Loan Documents.

Please be advised that any discussions that may have occurred or may occur in the future between representatives of Borrower and of Fannie Mae and/or the Servicer regarding the Property, the Note, the Security Instrument or any of the other Loan Documents do not constitute modifications, waivers or extensions of the provisions of the governing Loan Documents that relate to the Loan. Borrower may not rely upon any such discussions in any manner or fashion. Unless and until a binding, written agreement has been fully executed by and between all parties, Fannie Mae's rights and remedies are and will continue to be governed by and fully enforceable under the terms of the Loan Documents.

For your information, this letter is also being sent to the Guarantors as notice of Borrower's default under the operative Loan Documents. Fannie Mae, at its sole option and in addition to any other remedies available to Fannie Mae, may seek to recover from the Guarantors

NB Vue Mac, DST, *et al.*
December 4, 2020
Page 4

any indebtedness and any other obligations owing by Guarantors pursuant to and consistent with the Loan Documents.

Notwithstanding any previous action or inaction by or on behalf of Servicer or Fannie Mae to the contrary, if any, you are hereby notified that Fannie Mae will hereafter require strict compliance with the terms and conditions of the Note and other Loan Documents, and Fannie Mae does not in any manner waive any rights or remedies available against the Borrower or the Guarantors pursuant to the Note or other Loan Documents or applicable law, including without limitation the rights described in this letter.

**THIS LAW FIRM, FANNIE MAE AND SERVICER ARE ATTEMPTING TO COLLECT THE INDEBTEDNESS EVIDENCED BY THE NOTE AND/OR SECURED BY THE LIENS, SECURITY INTERESTS, AND TERMS AND PROVISIONS CONTAINED WITHIN THE LOAN DOCUMENTS, AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

Neither Fannie Mae, the Servicer, nor undersigned counsel have been advised and have no knowledge of any pending bankruptcy proceeding involving the Borrower or Guarantors. To the extent the Borrower's or Guarantors' obligations may have been discharged, dismissed, or are subject to an automatic stay of a bankruptcy order under Title 11 of the United States Code, this notice is for compliance and informational purposes only and does not constitute a demand for payment or any attempt to collect any such obligation.  This notice is given pursuant to 11 U.S.C. Section 362(b)(11), if applicable.

Your immediate attention to this matter is encouraged.

Sincerely,

BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC

Daniel J. Ferretti, Shareholder

Add a tracking number

70191120000044114548

**Delivered:**
SAN CLEMENTE, CA 92673 on
December 7, 2020 at 11:23 am

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®*.

OFFICIAL USE

Certified Mail Fee
$

Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)          $
☐ Return Receipt (electronic)        $
☐ Certified Mail Restricted Delivery $
☐ Adult Signature Required           $
☐ Adult Signature Restricted Delivery $

Postage
$

Total Postage and Fees
$

Sent To
Nelson Brothers  ATTN: Patrick Nelson

Street and Apt. No., or PO Box No.

Postmark
Here

4548  4411  1120  7019

---

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse
  so that we can return the card to you.
■ Attach this card to the back of the mailpiece,
  or on the front if space permits.

1. Article Addressed to:

NB Loft Vue, DST
c/o Tucker Ellis LLP
233 South Wacker Drive, Suite 6950
Chicago, IL 60606
Attention: Thomas R. Fawkes

9590 9402 5086 9092 4352 36

2. Article Number (Transfer from service label)

7019 1120 0000 4411 4487

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____     ☐ Agent
                      ☒ Addressee

B. Received by (Printed Name)   C. Date of Delivery
                                1/4/21

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery
  (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted
  Delivery
☒ Return Receipt for
  Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation
  Restricted Delivery

---

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse
  so that we can return the card to you.
■ Attach this card to the back of the mailpiece,
  or on the front if space permits.

1. Article Addressed to:

Brian Nelson
130 Vantis Drive, Suite 160
Aliso Viejo, CA 92656

9590 9402 5086 9092 4353 11

2. Article Number (Transfer from service label)

7019 1120 0000 4411 4500

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X Aris                ☒ Agent
                      ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery
Mailman CV            12/7

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery
  (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted
  Delivery
☒ Return Receipt for
  Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation
  Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053                Domestic Return Receipt



## FORBEARANCE AND SECOND LOAN MODIFICATION AGREEMENT

**THIS FORBEARANCE AND SECOND LOAN MODIFICATION AGREEMENT** (this "Agreement") is entered into as of January 5, 2021 (the "Effective Date"), by and among **FANNIE MAE**, a corporation organized and existing under the laws of the United States ("Holder"), **NB VUE MAC, DST**, a Delaware statutory trust ("Borrower"), **NELSON BROTHERS PROFESSIONAL REAL ESTATE, LLC**, a California limited liability company ("Nelson Brothers"), **PATRICK NELSON**, an individual ("P. Nelson"), and **BRIAN NELSON**, an individual ("B. Nelson" and together with Nelson Brothers and P. Nelson, collectively, the "Guarantors"; Borrower and Guarantors are referred to herein, collectively, as the "Obligors").

### RECITALS

A.      Borrower is indebted to Holder for a loan in the original principal amount of $23,265,000.00 (the "Loan") pursuant to that certain Multifamily Loan and Security Agreement dated December 18, 2015 (the "Loan Agreement"), executed by Borrower and Berkeley Point Capital, LLC, d/b/a Newmark Knight Frank (in its capacity as the original lender of the Loan, the "Original Lender", and in its capacity as the servicer on behalf of Holder, the "Loan Servicer"). The Loan is evidenced by that certain Multifamily Note dated December 18, 2015, made by Borrower payable to Original Lender in the original principal amount of $23,265,000.00 (the "Note"). The Loan is secured by the Loan Agreement and by that certain Multifamily Deed of Trust, Assignment of Leases and Rents, Security Agreement, and Fixture Filing dated December 18, 2015, executed by Borrower in favor of Original Lender, recorded in the real property records of Harris County, Texas on December 21, 2015, as Instr. No. 20150570034 (the "Security Instrument") and encumbering the "Mortgaged Property" more particularly described therein. Borrower agreed to indemnify Original Lender and successor holders of the Loan for certain environmental liabilities pursuant to, and as more particularly described in, that certain Environmental Indemnity Agreement dated December 18, 2015, executed by Borrower in favor of Original Lender (the "Environmental Indemnity"). Guarantors agreed to guarantee certain of Borrower's obligations under the Loan Agreement, Note, Security Instrument, Environmental Indemnity, and other Loan Documents described in the Loan Agreement by that certain Guaranty of Non-Recourse Obligations dated December 18, 2015, executed by Guarantors in favor of Original Lender (the "Guaranty").

B.      The Loan Agreement, Note, Security Instrument, Environmental Indemnity, Guaranty, Forbearance Agreement (as herein defined), First Modification Agreement (as herein defined), all prior amendments or modifications of the foregoing, and all other documents evidencing or securing the Loan are referred to herein collectively as the "Loan Documents". All collateral granted by Obligors as security for the Loan, including, without limitation, the property described in the Loan Agreement and the Security Instrument, is referred to herein, collectively, as the "Collateral".

C.      Original Lender transferred and assigned the Loan Documents to Holder pursuant to, among other agreements, that certain Assignment of Security Instrument dated December 18, 2015, executed by Original Lender in favor of Holder and recorded in the real property records of Harris County, Texas on December 21, 2015, as Instr. No. 20150570035.

D.      Borrower was unable to make payments due under the Loan Documents as a result of the Health Crisis described in that certain Forbearance Agreement dated May 8, 2020,

EXHIBIT A-9

between Borrower and Loan Servicer (the "Forbearance Agreement").   At the end of the Forbearance Agreement's forbearance period, Borrower was not able to cure the existing defaults under the Loan Documents, and Borrower and Holder were not able to agree to an extension of the Forbearance Agreement.  As a result, Holder, through counsel, gave notice of the acceleration of the Loan's maturity date by letter dated August 24, 2020.

E.     Obligors and Holder entered into Loan Modification Agreement dated as of November 1, 2020 (the "First Modification Agreement") in which Obligors and Holder agreed to reinstate the original maturity date of the Loan and make other modifications of the Loan Documents.

F.     Borrower defaulted on its obligations under the First Modification Agreement and Holder again gave notice of the acceleration of the Loan's maturity date by letter dated December 3, 2020 (the "Second Acceleration Letter").

G.     The outstanding indebtedness due under the Loan Documents and all of Obligors' other obligations under the Loan Documents are referred to herein as the "Loan Obligations".

H.     Obligors have requested that Holder forbear from exercising its rights and remedies under the Loan Documents, allow Obligors the opportunity to cure the defaults under the Loan Documents, and make other modifications to the Loan Documents as more particularly described in this Agreement.  Holder is willing to do so, but only on the terms hereinafter provided.

## AGREEMENT

NOW, THEREFORE, in consideration of the Recitals, the mutual agreements herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Obligors agree with Holder, and represent and warrant to Holder, and Holder agrees with Obligors, and the Loan Documents are modified as follows:

1.     **Definitions.**  Capitalized terms used, but not defined, in this Agreement shall have the meanings set forth in the Loan Documents.

2.     **Acknowledgement of Obligations by Obligors.**  Obligors acknowledge and agree that the Recitals set forth above are true and correct and are incorporated by reference into the body of this Agreement.  Obligors acknowledge and agree that Obligors are indebted to Holder for repayment of the Loan Obligations, including all accrued interest, costs, fees (including attorneys' fees) and expenses.  Obligors hereby reaffirm and ratify the terms of the Loan Documents, as amended herein, and acknowledge that they are enforceable in accordance with their terms.  The Guaranty remains in full force and effect and the Guarantor, by signing below, hereby ratifies and affirms all terms and conditions of the Guaranty and hereby consents to all modifications and amendments to the Loan Documents described herein.

3.     **Acknowledgment of Security Interests.**  Obligors acknowledge the validity and enforceability of the security interests granted in favor of Holder in the Collateral, that the security interests are properly recorded or perfected, as the case may be, and that Holder holds a first-priority security interest in all of the Collateral.  Obligors agree, at the request of Holder, to execute and consent to the filing of any new or additional security agreements, mortgages or UCC-1 financing statements or any other documents, as Holder may require to perfect or to continue the perfection of such security interests, consistent with Article 9 of the Uniform Commercial Code and other applicable law.  Obligors acknowledge and agree that Holder will require strict compliance with the terms of the Loan Documents, as amended herein, with time being strictly of the essence.

4.     **Acknowledgement of Lack of Defenses.**  Obligors acknowledge that as of the Effective Date each has no defense, counterclaim, offset, cross complaint, claim or demand of any kind or nature whatsoever (collectively, the "Defenses") that can be asserted to reduce or eliminate all or any part of their liability to repay any indebtedness to Holder or seek affirmative relief for damages of any kind or nature from Holder, which Defenses arise out of or are related to the Loan Documents or, more generally, Obligors' relationship with Holder.  To the extent that any such Defenses exist as of the Effective Date, Obligors acknowledge and agree that they have been fully, forever and irrevocably released pursuant to Section 12 hereto.

5.     **Conditions Precedent.**  As conditions precedent to the Holder's obligation to reinstate the Maturity Date and otherwise modify the Loan Documents hereunder, Obligors agree as follows:

(a)     Borrower shall have made the Initial Cure Payment (as described in Section 7(a) of this Agreement) to Holder (Holder acknowledges receipt of the Initial Cure Payment as of January 5, 2021);

(b)     Obligors shall have executed and delivered to Holder this Agreement; and

(c)     All representations of Obligors in this Agreement shall be true and correct as of the Effective Date.

6.     **Forbearance; Conditional Reinstatement.**  Upon Borrower's execution of this Agreement and the occurrence of the conditions precedent set forth herein:

(a)     Holder will forbear from exercising any remedies available to it under the Loan Documents from the Effective Date through and including April 5, 2021 (the "Forbearance Period").   During the Forbearance Period, Holder will not seek collection of the   Loan Obligations except as set forth herein; provided, however, that the Forbearance Period shall terminate and Holder shall be permitted to enforce or exercise any remedies available to it under the Loan Documents, without notice to Obligors, if: (i) Obligors fail to make any payment when due under the Loan Documents or this Agreement or Obligors breach, default, or fail to perform any obligation or agreement contained in the Loan Documents or this Agreement; (ii) any case or other proceeding is instituted by or against any of the Obligors under any state or federal law relating to the bankruptcy of debtors, including without limitation, the United States Bankruptcy Code, 11 U.S.C. § 101, *et seq.*; (iii) any further Default or Event of Default occurs under any of the Loan Documents; (iv) any of the Obligors transfers any funds, the Collateral or other assets to any other person or entity absent Holder's written consent (other than the payment of Mortgaged Property-related operating expenses incurred in the ordinary course of Borrower's business and in accordance with the Loan Documents); or (v) any of the acknowledgments, warranties or representations of Obligors set forth herein shall be untrue or inaccurate in any material respect as of the date made.  Each of the foregoing events is hereinafter referred to as a "Terminable Event".

(b)     In any event, unless otherwise agreed to in writing by Holder, the Forbearance Period will terminate on April 5, 2021, at which point the total Loan Obligations shall be immediately due and payable in full and Holder shall be permitted to enforce or exercise any remedies available to it under the Loan Documents, unless the Reinstatement Conditions described in Section 6(c) below shall have occurred. The date on which the Forbearance Period terminates, whether on April 5, 2021, or as a result of a Terminable Event, is referred to herein as the "Termination Date".

(c)     The original maturity date of January 1, 2026 (the "Maturity Date") shall be automatically deemed reinstated and the acceleration of the Maturity Date pursuant to the Second Acceleration Letter shall be deemed rescinded, without further action on the part of

either Obligors or Holder, upon satisfaction of the following conditions on or before the Termination Date (the "Reinstatement Conditions"): (i) Obligors shall make all cure payments required under Sections 7(a) and 7(b) below; (ii) Obligors shall have timely provided the plan or proposal required under Section 7(f) below; (iii) Obligors shall have commenced timely monthly payments as required under Section 7(c) below, and (iv) no Terminable Event shall have occurred. If Holder, in its absolute discretion, deems necessary, Borrower agrees to execute and deliver to Holder an agreement, in recordable form, and in form and substance acceptable to Holder in its sole discretion, to reflect the reinstatement of the Maturity Date in the public records where the Security Instrument is filed or recorded. Borrower further agrees to pay any recording cost associated with such reinstatement agreement. By agreeing to reinstate the Maturity Date, Holder is not committing to any future extensions, renewals, or modifications of the Loan or Loan Documents.

7.     **Additional Modifications to Loan Documents.** The Loan Documents are hereby amended as follows:

(a)     On or before January 5, 2021 Obligors shall pay to Holder an amount equal to $503,523.43 (the "Initial Cure Payment"). Holder shall apply the Initial Cure Payment to amounts that are due or past due under the First Modification Agreement in such order as Holder may elect in its discretion.

(b)     During the Forbearance Period, Borrower shall make additional cure payments to Holder on the following schedule, which amounts shall be applied by Holder to the amounts due or past due under the First Modification Agreement in such order as Holder may elect in its discretion, provided however, that a portion of the March 2021 Cure Payment sufficient to fund the Additional Required Repairs Deposit (as more particularly described herein) will be applied to the Additional Required Repairs Deposit:

| Date | Payment Amount |
|------|----------------|
| January 29, 2021 | $133,557.50 |
| February 26, 2021 | $149,809.83 |
| March 31, 2021 | $220,708.91 |

Obligors agree that Borrower's failure to pay any amounts or perform any obligations described in this Section 7(b) shall be an Event of Default under the Loan Documents that shall entitle Holder to exercise any and all rights and remedies under the Loan Documents, including without limitation, accelerating the Maturity Date and noticing the Mortgaged Property for foreclosure sale. Obligors acknowledge that they previously waived in the Loan Documents, and further agree to waive, notice of intent to accelerate the Maturity Date and notice of acceleration of the Maturity Date.

(c)     Beginning on April 1, 2021, Borrower shall make monthly payments when due pursuant to the amortization schedule attached hereto as Schedule 2A, as well as the monthly Arrearage payments required under Section 7(a)(1) of the First Modification commencing on April 1, 2021, and the monthly escrow deposits required under Section 7(a)(4) of the First Modification commencing on April 1, 2021; it being understood and agreed that the payments due on November 1, 2020, December 1, 2020, January 1, 2021, February 1, 2021, and March 1, 2021 under such Section 7(a)(1) and Section 7(a)(4) of the First Modification shall be paid by the Cure Payments described in Sections 7(a) and (b) above. Obligors agree that Borrower's failure to pay any amounts or perform any obligations described herein shall be an Event of Default under the Loan Documents that shall entitle Holder to exercise any and all

rights and remedies under the Loan Documents, including without limitation, accelerating the Maturity Date and noticing the Mortgaged Property for foreclosure sale. Obligors acknowledge that they previously waived in the Loan Documents, and further agree to waive, notice of intent to accelerate the Maturity Date and notice of acceleration of the Maturity Date.

(d)     Obligors hereby acknowledge and agree that the requirements under Section 7(b) of the First Modification Agreement with respect to the Additional Required Repairs and Additional Required Repairs Deposit shall remain in full force and effect and are incorporated herein by reference; provided, however, that (1) Schedule 6A attached hereto is substituted for Schedule 6A attached to the First Modification Agreement and (2) the Additional Required Repairs Deposit shall be deemed made when and as required by the First Modification Agreement upon Holder's receipt of all of the Cure Payments described in Sections 7(a) and (b) above. Obligors agree that Borrower will complete the Additional Required Repairs described in Schedule 6A not later than the dates identified on Schedule 6A.

(e)     Holder hereby waives the requirements under Section 7(c) and 7(d) of the First Modification Agreement to establish a Debt Service Reserve Account and a springing cash management system.

(f)     On or before January 29, 2021, Obligors shall provide to Holder a long-term plan or proposal for the payment in full of the Loan, whether through reinstatement, restructure, refinance, or sale of the Collateral. Nothing herein shall be construed to require Holder to accept any such plan or proposal, and Obligors acknowledge and agree that Holder is not committing to any future extensions, renewals, or modifications of the Loan or Loan Documents.

**8.     Additional Affirmative Covenants.**  Obligors agree with and covenant unto Holder that until the Loan Obligations have been paid in full, Obligors shall, in addition to, and not in limitation of, any other agreements or covenants contained in this Agreement or the Loan Documents:

(a)     Pay to Holder in full all principal and interest as the same becomes due under this Agreement and the Loan Documents;

(b)     Pay all taxes as they come due and owing on the Collateral, including without limitation, real and personal property taxes;

(c)     Maintain insurance on the Collateral as required by the Loan Documents, including without limitation, naming Holder as insured mortgagee or loss payee, as applicable, and providing satisfactory proof of same to Holder upon Holder's request; and

(d)     Provide to Holder such financial information as Holder may request.

**9.     Other Terms and Conditions.**  Except as hereby expressly modified, the Loan Documents and all terms and conditions of the Loan Documents remain in full force and effect, and the terms and conditions of the Loan Documents, as so modified, are hereby ratified and affirmed in all respects. The Loan continues to be secured by the Collateral.

**10.     Holder's Expenses.**  Obligors shall pay to Holder an amount sufficient to reimburse Holder for the costs, fees, and expenses it has incurred in connection with the Loan, including, without limitation, Holder's legal expenses, title update and title policy expenses, appraisal expenses, recording expenses, and UCC search expenses (collectively, the "Expenses").

**11.     No Novation.**  Nothing contained in this Agreement shall be construed to waive any rights that Holder may have against Obligors except as expressly set forth herein. The execution and delivery of this Agreement shall not be interpreted or construed as, and in fact

does not constitute, a novation, waiver, payment, or satisfaction of all or any portion of the Loan. Obligors acknowledge and agree that anything herein to the contrary notwithstanding, this Agreement is not intended to be, and shall not be deemed or construed to be, a limitation, novation or release of the rights and remedies which Holder has under applicable law, or the Loan Documents, respectively, or any of them.

> 12.   **Release of Holder.**   In consideration of the agreements of Holder contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Obligors hereby agree as follows:

>> (a)   Each of the Obligors, on behalf of themselves, and each of their heirs, successors, assigns, directors, officers, employees, agents, and other legal representatives, as applicable (collectively, the "Releasors"), hereby absolutely, unconditionally and irrevocably release, remise and forever discharge Holder, and its successors and assigns, and its present and former members, shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, managers, attorneys, employees, agents and other representatives (Holder and all such other persons being hereinafter referred to collectively as the "Releasees" and individually as a "Releasee"), of and from all actions, causes of action, suits, covenants, contracts, controversies, agreements, promises, accounts, bills, reckonings, damages and any and all other claims, counterclaims, defenses, rights of set-off, demands and liabilities whatsoever (individually, a "Claim" and collectively, "Claims") of every name and nature, known or unknown, suspected or unsuspected, both at law and in equity, which Releasors may now or hereafter own, hold, have or claim to have against the Releasees or any of them for, upon, or by reason of any circumstance, action, cause or thing whatsoever which arises at any time on or prior to the Effective Date of this Agreement, including, without limitation, for or on account of, or in relation to, or in any way in connection with any of the Loan Documents or transactions thereunder or related thereto.

>> (b)   Obligors understand, acknowledge, and agree that the release set forth above may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit, or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such release.

>> (c)   Obligors agree that no fact, event, circumstance, evidence, or transaction, which could now be asserted or which may hereafter be discovered shall affect in any manner the final, absolute, and unconditional nature of the release set forth above.

> 13.   **Obligors' Representations and Warranties.**

>> (a)   As a material inducement to Holder to enter into this Agreement, Obligors represent and warrant to Holder that (1) this Agreement has been duly authorized, executed and delivered pursuant to all necessary legal action and constitutes a valid and legally binding obligation of Obligors, enforceable in accordance with its terms; (2) the persons executing this Agreement on behalf of each Obligor have the capacity, power and authority to execute and deliver and to perform his, her or its respective obligations under this Agreement and to consummate all the transactions contemplated hereby and thereby; (3) this Agreement does not violate, conflict with, or constitute any default under any law or regulation binding on or applicable to Obligors, or any mortgage, security agreement, assignment, lease, credit or loan agreement, contract, corporate, organizational or operational document, or other instrument binding upon or affecting Obligors; (4) no Default or Event of Default exists as of the date hereof (other than those expressly referenced herein); (5) Obligors have no setoff, defense, claim, or counterclaim with respect to the Loan Documents, as so modified, or the payment or performance of the obligations evidenced by the Loan Documents; and (6) Holder's agreed modification of the Loan Documents constitutes full and adequate consideration for the

execution and delivery by Obligors of this Agreement, and any other document executed in connection or as required by this Agreement.

(b)     Obligors hereby reaffirm all of the representations and warranties contained in the Loan Documents and warrant that such representations and warranties, are true and correct as of the date of this Agreement (it being understood that any representation or warranty made as of a specific date shall be true and correct in all material respects as of such specified date).

(c)     All representations and warranties of Obligors contained in this Agreement and in all other documents and instruments executed in connection herewith or otherwise relating to this Agreement shall survive the execution of this Agreement and are material and have been or will be relied upon by the parties hereto, notwithstanding any investigation made by any person, entity or organization.   No implied representations or warranties are created or arise as a result of this Agreement or the documents comprising or relating to this Agreement.

**14.     Adequate Consideration.**  Holder and Obligors hereby acknowledge and agree that prior to giving effect to this Agreement, (a) Obligors requested Holder to modify the terms of the Loan Documents; (b) Holder and Obligors had an opportunity to consult counsel of their own choosing and have reviewed directly the terms and conditions of this Agreement; and (c) Holder's agreed modification of the Loan Documents constitutes full and adequate consideration for the execution and delivery by Obligors of this Agreement, and any other document executed in connection or as required by this Agreement.

**15.     Indemnification.**  Obligors hereby waive the right to seek to void or avoid any payment made under this Agreement or under the Loan Documents for any reason, including, without limitation, under Chapter 5 of Title 11 of the U.S. Code, Chapter 24 of the Texas Business & Commerce Code, or similar laws. If, after receipt of any payment from Obligors for any indebtedness owed by Obligors, Holder is compelled to surrender such payment to any person or entity for any reason (including, without limitation, a determination that such payment is void or voidable as a preference or fraudulent conveyance, an impermissible setoff, or a diversion of trust funds), then Obligors shall be liable for, and shall indemnify, defend and hold harmless Holder with respect to the full amount so surrendered relating to Obligors, including any fees and costs incurred by Holder in connection therewith, **regardless of cause or the fault or negligence of Holder**.  The provisions of this section shall survive the termination of this Agreement and the other Loan Documents and shall be and remain effective notwithstanding the repayment of the Loan, the cancellation of any Loan Document, the release of any lien, security interest, or other encumbrance securing the Loan, or any other action that Holder may have taken in reliance upon the receipt of such payment.  Any cancellation of a note, release of any such encumbrance, or other such action shall be deemed to have been conditioned upon any payment having become final and irrevocable.

**16.     Cooperation; Other Documents.**   At all times following the execution of this Agreement, Obligors shall execute and deliver, or shall cause to be executed and delivered, and shall do or cause to be done all such other acts and things as Holder may reasonably deem to be necessary or desirable to assure Holder of the benefit of this Agreement and the documents comprising or relating to this Agreement.

**17.     Remedies Cumulative; No Waiver.**    The respective rights, powers and remedies of Holder in this Agreement and in the Loan Documents are cumulative and not exclusive of any right, power or remedy provided by law or equity, and no failure or delay on the part of Holder in the exercise of any right, power or remedy shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or remedy preclude any other or

further exercise thereof, or the exercise of any other right, power or remedy.  Nothing contained in this Agreement or in any prior communications between Obligors and Holder shall constitute a waiver or modification of any rights or remedies that Holder may have under the Loan Documents or applicable law.  Holder expressly reserves and preserves all of its rights and remedies.

**18.    Waiver of Marshaling.**  Obligors further acknowledge and agree that all of the Collateral described in the Loan Documents will continue to secure the Obligations, and Obligors have heretofore and do hereby waive any right for a marshaling of the respective Collateral now or hereafter subject to the liens and security interests of the Loan Documents.

**19.    Notices.**  All notices, demands, or other communications under this Agreement (collectively, "Notices") shall be in writing and shall be delivered to the appropriate recipient at the address set forth below (subject to change from time to time by written notice to all other parties to this Agreement). All Notices shall be deemed to have been given (a) upon delivery, if delivered in person, (b) upon delivery, if by sent by electronic mail with receipt acknowledged by the recipient thereof, (c) one (1) business day after having been deposited for overnight delivery with any reputable overnight courier service and addressed to the appropriate recipient at the address specified below, or (d) three (3) business days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, addressed to the appropriate recipient at the address specified below; provided, however, that non-receipt of any Notice as the result of any change of address of which the sending party was not notified or as the result of a refusal to accept delivery shall be deemed receipt of such notice or communication.  For purposes of notice, the address of the parties shall be:

Obligors:     NB Vue Mac, DST
           Nelson Brothers Professional Real Estate, LLC
           180 Avenida La Pata, 2nd Floor
           San Clemente, California 92673
           Attention: Patrick Nelson
           Email: patrick@nelsonpartners.com

           Patrick Nelson
           104 Via Almodovar,
           San Clemente, CA 92672
           Email: patrick@nelsonpartners.com

           Brian Nelson
           130 Vantis Drive, Suite 160
           Aliso Viejo, CA  92656

   with a copy to:

           Thomas R. Fawkes
           Tucker Ellis LLP
           233 S. Wacker Dr., Suite 6950
           Chicago, IL 60606
           E-mail:  thomas.fawkes@tuckerellis.com

Holder:      Fannie Mae
           c/o Berkley Point Capital LLC, d/b/a Newmark Knight Frank
           7700 Wisconsin Ave, Suite 1100

Bethesda, MD 20814
Attention: Josephine Ajayi
Email: josephine.ajayi@ngkf.com

with a copy to:

Daniel J. Ferretti
Baker Donelson, Bearman, Caldwell, & Berkowitz, PC
1301 McKinney St., Suite 3700
Houston, TX 77010
Email: dferretti@bakerdonelson.com

**20.** **Severability; Interpretation.** Any provision in this Agreement that may be unenforceable or invalid under any law shall be ineffective to the extent of such unenforceability or invalidity without affecting the enforceability or validity or any other provision hereof. All masculine, feminine, and neuter pronouns used herein shall be interpreted to include the masculine, feminine, or neuter where the context so requires. Likewise, the singular shall include the plural, and vice versa. The terms and conditions set forth in this Agreement are the product of joint draftsmanship by all parties, each being represented or having the opportunity to be represented by counsel, and any ambiguities in this Agreement or any documentation prepared pursuant to or in connection with this Agreement shall not be construed against any of the parties because of draftsmanship. This Agreement is not intended to modify and does not modify the rights, remedies and obligations of Holder and Obligors pursuant to any of the Loan Documents except to the extent expressly set forth herein.

**21.** **Integration.** This Agreement constitutes the entire agreement of the parties pertaining to the subject matter hereof and all prior negotiations and representations relating thereto are merged herein. **THE WRITTEN LOAN AGREEMENT, AS MODIFIED BY THIS AGREEMENT, REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

**22.** **Counterparts.** This Agreement may be executed in counterparts, each of which shall be an original, but all of which when taken together shall constitute one and the same instrument. Signatures transmitted by email or facsimile shall have the same force and effect as originals.

**23.** **Review of Agreement.** Obligors and Holder acknowledge and agree that each has had an opportunity to review and consider the terms and provisions of this Agreement and each of the other Loan Documents, to consult with counsel of each party's choice, if desired, and to suggest changes to the structure and terms of this Agreement and the other Loan Documents. Obligors and Holder represent and warrant to the other that each is a sophisticated business party and that the execution of this Agreement and any related Loan Documents is made voluntarily and with full knowledge of the significance and effect of such agreements.

**24.** **Successors and Assigns.** This Agreement shall inure to the benefit of, and be binding upon, the representatives, successors and assigns of the parties hereto, respectively; provided, however, Obligors may not assign the Loan Documents, as modified herein, or any rights under the Loan Documents, as modified herein, or delegate any duties or obligations under the Loan Documents, as modified herein, without the express written consent of Holder, which consent shall be in Holder's sole and absolute discretion. Obligors acknowledge and agree that Holder may sell or transfer all or part of the Loan and Loan Documents to one or

more purchasers, whether related or unrelated to Holder, without notice and without the consent of the parties.

     **25.**   <u>Governing Law</u>.  This Agreement shall be governed by and be construed in accordance with the laws of the State of Texas (without regard to conflicts of laws).

     **26.**   <u>**WAIVER OF JURY TRIAL.**</u>  **TO THE EXTENT PERMITTED BY APPLICABLE LAW, OBLIGORS AND HOLDER HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING OUT OF OR IN ANY WAY PERTAINING OR RELATING TO THIS AGREEMENT, THE LOAN DOCUMENTS OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION WITH THE LOAN OR (B) IN ANY WAY CONNECTED WITH OR PERTAINING OR RELATED TO OR INCIDENTAL TO ANY DEALINGS OF THE PARTIES HERETO WITH RESPECT TO THIS AGREEMENT, THE LOAN DOCUMENTS, OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION WITH THIS AGREEMENT OR THE LOAN DOCUMENTS OR IN CONNECTION WITH THE TRANSACTIONS RELATED THERETO OR CONTEMPLATED THEREBY OR THE EXERCISE OF ANY PARTY'S RIGHTS AND REMEDIES THEREUNDER, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.**

**- Remainder of Page Intentionally Left Blank -**

**IN WITNESS WHEREOF**, Obligors and Holder have hereunto caused these presents to be executed on the date first written above.

**BORROWER:**

**NB VUE MAC, DST,**
a Delaware statutory trust

By: NB Vue Mac ST, LLC,
    a Delaware limited liability company,
    its Signatory Trustee

    By: Nelson   Brothers   Professional   Real
        Estate, LLC,
        a California limited liability company,
        its sole member

        By: _____
        Name: Brian Nelson
        Title: Manager

**GUARANTOR:**

**NELSON BROTHERS PROFESSIONAL REAL ESTATE, LLC,**
a California limited liability company

By: _____
Print Name: Brian Nelson
Title: Manager

_____
**PATRICK NELSON**

_____
**BRIAN NELSON**

**IN WITNESS WHEREOF**, Obligors and Holder have hereunto caused these presents to be executed on the date first written above.

        **BORROWER:**

        **NB VUE MAC, DST,**
        a Delaware statutory trust

        By: NB Vue Mac ST, LLC,
            a Delaware limited liability company,
            its Signatory Trustee

            By: Nelson  Brothers  Professional  Real
                Estate, LLC,
                a California limited liability company,
                its sole member

                By:_____
                Name: Brian Nelson
                Title: Manager

        **GUARANTOR:**

        **NELSON BROTHERS PROFESSIONAL REAL ESTATE, LLC,**
        a California limited liability company

        By:_____
        Print Name: Brian Nelson
        Title: Manager

        _____
        **PATRICK NELSON**

        _____
        **BRIAN NELSON**

HOLDER:

**FANNIE MAE**

By: _____

Print Name: ___oy ___ler_____

Title: ___Assistant Vice President_____

## SCHEDULE 6A

### (Additional Required Repairs)

| Item | Total Cost | Brief Description |
|---|---|---|
| Fire Extinguishers<br><br>Completion Date:<br><br>February 15, 2021 | $2,500 | Type ABC fire extinguishers are installed in cabinets throughout the interior hallways/breezeways. The inspection tags are out of date (see Photo 45). f3 recommends the fire extinguishers be inspected by a licensed fire equipment inspection firm to insure proper operation and eliminate potential life safety hazards. |
| Down Unit<br><br>Completion Date:<br><br>July 5, 2021 | $5,000 | Unit 119 (3 bedrooms) is "down" (unleasable) reportedly due to microbial growth from a previous plumbing leak. f3 recommends a licensed mold remediation firm be contracted to remediate the mold. In addition the unit should be renovated and returned to rent ready condition. Renovation should include replacement of flooring, drywall repairs, duck cleaning, unit cleaning and painting as needed. |
| Moisture Management Plan<br><br>Completion Date:<br><br>July 5, 2021 | $650 | Mold was reported in "down" Unit 119 (3 bedrooms) due to a past plumbing leak. Based on observed/reported evidence of water intrusion and/or mold, a Moisture Management Plan should be developed and implemented. At a minimum, the MMP must contain a provision for (i) staff training, (ii) information to be provided to tenants, (iii) documentation of the plan, (iv) the appropriate protocol for incident response and remediation and (v) routine, scheduled inspections of common space and unit interiors. |
| Parking<br><br>Completion Date:<br><br>January 5, 2022 | $1,800 | Parking for the Property is provided by a five-story concrete parking garage attached to the building. The garage is in good condition; however, the parking stall markings are faded (see Photo 6). f3 recommends the parking stall and fire lane markings be restriped. |
| **Total Additional Required Repairs** | **$9,950** | |

## SCHEDULE 2A
### (Amortization Schedule)

| Pmt | Due Date | Int Accrual Begin Date | Int Accrual Through Date | Description | P & I Amount | Interest | Principal | Balance |
|---|---|---|---|---|---|---|---|---|
| 63 | 04/01/2021 | 03/01/2021 | 03/31/2021 | Sch Payment | $90,304.44 | $90,304.44 | $0.00 | $22,847,423.23 |
| 64 | 05/01/2021 | 04/01/2021 | 04/30/2021 | Sch Payment | $87,391.39 | $87,391.39 | $0.00 | $22,847,423.23 |
| 65 | 06/01/2021 | 05/01/2021 | 05/31/2021 | Sch Payment | $90,304.44 | $90,304.44 | $0.00 | $22,847,423.23 |
| 66 | 07/01/2021 | 06/01/2021 | 06/30/2021 | Sch Payment | $87,391.39 | $87,391.39 | $0.00 | $22,847,423.23 |
| 67 | 08/01/2021 | 07/01/2021 | 07/31/2021 | Sch Payment | $90,304.44 | $90,304.44 | $0.00 | $22,847,423.23 |
| 68 | 09/01/2021 | 08/01/2021 | 08/31/2021 | Sch Payment | $90,304.44 | $90,304.44 | $0.00 | $22,847,423.23 |
| 69 | 10/01/2021 | 09/01/2021 | 09/30/2021 | Sch Payment | $87,391.39 | $87,391.39 | $0.00 | $22,847,423.23 |
| 70 | 11/01/2021 | 10/01/2021 | 10/31/2021 | Sch Payment | $119,127.71 | $89,462.70 | $29,665.01 | $22,604,793.61 |
| 71 | 12/01/2021 | 11/01/2021 | 11/30/2021 | Sch Payment | $119,127.71 | $86,463.34 | $32,664.37 | $22,572,129.24 |
| 72 | 01/01/2022 | 12/01/2021 | 12/31/2021 | Sch Payment | $119,127.71 | $89,216.34 | $29,911.37 | $22,542,217.87 |
| 73 | 02/01/2022 | 01/01/2022 | 01/31/2022 | Sch Payment | $119,127.71 | $89,098.12 | $30,029.59 | $22,512,188.28 |
| 74 | 03/01/2022 | 02/01/2022 | 02/28/2022 | Sch Payment | $119,127.71 | $80,368.51 | $38,759.20 | $22,473,429.08 |
| 75 | 04/01/2022 | 03/01/2022 | 03/31/2022 | Sch Payment | $119,127.71 | $88,826.23 | $30,301.48 | $22,443,127.60 |
| 76 | 05/01/2022 | 04/01/2022 | 04/30/2022 | Sch Payment | $119,127.71 | $85,844.96 | $33,282.75 | $22,409,844.85 |
| 77 | 06/01/2022 | 05/01/2022 | 05/31/2022 | Sch Payment | $119,127.71 | $88,574.91 | $30,552.80 | $22,379,292.05 |
| 78 | 07/01/2022 | 06/01/2022 | 06/30/2022 | Sch Payment | $119,127.71 | $85,600.79 | $33,526.92 | $22,345,765.13 |
| 79 | 08/01/2022 | 07/01/2022 | 07/31/2022 | Sch Payment | $119,127.71 | $88,321.64 | $30,806.07 | $22,314,959.06 |
| 80 | 09/01/2022 | 08/01/2022 | 08/31/2022 | Sch Payment | $119,127.71 | $88,199.88 | $30,927.83 | $22,284,031.23 |
| 81 | 10/01/2022 | 09/01/2022 | 09/30/2022 | Sch Payment | $119,127.71 | $85,236.42 | $33,891.29 | $22,250,139.94 |
| 82 | 11/01/2022 | 10/01/2022 | 10/31/2022 | Sch Payment | $119,127.71 | $87,943.68 | $31,184.03 | $22,218,955.91 |
| 83 | 12/01/2022 | 11/01/2022 | 11/30/2022 | Sch Payment | $119,127.71 | $84,987.51 | $34,140.20 | $22,184,815.71 |
| 84 | 01/01/2023 | 12/01/2022 | 12/31/2022 | Sch Payment | $119,127.71 | $87,685.48 | $31,442.23 | $22,153,373.48 |
| 85 | 02/01/2023 | 01/01/2023 | 01/31/2023 | Sch Payment | $119,127.71 | $87,561.21 | $31,566.50 | $22,121,806.98 |
| 86 | 03/01/2023 | 02/01/2023 | 02/28/2023 | Sch Payment | $119,127.71 | $78,974.85 | $40,152.86 | $22,081,654.12 |
| 87 | 04/01/2023 | 03/01/2023 | 03/31/2023 | Sch Payment | $119,127.71 | $87,277.74 | $31,849.97 | $22,049,804.15 |
| 88 | 05/01/2023 | 04/01/2023 | 04/30/2023 | Sch Payment | $119,127.71 | $84,340.50 | $34,787.21 | $22,015,016.94 |
| 89 | 06/01/2023 | 05/01/2023 | 05/31/2023 | Sch Payment | $119,127.71 | $87,014.35 | $32,113.36 | $21,982,903.58 |
| 90 | 07/01/2023 | 06/01/2023 | 06/30/2023 | Sch Payment | $119,127.71 | $84,084.61 | $35,043.10 | $21,947,860.48 |
| 91 | 08/01/2023 | 07/01/2023 | 07/31/2023 | Sch Payment | $119,127.71 | $86,748.92 | $32,378.79 | $21,915,481.69 |
| 92 | 09/01/2023 | 08/01/2023 | 08/31/2023 | Sch Payment | $119,127.71 | $86,620.94 | $32,506.77 | $21,882,974.92 |
| 93 | 10/01/2023 | 09/01/2023 | 09/30/2023 | Sch Payment | $119,127.71 | $83,702.38 | $35,425.33 | $21,847,549.59 |
| 94 | 11/01/2023 | 10/01/2023 | 10/31/2023 | Sch Payment | $119,127.71 | $86,352.44 | $32,775.27 | $21,814,774.32 |
| 95 | 12/01/2023 | 11/01/2023 | 11/30/2023 | Sch Payment | $119,127.71 | $83,441.51 | $35,686.20 | $21,779,088.12 |
| 96 | 01/01/2024 | 12/01/2023 | 12/31/2023 | Sch Payment | $119,127.71 | $86,081.85 | $33,045.86 | $21,746,042.26 |
| 97 | 02/01/2024 | 01/01/2024 | 01/31/2024 | Sch Payment | $119,127.71 | $85,951.23 | $33,176.48 | $21,712,865.78 |
| 98 | 03/01/2024 | 02/01/2024 | 02/29/2024 | Sch Payment | $119,127.71 | $80,283.32 | $38,844.39 | $21,674,021.39 |
| 99 | 04/01/2024 | 03/01/2024 | 03/31/2024 | Sch Payment | $119,127.71 | $85,666.57 | $33,461.14 | $21,637,791.86 |
| 100 | 05/01/2024 | 04/01/2024 | 04/30/2024 | Sch Payment | $119,127.71 | $82,764.55 | $36,363.16 | $21,601,417.76 |
| 101 | 06/01/2024 | 05/01/2024 | 05/31/2024 | Sch Payment | $119,127.71 | $85,379.60 | $33,748.11 | $21,567,669.61 |
| 102 | 07/01/2024 | 06/01/2024 | 06/30/2024 | Sch Payment | $119,127.71 | $82,496.34 | $36,631.37 | $21,531,038.24 |
| 103 | 08/01/2024 | 07/01/2024 | 07/31/2024 | Sch Payment | $119,127.71 | $85,101.43 | $34,026.28 | $21,497,011.96 |
| 104 | 09/01/2024 | 08/01/2024 | 08/31/2024 | Sch Payment | $119,127.71 | $84,966.94 | $34,160.77 | $21,462,851.19 |
| 105 | 10/01/2024 | 09/01/2024 | 09/30/2024 | Sch Payment | $119,127.71 | $82,095.41 | $37,032.30 | $21,425,818.89 |
| 106 | 11/01/2024 | 10/01/2024 | 10/31/2024 | Sch Payment | $119,127.71 | $84,685.55 | $34,442.16 | $21,391,376.73 |
| 107 | 12/01/2024 | 11/01/2024 | 11/30/2024 | Sch Payment | $119,127.71 | $81,822.02 | $37,305.69 | $21,354,071.04 |
| 108 | 01/01/2025 | 12/01/2024 | 12/31/2024 | Sch Payment | $119,127.71 | $84,401.97 | $34,725.74 | $21,319,345.30 |
| 109 | 02/01/2025 | 01/01/2025 | 01/31/2025 | Sch Payment | $119,127.71 | $84,264.71 | $34,863.00 | $21,284,482.30 |
| 110 | 03/01/2025 | 02/01/2025 | 02/28/2025 | Sch Payment | $119,127.71 | $78,699.37 | $40,428.34 | $21,244,053.96 |
| 111 | 04/01/2025 | 03/01/2025 | 03/31/2025 | Sch Payment | $119,127.71 | $83,967.12 | $35,160.59 | $21,208,893.37 |
| 112 | 05/01/2025 | 04/01/2025 | 04/30/2025 | Sch Payment | $119,127.71 | $81,124.02 | $38,003.69 | $21,170,889.68 |
| 113 | 06/01/2025 | 05/01/2025 | 05/31/2025 | Sch Payment | $119,127.71 | $83,677.94 | $35,449.77 | $21,135,439.91 |
| 114 | 07/01/2025 | 06/01/2025 | 06/30/2025 | Sch Payment | $119,127.71 | $80,843.06 | $38,284.65 | $21,097,155.26 |
| 115 | 08/01/2025 | 07/01/2025 | 07/31/2025 | Sch Payment | $119,127.71 | $83,386.51 | $35,741.20 | $21,061,414.06 |
| 116 | 09/01/2025 | 08/01/2025 | 08/31/2025 | Sch Payment | $119,127.71 | $83,245.24 | $35,882.47 | $21,025,531.59 |
| 117 | 10/01/2025 | 09/01/2025 | 09/30/2025 | Sch Payment | $119,127.71 | $80,422.66 | $38,705.05 | $20,986,826.54 |
| 118 | 11/01/2025 | 10/01/2025 | 10/31/2025 | Sch Payment | $119,127.71 | $82,950.43 | $36,177.28 | $20,950,649.26 |
| 119 | 12/01/2025 | 11/01/2025 | 11/30/2025 | Sch Payment | $119,127.71 | $80,136.23 | $38,991.48 | $20,911,657.78 |
| 120 | 01/01/2026 | 12/01/2025 | 12/31/2025 | Sch Payment | $20,911,657.78 | $82,653.33 | $20,911,657.78 | $0.00 |



**BAKER DONELSON**
BEARMAN, CALDWELL & BERKOWITZ, PC

1301 MCKINNEY STREET
SUITE 3700
HOUSTON  TEXAS 77010

PHONE:   713.650.9700
FAX:        713.650.9701

www.bakerdonelson.com

DANIEL J. FERRETTI, SHAREHOLDER
**Direct Dial**: 713.210.7436
**E-Mail Address**: dferretti@bakerdonelson.com

May 3, 2021

*Via Federal Express (Next Business Day Delivery) and*
*U.S. Mail – Certified (Return Receipt Requested)*

NB Vue Mac, DST
c/o Nelson Brothers Professional Real Estate
180 Avenida La Pata, 2nd Floor
San Clemente, CA 92673
Attention: Patrick Nelson
*CM/RRR:  7019 1120 0000 4411 6306*

NB Vue Mac, DST
c/o Tucker Ellis LLP
233 South Wacker Drive, Suite 6950
Chicago, IL 60606
Attention: Thomas R. Fawkes
*CM/RRR:  7019 1120 0000 4411 6290*

Patrick Nelson
104 Via Almodovar,
San Clemente, CA 92672
*CM/RRR:  7019 1120 0000 4411 6313*

Brian Nelson
130 Vantis Drive, Suite 160
Aliso Viejo, CA  92656
*CM/RRR:  7019 1120 0000 4411 6337*

Re:  <u>Holder</u>:                    Fannie Mae
     <u>Mortgaged Property</u>:  The Vue at MacGregor Apartments, 4460 S. MacGregor Way, Houston, TX 77021 (Harris County)
     <u>Loan Number</u>:          █████████
     <u>Servicer</u>:                Berkeley Point Capital, LLC d/b/a Newmark Knight Frank

   *Loan and Security Agreement* (the "<u>Loan Agreement</u>") dated as of December 18, 2015, (the "<u>Loan Date</u>") executed by NB Vue Mac, DST, a Delaware statutory trust (the "<u>Borrower</u>") and Berkeley Point Capital, LLC, a Delaware limited liability company (the "<u>Original Lender</u>" or "<u>Servicer</u>") with respect to the Loan defined therein, which Loan is evidenced by the *Multifamily Note* (the "<u>Note</u>"), dated as of the Loan Date, executed by Borrower to the order of Original Lender, in the original principal amount of $23,265,000.00, and is secured by, *inter alia,* the lien of that certain *Multifamily Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing* (the "<u>Security Instrument</u>"), dated as of the Loan Date, recorded at Instrument Number 20150570034, in the official records of Harris County, Texas (the "<u>Recording Office</u>"), covering certain real and personal property (collectively, the "<u>Property</u>") located in Houston, Texas, and more particularly described in the Security Instrument, and is also supported by, *inter alia*, that certain *Guaranty of Non-Recourse Obligations* (the "<u>Guaranty</u>"), dated as of the Loan Date, executed by Patrick Nelson, Brian Nelson, and Nelson

EXHIBIT A-10

ALABAMA • FLORIDA • GEORGIA • LOUISIANA • MARYLAND • MISSISSIPPI • SOUTH CAROLINA • TENNESSEE • TEXAS • VIRGINIA • WASHINGTON D.C.

NB Vue Mac, DST, *et al.*
May 3, 2021
Page 2

Brothers Professional Real Estate, LLC (collectively, "Guarantors") in favor of Original Lender; said Loan Agreement, Note, Security Instrument and Guaranty having been endorsed, transferred and assigned from Original Lender to Fannie Mae ("Fannie Mae" or "Holder") as of the Loan Date, pursuant to that certain *Assignment of Security Instrument* recorded at Instrument Number 20150570035, in the Recording Office.

To Whom It May Concern:

As you are aware, our firm has been retained by Fannie Mae in connection with the Loan Agreement, the Note, the Security Instrument, the Guaranty and all other documents (collectively, the "Loan Documents") executed in connection with the above-described loan (the "Loan").

Borrower, Guarantors, and Fannie Mae entered into that certain Forbearance and Second Loan Modification Agreement dated as of January 5, 2021 (the "Modification Agreement"). Among other provisions, Borrower agreed in the Modification Agreement to pay monthly payments to Fannie Mae beginning on April 1, 2021 and continuing on the same day of each month thereafter. Borrower has failed to pay the full amount of the monthly payment due on April 1, 2021.

As a result of Borrower's failure to commence making monthly payments after the expiration of the Forbearance Period, an "Event of Default" has occurred pursuant to Section 14.01(a)(1) of the Loan Agreement and Sections 7(c) of the Modification Agreement, which entitles Fannie Mae to, among other things, declare the entire indebtedness of the Loan to be immediately due and payable and to invoke the power of sale and any other remedies permitted by Texas law or provided in the Security Instrument or in any other Loan Document. Under Section 7 of the Note and Section 7(c) of the Modification Agreement, Borrower and Guarantors have waived notice of intent to accelerate and notice of acceleration of the maturity of the Loan.

This letter hereby constitutes a formal notice that the maturity date of the Note **has been accelerated** as a result of the occurrence and present continuation of such Events of Default. Demand is hereby made for immediate payment in full of the entire unpaid principal balance of the Note, plus (to the extent lawful) accrued and unpaid interest thereon and the costs and attorneys' fees of Fannie Mae. In order to determine the exact payoff figure currently owing to Fannie Mae pursuant to the Note, please contact Josephine Ajayi of the Servicer at 301-347-4902 or via email at josephine.ajayi@ngkf.com, or, if you have counsel, you may have your counsel contact me at the direct dial telephone number set forth above.

You are further notified that, by reason of such default and acceleration of said indebtedness of the Loan, Fannie Mae will immediately institute foreclosure proceedings under the Security Instrument and may otherwise exercise any and all other rights and remedies enumerated in the Loan Documents or otherwise available at law or in equity (including, without limitation, the appointment of a receiver over the Property, applications of escrow deposits, reserves and/or other funds held by Servicer toward payment of Borrower's obligations under the Loan Documents in the manner set forth therein). The foreclosure notice to be posted and filed

NB Vue Mac, DST, *et al.*
May 3, 2021
Page 3

in accordance with Texas foreclosure law will be forwarded to you by separate correspondence.

Please be advised that the demand made hereby is being given pursuant to the terms and provisions of the Loan Documents. By making this demand, Fannie Mae does not waive any of the rights or remedies available to Fannie Mae under the Loan Documents or otherwise. No failure to exercise any rights or remedies available to Fannie Mae and no delay in exercising any such rights or remedies shall operate as a waiver of any rights which Fannie Mae may have pursuant to the terms of the Loan Documents or otherwise. Further, any reference by Fannie Mae or Servicer to any Event of Default or default shall in no way constitute, or be construed to be, a waiver of any other Event of Default or default which may now exist or hereafter arise under the Loan Documents.

UNDER THE SECURITY INSTRUMENT EXECUTED BY BORROWER IN FAVOR OF FANNIE MAE, BORROWER'S LICENSE TO COLLECT RENTS HAS TERMINATED, AND FANNIE MAE IS NOW ENTITLED TO ALL RENTS AS THEY BECOME DUE AND PAYABLE, INCLUDING RENTS CURRENTLY DUE AND UNPAID. UNTIL FURTHER NOTICE, ANY RENTS BORROWER RECEIVED OR RECEIVES AFTER THE OCCURRENCE OF THE EVENTS OF DEFAULT SHALL BE RECEIVED AND HELD BY BORROWER IN TRUST FOR THE BENEFIT OF FANNIE MAE. UNTIL FURTHER NOTICE, ALL SUCH RENTS SHALL BE APPLIED ONLY TO BONA FIDE CURRENT OPERATING EXPENSES TO THIRD PARTIES IN CONNECTION WITH THE OPERATION OF THE PROPERTY WITH ANY AND ALL EXCESS PAID TO FANNIE MAE, TO BE APPLIED IN ACCORDANCE WITH THE LOAN DOCUMENTS.

Also, please be advised that pursuant to the Guaranty, the Guarantors are liable to Fannie Mae for, among other things under Section 3.02(a) of the Loan Agreement, (x) all Rents to which Fannie Mae is entitled under the Loan Documents, and (y) Borrower's failure, following a default under any of the Loan Documents, to deliver to Fannie Mae on demand all Rents and security deposits relating to the Property. Specification of certain bases for exceptions to non-recourse liability on the part of the Borrower or the Guarantors in no way constitutes a waiver of any other bases for exceptions to non-recourse liability that the Borrower or the Guarantors may have under the Loan Documents.

Please be advised that any discussions that may have occurred or may occur in the future between representatives of Borrower and of Fannie Mae and/or the Servicer regarding the Property, the Note, the Security Instrument or any of the other Loan Documents do not constitute modifications, waivers or extensions of the provisions of the governing Loan Documents that relate to the Loan. Borrower may not rely upon any such discussions in any manner or fashion. Unless and until a binding, written agreement has been fully executed by and between all parties, Fannie Mae's rights and remedies are and will continue to be governed by and fully enforceable under the terms of the Loan Documents.

For your information, this letter is also being sent to the Guarantors as notice of Borrower's default under the operative Loan Documents. Fannie Mae, at its sole option and in addition to any other remedies available to Fannie Mae, may seek to recover from the Guarantors any indebtedness and any other obligations owing by Guarantors pursuant to and consistent with

NB Vue Mac, DST, *et al.*
May 3, 2021
Page 4

the Loan Documents.

Notwithstanding any previous action or inaction by or on behalf of Servicer or Fannie Mae to the contrary, if any, you are hereby notified that Fannie Mae will hereafter require strict compliance with the terms and conditions of the Note and other Loan Documents, and Fannie Mae does not in any manner waive any rights or remedies available against the Borrower or the Guarantors pursuant to the Note or other Loan Documents or applicable law, including without limitation the rights described in this letter.

**THIS LAW FIRM, FANNIE MAE AND SERVICER ARE ATTEMPTING TO COLLECT THE INDEBTEDNESS EVIDENCED BY THE NOTE AND/OR SECURED BY THE LIENS, SECURITY INTERESTS, AND TERMS AND PROVISIONS CONTAINED WITHIN THE LOAN DOCUMENTS, AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

Neither Fannie Mae, the Servicer, nor undersigned counsel have been advised and have no knowledge of any pending bankruptcy proceeding involving the Borrower or Guarantors. To the extent the Borrower's or Guarantors' obligations may have been discharged, dismissed, or are subject to an automatic stay of a bankruptcy order under Title 11 of the United States Code, this notice is for compliance and informational purposes only and does not constitute a demand for payment or any attempt to collect any such obligation. This notice is given pursuant to 11 U.S.C. Section 362(b)(11), if applicable.

Your immediate attention to this matter is encouraged.

Sincerely,

BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC

Daniel J. Ferretti, Shareholder

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

NB Vue Mac, DST
c/o Nelson Brothers Professional Real Estate
180 Avenida La Pata, 2nd Floor
San Clemente, CA 92673
Attention: Patrick Nelson

9590 9402 5086 9092 4416 02

2. Article Number (Transfer from service label)

7019 1120 0000 4411 6306

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent   ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☑ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
   Mail Restricted Delivery
   (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053   Domestic Return Receipt

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Patrick Nelson
104 Via Almadovar,
San Clemente, CA 92672

9590 9402 5086 9092 4416 19

2. Article Number (Transfer from service label)

7019 1120 0000 4411 6313

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent   ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☑ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
   Mail Restricted Delivery
   (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053   Domestic Return Receipt

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Brian Nelson
130 Vantis Drive, Suite 160
Aliso Viejo, CA 92656

9590 9402 5086 9092 4416 57

2. Article Number (Transfer from service label)

7019 1120 0000 4411 6337

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☑ Agent   ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery
Mailman CA   5 6

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☑ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
   Mail Restricted Delivery
   (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☑ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053   Domestic Return Receipt

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

NB Vue Mac, DST
c/o Tucker Ellis LLP
233 South Wacker Drive, Suite 6950
Chicago, IL 60606
Attention: Thomas R. Fawkes

9590 9402 5086 9092 4415 96

2. Article Number *(Transfer from service label)*

7019 1120 0000 4411 6290

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _Kelly C Chle_          ☐ Agent
                          ☐ Addressee

B. Received by *(Printed Name)*    C. Date of Delivery
                                   5/11/21

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☒ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053          Domestic Return Receipt