IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § § § § § § § | Chapter 11 |
| NB LOFT VUE, DST, *ET AL.*, | | Case No. 21-32292 |
| Debtors. | | (Jointly Administered) |

### NB LOFT VUE, DST'S OBJECTION TO FANNIE MAE'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY AS TO PROPERTY OF DEBTOR NB LOFT VUE, DST

Debtor NB Loft Vue, DST ("Loft Vue"), by its undersigned counsel, hereby submits its objection (the "Objection") to *Fannie Mae's Motion for Relief from the Automatic Stay as to Property of Debtor NB Loft Vue, DST* (the "Stay Motion"). In further support of its Objection, Loft Vue respectfully states as follows:

### PRELIMINARY STATEMENT

1. The Stay Motion – which should be denied on its face due to a complete lack of evidentiary support – is merely the latest salvo by Fannie Mae, a lending entity sponsored and funded by the U.S. Government, to leverage destructive COVID-era governmental regulations on Loft Vue's business in order to disenfranchise creditors and investors. To put a finer point on it: it is no secret that Fannie Mae recognizes the substantial value of Loft Vue's assets and will stop at nothing to usurp that value in anticipation of a multi-million dollar future windfall. Conveniently, the opportunity to carry out this strategy arose from regulations imposed by the very same federal government that sponsors it. This Court must put Fannie Mae's craven strategy to an end and permit Loft Vue the reasonable breathing room afforded by the Bankruptcy Code to effectuate a sale, refinancing, or restructuring that will maximize value for *all* stakeholders.

5301971.1

2.      Turning to the substance of the Stay Motion, it becomes fairly apparent that there is no merit whatsoever to the extraordinary relief Fannie Mae seeks. Its arguments are based predominantly on speculation and conjecture, and a self-serving, facially erroneous appraisal that conveniently concludes that the estate is "out of the money." Specifically:

- Fannie Mae argues that its interest in Loft Vue's property is not adequately protected; yet bases this on a misleading argument that the property has been in precipitous decline since the bankruptcy. Not only is this untrue, but Loft Vue asserts the precise *opposite* is true; the reopening of Texas Christian University for in-person instruction, and the corresponding increase in occupancy at Loft Vue, suggests the property has only *increased* in value since the Petition Date, and will continue to do so.

- Fannie Mae also argues – again, with absolutely no evidentiary support – that the property "will continue to depreciate[1] in value while Loft Vue continues to retain it." In so arguing, Fannie Mae does not articulate *why* it believes that to be the case, and also does not articulate how dispossessing Loft Vue of the property will somehow reverse the "depreciation" trend. In any event, Fannie Mae is wrong because the property will almost undoubtedly increase in value as the pandemic subsides and university life returns to "normal," as acknowledged by its own appraiser.

- Even if Loft Vue's current valuation is consistent with the appraisal obtained by Fannie Mae, such that there is no current "equity" in the property, it is beyond dispute (despite Fannie Mae's unsubstantiated protestations to the contrary) that the property serving as Fannie Mae's collateral – the only property Loft Vue has – is essential to an effective reorganization, thereby rendering stay relief unavailable under section 362(d)(2).

---

[1] It also goes without saying that depreciation – the recovery of cost of a real estate investment for tax purposes – is completely irrelevant not only to an adequate protection determination, but also to a stay relief determination.

2

5301971.1

- However, even a cursory reading of the appraisal shows that it reaches an erroneous valuation conclusion, and that simply correcting several of Colliers' flawed assumptions results in a valuation substantially in excess of Fannie Mae's claim.

- Fannie Mae's lack of good faith is underscored by its declaration in the Stay Motion that it intends to object to confirmation of any plan propounded by Loft Vue, seemingly without regard to whatever that plan provides. That – in and of itself – is not grounds for depriving Loft Vue of all of its property *before it has even presented a plan for consideration*.

- Finally, Fannie Mae erroneously argues that Loft Vue is unable to meet the SARE requirements of section 362(d)(4). To the contrary, Loft Vue will meet those requirements by the resumption of contract-rate interest payments to Fannie Mae pursuant to a companion motion for authority filed contemporaneously herewith.

3. For these reasons, and as will be further demonstrated at an evidentiary hearing (to the extent the Court deems one necessary), Fannie Mae has come nowhere near establishing cause for relief from the automatic stay. The Stay Motion must therefore be denied.

## FACTUAL BACKGROUND

**A.  The Loft Vue Facility, and the Effects of the COVID-19 Pandemic**

4. Loft Vue, a single-asset real estate entity, owns and operates the "Loft Vue Student Housing Apartments" located at 3125 McCart Avenue, Fort Worth, Texas (the "Loft Vue Facility"). The Loft Vue Facility is located two blocks from Texas Christian University ("TCU") and offers 81 fully furnished and unfurnished apartments, with a total of 147 beds, for TCU students. The Loft Vue Facility also offers a host of luxury amenities for its student tenants, including an outdoor pool, gym, coffee bar, dog park, and secure and gated parking garage.

5. Prior to March 2020, when the COVID-19 pandemic hit, Loft Vue was consistently profitable, enjoyed nearly full occupancy on an annual basis, and met all of its obligations to both its lender, Fannie Mae, and to its trade creditors. *See Declaration of Patrick Nelson in Support of Objection* (the "Nelson Declaration"), attached hereto as Exhibit A, at ¶ 6.

6. In March 2020, in response to the nascent pandemic, TCU suspended all in-person instruction for its students and transitioned to a fully-remote learning environment. The suspension of in-person instruction resulted in a substantial percentage of the tenants in the Loft Vue Facility (which was nearly fully leased up) moving out of their apartments and/or ceasing the payment of rent. Nelson Declaration, at ¶ 7.

7. And even for those tenants that remained in their apartments, rent collection became substantially challenged due to the enactment by the United States Congress, and subsequently the U.S. Centers for Disease Control, of a tenant eviction moratorium. Coronavirus Aid, Relief, and Economic Security Act, Pub. L. 116-136, 134 Stat. 281 (2020); 85 Fed. Reg. 55292 (2020); Consolidated Appropriations Act, Pub. L. 116-260, § 502, 134 Stat. 2078-2079 (2021); 86 Fed. Reg. 8020, 16731, 34010. This moratorium had a disastrous impact on Loft Vue, in that it was obligated to continue to provide use and occupancy to any student-tenant who wished to stay in the Loft Vue Facility, but were not necessarily permitted to collect rent. Nelson Declaration, at ¶ 7-8. Student-tenants that did not pay rent (whether they stayed in the building or not) could not be evicted, and because of the institution of remote learning, it was impossible to replace tenants that departed. Meanwhile, Loft Vue was expected to continue making debt service payments to Fannie Mae, as well as payments to vendors and service providers. Nelson Declaration, at ¶ 8. So on one hand, the federal government relieved tenants of the obligation to pay rent, and on the other hand,

the federal government (through Fannie Mae) nevertheless demanded debt service payments notwithstanding the depletion of rental income.

8. Limitations on in-person instruction and on-campus activities, and the wide availability of remote learning options, at TCU carried through to the 2020-21 academic year. As a result, rent revenue at the Loft Vue Facility was substantially less than what it was in pre-COVID academic years, which in turn had a pronounced impact on profitability, and ability to meet obligations to their lenders and vendors. Nelson Declaration, at ¶ 9.

**B.   Fannie Mae's Campaign to Take the Loft Vue Facility, and Its Unwillingness to Provide Meaningful Relief to Loft Vue.**

9. As noted above, the COVID-19 pandemic, the closing of TCU to in-person instruction, and the government-implemented eviction moratoria had a catastrophic impact on Loft Vue's revenue and profitability, and consequently, its ability to satisfy its debt service obligations to Fannie Mae. Loft Vue requested relief from Fannie Mae reflecting its inability to meet debt service obligations. Unlike other lenders of Nelson Partners-managed properties, who almost immediately provided full deferrals of debt service payments for substantial periods of time (in some cases up to one year), Fannie Mae expressed a bare minimum of cooperation, agreeing to provide partial debt service relief to Loft Vue for approximately 90 days pursuant to a forbearance agreement dated May 8, 2020, and expecting that Loft Vue would resume full debt service payments in August 2020. Nelson Declaration, at ¶ 13.

10. This expectation simply did not jive with reality, however, in that Loft Vue was in no better position to meet debt service obligations in August 2020 than it was in March 2020. This notwithstanding, Fannie Mae declared its intention to dispossess Loft Vue of the Loft Vue Facility by giving notice of the acceleration of its loan to Loft Vue on August 24, 2020. Stay Motion, ¶ 12; Nelson Declaration, at ¶ 13.

11.     In order to prevent a foreclosure, Loft Vue had little choice but to enter into an onerous Loan Modification Agreement with Fannie Mae on November 1, 2020.  Among other things, the Loan Modification Agreement required Loft Vue to:  (i) resume monthly payments of interest (with principal payments deferred for one year); (ii) make certain required deposit payments to Fannie Mae (including for taxes and insurance); (iii) pay monthly installments of principal and interest for the months of May through September 2020 over a period of 24 months; (iv) make additional deposit payments for required repairs to the Loft Vue Facility; and (v) fund a "Debt Service Reserve Account" in the amount of $151,920.50.  Nelson Declaration, at ¶ 14.

12.     Despite best efforts, Loft Vue – still reeling from the pandemic and with occupancy well below historical levels – simply could not meet the enormous financial burdens that the Loan Modification Agreement placed on it.  Despite multiple requests to Fannie Mae for more meaningful debt relief that would allow Loft Vue to survive until the pandemic subsided, Fannie Mae continued undaunted on its quest to seize control of the Loft Vue Facility, declaring yet another default and scheduling a foreclosure sale for Loft Vue for January 6, 2021.  Nelson Declaration, at ¶ 15; Stay Motion, ¶ 14.

13.     Once again, Loft Vue found itself in the impossible position of either capitulating to Fannie Mae's aggressive financial demands or losing its property.  Ultimately, Loft Vue executed a Forbearance and Second Loan Modification Agreement with Fannie Mae on January 5, 2021, pursuant to which Loft Vue had to pay Fannie Mae $306,476.57 (curing a substantial portion of the prior payment defaults), and agreed to resume interest payments and tax/insurance deposits pursuant to the first Loan Modification Agreement, and to fund certain repair deposits. Nelson Declaration, ¶ 16; Stay Motion, ¶ 15.

14. Including the cure payment, Loft Vue made approximately $500,000 in payments to Fannie Mae between January and April 2021. These payments nearly wiped out Loft Vue's limited cash reserves, and required substantial infusions of cash from both Patrick Nelson and certain of the Loft Vue investors. Nelson Declaration, ¶ 17.

15. In April 2021, Loft Vue found itself once again unable to timely service its substantial debt obligations to Fannie Mae, and Fannie Mae once again declared a default, accelerated the loan, and noticed up a foreclosure sale for July 6, 2021. Loft Vue attempted on multiple occasions to obtain an additional forbearance period to facilitate a long-term solution to the repeated defaults committed under the Loan Documents. It requested long-term deferrals of principal and interest from Fannie Mae to allow it to properly maintain the Loft Vue Facility through what was expected to be another calendar year of below-average rental income. It asked for a reduction or waiver of the substantial prepayment penalty in place under the Fannie Mae loan documents, which would have allowed Loft Vue to go to market to either sell the property or refinance Fannie Mae out. Fannie Mae refused these requests in their entirety.[2] Fannie Mae insisted upon payment of $667,000 (representing all past due principal and interest, default interest, legal fees, and previously deferred amounts) to reinstate the loan and avoid foreclosure, and this demand was non-negotiable. After draining its cash reserves and tapping out already fatigued investors, Loft Vue simply not could meet this demand, and made the difficult decision to commence this chapter 11 case on July 6, 2021. Nelson Declaration, ¶ 18.

---

[2] Curiously, at the very same time that Loft Vue was (unsuccessfully) pleading with Fannie Mae for relief, Fannie Mae was publicly touting a program to provide debt service relief to its multi-family borrowers, providing full deferrals of payments for up to 12 months. https://www.forbes.com/advisor/mortgages/fannie-mae-extends-covid-19-landlord-renter-protection/ (published June 3, 2021). Of course, none of this relief was offered to Loft Vue, suggesting that Fannie Mae's intent was to dispossess Loft Vue of its property regardless of financial hardship.

### C. Loft Vue's Post-Petition Recovery

16. Since the filing of the chapter 11 case, however, Loft Vue has begun to recover from the impacts of the pandemic, and is on a path to restored profitability and pre-pandemic occupancy. While it has had to discount rents in order to entice new tenants, it is now **98.64% leased** (up from as low as 65.31% in mid-2020), and net rental revenue has increased year over year by 15%. Nelson Declaration, at ¶ 10. This occupancy level was achieved notwithstanding the continued inability of many international students (traditionally representing a material percentage of Loft Vue tenants) to attend college in the United States in person due to continuing COVID-related travel restrictions.

17. Moreover, because Loft Vue voluntarily agreed to cease the use of Fannie Mae's cash collateral in August 2021, all incoming rent payments are being segregated and not used for operating expenses, with those expenses now being funded by an unsecured debtor-in-possession facility being provided by Nelson Partners, LLC. This provides an additional cushion to protect Fannie Mae's interest in the Loft Vue Facility.

### D. Fannie Mae's Claims, and the Colliers Valuation

18. Fannie Mae asserts that as of the Petition Date, Loft Vue is indebted to it in the amount of $13,265,572.70. *See* Stay Motion, Ex. B-1. While Loft Vue does not dispute most of Fannie Mae's asserted claim, it does dispute Fannie Mae's asserted prepayment penalty of $2,056,929.16 (the "Prepayment Penalty"). Loft Vue intends to file an objection to Fannie Mae's proof of claim, seeking disallowance of the Prepayment Premium pursuant to section 506(b) of the Bankruptcy Code (the "Claim Objection").

19. Assuming that the Prepayment Premium is not enforceable against Loft Vue, indebtedness due Fannie Mae is in the aggregate amount of $11,208,642.90 (the "Uncontested Obligations").

20. Central to the Stay Motion is an appraisal performed by Colliers International Valuation & Advisory Services for Fannie Mae and Berkeley Point Capital LLC on August 4, 2021 (the "Appraisal"). Stay Motion, Ex. C. The Appraisal concludes that the as-is market value of the Loft Vue Facility, as of June 11, 2021, is $11,100,000. On its face, the Appraisal, and its conclusions, are faulty for the following reasons:

- The Appraisal is based on an occupancy level of 85.7% and a "stabilized" occupancy rate of 90.0%; the actual occupancy level of the Loft Vue Facility as of September 2021 is 98.65%.

- The Appraisal places a distressed value on the Loft Vue Facility notwithstanding Colliers' otherwise bullish outlook for the student housing market.

- The Appraisal places a lower per bed valuation on Loft Vue compared to other student housing facilities serving TCU, despite having a lower vacancy rate than all but one of the comparable properties (even using Colliers' incorrect figures).

- The Appraisal is based on incorrect real estate tax figures; Colliers cites annual real estate taxes of $304,495.00 when they are in fact $207,072.24.

- Simply making the correct adjustments to the occupancy rate and the real estate taxes, and taking the 5.5% capitalization rate cited by Colliers as accurate, the value of the Loft Vue Facility is **$14,818,181.80**, using Colliers' valuation methodology.

21. Accordingly, the actual valuation of Loft Vue (assuming everything else about the Colliers Appraisal is accurate, which is disputed by Loft Vue) exceeds the indebtedness due Fannie Mae, *even if* the Prepayment Premium is included.

## ARGUMENT

22. Fannie Mae presents three primary arguments in support of its Stay Motion: (i) cause exists to grant stay relief under section 362(d)(1) of the Bankruptcy Code; (ii) stay relief may be granted under section 362(d)(2) because Loft Vue lacks equity in its property; and (iii) Loft Vue is unable to meet the single asset real estate debtor requirements of section 362(d)(3). Aside from conclusory, unsupported allegations, Fannie Mae has done nothing to establish that relief is warranted under any of these sections.

**I.  Cause Does Not Exist for Relief from Stay Under Section 362(d)(1).**

23. Fannie Mae asserts that two "causes" exist for relief from the stay under section 362(d)(1): (i) Fannie Mae's interest in the Loft Vue Facility is not being adequately protected; and (ii) Loft Vue cannot propose a feasible plan of reorganization. Both alleged "causes" are in fact non-existent.

**A. Fannie Mae Has Done Nothing to Establish that It is Not Adequately Protected.**

24. The purpose of adequate protection payments is to adequately protect creditors from the diminution of value in a creditor's collateral. *See In re Timbers of Inwood Forest Assocs., Ltd.*, 793 F.2d 1380, 1389 (5th Cir. 1986), on reh'g, 808 F.2d 363 (5th Cir. 1987), aff'd sub nom. *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 108 S. Ct. 626, 98 L. Ed. 2d 740 (1988) ("adequate protection ... [is] intended to protect a secured creditor against a decrease in the value of its collateral due to the debtor's use, sale or lease of that collateral during the stay.") However, adequate protection payments are not meant to be interest payments,

insurance against a plan falling apart, or anything but tangible protections against the depreciation of a creditor's collateral. *See United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371, 108 S. Ct. 626 (1988). The proper time-span for assessing whether collateral has declined is from the date of the filing until the Court's ruling disposing of the case. See, e.g., *In re 499 W. Warren St. Assocs., Ltd. P'ship*, 142 B.R. 53, 57 (Bankr.N.D.N.Y.1992) ("The interest in property sought to be protected under Code § 361 is the value of the secured creditor's collateral during the interim period between the filing of the petition and confirmation of a plan of reorganization, or dismissal of the case.").

25.     Here, Fannie Mae argues that because the purported appraised value of the Loft Vue Facility as of June 2021 is less than the appraised value of the property in 2015, that somehow equates to a diminution of value during the bankruptcy case (which has been pending for less than three months).  Of course, such a comparison is absurd for several reasons, most notably, that the Appraisal's effective date is *before* the Petition Date, and as such it does not even address changes in valuation during the bankruptcy.  If Fannie Mae wanted to prove diminution, it would have to establish that the value of the property *now* is less than it was *on the Petition Date*.  Of course, it did not do that.  On this basis alone, the Court can easily dispose of this argument.

26.     But leaving this aside, there is simply no reason to believe that the Loft Vue Facility is diminishing in value; in fact, all signs point to meaningful *increases* in value since the Petition Date.  As an initial matter, the occupancy rate at the Loft Vue Facility has risen to over 98% for the 2021-22 academic year, up dramatically from the average 2020-21 academic year occupancy rate of 80.8%, and revenues have also increased.  Nelson Declaration, ¶ 19.  Second, as acknowledged by Colliers in its Appraisal, the student housing market has experienced a rebound from the COVID-19 pandemic, and further notes improvement in the Fort Worth student housing

market.  Stay Motion, Ex. C, Letter of Transmission, pg. 2 ("[T]he student housing market should slowly improve in the near future, especially considering recent enrollment growth trends."); 48 ("investment activity is coming back to the [student housing] sector" after a softening during the pandemic); 50 ("The data seems to support overall improvement for student housing fundamentals . . . [t]here is also an argument to be made for an oncoming surge in leasing," due to the return of no-show students as well as the eventual return of international students).  Third, Fannie Mae's cash collateral has improved – due in part to rising rent revenues and Loft Vue's decision to stop using Fannie Mae's cash collateral for operating expenses – with Loft Vue currently holding approximately $300,000 in cash (an increase of $172,000 from the Petition Date).  Nelson Declaration, ¶ 20.  And finally, there is no allegation nor evidence that Loft Vue is not maintaining the property or satisfying post-petition operating expenses as they come due.  In short, Fannie Mae's collateral is not only being preserved, it is unquestionably being enhanced every day that we approach the end of the pandemic.

27. In light of this, Fannie Mae's claim that "Loft Vue's negative cash flow means that Loft Vue is unable to make monthly adequate protection payments to Fannie Mae or feasibly propose a confirmable chapter 11 plan" is wholly meritless.  Given the lack any evidence whatsoever of a diminution in value of its collateral, Fannie Mae is not entitled to adequate protection payments (which, it must be mentioned, it has never once asked the Court to impose).  Similarly, to conclude at this still early stage of the case that Loft Vue will be unable to propose a feasible plan ignores the fact that the property is performing well and is primed to benefit from the ceasing of pandemic restrictions and the overall improvement in the student housing market (both by way of profitability and valuations) *that its own appraiser has acknowledged*.

28. Finally, with respect to the filing of a plan, Loft Vue acknowledges (as will be further discussed below) that section 362(d)(3) of the Bankruptcy Code requires that it either (i) file a plan or (ii) begin making interest payments to Fannie Mae at the contract rate by the 90th day after the filing of the case. Loft Vue has determined not to file a plan at this time for several reasons: (i) the pendency of this Stay Motion; and (ii) the active, ongoing marketing of the Loft Vue Facility, which has drawn substantial interest from buyers and investors and is expected to result in a proposed transaction that will form the basis for a future plan. As such, Loft Vue intends to begin making contract interest payments to Fannie Mae, and has filed contemporaneously with this Objection a motion with the Court to authorize it to use collected rents, which are currently being held in suspense due to the termination of Loft Vue's cash collateral usage.

29. Accordingly, for the foregoing reasons, "cause" is completely lacking for relief from the stay pursuant to section 362(d)(1), and the Stay Motion should be denied.

## II. Relief From the Stay is Not Warranted Under Section 362(d)(2).

30. In asserting that Fannie Mae is entitled to stay relief under section 362(d)(2), it argues that (i) there is no equity in the Loft Vue property; and (ii) the Loft Vue property is not necessary for an effective reorganization. Both arguments are utterly lacking in merit.

31. First, as demonstrated above – and as will further be demonstrated in a rebuttal appraisal that will be propounded by Loft Vue in advance of an evidentiary hearing in this matter – the Colliers Appraisal suffers from patently obvious errors that if correct, readily demonstrate that the value of the Loft Vue property – even taking all other Colliers assumptions as true – substantially exceeds the Loft Vue indebtedness to Fannie Mae. Even if Colliers' valuation conclusion was adopted without the necessary corrections, it is essentially identical to the Uncontested Obligations. Because Loft Vue is confident that the relief it seeks in the Claim

13

Objection will ultimately be granted, it cannot be said definitively, based on the evidence provided by Fannie Mae, that Loft Vue lacks equity in its property.

32. Moreover, when taking into account and correcting for the errors committed by Colliers in the Appraisal, the adjusted Appraisal results in a conclusion that there is substantial equity in the Loft Vue Facility, even taking all other Colliers assumptions as true.

33. But even if Fannie Mae were able to establish that equity in the property is lacking, relief still is not warranted under section 362(d)(2) because Loft Vue's property is necessary to an effective reorganization. *In re Kadlubek Family Revocable Living Trust*, 545 B.R. 660, 665 (Bankr. D. N.M. 2016). Any analysis of section 362(d)(2)(B) begins with the Supreme Court's dicta in *United Sav. Assn. of Tex. v. Timbers of Inwood Forest Assocs.,* 484 U.S. 365, 376, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988): "What [necessary to an effective reorganization] requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization that is in prospect. This means ... that there must be a 'reasonable possibility of a successful reorganization within a reasonable time." 484 U.S. at 376, 108 S.Ct. 626. Although the *Timbers* case turned on section 362(d)(1), the Supreme Court explained that § 362(d)(2) prevents a creditor from suffering an "inordinate and extortionate delay." *Id.* Fannie Mae cannot credibly argue that it has been subject to such a delay at this time, with this case having been filed less than three months ago.

34. The essential nature of the property is unchanged even if it is determined that Loft Vue lacks equity in it. "The fact that a debtor lacks equity in the property in question is not fatal where the secured claimant is adequately protected, the debtor has made progress in formulating a plan and there is a reasonable possibility of confirmation within a reasonable time." *In re White Plains Dev. Corp.,* 140 B.R. 948, 951 (Bankr. S.D.N.Y 1992). Here is where Fannie Mae's

position is particularly weak. It has done nothing to establish that it is not adequately protected in the property (namely, because it has not actually propounded evidence that the property has decreased in value since the Petition Date), and further, relies exclusively on conjecture in asserting that Loft Vue cannot propose and confirm a plan in a reasonable period of time.

35. Property is also considered "necessary if it furthers the interests of the estate through rehabilitation or liquidation." *In re Kadlubek Family Trust*, 535 BR at 665; *see also In re Keller*, 45 B.R. 469, 472 (Bankr. N.D. Iowa 1984). So, even if Loft Vue were to seek to liquidate (which is one of the options it is exploring along with refinancing and reorganization), the Loft Vue Facility would still be necessary. And in this instance, the property at issue is a building and its related personal property and fixtures, which would generate the majority of proceeds for creditors. *See also In re Commonwealth Renewable Energy, Inc.,* 540 B.R. 173, 194 (Bankr. W.D. Pa. 2015) (citing *Empire Enters., Inc. v. Koopmans (In re Koopmans)*, 22 B.R. 395, 407 (Bankr. D. Utah 1982)); *In re Harper Development, Inc.*, 2002 WL 32114481, at *3 (Bankr. E.D. Ark. 2002) (quoting *Koopmans*, 22 B.R. at 407).

36. Liquidation *or* rehabilitation plans are considered an effective reorganization for purposes of section 362(d)(2)(B). *See United Sav. Assn. of Texas v. Timbers of Inwood Forest Assocs., Ltd.,* 808 F.2d 363, 371 n. 14 (5th Cir.1987), *aff'd,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) ("[T]here may be circumstances under which the debtor is able to satisfy the "effective reorganization" test of § 362(d)(2) by showing that the property at issue is necessary to an effective liquidation of the debtor under Chapter 11, as distinguished from an effective rehabilitation of the debtor"); *see also In re Diplomat Elecs. Corp.,* 82 B.R. 688, 693 (Bankr. S.D.N.Y. 1988) ("[A] liquidating plan of reorganization which is more advantageous to creditors because it is an orderly liquidation may nonetheless constitute an 'effective reorganization'"); *In*

*re Conroe Forge & Mfg. Corp.,* 82 B.R. 781, 784–85 (Bankr. W.D. Pa. 1988) (the concept of reorganization includes liquidation). Fannie Mae has not articulated a single reason why Loft Vue – the entity that has owned and operated the Loft Vue Facility for six years, has an intimate knowledge of its operations (and the student housing business generally), and which has engaged a broker that one of the most experienced in the student housing industry – is somehow less well equipped than Fannie Mae to effectively sell the property for the highest possible price.

37. Finally, Loft Vue wishes to address Fannie Mae's declaration that even if a feasible chapter 11 plan is proposed, it will use its purported blocking position (to the extent it has a deficiency claim) to ensure that any such plan cannot be confirmed. Aside from the fact that this statement smacks of bad faith, and suggests that it would refuse to support even a viable, attractive plan out of spite, it is also flawed factually and legally. First, it is simply premature to conclude that Loft Vue under no circumstances can propose a plan that will meet the requirements of section 1129 of the Bankruptcy Code. Depending on the quality of the sale or refinance offers obtained for the Loft Vue Facility, or the independent valuation it obtains for the Loft Vue Facility, it is not outside the realm of possibility that a 100 cent plan (or some other plan that may be acceptable to Fannie Mae) can be confirmed – especially if the relief sought by Loft Vue in the Claim Objection is granted. Moreover, while the parties are very clearly in an adversarial position at this time, it is possible that ultimately Fannie Mae and Loft Vue will resolve their differences and negotiate a consensual plan.[3]

38. In addition, while the *Greystone III* court rejected a debtor's attempt to separately classify an undersecured lender's deficiency claim, it is *not* the case that separate classification of

---

[3] To that effect, Loft Vue has suggested to Fannie Mae that the Court refer the parties to a mediation – perhaps through one of the other bankruptcy judges in the District. Loft Vue would certainly prefer a negotiated outcome to continued litigation.

16

5301971.1

a deficiency claim is subject to an outright bar. Indeed, in *Briscoe Enterprises*, the Fifth Circuit affirmed the confirmation of a single-asset real estate plan that separately classified a deficiency claim, holding (just as did *Greystone III*) that where there is are "good business reasons" to support separate classification, separate classification may be appropriate. *Matter of Briscoe Enters., Ltd., II*, 994 F.2d 1160, 1167 (5th Cir. 1993); *Matter of Greystone III Joint Venture*, 948 F.2d 134, 141 n.7 (5th Cir. 1991); *In re U.S. Truck*, 800 F.2d 581, 587 (permitting separate classification of unsecured claims; allowing debtor to place union in separate class because it had "a different stake in the future viability of the reorganized company and [had] alternative means at its disposal for protecting its claim."). Again: a plan has not yet been proposed, and Loft Vue favors a refinancing or sale over attempting to confirm a cramdown plan over Fannie Mae's objection. But it is plainly untrue that if a cramdown plan is proposed, that it is dead on arrival simply because Loft Vue proposes separate classification of a Fannie Mae deficiency claim (if any).

**III.     Loft Vue *Will* Satisfy the SARE Requirements of Section 362(d)(3).**

39.     Finally, Fannie Mae argues that because Loft Vue "cannot hope to commence interest payments" before the fall of 2022, and because it will object to any plan that Loft Vue proposes, stay relief is appropriate under section 362(d)(3). Fannie Mae is incorrect. Loft Vue *will* satisfy section 362(d)(3) by commencing monthly contract interest payments to Fannie Mae based on Fannie Mae's asserted secure claims, and is concurrently seeking the relief necessary to do so from the collected rents currently on hand. Accordingly, section 362(d)(3) is satisfied.

### REQUEST FOR EVIDENTIARY HEARING

40.     Loft Vue submits that this Court can easily deny the Stay Motion on the pleadings, due to Fannie Mae's complete failure to meet its burden of proving cause for relief from the automatic stay. However, if the Court is not inclined to do so, Loft Vue requests an evidentiary

hearing and an opportunity to cross-examine representatives of Fannie Mae and Colliers. In preparation for such a hearing, Loft Vue will issue written discovery requests contemporaneously with the filing of this Objection, and will seek to depose representatives of Fannie Mae and the Colliers appraisal. Loft Vue submits that it will be prepared to go to evidentiary hearing before the end of October 2021.

## CONCLUSION

WHEREFORE, Loft Vue respectfully requests that this Court: (i) deny the Stay Motion on the pleadings; (ii) alternatively, deny the Stay Motion after conducting an evidentiary hearing; and (iii) grant such other and further relief as is just and proper.

RESPECTFULLY SUBMITTED this 1st day of October, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: */s/ Thomas Berghman*
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
500 North Akard St., Ste. 3800
Dallas, Texas 75201
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

tberghman@munsch.com

and

**TUCKER ELLIS LLP**

Thomas R. Fawkes, Esq.
(*pro hac vice*)
233 S. Wacker Dr. Suite 6950
Chicago, Illinois 60606
Telephone: (312) 256-9425
Facsimile: (312) 624-6309
thomas.fawkes@tuckerellis.com

*Counsel to the Debtor*

5301971.1